UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JASPER WIRTSHAFTER, *et al.*,      )
                                )
        Plaintiffs,        )
                                )
       v.              )       No. 1:24-cv-754-RLY-MJD
                                )
PAMELA WHITTEN, *et al.*,        )
                                )
        Defendants.      )

**Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction**

Imagine the following common scenarios at Indiana University occurring after 11:00 p.m.—a dozen students returning to the Indiana University campus after an evening in downtown Bloomington, thousands of students and fans descending on campus after the ending of a late-night basketball game, or groups of students "hanging out" in the expanse of Dunn Meadow. If those people engaging in these obviously commonplace behaviors pass three students holding up signs in silent protest, it is those latter protesting students who are acting in violation of university policy and who may be sanctioned. Indeed, if a single person departing the basketball game walks across campus wearing a "Fire Mike Woodson" t-shirt (a protest by any definition) that person also violates university policy. And, while several people may permissibly engage in conversation, if one of them talks long enough to be considered a "speech," that person also violates Indiana University policy.

Indiana University's amended Expressive Activity Policy – UA-10 ("the Amended Policy") prohibits any sort of protest activity, speeches, and circulation of petitions on University property between 11:00 p.m. and 6:00 a.m., unless permission is sought ten days prior to the date of the desired expression and permission is granted. Absent this permission all these activities, obviously imbued with First Amendment protection, are prohibited, while activities not deemed to be protest, speeches, or the circulating of petitions may occur unimpeded. A policy that allows First Amendment expression to be impinged upon in this way is obviously unconstitutional and it is not made any less so by allowing the expression to occur if permission is requested ten days in advance and if Indiana University deigns it to be allowed. The Amended Policy violates the First Amendment as it is unconstitutionally overbroad and is neither a content-neutral nor a reasonable, time, place, and manner restriction on expression.

The Amended Policy is negatively affecting the plaintiffs, all of whom wish to engage in activity protected by the First Amendment that is prohibited by the policy. They are being caused irreparable harm and as all the other requirements for the grant of a preliminary injunction are met, one should issue enjoining defendants ("the University") from enforcing the Amended Policy.

## Facts

### *Indiana law*

Indiana law provides expansive protections for "protected expressive activity" in

Indiana's institutions of higher education, Indiana Code § 21-39-8-5, and recognizes that First Amendment expression is to be broadly allowed in the public areas of Indiana University. Ind. Code § 21-39-8-1, *et seq*. "A state educational institution may not designate an outdoor area of campus as an area where protected expressive activities are prohibited." Ind. Code 21-39-8-9(a). Instead, persons may engage in "noncommercial protected expressive activity" "on any outdoor area of campus," provided that the activity is lawful, does not substantially and materially disrupt the functioning of the institution or of others who have reserved the space for their own expressive activity, and does not involve expression unprotected by the First Amendment. Ind. Code § 21-39-8-10.

"Outdoor area of a campus" is defined by state law as any "outside area of the campus of a state educational institution where members of the campus community are commonly allowed." Ind. Code § 21-39-8-6(a). This includes "grassy areas, walk-ways, and similar common areas," but excludes "outdoor areas where access is restricted from a majority of the campus community." Ind. Code § 21-39-8-6(b), (c). The law allows the institution to "enforce reasonable time, place, and manner restrictions." Ind. Code § 21-39-8-9(b).[1]

---

[1]     Any such restriction must be "narrowly tailored in service of a significant state educational institution's interest," "employ criteria that are clear, published, and content and viewpoint neutral," "provide ample alternative means of expression," and "allow member of the campus community to spontaneously and contemporaneously assemble and distribute literature." Ind. Code § 21-39-8-9(b).

*The Amended Policy*

The Amended Policy, which became effective on November 15, 2024, replaced a prior expressive activity policy that was challenged in an earlier complaint in *Akou v. The Trustees of Indiana University*, No. 1:24-cv-1469-RLY-MJD. (*See Akou*, Dkt. 48-1, 48-2 admitted at Dkt. 55 ¶¶ 17, 25]).[2] The prior Policy prohibited all expressive activity if it occurred on University property from 11:00 p.m. to 6:00 a.m. (Akou, Dkt. 48-1 at 5). Consistent with Indiana law, the Amended Policy provides that it "is committed to protecting the right of students, academic appointees, staff, and guests and visitors to free speech and expressive activity, such as assembling and speaking in public areas of campus." (*Akou*, Dkt. 48-2 at 3). One such "public area" is Dunn Meadow, a large open field on the Bloomington campus that has been specifically designated a "public forum for expression on all subjects" and has been the site of many demonstrations and other expressive activities over the years. (Dkt. 47 at 3 ¶¶ 7-9). And there are numerous other public areas on the Bloomington campus, "including grassy areas, walkways, and similar common areas," where people congregate at all hours as there is no campus curfew. (*See, e.g.*, Dkt. 69-8 at 4).

---

[2]    The *Akou* case was consolidated with this case on December 10, 2024, and was closed. (Dkt. 57). To the extent that material from the *Akou* case, prior to consolidation, is utilized in this memorandum it will be cited to with reference to the docket number in *Akou*.

The public areas of the Bloomington campus are vibrant with groups of people engaging in activities after 11:00 p.m. and before 6:00 a.m. (Dkt. 69-9 at 4). For instance, after 11:00 p.m. there may be individuals or groups of people walking through campus on their return from the restaurants and bars in Bloomington, people gathering in parking lots looking at the sky during at astronomy-department sponsored events or gathering in Dunn Meadow for informal sky viewing, people engaging in post-basketball game celebrations, fraternity members whose parties and revelry expand into many outdoor areas of campus, musicians informally entertaining groups of persons in Dunn Meadow, and students and other people who are just "hanging out" in the many open areas on campus. (Dkt. 69-5 at 3; Dkt. 69-8 at 4; 69-9 at 3).

The Amended Policy is a University policy, meaning that it has been approved by the University's Trustees. (30(b)(6) Deposition of Doug Booher, Dkt. 69-1 at 9:3-12).[3] As such it is controlling over and supersedes all other policies, directives, or rules that are not approved by the Trustees. (*Id.* at 9:13 – 10:2). It defines protected expressive activity, consistent with Indiana Code § 21-39-8-5, as:

> (1) Participating in speech or conduct protected by the First Amendment to the Constitution of the United States.

> (2) Communicating by any lawful verbal, written, audio visual, or electronic means.

> (3) Participating in peaceful assembly.

---

[3] The page numbers are those assigned by the Court's electronic filing system.

(4) Protesting.

(5) Making speeches, including speeches of guest speakers.

(6) Distributing literature.

(7) Carrying signs.

(8) Circulating petitions.

(*Akou*, Dkt. 48-2 at 7).

In pertinent part, the Amended Policy states:

1.     Pursuant to IC 21-39-8-9(b)(4), during the overnight hours of 11:00 p.m. to 6:00 a.m. IU Community Members[4] may spontaneously and contemporaneously assemble and distribute literature.

2.     For the protection of the University community and in furtherance of the educational mission of the University, from the overnight hours of 11:00 p.m. to 6:00 a.m. the activities listed below are prohibited on University property unless:

    a.     they are part of a scheduled or authorized University activity extending into that time period, or

---

[4]     The Amended Policy defines University Community Members as:

- Any employee of the University, including administrators, academic appointees, staff, part-time and student employees;
- All students and student organizations;
- All University units;
- University contractors;
- Any individual using Indiana University resources or facilities or receiving funds administered by Indiana University; and
- Volunteers and other representatives when speaking or acting on behalf of Indiana University.

(*Akou*, Dkt. 48-2 at 2-3).

      b.    prior written approval has been obtained from the appropriate University office:

- Students and Student Organizations: Campus Chief Student Affairs Officer; or
- Faculty: Executive Vice Chancellor of Academic Affairs; or Campus Chief Academic Officer; or
- Staff, Guests, and Visitors: University Events.

    3.    The Expressive Activities prohibited on University property during the overnight hours of 11:00 p.m. to 6:00 a.m., are:

- protesting;
- making speeches;
- circulating petitions; and
- all other unapproved conduct and activities otherwise prohibited by this Policy or applicable law.

(Akou, Dkt. 48-2 at 5-6).

In January of 2025, the University enacted the University Space Use Pre-Approval Standard ("Pre-Approval Standard). (Dkt. 69-1 at 17:3-18, 86-89). It is not a University policy that was enacted by the Trustees, and it is therefore controlled by University policies. (*Id.* at 17:25 – 18:7). It requires prior approval for events of more than 50 people taking place on University property between 6:00 a.m. and 11:00 p.m., and any preplanned event, regardless of size, which is to take place between 11:00 p.m. and 6:00 a.m. (*Id.* at 86). It further provides "[f]or the sake of clarity" that prior approval is not required for preplanned events of "less than 50 persons that will not extend into the overnight hours of 11:00 p.m. to 6:00 a.m.," "[s]pontaneous and contemporaneous assembly which occurs without prior planning or announcement for the purpose of an

immediate and spontaneous response to a newsworthy occurrence," and "[t]he peaceful distribution of literature at any time." (*Id.* at 87). The terms "spontaneous," "contemporaneous," and "newsworthy" are not defined in the Pre-Approval Standard. The key is that if an event is preplanned, it is not "spontaneous and contemporaneous." (*Id.* at 20:4-8).

The Pre-Approval Standard notes that if competing requests are made for the use of the same space, space will be allocated based on the following categories, listed in terms of priority:

1.    Academic Activities.
2.    University-Sponsored Events, which include events "hosted by faculty, staff, and officially recognized student organizations."
3.    Community Engagement, which "[i]ncludes events with external organizations that align with the University's mission."
4.    External requests.

(*Id.* at 87-88). The term "University mission," refers to the event being consistent with the "expressed mission of the University in terms of teaching and learning." (*Id.* at 29:14-25).

Applications must be submitted at least 10 days before the event and will be approved based on satisfying the following criteria: availability of the space requested; compliance with general principles outlined in the Pre-Approval Standard; and whether there has been adequate event planning, which includes a consideration of "safety measures, setup needs." (*Id.* at 88). Among other things, the applicants "may be required to pay applicable fees, including those for staffing, security, or cleaning, and must provide proof of liability insurance if necessary." (*Id.* at 87).

[8]

*The plaintiffs*

The plaintiffs are all people who have engaged in protest activities on University property and wish to be able to do so after 11:00 p.m. and before 6:00 a.m. without seeking prior permission. For instance, Heather Akou is a faculty member on the Bloomington campus who has previously engaged in peaceful and non-disruptive protests on campus after 11:00 p.m. (Dkt. 69-2 at 2). She wants to make speeches and circulate petitions during this time without seeking prior permission (*Id.*). She wants to engage in such simple protests as wearing expressive t-shirts and religious items, but even this passive protest action cannot occur after 11:00 p.m. without prior permission. (*Id.* at 2-4). Other plaintiffs wish to be able to engage in similar activities after 11:00 p.m. without obtaining prior permission. Some wish to participate in candlelight vigils. (Dkt. 69-6 at 2; 69-9 at 3). Others want to hold signs or wear t-shirts with messages as a form of protest. (Dkt. 69-3 at 2; 69-5 at 2; 69-7 at 2; 69-9 at 2-3; 69-11 at 3). They want to peaceably assemble with others without having to seek permission to do so. (Dkt. 69-3 at 2; 69-5 at 2; 69-9 at 3). Others want to speak after 11:00 p.m., again without seeking permission. (Dkt. 69-4 at 2; Dkt. 69-9 at 2-3). Some wish to circulate petitions after 11:00 p.m. (Dkt. 69-7 at 2; 69-9 at 3).

The plaintiffs recognize that important events occur between 11:00 p.m. and 6:00 a.m. and they have a right to respond or recognize those events, without prior permission, even if the activity is preplanned in some way. (Dkt. 69-2 at 4; Dkt. 69-4 at 3; Dkt. 69-5 at

3; Dkt. 69-6 at 2-3; Dkt. 69-8 at 4; Dkt. 69-9 at 3). Some of the protest activities that the plaintiffs wish to engage in may involve fewer people and be no more disruptive than the non-expressive group activity that frequently takes place on University property after 11:00 p.m. (Dkt. 69-3 at 3; Dkt. 69-6 at 3; Dkt. 69-7 at 3; Dkt. 69-8 at 5; Dkt. 69-9 at 4).

As noted, the Amended Policy allows "IU community members" to "spontaneously and contemporaneously assemble and distribute literature," even if this occurs from 11:00 p.m. to 6:00 a.m. (*Akou*, Dkt. 48-2 at 5). The precise contours of this exception may not be completely clear, but what is clear is that the assembly must not be preplanned. (Dkt. 69-1 at 20:4-8). Whatever is allowed by this exception to the Amended Policy's prohibition, plaintiffs Murphy and Wirtshafter, who are not IU Community members, may not engage in spontaneous protests, rallies, or similar events that take place on the Bloomington campus in response to late-breaking news, although they wish to do so. (Dkt. 69-7 at 2, Dkt. 69-11 at 2).

On August 25, 2024, a number of the plaintiffs participated in a candlelight vigil at the Sample Gates that began at 11:30 p.m. and that was designed to protest the original Policy and the temporal prohibition on expressive activity. (Dkt. 69-2 at 2; Dkt.69-4 at 2; Dkt. 69-8 at 2; Dkt. 69-9 at 2). The Sample Gates are stone gates that form an entryway onto the campus and that frame a large sidewalk area and plaza. (Dkt. 69-8 at 2-3). The vigil was not in any way disruptive. (*Id.* at 3). Nevertheless, three professors who participated in the vigil, plaintiffs Akou, Phillips, and Robinson, all received written

warnings from the University for violating the original Policy. (Dkt. 69-2 at 3, 6-7; Dkt. 69-8 at 3, 7-8; Dkt. 69-9 at 2, 6-7). The letters informed them that the warnings would be kept in their permanent personnel files and that future violations of this or other University policies could result in additional discipline, including termination. (Dkt. 69-2 at 6; Dkt. 69-8 at 7-8; Dkt. 69-9 at 6-7). Two of the professors were explicitly informed that any future violations of the Policy, or any university policies, could also result in "additional disciplinary action including but not limited to citation, trespass, [and] interim suspension from campus." (Dkt. 69-8 at 7; Dkt. 69-9 at 6-7). Professor David McDonald received a similar letter for participating in a protest after 11:00 p.m. at Sample Gates in September. (Dkt. 69-5 at 2, 5).[5] And, graduate student Bryce Greene, who also participated in the August 25, 2024 vigil, was issued a notice that he was being investigated for violating University policy. (Dkt. 69-4 at 2-3, 5-6).

Unauthorized protests have continued at Indiana University after 11:00 p.m. (Dkt. 69-2 at 4; Dkt. 69-3 at 3; Dkt. 69-4 at 2; Dkt. 69-5 at 2; Dkt. 69-6 at 2; Dkt. 69-7 at 3; Dkt. 69-8 at 4; Dkt. 69-10 at 2). However, because of fear of sanctions, or additional sanctions, a number of plaintiffs have not participated, although they wish to. (Dkt. 69-2 at 3; Dkt. 69-

---

[5]    The Dean who sent the discipline letters to Professors Phillips and Robinson certainly seemed to recognize the problem with a policy that banned all First Amendment expression between 11:00 p.m. and 6:00 a.m., stating that "[o]n a personal note, let me add that I find the aspect of overly broad application of expressive activity between the hours of 11:00 p.m. and 6:00 a.m. a problematic component of the policy." (Dkt. 69-8 at 7; 69-9 at 6). Identical sentiments were expressed in the discipline letter received by Professor McDonald. (Dkt. 69-5 at 6).

5 at 2; 69-7 at 3; 69-10 at 2).  Indeed, at least one plaintiff who has attended protests that started before 11:00 p.m. has left them by 10:59 so as to avoid sanctions. (Dkt. 69-2 at 3).

Plaintiffs object to having to apply for permission to exercise their First Amendment rights and point out that there is no guarantee that the University will grant the permission. (Dkt. 69-3 at 3; Dkt. 69-5 at 2; Dkt. 69-6 at 2; Dkt. 69-7 at 3; Dkt. 69-8 at 4; Dkt. 69-9 at 3). Moreover, situations may certainly arise when plaintiffs wish to have an organized protest to respond to an immediate event and do not want to wait for at least ten days to see if a protest will be allowed. (Dkt. 69-2 at 4; Dkt. 69-3 at 3; Dkt. 69-5 at 3; Dkt. 69-6 at 3; Dkt. 69-8 at 4; Dkt. 69-9 at 3; Dkt. 69-10 at 2). Things happen in the world that call for a quick response and protest, even if the protest is planned. (Dkt. 69-4 at 3; Dkt. 69-6 at 3; Dkt. 69-10 at 2). There also may be reasons why a protest organizer will not want to disclose their identity to the University, which will of course happen if they must apply for a permit. (Dkt. 69-3 at 3).

### The preliminary injunction standard

A court must weigh several factors in the preliminary injunction determination:

(1) whether the plaintiff has established a prima facie case, thus demonstrating at least a reasonable likelihood of success at trial;

(2) whether the plaintiff's remedies at law are inadequate, thus causing irreparable harm pending the resolution of the substantive action if the injunction does not issue;

(3) whether the threatened injury to the plaintiff outweighs the threatened harm the grant of the injunction may inflict on the

defendant; and

(4) whether, by the grant of the preliminary injunction, the public interest would be disserved.

*See, e.g., Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987). The heart of this test, however, is "a comparison of the likelihood, and the gravity of two types of error: erroneously granting a preliminary injunction, and erroneously denying it." *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 590 (7th Cir. 1984). Thus, "the more likely [the preliminary injunction movant] is to win, the less the balance of harms must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015).

## Argument

### I.    Plaintiffs will prevail on the merits of their claim that the Amended Policy violates the First Amendment

Widely accepted and recognized First Amendment rights exist on the University's campuses until 11:00 p.m. But when the clock strikes 11:00 p.m. (much as in *Cinderella*, albeit an hour earlier), everything changes. The simplest of First Amendment activities—including silent or small group protests, speaking to a small group, carrying signs, asking persons to sign petitions—are all prohibited unless prior approval is sought ten days in advance. And the approval may not be forthcoming. The Amended Policy violates the First Amendment.

### A.    The Amended Policy is substantially and unconstitutionally overbroad

Attempts to regulate First Amendment expression cannot be substantially

overbroad. As the Supreme Court has made clear,

> [u]nder the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face "because it also threatens others not before the court -- those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." A statute may be invalidated on its face, however, only if the overbreadth is "substantial."

*Bd. of Airport Comm'rs of the City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (cleaned up). Substantial overbreadth is present if there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). Even if the plaintiffs' own First Amendment rights are compromised by the challenged regulation so that "they need not really rely on the overbreadth doctrine to assert their facial challenge . . . the plaintiffs may launch a facial attack on their own behalf if the statute creates an unacceptable risk of suppression of ideas." *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1056 (7th Cir. 2004). The unconstitutional overbreadth of the Amended Policy is apparent in multiple ways.

      **1.**      **The Amended Policy's requirement that a permit be sought at least ten days in advance, regardless of the number of people who will engage in expressive activity, renders it substantially overbroad**

At least ten days before any protest, speech, or similar activity can occur between 11:00 p.m. and 6:00 a.m., a permit must be sought. This applies whether the protest consists of five people, or even one person standing silently with a sign or wearing a t-

shirt with a specific message.

"Permit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring." *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005). "[A]dvance notice provisions . . . 'drastically burden free speech.'" *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994) (citation omitted). Among other things, they prohibit "[s]pontaneous expression, which is often the most effective kind of expression." *Id.* Thus, the Seventh Circuit has noted that the requirement that all permit seekers apply 45 days in advance, no matter the circumstances, was a clear violation of the First Amendment. *Church of the Am. Knights of the Ku Klux Klan v. City of Gary*, 334 F.3d 676, 683 (7th Cir. 2003). That court has also noted that "[r]equirements that small groups obtain a permit to gather in a traditional public forum frequently fail the narrow tailoring requirement." *Smith v. Executive Dir. of Ind. War Mem. Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014).

Unsurprisingly, cases are numerous that find requirements unconstitutional (1) that mandate a permit be sought under all circumstances and (2) that it be applied for far in advance of events. *See, e.g., City of Dearborn*, 418 F. 3d at 607, 608 (finding a 30-day notice provision to be "invalid on its face" and that applying the permit requirement to small groups was "hopelessly overbroad"); *Cox v. City of Charleston, S.C.*, 416 F.3d 281, 286 (4th Cir. 2005) (permit requirement for small groups facially violated the First Amendment in that it burdened more speech than necessary to advance any legitimate

[15]

interests); *Douglas v. Brownell,* 88 F.3d 1511, 1524 (8th Cir. 1996) (invalidating a 5-day requirement in a parade ordinance as it "restricts a substantial amount of speech that does not interfere with the city's asserted goals"); *Grossman,* 33 F.3d at 1207 (in finding a permit requirement unconstitutional when applied to a group of 6-8 persons, the court stated that "we simply cannot agree that six to eight people carrying signs in a public park constituted enough of a threat to the safety and convenience of park users . . .to justify the restrictions imposed on their speech here"); *NAACP, Western Region v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984) (striking down a requirement that a parade permit be sought at least 20 days in advance of the event and stating that "all available precedent suggests that a 20-day advance notice requirement is overbroad").

There is simply no suggestion in these cases that the First Amendment prohibition on permit requirements for small protests and requiring permits far in advance is altered if the activity is at night. "In determining whether expressive conduct is at issue in a censorship case, we do not look solely to the time, place, or manner of expression, but rather to whether the activity in question is commonly associated with expression." *City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 769 (1988). First Amendment analysis does not change merely because expressive activity occurs after dark. *See, e.g., Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1062-63 (7th Cir. 2004) (juvenile curfew law violated the First Amendment and noting that many times "the late hours is closely linked  with the purpose and message of the activity"); *Scott v. City of Daytona Beah Fla.,*

740 F. Supp. 3d 1205, 1217 (M.D. Fla. 2024) ("After-Dark Provision" banning panhandling at night violates the First Amendment). This is particularly the case here, where the nature of the forum—a college campus—is such that activities and informal gatherings frequently occur during nighttime hours.

There is no justification for requiring a permit for a small group or individual to engage in expressive activity. This is an unconstitutionally overbroad requirement, and the Amended Policy is facially unconstitutional.

> ### 2.    The Amended Policy is substantially overbroad because of the breadth of First Amendment expression to which it applies

A regulation is substantially overbroad if "in all its applications [it] directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest." *Secretary of State of Md. v. J.H. Munson Co.*, 467 U.S. 947, 965-66 n. 13 (1984) (citations omitted). Of course, by its very terms, the Amended Policy imposes limitations on First Amendment activities occurring from 11:00 p.m. to 6:00 a.m.—protesting, making speeches, and circulating petitions. And just as clearly, the means employed in the Amended Policy are not narrowly tailored. After all, the Amended Policy imposes a prohibition on three people engaging in silent protest at 11:05 p.m. Absent prior permission, a person cannot wear a protest T-shirt. Neither can one person politely ask another person to sign a petition.

What possible justification does Indiana University have to prohibit someone wearing a "Free Palestine" t-shirt at 11:30 p.m.? This, of course, is expressive activity,

*Cohen v. California*, 403 U.S. 15, 19 (1971) (freedom of speech secures the right to wear a jacket bearing the words "F**k the Draft"), as is Professor Akou's wearing of religious symbols, which is also banned without prior permission. *See, e.g., Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 63 F.3d 581, 586 (7th Cir. 1995) (display of religious symbols is symbolic speech that is protected by the First Amendment). A plaintiff speaking (or advocating) about politics to a small group gathered in a public space on campus is a "speech," and while it is, of course, protected by the First Amendment, it is just as clearly prohibited by the Policy absent prior permission. *See, e.g., Boos v. Barry*, 485 U.S. 312, 318 (1988) ("classically political speech" is "at the core of the First Amendment"). Quietly holding a protest sign is also protected expression and is prohibited if a permit is not obtained. *See, e.g., Thayer v. City of Worcester*, 144 F. Supp. 3d 218, 232 (D. Mass. 2015) (noting that "it is black letter law" that speech involving the holding up of political signage and waving to those passing by "is afforded the strongest protection under the First Amendment").

There is no justification, let alone a compelling one, for a regulation that inhibits this sort of peaceful and non-disruptive expression. After all, there is no curfew on campus and there are frequently many people engaged in various forms of non-expressive conduct between 11:00 p.m. and 6:00 a.m.— gathering in Dunn Meadow to listen to a musician, watching the stars through organized viewings, returning in groups from a night out, or just hanging out. All sorts of activities are allowed without seeking

prior permission, as long as they are not protesting, making speeches, or circulating petitions. It is unclear what compelling state interest is served by the restriction in the Amended Policy. But given the vast universe of non-protest activity that is allowed without restriction, the restrictions in the Amended Policy clearly are not narrowly tailored. *J.H. Munson Co.*, 467 U.S. at 965-66 n. 13 (1984).

In *Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus*, 482 U.S. 569 (1987), the Court addressed the constitutionality of a resolution that banned "all 'First Amendment activities' at Los Angeles International Airport." *Id.* at 570. The plaintiffs sought to deliver literature, *id.* at 571, but the effect of the policy was to create a "First Amendment Free Zone," such that in addition to prohibiting the plaintiffs' activities, "it prohibits even talking and reading, or the wearing of campaign buttons or symbolic clothing. Under such a sweeping ban, virtually every individual who enters [the airport] may be found to violate the resolution by engaging in some 'First Amendment activit[y].'" *Id.* at 575. The Court found the ban "facially unconstitutional under the First Amendment overbreadth doctrine" as "no conceivable interest would justify such an absolute prohibition of speech." *Id.* at 573, 575. As an example of this overbreadth the Court noted that "[m]uch nondisruptive speech—such as wearing of a T-shirt or button that contains a political message . . .is still protected speech." *Id.* at 576.

Of course, the First Amendment burden here is even more apparent than in *Jews for Jesus*, as airports are not generally considered places inviting expression. This case

concerns a public university that as this Court has noted "is an institution of higher education that encourages the free and civil exchange of ideas." *Speech First, Inc. v. Pamela Whitten, et al.,* 2024 WL 3964864, *1 (S.D. Ind. Aug. 28. 2024) (internal quotation and citation omitted), *aff'd* 2024 WL 4363740 (7th Cir. Sept. 5, 2024), *pet. for cert. filed,* No. 24-361 (Oct. 1, 2024). It is therefore even more "obvious," *Jews for Jesus*, 482 U.S. at 575, that the Amended Policy is substantially overbroad and violates the First Amendment. There is no need to go further.

### B.     The Policy violates the First Amendment as it is neither content nor viewpoint neutral

The First Amendment allows for reasonable regulations on the time, place, and manner of expression or conduct in a public forum if the regulations are content neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). On the other hand, if a regulation of expression is based on the content of that expression, or "content-based," it is subject to strict scrutiny, requiring that it be narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted). Similarly, strict scrutiny is also warranted if regulation of speech discriminates based on its viewpoint. *Brown v. Kemp*, 86 F.4th 745, 780 (7th Cir. 2023). "If applying the regulation requires an examination or distinguishing of speech only in service of drawing neutral lines, the statute is considered agnostic as to content. Otherwise, the regulation is considered content-or viewpoint-discriminatory on its face

and warrants strict scrutiny." *Id.*

"A regulation of speech is facially content based under the First Amendment if it targets speech based on its communicative content—that is, if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin, Tex. v. Reagan Nat'l Adver. of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up). Under the policy, if the "message expressed" is one of protest, it is prohibited from 11:00 p.m. to 6:00 a.m. absent a permit. A group of students with guitars in Dunn Meadow on a warm spring night playing popular music is fine. However, if they are playing a song in protest against American foreign policy at 11:05 p.m., it is prohibited absent a permit. If students wear t-shirts at 11:30 p.m. that say, "Beat Purdue," and walk through campus, that is allowed without restraint. On the other hand, if the t-shirts say, "Leave Gaza Now," it is a protest and is not allowed without prior permission. "Some facial distinctions based on a message are obvious, [and] defining regulated speech by particular subject matter" is a clear example of a content-based regulation of speech. *Reed*, 576 U.S. at 163.[6]

---

[6]    Although the permit requirement imposed by the Amended Policy is unconstitutional for the reasons noted above, even the process for obtaining a permit established in the University Space Use Pre-Approval Standard is unconstitutional as creating a viewpoint-based restriction on First Amendment expression. For, the Standard ranks the University's preferences for resolving "competing requests for use of space," and gives a priority to "events promoting partnerships with external organizations that align with the University's mission." (Dkt. 69-1 at 28:19 – 29:19, 88). Nowhere in the list is there any priority or mention of permits for University members to engage in protests that do not align with the University's mission. This is obviously not viewpoint neutral. "A speech regulation is viewpoint-based when it goes beyond general discrimination against speech about a specific topic and instead regulates one perspective within a debate about a broader topic." *Brown*, 86 F.4th at 780. Moreover, the ranking of the preferences for allocating permission to use the public spaces at the University, which makes no mention of

Strict scrutiny "really means what it says." *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 888 (1990). It is "a demanding and rarely satisfied standard." *South Bay United Pentecostal Church v. Newsom*, --U.S.--, 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J.). The Policy fails strict scrutiny.

### C.   The Amended Policy is unconstitutional even if it is assessed under intermediate scrutiny

Public forums, where First Amendment rights are at their most fulsome, include streets, sidewalks, and parks—areas that have "immemorially" been reserved for expressive conduct. *Hague v. CIO*, 307 U.S. 496, 55 (1939). The University, consistent with Indiana law, has declared that Dunn Meadow as well as the "public areas of campus" are open for free speech and assembly. (*Akou*, Dkt. 48-2 at 3). These are all public forums. Even if content neutral, the regulation of expression in a public forum must be narrowly tailored to serve a significant government interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The Amended Policy is not narrowly tailored.

"A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citation omitted). That is, the "[g]overnment may not regulate expression in such a manner that

---

private protests by University members, is itself unconstitutional as "[g]overnment actors commit unconstitutional viewpoint discrimination in any kind of public forum when they hamper speech because of 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Tanner v. Ziegenhorn*, No. 4:17-cv-780-DPM, 2020 WL 5648642, *1 (C.D. Ark, Sept. 22, 2020) (quoting *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 825 (1995)), *aff'd*, No. 21-3462, 2023 WL 327848 (8th Cir. Jan. 20, 2023).

[22]

a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799 (footnote omitted). The Policy fails the narrow tailoring requirements in various ways.

First, as noted above, the requirement that an individual or a small group apply for a permit has been repeatedly deemed to be a First Amendment violation as it is "hopelessly overbroad." *American-Arab Anti-Discrimination Committee*, 418 F.3d at 608. "For the same reason, the [Policy] lacks narrow tailoring." *Id.* Whatever interests the University has in regulating large gatherings of people in its public spaces are not present when one person or a small number engage in protest. This is especially true given that college students are frequently out in large numbers after 11:00 p.m. engaging in non-protest activities that are not regulated by the University. As the Fifth Circuit has tersely explained, "[o]ther circuits have held, and we concur, that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant governmental interest." *Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) (citing cases); *see also, e.g., Smith*, 742 F.3d at 289 (given that groups of persons may gather at Monument Circle in Indianapolis to eat lunch, the plaintiff "seems likely to succeed in showing that the fourteen-person limit on demonstrations without a permit is not narrowly tailored").

Second, the fact that the Amended Policy allows for IU Community Members to "spontaneously and contemporaneously assemble" during the overnight hours does not

rescue the policy. People who are not IU Community Members, like plaintiffs Wirtshafter and Murphy, are not able to partake of this exception to the permit requirement. Moreover, the IU Community Member plaintiffs recognize that preplanned protests frequently occur in response to newsworthy matters and although they are preplanned it is important that they occur as quickly as possible, and certainly sooner than 10 days. (Dkt. 69-2 at 4; Dkt. 69-4 at 3; Dkt. 69-5 at 3; 69-6 at 3). But if the event is preplanned the University does not consider it to be spontaneous and contemporaneous, and a permit must be sought ten days before the event. (Dkt. 69-1 at 20:4-8). It is more than odd that the University is erecting a penalty and barrier when a person plans an event, even a small one. The bottom line is that people should not have to wait ten days to respond to a significant event, even if the response is planned. (Dkt. 69-9 at 3.) As the above cases illustrate, for the same reason requiring a permit for any small group or individual protest is overbroad and not narrowly tailored, so is a ten day requirement to apply for a permit.

Third, in order to be able to engage in protests, speeches, or to solicit signatures for a petition, a person must obtain permission. In seeking permission, they must disclose their names and provide other identifying information. (Dkt. 69-1 at 22:12-16). This infringes on the potential protester's right to engage in anonymous speech. "A speaker's 'decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment.'" *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 523 (D.C. Cir. 2010), quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (2010). As the court noted in

*Boardley* in finding a regulation unconstitutional that required a permit for any sized gathering involving the expression of views in a public park, the burden of the disclosure

> falls harder on individuals and small groups than on larger groups. Whereas members of large groups easily can remain anonymous—except, perhaps, for the leader who fills out the permit application—a lone individual has no choice but to put her own name on the application. Moreover, common experience reveals that large groups tend to seek as much publicity as possible; anonymity is more often prized by those operating outside of an organized group. In sum, the permit requirement imposes substantial burdens on individuals and small groups—burdens which the government has failed to justify.

615 F.3d at 524. Similarly, given the activities that may occur on the University property without seeking a permit, the University will also be unable to justify the permit requirement on anyone who wishes to engage in protests, speeches, or the solicitation of signatures on a petition.

The Amended Policy that the University has created to regulate activity protected by the First Amendment "is substantially broader than necessary to achieve the [University's] interest." *Ward*, 491 U.S. at 800. The Policy is not narrowly tailored and is unconstitutional.

## II.    The other requirements for the grant of a preliminary injunction are met

### A.    Plaintiffs are being caused irreparable harm for which there is no adequate remedy at law

Plaintiffs are being denied their First Amendment rights and "the loss of First Amendment freedoms, even for minimal periods of time unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The Seventh Circuit has

stressed that the "[t]he loss of First Amendment freedoms is presumed to constitute an irreparable injury for which money damages are not adequate." *Christian Legal Soc'y v. Walker*, 453 F.3d at 859. Indeed, a number of the plaintiffs have already been disciplined or are facing discipline because of their exercise of First Amendment rights after 11:00 p.m. in violation of the earlier Policy. Plaintiffs must now either choose to forego exercise of their First Amendment rights because of fear of sanctions, as a number of plaintiffs have chosen to do, or must face sanctions for violating the Amended Policy if they do exercise their rights. Money damages are not sufficient to rectify the irreparable injury that they are suffering and that they face.

### B.    The balance of harms favors the plaintiffs

A governmental entity cannot claim that requiring it to comply with the First Amendment is harmful or burdensome. *See id.* at 867 (holding that if a governmental entity "is applying [a] policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the] claimed harm is no harm at all"). The same is true here. An injunction will simply maintain the state of affairs that existed prior to the University's enactment of the original Policy and Amended Policy and will allow each of the plaintiffs to continue to engage in their constitutionally protected expressive activities.

### C.    The public interest will not be disserved by the grant of a preliminary injunction

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Id.* at 859. Thus, "the public interest is served by the maintenance of First

Amendment freedoms and could not possibly be served by the enforcement of an unconstitutional" policy. *Howard v. City of Jacksonville*, 109 F. Supp. 2d 1360, 1365 (M.D. Fla. 2000)

## III.    The preliminary injunction should issue without bond

While Federal Rule of Civil Procedure 65, by its terms, requires that a preliminary injunction be accompanied by "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined," Fed. R. Civ. P. 65(c), no bond should be required in the absence of the possibility of any monetary injuries. *See, e.g., Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (noting cases that "allow a district court to waive the requirement of an injunction bond [where] the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction."). A preliminary injunction here will not expose the University to any damage or risk of economic harm, and one should therefore issue without bond.

## Conclusion

For the foregoing reasons so much of the Amended Policy that prohibits expressive activities that occur from 11:00 p.m. to 6:00 a.m. without prior permission should be enjoined. The University should further be enjoined from in any way disciplining or taking any action against any of the plaintiffs who violated the Policy prior to its amendment or violated the Amended Policy prior to the issuance of the preliminary

injunction.[7]

Kenneth J. Falk
Gavin M. Rose
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiffs

---

[7]    Plaintiffs have previously demonstrated why the original policy, which banned all expressive activity if it occurred between 11:00 p.m. and 6:00 a.m., was unconstitutional. (*See Akou*, Dkt. 21, Dkt. 31). Suffice it to say, if the Amended Policy is unconstitutional, then the original policy certainly was. It is therefore appropriate, as part of the preliminary injunction, to prevent the University from sanctioning plaintiffs for any violation of the original Policy as well as its amended version.

[28]