UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JASPER WIRTSHAFTER, BENJAMIN ROBINSON,     )
MADELEINE MELDRUM, HEATHER AKOU, ANJALI    )
BISWAS, BRYCE GREENE,                       )
DAVID MCDONALD, MAUREEN MURPHY, SARAH       )
PHILLIPS, AND JESS TANG,                    )
                                            )
                    *Plaintiffs*,           )
            v.                              )    Case No. 1:24-cv-754-RLY-MJD
                                            )
PAMELA WHITTEN, *in her individual and official capacity as*  )
*President of Indiana University*; BENJAMIN HUNTER, *in his*   )
*individual capacity as Associate Vice President and*         )
*Superintendent for Public Safety of Indiana University*; and )
THE TRUSTEES OF INDIANA UNIVERSITY, *in their official*       )
*capacities*,                               )
                                            )
                    *Defendants*.           )

**DEFENDANTS' RESPONSE IN
<u>OPPOSITION TO PRELIMINARY INJUNCTION</u>**


John R. Maley
Dylan A. Pittman
Amanda Jane Gallagher
Charity Seaborn
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
Telephone: (317) 231-7464
Email:  jmaley@btlaw.com
dylan.pittman@btlaw.com
amanda.gallagher@btlaw.com
charity.seaborn@btlaw.com

*Counsel for Defendants*

# TABLE OF CONTENTS

**Page**

I.    Background .................................................................................................................1

    A.    The University's Commitment to Freedom of Expression ............................2

    B.    IUPD's Obligation to Ensure Campus Safety ...............................................2

    C.    The Escalation of Political Tensions Surrounding the Middle East Conflict...............3

    D.    The Dunn Meadow Encampment ..................................................................5

    E.    In Response to Nationwide Tensions, Universities Across the Country Enact Overnight and Permitting Restrictions ..........................................................6

    F.    IU Adopts the Policy ......................................................................................7

    G.    The University Adopts the Standards ............................................................9

    H.    This Lawsuit ................................................................................................10

    I.    Plaintiffs Do Not Challenge Most of the Amended Policy's Provisions. ....11

II.    Standard of Review .................................................................................................11

III.    Argument ................................................................................................................12

    A.    Plaintiffs Lack Standing and Ripe Claims for the Preliminary Injunction. ..14

        1.    Pertinent Article III Principles. ........................................................14

        2.    Plaintiffs Fail to Establish an Article III Basis for the Preliminary Injunction. .......................................................................................16

    B.    The Pre-Approval Requirement is a Permissible Time, Place, Manner Restriction. ..................................................................................................20

        1.    The Pre-Approval Requirement is Content Neutral ........................21

        2.    The Pre-Approval Requirement is Narrowly Tailored to Serve a Substantial Interest .........................................................................21

            a.    The University's Interest in Public Safety .............................24

            b.    The Ten-Day Advanced Notice Requirement .......................24

            c.    The Application of the Pre-Approval Requirement to Overnight Events .................................................................25

        3.    The Pre-Approval Requirement leaves ample alternatives for communication. ...............................................................................27

    C.    The Balance of Harms Weighs Against Granting Preliminary Injunction ..27

IV.    Conclusion .............................................................................................................30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Mead Johnson & Co.,*
971 F.2d 6 (7th Cir. 1992) ......................................................................................... 12, 29

*Akou v. The Trustees of Indiana University,*
No. 1:24-cv-1469-RLY-MJD ......................................................................................*passim*

*Am. C.L. Union v. Mote,*
423 F.3d 438 (4th Cir. 2005) ................................................................................................26

*Am. Future Sys., Inc. v. Pennsylvania State Univ.,*
752 F.2d 854 (3d Cir. 1984) ........................................................................................ 15, 29

*Ashley W. v. Holcomb,*
34 F.4th 588 (7th Cir. 2022) .............................................................................................21

*Ayotte v. Planned Parenthood of N. New England,*
546 U.S. 320 (2006) ...........................................................................................................30

*Babbitt v. United Farm Workers Nat. Union,*
442 U.S. 289 (1979) ...........................................................................................................15

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
591 U.S. 610 (2020) ...........................................................................................................30

*Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus,*
482 U.S. 569 (1987) ...........................................................................................................18

*Boardley v. U.S. Dep't of Interior,*
615 F.3d 508 (D.C. Cir. 2010) .........................................................................................25

*Bowman v. White,*
444 F.3d 967 (8th Cir. 2006) ...................................................................................... 26, 27

*Brandt v. Bd. of Educ. of City of Chicago,*
480 F.3d 460 (7th Cir. 2007) ............................................................................................29

*Brown v. Kemp,*
86 F.4th 745 (7th Cir. 2023) ....................................................................................... 15, 16

*Carr v. Trustees of Purdue Univ.,*
No. 1:24-CV-00772-SEB-MJD, 2024 WL 3819424 (S.D. Ind. Aug. 14, 2024) ...................... 15, 17

*Church of Am. Knights of Ku Klux Klan v. City of Gary, Indiana,*
    334 F.3d 676 (7th Cir. 2003)..................................................................... 24, 25

*City of Lakewood v. Plain Dealer Publ'g Co.,*
    486 U.S. 750 (1988)......................................................................................26

*City of Watseka v. Illinois Pub. Action Council,*
    796 F.2d 1547 (7th Cir. 1986), *aff'd,* 479 U.S. 1048 (1987).........................27

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)......................................................................................16

*Clark v. Cmty. for Creative Non-Violence,*
    468 U.S. 288 (1984)......................................................................................21

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006)......................................................................................14

*Forsyth Cnty., Ga. v. Nationalist Movement,*
    505 U.S. 123 (1992)........................................................................25, 26, 27

*Frisby v. Schultz,*
    487 U.S. 474 (1988).............................................................................. 21, 23

*Glover v. Cole,*
    762 F.2d 1197 (4th Cir. 1985) ....................................................................24

*Gresham v. Peterson,*
    225 F.3d 899 (7th Cir. 2000).......................................................................28

*Heffron v. Int'l Soc. for Krishna Consciousness, Inc.,*
    452 U.S. 640 (1981)......................................................................................20

*Illinois Republican Party v. Pritzker,*
    973 F.3d 760 (7th Cir. 2020)........................................................................12

*Indiana Coal. for Pub. Educ. - Monroe Cnty. v. McCormick,*
    338 F. Supp. 3d 926 (S.D. Ind. 2018)...........................................................14

*Laird v. Tatum,*
    408 U.S. 1 (1972)..........................................................................................16

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)......................................................................................14

*MacDonald v. City of Chicago,*
    243 F.3d at 1025................................................................................... 20, 24

*Marcavage v. City of Chicago,*
  659 F.3d 626 (7th Cir. 2011)..................................................................................24

*Mays v. Dart,*
  974 F.3d 810 (7th Cir. 2020)..................................................................................12

*McCullen v. Coakley,*
  573 U.S. 464 (2014)..............................................................................................24

*Murthy v. Missouri,*
  603 U.S. 43 (2024)................................................................................................15

*Navratil v. City of Racine,*
  101 F.4th 511 (7th Cir. 2024) ..........................................................................21, 24

*Nw. Hosp., Inc. v. Hosp. Serv. Corp.,*
  687 F.2d 985 (7th Cir. 1982)..................................................................................13

*Pennhurst State Sch. & Hosp. v. Halderman,*
  465 U.S. 89 (1984)................................................................................................21

*Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health,*
  699 F.3d 962 (7th Cir. 2012)..................................................................................12

*Regan v. Time, Inc.,*
  468 U.S. 641 (1984)..............................................................................................30

*Republican Party of Minnesota v. White,*
  416 F.3d 738 (8th Cir. 2005)..................................................................................23

*Roland Mach. Co. v. Dresser Indus., Inc.,*
  749 F.2d 380 (7th Cir. 1984)..................................................................................12

*Schenck v. Pro-Choice Network Of W. New York,*
  519 U.S. 357 (1997)..............................................................................................24

*Schirmer v. Nagode,*
  621 F.3d 581 (7th Cir. 2010)..................................................................................18

*Schmidling v. City of Chicago,*
  1 F.3d 494 (7th Cir. 1993)......................................................................................15

*Schultz v. City of Cumberland,*
  228 F.3d 831 (7th Cir. 2000)............................................................................13, 22

*Smith v. United States,*
  508 U.S. 223 (1993)..............................................................................................13

*Smith v. Wisconsin Dep't of Agric., Trade & Consumer Prot.*,
  23 F.3d 1134 (7th Cir. 1994)..................................................................16

*Speech First, Inc. v. Killeen*,
  968 F.3d 628 (7th Cir. 2020)..............................................................*passim*

*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*,
  695 F.3d 676 (7th Cir. 2012)............................................................28, 29

*Sweeney v. Raoul*,
  990 F.3d 555 (7th Cir. 2021)..................................................................16

*Thole v. U. S. Bank N.A*,
  590 U.S. 538 (2020)..............................................................................14

*Thomas v. Chicago Park Dist.*,
  534 U.S. 316 (2002)..........................................................................*passim*

*Trump v. New York*,
  592 U.S. 125 (2020)........................................................................14, 15

*Turnell v. CentiMark Corp.*,
  796 F.3d 656 (7th Cir. 2015)..................................................................28

*United States v. Albertini*,
  472 U.S. 675 (1985)..............................................................................23

*United States v. Hansen*,
  599 U.S. 762 (2023)........................................................................13, 23

*United States v. Lock*,
  466 F.3d 594 (7th Cir. 2006)..................................................................14

*Valencia v. City of Springfield, Illinois*,
  883 F.3d 959 (7th Cir. 2018)..................................................................28

*Virginia v. American Booksellers Ass'n, Inc.*,
  484 U.S. 383 (1988)..............................................................................15

*Ward v. Rock Against Racism*,
  491 U.S. 781 (1989) ....................................................................13, 21, 23

*Weinberg v. City of Chicago*,
  310 F.3d 1029 (7th Cir. 2002) ..........................................................22, 28

*Whole Woman's Health v. Jackson*,
  595 U.S. 30 (2021)................................................................................15

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................................................................... 12

*Wisconsin Action Coal. v. City of Kenosha*,
   767 F.2d 1248 (7th Cir. 1985) ................................................................................................ 27

**Statutes**

Ind. Code § 21-39-8 ........................................................................................................................ 7

Ind. Code § 21-39-8-9 ............................................................................................................ 20, 21

Ind. Code § 21-39-8-9(b)(4) .......................................................................................................... 8

The right to free expression is fundamental, but it is not absolute—especially when exercised in ways that threaten public safety, disrupt university operations, and infringe on the rights of others. Indiana University has long embraced free speech and open discourse. Yet the University also has public health, safety, and welfare responsibilities to protect its students, faculty, and staff from escalating campus tensions, harassment, vandalism, unsanitary conditions, and safety threats. In response to increasingly volatile demonstrations—including an unauthorized encampment that destroyed University property, created safety hazards, and interfered with student life—the University enacted a content-neutral, narrowly tailored policy regulating the time, place, and manner of certain events on campus. These reasonable safeguards align with well-established First Amendment principles, and are necessary to protect the safety of students (thousands of whom live on campus, including minors), faculty, and staff while preserving IU's core educational mission.

Plaintiffs seek to dismantle these safeguards asserting speculative claims lacking Article III ripeness and standing, arguing that they impose unconstitutional restrictions on speech. But decades of legal precedent confirm: universities are not required to sacrifice order and security in the name of unregulated protest. The policy at issue does not ban speech; it ensures that on-campus events occur in a manner that protects both the entire IU community and the rights of students to learn in a safe, functioning environment. Because the University's policy is legally sound, carefully crafted, and necessary to preserve the integrity of the University, Plaintiffs do not meet their heavy burden for preliminary injunctive relief. The Court should deny Plaintiffs' request for a preliminary injunction and uphold IU's right to maintain residential campuses that are both expressive and secure.

## I.      Background

Since 1820, the University has helped students create brighter futures while also seeking ways to drive innovation. The University system is composed of seven campuses and two regional centers across Indiana and partner locations around the globe. The IU community represents a diverse cross-

section of people from all backgrounds and cultures, including over 88,000 students from 166 countries and 45,000 faculty, staff, and employees University-wide.

### A.    The University's Commitment to Freedom of Expression

In accordance with its responsibilities under the First Amendment and Indiana law, the University affords and is committed to protecting all IU community members' rights to free speech and expressive activity, such as assembling and speaking in public areas of campus, writing, publishing, and inviting speakers on any subject. [ECF 69-1 at 80.] As a public institution, the University does not limit speakers or visitors based on their points of view or beliefs, and the University does not prohibit the expression of objections to speakers or their points of view. [ECF 69-1 at 52, 80, 84.]

Since its creation, the University has undertaken actions reflecting this longstanding commitment to campus free speech. Concerning the IU Bloomington campus, the University recognizes that Dunn Meadow has historically served as an important place for IU community members to engage in freedom of expression. [ECF 69-1 at 80.] In 1969, the University's Board of Trustees designated Dunn Meadow as the Indiana University Assembly Ground. [ECF 69-1 at 80.] Dunn Meadow has since been the location of numerous non-political and political campus activities alike. [ECF 69-1 at 10, 80.]

### B.    IUPD's Obligation to Ensure Campus Safety

Although the University's campus in Bloomington is its flagship location, the University is composed of two core campuses, five regional campuses, and two regional centers. *See* IU Locations, *available at:* http://iu.edu/about/locations.html Although they are part of the same University system, these campuses range from a traditional college campus setting to urban environments. [*See* ECF 84-1, ¶ 9; -2, ¶ 10.] Each of the University's campuses are open to the public and not fenced or closed off from pedestrians. [ECF 84-1, ¶ 9.] As a result, the University is very large and porous in terms of the ability of persons to enter and exit campus quickly and undetected. [ECF 84-2 ¶ 10; -3, ¶ 8.] This

is particularly true for the Bloomington campus, which is 1,933 acres and, in some places, heavily wooded. *See,* Protect IU, *available at:* https://protect.iu.edu/about/index.html Given the large number of resident students (many of whom are minors), this structure presents unique challenges to the University to ensure the IU community's safety and welfare. [ECF 84-1, ¶ 10; -2, ¶ 11; -3, ¶ 9.]

The IU Police Department ("IUPD") serves as the general police power for the University. [*See Akou* Docket, ECF 27-1.] Although IUPD's primary jurisdiction is the University's campuses, IUPD is regularly called to respond to incidents in the surrounding areas. [*Akou Docket,* ECF 27-1.] Similar to nationwide trends, IUPD has recently experienced understaffing issues. [*Akou Docket,* ECF 27-1.] These resource issues are particularly strained by overnight or late evening events due to limited visibility, increased prevalence of crime, and the heightened presence of alcohol and narcotics. [*Akou* Docket, ECF 27-1; *see also Akou* Docket, ECF 27-2.][1] Due to the unique challenges confronting University personnel, advance notice is required for overnight events on University property. [ECF 84-1, ¶ 18-20.] Advanced notice allows University personnel to have ample time to ensure that adequate staffing and resources are dedicated to protecting the safety of event participants. [ECF 84-1, ¶ 19; -3, ¶ 15.] This also allows IUPD to be prepared for the next full day of activity and policing and to limit the number of individuals attempting to habitat on campus. [ECF 84-1, ¶ 11, 17; -2, ¶ 12; -3, ¶ 10, 13.]

### C.    The Escalation of Political Tensions Surrounding the Middle East Conflict

Following October 7, 2023, student protests proliferated across U.S. universities. *See* "Scenes From the Student Protests Churning Across the Country," *New York Times,:* https://tinyurl.com/42k96e58. Nationwide, these demonstrations saw significant participation; between October 2023 and June 2024, nearly 12,400 pro-Palestinian protests were recorded in the

---

[1] *Akou v. The Trustees of Indiana University,* No. 1:24-cv-1469-RLY-MJD was consolidated with this case on December 10, 2024, and was closed. [*Akou* Docket, ECF 57.] Consistent with Plaintiffs' practice, any material referenced from the *Akou* case prior to consolidation is cited by reference to the docket number in that case.

U.S., with over 2,000 pro-Israel counter-protests. *See* https://ash.harvard.edu/articles/crowd-counting-blog-an-empirical-overview-of-recent-pro-palestine-protests-at-u-s-schools/. Some protests escalated into confrontations resulting in property damage and arrests. *Id.*

For example, at Columbia University demonstrators established a "Gaza Solidarity Encampment" in April 2024, demanding divestment from companies associated with the Israeli government. The encampment was dismantled by law enforcement, resulting in over 100 arrests. *See* The Foundation for Individual Rights and Expression, 2024 Student Encampment Protests, *available at:* https://tinyurl.com/yf2jvead



https://tinyurl.com/42k96e58. Similarly, at UCLA protests resulted in violent clashes and over 200 arrests. *Id.* Violence broke out when counter-protesters tried to pull apart an encampment. After UCLA officials declared it illegal, counter-protestors launched fireworks into an encampment. *Id.*



Consistent with the nationwide trend, the IU community similarly experienced increased political tensions surrounding this issue starting in October 2023. [*Akou* Docket, ECF 27-1.] As the conflict intensified, many students, faculty, and community members engaged in peaceful acts of political expression on University property. [*Akou* Docket, ECF 27-1.] In total, IU authorized and supported over 100 events related to both sides of the conflict. [*Akou* Docket, ECF 27-1.]

Unfortunately, IU also saw an increase in reported instances of antisemitic and Islamophobic activity during this period. [*Akou* Docket ECF 27-1.] Around this time, there were frequent reported acts of intimidation and harassment against members of the IU community, including against community members attempting to engage in political activity. [*Akou* Docket, ECF 27-1.]



"33 pro-Palestinian protesters arrested at Dunn Meadow encampment Thursday," Indiana Daily Student, *available at* https://tinyurl.com/4yxernep (last accessed February 27, 2025). Meanwhile, protestors clashed, and University operations unrelated to the protests were disrupted. [*Akou* Docket, ECF 27-1; *see also Akou* Docket, ECF 20-8 at 3 (photograph of Dunn Meadow).]



"Separate peaceful gatherings over Israel-Palestine conflict end in clash on IU's campus," *Indiana Daily Student*, https://tinyurl.com/5n8um8wy. As a result, significant burdens were placed on IUPD to ensure campus safety and the continuity of University operations. [*Akou* Docket, ECF 27-1.]

### D.    The Dunn Meadow Encampment

In late April 2024, the situation reached a tipping point when protestors established an "encampment" in Dunn Meadow, which was intended to occupy this part of IU Bloomington's campus continuously. [*Akou* Docket, ECF 27-1.] The encampment substantially burdened University

resources, including IUPD. [*Akou* Docket, ECF 27-1.] Several altercations occurred between protestors and individuals leaving events for other student organizations. [*Akou* Docket, ECF 27-1.]

Additionally, the encampment residents were the reported source of vandalism to IU property. [*Akou* Docket, ECF 27-1.] IUPD has also received reports of encampment residents engaging in unhygienic practices, including protestors setting up "dry toilets" on Dunn Meadow, and bathing in and collecting water from IU's Campus River, a small stream that runs just south of the encampment. [*Akou* Docket, ECF 27-1.]; *see also* Akou Docket, ECF 20-8 at 3 (photograph of the Campus River).]

Relatedly, parts of the encampment became occupied by individuals unaffiliated with the University. [*Akou* Docket, ECF 27-1.] IUPD received reports of individuals with violent criminal histories, including with firearm and weapons violations, taking up occupancy in the encampment. [*Akou* Docket, ECF 27-1.] One individual overdosed on drugs in the Dunn Meadow encampment. [*Akou* Docket, ECF 27-1.] As a direct result of the encampment, Dunn Meadow had to be closed for University activities due to significant necessary environmental remediation. [*Akou* Docket, ECF 27-1.] It was unavailable for use by the University or other groups during May, June, and July 2024. Because Dunn Meadow is typically used as part of University operations, including orientation weekend, its closure impacted the University community. [*See Akou* Docket, ECF 27-1.]

E.    **In Response to Nationwide Tensions, Universities Across the Country Enact Overnight and Permitting Restrictions**

Universities nationwide face similar challenges related to promoting and ensuring public welfare and safety in their respective communities. [ECF 84-3, ¶ 6.] Following the nationwide rise in political tensions, several public universities instituted time, place, and manner restrictions. For example, the University of South Florida ("USF") implemented an overnight restriction in its policy governing Activities, Signage, and Use of Public Space, "ensure the safety of the USF community, continuity of operations, and the engagement of the University campus." https://usf.app.box.com/v/usfpolicy6-028. Under USF's policy, overnight activities between 12 a.m.

6

and 7 a.m. require a reservation and may be reserved only by student organizations or University departments. The California State University System also prohibits overnight demonstrations and loitering to "ensure the health and safety of the entire University communication, and to protect University Property." https://tinyurl.com/2p2b4zcz.

Schools within the Big Ten have similarly followed suit. For example, the Ohio State University requires that on-campus events end at 10 p.m. unless otherwise approved by the university. Requests for events past 10 p.m. are reviewed and approved by Ohio State's public safety, facilities, athletics, and student life departments. https://tinyurl.com/3t8k2vyb. Similarly, the University of Minnesota, Twin Cities, permits its campus community members to engage in spontaneous activity before 10 p.m. https://osa.umn.edu/know-campus-policies.

## F.    IU Adopts the Policy

Indiana University adopted its Expressive Activity Policy ("the Policy") on July 24, 2024, and amended the Policy on November 15, 2024. [ECF 72-2.] The Policy's goal is to "provide[] the time, place, and manner guidelines for Expressive Activity on University property" and "ensure[] the University's educational mission is actualized while preserving the rights guaranteed to Indiana University Community Members under the U.S. Constitution and IC 21-39-8." [ECF 72-2.] The Policy applies to all University property and the following community members:

(1)    Any employee of the University, including administrators, academic appointees, staff, part-time, and student employees;
(2)    All students and student organizations;
(3)    All University units;
(4)    University contractors;
(5)    Any individual using Indiana University resources or facilities or receiving funds administered by Indiana University; and
(6)    Volunteers and other representatives when speaking or acting on behalf of Indiana University.

[ECF 72-2.] The Policy also notes that Ind. Code § 21-39-8 permits IU to adopt reasonable time, place, and manner restrictions subject to the following requirements:

7

> (1)     the restrictions are narrowly tailored in service of a significant University interest;
> (2)     the restrictions employ criteria that are clear, published, and content and viewpoint neutral;
> (3)     the restrictions provide ample alternative means of expression; and
> (4)     the restrictions allow IU community members to spontaneously and contemporaneously assemble and distribute literature.

[ECF 72-2.]

The Policy expressly implements regulations *only* on certain limited kinds of expressive conduct. The Policy states: "To allow for freedom of expression and peaceful demonstration on campus while also respecting the University's operations, the following regulations for Expressive Activity are in place: . . . ." That sentence is followed by certain enumerated topics, including: the use of temporary installation of structures or mass physical objects; the affixing of signs, symbols, and light shows upon University property; camping on University property; blocking the ingress or egress to University property; and the use of amplified sound. [ECF 72-2.] Finally, the Policy notes that Expressive Activity must comply with all federal, state, local, and municipal laws, ordinances, rules, and regulations, as well as University policies. [ECF 72-2.]

> The Policy also includes "Limited Content-Neutral Overnight Restrictions" which include:
> 1. Pursuant to IC 21-39-8-9(b)(4), during the overnight hours of 11:00 p.m. to 6:00 a.m. IU Community Members may spontaneously and contemporaneously assemble and distribute literature.
>
> 2. For the protection of the University community and in furtherance of the educational mission of the University, from the overnight hours of 11:00 p.m. to 6:00 a.m., the activities listed below are prohibited on University property unless:

> > *a.*     they are part of a scheduled or authorized University activity extending into that time period or
> > *b.*     prior written approval has been obtained from the appropriate University office:
> > - Students and Student Organizations: Campus Chief Student Affairs Officer; or
> > - Faculty: Executive Vice Chancellor of Academic Affairs; or Campus Chief Academic Officer; or
> > - Staff, Guests, and Visitors: University Events.

3. The Expressive Activities prohibited on University property during the overnight hours of 11:00 p.m. to 6:00 a.m., are:

- protesting;
- making speeches;
- circulating petitions; and
- all other unapproved conduct and activities otherwise prohibited by this Policy or applicable law.

[ECF 72-2 at 5-6.]

### G.    The University Adopts the Standards

As part of the University's implementation of the Policy, the University adopted the University Space Use Pre-Approval Standard (the "Standards"). [ECF 69-1 at 86-89.] These Standards were established to ensure equitable allocation of University space, to ensure the freedom of speech and assembly guaranteed under the First Amendment and Indiana law, and to comply with safety, legal, and operational requirements. [ECF 69-1 at 86.]

As the Standards confirm, prior approval is *only* required for these categories of expression:

- Preplanned events of more than 50 people between 6:00 a.m. and 11:00 p.m.;
- Preplanned events during the overnight hours of 11:00 p.m. to 6:00 a.m.;
- Use of amplified sound;
- Affixing signs or structures into the ground or to the exterior of any University structure or property, including, but not limited to, buildings and flagpoles;
- Installation of structures and/or mass physical objects; and
- Camping, including the use of any item to create a shelter, cooking, and the use of portable electric heaters, heating devices, generators, and other similar appliances and devices, and all portable toilets.

[ECF 69-1 at 86-87.] The Standards make clear that prior approval is *not* required for any of the following activities:

- Preplanned events of less than 50 people that will not extend into the overnight hours of 11:00 p.m. to 6:00 a.m.;
- Spontaneous and contemporaneous assembly which occurs without prior planning or announcement for the purpose of an immediate and spontaneous response to a newsworthy occurrence;
- The peaceful distribution of literature at any time.

[ECF 69-1 at 87.]

Although the University's Events Registration Committee (the "UERC") uses the Standards to determine whether to grant or deny a reservation request, events that are: (1) less than 100 attendees and (2) scheduled between 6 a.m. and 11 p.m. are automatically approved without further review. [ECF 69-1 at 50-51.] An event request will be reviewed by UERC only if the submitter selects one of the following categories in their submission: controversial topic, speaker, or guest; high-profile dignitary, guest, or attendee; demonstration or protest; or exterior signs, symbols, banners, or light projections. [ECF 69-1 at 50-51.] If a review is triggered, the UERC subject matter experts will review the proposed event for sufficient preparation and planning and to ensure that the University has adequate resources to support the event. [ECF 69-1 at 50:1-51:8.] In order to provide time for any necessary UERC review, applications must be submitted at least 10 days before the event. [ECF 69-1 at 102.] The University favors approval in reviewing applications pursuant to the Standards. [ECF 69-1 at 50:25-51:8.] If an event is denied pre-approval, the submitter can submit the request for reconsideration if revised to comply with the University's policies. [ECF 69-1 at 69:11.]

### H.    This Lawsuit

Plaintiffs are all individuals with varying connections to the University who were arrested by Indiana State Police and received no trespass orders from the University as part of the Dunn Meadow encampment. [*See* ECF 72.] Except for Plaintiff Akou, *none* of the other nine Plaintiffs have sought approval for *any* event of *any* size at *any* time under *any* version of the Policy. [*See* ECF 69-2 at 2.] Instead, several Plaintiffs have chosen to deliberately violate the Policy through a series of late-night "vigils." [ECF 69-2 at 4; -3 at 3; -4 at 2; -5 at 2; -6 at 2; -7 at 3; -8 at 4; -10 at 2.]

As a result, Plaintiffs Akou, Phillips, Robinson, and McDonald, who are IU faculty members, received written warnings about their noncompliance with the Academic Appointee Responsibilities and Conduct Policy (ACA-33). [ECF 69-2 at 6; -5 at 2; -8 at 7-8; -9 at 6-7.] Similarly, Plaintiff Greene, a graduate student, alleges that he was told that he is being "investigated" for violations of the Policy

under the University's Student Code of Conduct. [ECF 69-4 at 2-3, 5-6.] But Greene does not claim to have been disciplined. [*Id.*] Moreover, no other student Plaintiff claims to have received such a warning.

In February of this year Plaintiffs filed their Second Amended Complaint seeking "declaratory relief that . . . the 11:00 p.m. to 6:00 a.m. prohibition in both the original Policy and amended Policy violates the First Amendment." [ECF 72 at 12.] Plaintiffs also filed a Second Renewed Motion for Preliminary Injunction, which seeks an injunction that the Policy "be enjoined that prohibits the following activities on Indiana University property if they occur without prior permission between the hours of 11:00 p.m. and 6:00 a.m.: protesting, making speeches, circulating petitions, and all otherwise unapproved conduct and activities otherwise prohibited." [ECF 73.]

## I.    Plaintiffs Do Not Challenge Most of the Amended Policy's Provisions.

Neither the Second Amended Complaint nor the Second Renewed Motion for Preliminary Injunction challenges any other aspect of the Policy, such as the new enumerated regulation of expressive activity, for instance, which addresses the use of temporary installation of structures or mass physical objects; the affixing of signs, symbols, and light shows upon University property; camping on University property; blocking the ingress or egress to University property; and the use of amplified sound. Nor has any Plaintiff expressed a desire to engage in conduct regulated by the other provisions of the Policy, such as using amplified sound or camping on University property. [ECF 72.] Plaintiffs do not claim that the entirety of the Policy is unconstitutional nor do they seek to enjoin the entirety of its implementation. [*See* ECF 72; ECF 73.] Instead, Plaintiffs seek only to enjoin the preapproval requirement for overnight events (the "Pre-Approval Requirement"). [*See* ECF 73.] Yet nine of the ten Plaintiffs have *not* sought and have *not* been denied any preapproval for overnight events. [ECF 69-3; -4; -5; -6; -7; -8; -9; -10; -11.]

## II.    Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (cleaned up). Granting a preliminary injunction is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (citation and quotation marks omitted).

To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; and (3) irreparable harm absent the injunction. *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012). If the moving party fails to demonstrate any one of these three threshold requirements, the injunctive relief must be denied. *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). At this stage of the analysis, "a mere possibility of success is not enough." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). Thus, Plaintiffs "must demonstrate that '[their] claim has some likelihood of success on the merits . . . not merely a 'better than negligible' chance.'" *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (internal citations omitted). If these threshold conditions are met, the Court must then assess the balance of the harm — the harm to Plaintiffs, if the injunction is not issued, against the harm to Defendants, if it is issued — and determine the effect of an injunction on the public interest. *Speech First, Inc. v. Killeen*, 968 F.3d 628, 637 (7th Cir. 2020).

## III.    Argument

Despite seeking to preliminarily enjoin the Pre-Approval Requirement under the Amended Policy, Plaintiffs comment remarkably little as to what the challenged provision actually says, and how it properly furthers the goal of keeping campuses both expressive and secure. Nor do they establish ripeness or standing for their speculative desires. Rather than meaningfully engage with what they facially challenge, Plaintiffs cite activities falling *outside* the Pre-Approval Requirement's plain language.

The Requirement does not regulate, for example, "conversations," wearing "religious items," or wearing a "Free Palestine" t-shirt, notwithstanding Plaintiffs' contrary suggestions. The Policy does not need to and does not further define plain language terms of "protesting," "making speeches," or "circulating petitions."  For purposes of the Pre-Approval Requirement, the Standards confirm that the Requirement applies only to: (1) certain categories of preplanned **events**; and (2) use of signs, amplified sound, and structures (which is not at issue).[2] [ECF 69-1 at 86 (emph. added).] Any expressive activity that is not an event—*i.e.*, "[a] planned public or social occasion," *see Oxford English Dictionary*, Second Edition —falls plainly outside the Pre-Approval Requirement's scope and, thus, requires no preapproval and is properly disregarded for purposes of Plaintiffs' Motion.[3] "When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993). Absent a clearly expressed legislative intent to the contrary, the plain language should be conclusive. *United States v. Lock*, 466 F.3d 594 (7th Cir. 2006).

---

[2] Plaintiffs suggest that Wirtshafter and Murphy are both subject to the Pre-Approval Requirement but unable to participate in events outside the Pre-Approval Requirement, such as spontaneous and contemporaneous assembly, because they are not IU Community Members for purposes of the Policy. [ECF 70 at 23-24.] This is a non-starter. The Policy defines "IU Community Member" to include "any individual using Indiana University resources or facilities." [ECF 69-1 at 79-90.] If Wirtshafter and Murphy use University property to engage in expressive conduct, they are, by definition, IU Community Members; if otherwise, the Amended Policy could have no effect on them.

[3] To the extent the Policy is open to multiple interpretations, and "even if the [University's] reading were not the best one," the University's interpretation "is at least fairly possible," and "so the canon of constitutional avoidance would still counsel us to adopt it." *United States v. Hansen*, 599 U.S. 762, 781 (2023) (thus rejecting First-Amendment facial overbreadth challenge, and adding that although plaintiff urged "the most expansive reading possible, effectively asking us to apply a canon of constitutional collision," "[t]his tactic is wrong"); *accord Nw. Hosp., Inc. v. Hosp. Serv. Corp.*, 687 F.2d 985, 992 (7th Cir. 1982) (applying canon of constitutional avoidance beyond statutory context, specifically to "administrative regulations"). Further, even where a plaintiff "suggest[s] scenarios to which [the object of their facial challenge] might apply on its face and would unconstitutionally restrict protected expression," the challenge fails where that object "is readily susceptible to a narrowing construction that saves the potentially unconstitutional applications from dwarfing [its] legitimate reach." *Schultz v. City of Cumberland*, 228 F.3d 831, 850-51 (7th Cir. 2000) (in other words, "a facial overbreadth challenge fails when the regulation's plain language is readily susceptible to a narrowing construction that would make it constitutional" (cite omitted)). Indeed, "[e]ven if the [challenged] language … were not sufficient on its face to withstand" scrutiny, "[a]n administrative interpretation and implementation of a regulation are, of course, highly relevant to [the] analysis, for in evaluating a facial challenge to a state law, a federal court must … consider any limiting construction that a state court or enforcement agency has preferred." *Ward*, 491 U.S. at 795–96 (upholding guideline against facial challenge where "[a]ny inadequacy on [its] face … would have been more than remedied by the city's narrowing construction" via its "additional guidance to the officials charged with its enforcement").

Plaintiffs' Motion should be denied for any of multiple reasons. *First*, Plaintiffs lack Article III standing and ripe claims to pursue the preliminary injunction. *Second*, Plaintiffs are not likely to prevail on the merits because the Policy is a permissible time, place, and manner restriction. *Finally*, the balance of harms weighs against entering a preliminary injunction.

### A.    Plaintiffs Lack Standing and Ripe Claims to Seek the Preliminary Injunction.

Plaintiffs fail to establish an Article III basis for their Motion's sole requested preliminary injunction, which targets only the Pre-Approval Requirement of the Amended Policy [ECF 73 at 1– 2]. Despite Plaintiffs' speculation about how that Requirement *might* be misapplied against them down the road (*e.g.*, for wearing expressive t-shirts and other activities expressly outside the Amended Policy's scope), nothing supports their conjecture. They fail to show the particularized, concrete, and actual or imminent injury-in-fact required to secure the preliminary relief for which they have moved. Nor are their claims yet ripe in any case.

### 1.    Pertinent Article III Principles.

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). Article III "enforces" that limitation (id.) *via* "[t]wo related doctrines of justiciability": standing and ripeness (*Trump v. New York*, 592 U.S. 125, 131 (2020)). Standing requires Plaintiffs to show (1) "injury in fact that is concrete, particularized, and actual or imminent" (rather than conjectural or hypothetical); (2) "was caused by the defendant"; and (3) "would likely be redressed by the requested judicial relief." *Thole v. U. S. Bank N.A*, 590 U.S. 538, 540 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *Indiana Coal. for Pub. Educ. - Monroe Cnty. v. McCormick*, 338 F. Supp. 3d 926, 941 (S.D. Ind. 2018) ("remedy must be tailored to redress the plaintiff's particular injury" (cite omitted)). Ripeness requires that the case stand independent of "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump,*

592 U.S. at 131. In a pre-enforcement challenge like this one, ripeness and standing "plumb the same concept: timing." *Carr v. Trustees of Purdue Univ.*, No. 1:24-CV-00772-SEB-MJD, 2024 WL 3819424, at *4 (S.D. Ind. Aug. 14, 2024) (citation omitted).

Pertinent here, for a First-Amendment facial challenge, "a prior enforcement action is not required" to establish such an injury-in-fact. *Speech First, Inc.*, 968 F.3d at 638; *accord Murthy v. Missouri*, 603 U.S. 43, 59 (2024) ("'Past exposure to illegal conduct' can serve as evidence of threatened future injury but 'does not in itself show a present case or controversy regarding injunctive relief' (cite omitted)); *Schmidling v. City of Chicago*, 1 F.3d 494, 499 (7th Cir. 1993) (no standing regardless whether there was prior enforcement of "earlier version of the ordinance"). Absent prior enforcement action, "[P]laintiffs must make one of two showings to show injury in fact." *Speech First, Inc.*, 968 F.3d at 638.

First, they may aver a *future* injury based on their "'intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and ... a credible threat of prosecution thereunder.'" *Carr*, 2024 WL 3819424, at *4 (quoting *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). This "credible threat" must be "particularized" to Plaintiffs, "affect[ing] the[m] in a personal and individual way." *Speech First, Inc.*, 968 F.3d at 638–39.

Second, Plaintiffs may demonstrate "a *current* injury if they have resorted to self-censorship out of an 'actual and well-founded fear' that the law will be enforced against them." *Carr*, 2024 WL 3819424, at *4 (citing *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (quoting *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988))). The "chilling effect" of "a potentially unconstitutional law being on the books is insufficient to justify federal intervention' in a pre-enforcement suit," even where the "law … is said to chill ... freedom of speech ...." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 50 (2021) (cite omitted). Rather, Plaintiffs "must show a chilling effect on speech that is objectively reasonable" (*Speech First, Inc.*, 968 F.3d at 638)—not "merely 'imaginary or speculative'" (*Brown*, 86 F.4th at 761) or "subjective" (*Laird v. Tatum*, 408 U.S. 1, 13–14 (1972))—and they "must substantiate

a concrete and particularized chilling effect on his protected speech or expressive conduct to pursue prospective relief" (*Speech First, Inc.*, 968 F.3d at 638–39 (cite omitted)). Litigants "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

"[M]any of these same precepts" also apply "in terms of ripeness," which "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Sweeney v. Raoul*, 990 F.3d 555, 559–60 (7th Cir. 2021) (cleaned up). The ripeness determination turns on the fitness of the issues for judicial review (*i.e.*, the adequacy of the factual record) and the hardship to the parties in withholding pre-enforcement review. *Id.* at 560; *see Smith v. Wisconsin Dep't of Agric., Trade & Consumer Prot.*, 23 F.3d 1134, 1141 (7th Cir. 1994).

    2.   <u>Plaintiffs Fail Their Burden to Show an Article III Basis for the Preliminary Injunction.</u>

Plaintiffs cannot square Article III with their requested preliminary injunction against the Pre-Approval Requirement. [ECF 73 at 1–2.]  To start, *no* Plaintiff claims to have experienced a prior enforcement action concerning the sole focus of the preliminary injunction for which they have moved [ECF 73]: the Amended Policy's Pre-Approval Requirement. Although five Plaintiffs (Akou, Phillips, Robinson, McDonald, Greene) say they received warning letters for their conduct, this was under the "***prior*** Policy [that] prohibited all expressive activity … occurr[ing] on University property from 11:00 p.m. to 6:00 a.m." [ECF 70 at 4, 10–11 (emph. added)]. The ***Amended*** Policy's Pre-Approval Requirement is materially distinct, facilitating pre-approval and covering only a fraction of the Expressive Activities within its predecessor. [*Compare* ECF 72-1, *with* ECF 69-1 at 80-85.]

Nor does *any* Plaintiff even try to meaningfully establish an "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged portion of the Amended Policy], and … a credible threat of prosecution thereunder" (*Carr*, 2024 WL 3819424, at *4 (cite omitted)) that is "particularized" to Plaintiffs and "affect[s] the[m] in a personal and

individual way" (*Speech First, Inc.*, 968 F.3d at 638–39). None claims, for example, that they will imminently organize and engage in a preplanned event without complying with Pre-Approval.

Instead, Plaintiffs' thesis seems to be that the Amended Policy's Pre-Approval Requirement has forced them to self-censor desired activities. [ECF 69-2 at 4; -3 at 3; -4 at 2; -5 at 2; -6 at 2; -7 at 3; -8 at 4; -10 at 2.] Yet this, too, goes nowhere, as Plaintiffs make no concrete, particularized showing that the Requirement has an "objectively reasonable chilling effect that is or imminently will cause them to miss out on activities in which they would otherwise engage. *E.g.*, *Speech First, Inc.*, 968 F.3d at 638–40 (plaintiff lacked standing to seek preliminary injunction against university policy that supposedly infringed free speech, as plaintiff failed to show particularized chilling—*i.e.*, plaintiff "has failed to identify in the record specific statements any students wish to make that the University's policies have chilled"). Several points so illustrate.

***First***, although Plaintiffs attack the Pre-Approval Requirement that, as the Standards explain, applies to "[p]replanned events during the overnight hours of 11:00 p.m. and 6:00 a.m." [ECF 69-1 at 86; ECF 70 at 7–8, 24], they fail to meaningfully identify even one such desired "[p]replanned" overnight "event" that any objectively reasonable, Requirement-based fear has or imminently will force them to miss. Instead, and unavailingly, Plaintiffs:

1) Broadly say they "recognize that important events occur" overnight and "they have a right to respond or recognize those events, without prior permission, even if the activity is preplanned in some way" [ECF 70 at 9; *accord id.* at 24]
2) Speculate in conclusory fashion that "situations may certainly arise when plaintiffs wish to have an organized protest to respond to an immediate event and do not want to wait for at least ten days to see if a protest will be allowed." [ECF 70 at 12.][4]

---

[4] *Compare also, e.g.*, ECF 70 at 10 (noting some protests are "spontaneous"), *with, e.g.*, ECF 69-2 at 1–4 (conclusory noting desire to protest and claiming to have "planned events before"); ECF 69-3 at 1–3 (conclusory noting desire to protest but identifying no desired overnight preplanned protest event that the Amended Policy is or imminently will be causing Plaintiff to miss); ECF 69-4 at 1–3 (same); ECF 69-5 at 1–3 (same); ECF 69-7 at 1–3 (same); ECF 69-8 at 1–4 (same); ECF 69-10 at 1–2 (same); ECF 69-11 at 1–3 (same); ECF 69-6 at 1–3 (same; saying, "there ***may*** be matters occurring that require a quick response about which I may wish to plan immediate protest events," but identifying no such ongoing or certainly impending instance (emph. added)); ECF 69-9 at 1–4 (similar; noting vague possibility that Plaintiff "***may*** wish to plan and organize … events" at some point (emph. added)).

None of that suffices. *E.g.*, *Schirmer v. Nagode*, 621 F.3d 581, 583, 587 (7th Cir. 2010) (denying requested preliminary injunction for want of standing, as movants lacked "standing to challenge the facial validity of the law that was misapplied to them"; a plaintiff lacks "standing for a First Amendment challenge if the statute in question clearly fails to cover [her] conduct" (cite omitted)).

***Next***, much of the conduct Plaintiffs reference is *not* covered by the Pre-Approval Requirement for yet additional reasons. Plaintiffs note [ECF 70 at 5–7] that the Amended Policy defines "Expressive Activity" to include various activities (*e.g.*, "[c]ommunicating by any lawful verbal, written, audio visual, or electronic means," "[c]arrying signs") and that the overnight Pre-Approval Requirement applies to some of those activities (*e.g.*, "protesting," "making speeches," "circulating petitions"), subject to various exceptions. [ECF 69-1 at 82 (exempting "spontaneously and contemporaneously assembl[ing] and distribut[ing] literature" and activities forming "part of a scheduled or authorized University activity extending into that time period").] But numerous activities cited by Plaintiffs cannot confer standing as they fall "clearly outside the [challenged provision's] scope" (*Schirmer*, 621 F.3d at 583, 587), for reasons beyond not being preplanned events.[5] For example, the Pre-Approval Requirement does *not* bar (and Plaintiffs cite no enforcement to the contrary):

1) Distributing "literature" [ECF 69-10 at 2]
2) Wearing "expressive t-shirts" or "t-shirts with messages" [ECF 69-2 at 2–4 (giving example of t-shirt that says "'love' in both English and Arabic"); -7 at 2–3; -8 at 2; *accord, e.g.*, ECF 70 at 14–15; *see also* ECF 69-3 at 2 (wearing keffiyeh)]
3) Wearing "religious items" [ECF 69-2 (Akou) at 2–4); *accord, e.g.*, ECF 70 at 18]
4) "[C]arrying" or holding signs [ECF 69-3 at 2; -5 at 2; -11 at 3; *see also* -9 at 2–3 ("displaying visual signs (a graphic t-shirt, a candle, or a poster)"]
5) "[T]alking" [ECF 69-4 at 2; -9 at 2–3; -5 at 2; -10 at 2; *accord* -7 at 3]
6) "[P]eaceably assembling with others" [ECF 69-3 at 2–3; -5 at 2; -9 at 3; -11 at 3 *see also* -9 at 2–3]

---

[5] Plaintiffs rely upon *Board of Airport Commissioners of the City of Los Angeles v. Jews for Jesus*, 482 U.S. 569 (1987), to support their position that the Policy is unconstitutional. However, in Jews for Jesus, the Supreme Court invalidated an airport policy that categorically banned all First Amendment activities, finding it unconstitutionally overbroad because it effectively silenced all expressive conduct in a public forum. *Id.* at 570. By contrast, the Policy regulates specific conduct and leaves ample alternative avenues for speech.

Further, noting that "spontaneous expression … is often the most effective kind" [ECF 70 at 15 (cite omitted)], Plaintiffs such as Wirtshafter and Murphy suggest they want to engage in "spontaneously and contemporaneously assembl[ing]" [ECF 69-1 at 82] or "peaceful distribution of literature" [*id.* at 87; *accord id.* at 82; ECF 69-1 at 20:9-14]. [ECF 69-7 at 1–2 (giving examples of "protests, rallies, and similar events" that continue to occur "on [IU's] Bloomington campus" "with little or no advance notice" in response to late-breaking news); ECF 69-11 at 1–2 (same).] Yet again, the Amended Policy is clear that it does *not* cover such activities. [ECF 72-2.] Perhaps realizing this, Wirtshafter and Murphy resort to suggesting [ECF 69-7 at 2; -11 at 1–2] that they are mere alumni who do not fit the Amended Policy's definition of "IU Community Members," which includes "any individual using Indiana University resources or facilities" [ECF 69-1 at 83]. But this only further refutes standing, as not using University resources means not using "University property"—the key University resource to which the Amended Policy expressly applies [ECF 69-1 at 80].

*Last*, Plaintiffs cannot manufacture standing through their unsupported insinuation that requests for approval are doomed or "will be denied." [*E.g.*, ECF 69-2 at 4.] They identify no concrete instances of desired activity that objectively reasonable, Policy-based fears are or imminently will be causing them to forgo. And, under the Amended Policy and Standards approval is favored:

1) "[G]enerally if [a requested] event is smaller than 100 persons, it's auto-approved." [ECF 69-1 at 53:8-11; *accord id.* at 50:4-18.]
2) "If it's 50 or more, but less than 100, and the submitter has selected the check box for controversial topic, speaker, or guest; high-profile dignitary, guest, or attendee; demonstration or protest; or exterior signs, symbols, banners, or light projections," then it goes to review by "subject matter experts" [ECF 69-1 at 53:23-54:4, 54:10-16], but there too the "approach is to always default to yes whenever possible" [ECF 69-1 at 50:22-51:8].

Plaintiffs have no basis to say otherwise, including because nine of the ten have *not* submitted any pre-approval requests, let alone any that was denied. [ECF 69-2, -3, -4, -5, -6, -7, -8, -9, -10, -11; *compare* ECF 69-2 at 3 (claiming to have applied to hold an event to occur before the Amended Policy and Pre-Approval Requirement existed).] At bottom, Plaintiffs fail to show concrete, particularized, actual

or imminent injury-in-fact, instead relying on misinterpretation of the Amended Policy (which cannot confer standing) and conclusory speculation about the future (which cannot confer ripeness). Article III precludes the claims and injunctive relief.

**B.      The Pre-Approval Requirement is a Permissible Time, Place, Manner Restriction.**

Beyond Article III, Plaintiffs are not entitled to their requested preliminary injunction in any event, having failed their heavy burden to demonstrate they are likely to prevail on the merits of their challenge to the Pre-Approval Requirement. Indeed, the Pre-Approval Requirement is a content-neutral, narrowly tailored policy providing ample alternative communications opportunities. Accordingly, it is a permissible time, place, and manner restriction.

The University acknowledges that by Indiana law Dunn Meadow and the other campus outdoor areas are "where protected expressive activities [cannot be] prohibited." Ind. Code § 21-39-8-9. Even so, under Indiana law and under the First Amendment, these areas can be subject to reasonable time, place, and manner restrictions. *Id.; see also Heffron*, 452 U.S. at 647 ("[T]he First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired."); *MacDonald*, 243 F.3d at 1025 ("Although [Plaintiff] has the right to demonstrate and speak freely on this issue, that right does not allow him and other participants to create chaos by disrupting traffic, impeding pedestrians, endangering themselves or other people, and otherwise causing gridlock on the busy streets and sidewalks of the city.").[6]

A permissible time, place, and manner restriction must be: (1) content neutral; (2) narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communication. *See Ward*, 491 U.S. at 791, 803 (upholding New York City regulations on protests in

---

[6] Defendants acknowledge that Indiana law uses a slightly different framing for these same concepts when evaluating the permissibility of time, place, and manner restrictions. *See, e.g.*, Ind. Code § 21-39-8-9. Defendants in this Brief use the framework imposed under the First Amendment, on which Plaintiffs base their claims. Indeed, any argument that IU violates **state law** would be unavailing in this federal action. *Ashley W. v. Holcomb*, 34 F.4th 588, 594 (7th Cir. 2022) ("[i]t is improper for a federal court to issue an injunction requiring a state official to comply with state law" (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 97–124 (1984))).

Central Park); *Frisby*, 487 U.S. at 487–88 (upholding City of Brookfield municipal ordinance prohibiting picketing targeting particular residences). Reasonable time, place, and manner restrictions can include permitting schemes that limit expression in public places. *Navratil*, 101 F.4th at 519–21.

  1. The Pre-Approval Requirement is Content Neutral.

  Because the Policy is content and viewpoint neutral, it is subject to intermediate scrutiny. *Ward*, 491 U.S. 781, 791. However, given the Policy's narrow application to public safety – a consistently recognized significant governmental interest, *see infra* at 24, the Policy is equally permissible under strict scrutiny. Based on its plain language, the Pre-Approval Requirement is content neutral. Government regulation of expressive activity is content-neutral so long as it is "justified without reference to the content of the regulated speech." *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984). "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791.

  When a regulation does not "single out a certain message for different treatment," it will be deemed to be content neutral.[7] *Weinberg v. City of Chicago*, 310 F.3d 1029, 1037 (7th Cir. 2002) (citing *Schultz v. Cumberland*, 228 F.3d 831, 840 (7th Cir. 2000)). The Supreme Court has "consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 72-75 (2022) (collecting cases) (holding that First Amendment precedent counsels "a rejection of the view

---

[7] Plaintiffs claim that the Pre-Approval Requirement is "viewpoint-based" because the Standards prioritize community engagement, including "partnerships with external organizations that align with the University's mission" over external requests. [ECF 70 at 21-22.] Plaintiffs misinterpret this provision to mean that the University prioritizes events that "align with the University's mission" and "makes no mention of private protests by University members." But Plaintiffs' position misreads the Standards. The Standards are not prioritizing events that "align with the University's mission." Rather, the Standards clarify when an outside organization is eligible to engage in an external partnership with the University. The University has many formalized partnerships with institutions of higher education, organizations, and governments around the world, which are used to support the University's academic mission and facilitate research and innovation. The development of partnerships with the University is typically a longer-term process that requires a sustained commitment to identify areas of mutual interest for collaboration. Given that an external partner is often acting in conjunction with the University (or on behalf of the University), it is entirely appropriate for the University to ensure that these long-term relationships are fully aligned with the University's mission.

that any examination of speech or expression inherently triggers heightened First Amendment concern.") (emphasis original); *see also, Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981) (holding that restrictions on "solicitation" are not content based and do not inherently present "the potential for becoming a means of suppressing a particular point of view," so long as they do not discriminate based on topic, subject matter, or viewpoint."); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("it has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was [] carried out by means of language." Because the Policy remains neutral in its enforcement and does not impose restrictions based on content, it does not trigger the heightened scrutiny reserved for content-based regulations.

This precedent demonstrates that regulations like the one at issue here fall well within the permissible bounds of First Amendment jurisprudence. Courts have repeatedly recognized that content-neutral restrictions serve legitimate governmental interests, such as maintaining order and ensuring equal access to public spaces, without infringing on free speech rights. Consequently, the Policy should be upheld as a lawful and appropriate measure that aligns with established Supreme Court doctrine. Indeed, the Standards expressly state that the University *will not* consider the message or viewpoint of the requestors when approving or denying requests. As the Standards explain, the Pre-Approval Requirement exists for events of a particular size, occurring at a particular time, or those with amplified sound, structure installation, or use of camping equipment. There is no mention of the event's purpose or the message that the event organizer is attempting to convey. Events are presumptively approved and are only denied based on space availability and the sufficiency of planning. The Supreme Court has held that similar permitting schemes are content-neutral and subject to intermediate scrutiny. *See, e.g., Thomas v. Chicago Park Dist.*, 534 U.S. 316 (2002) (permitting scheme was content neutral where "[n]one of the grounds for denying a permit has anything to do with the content of speech"). Thus, the Pre-Approval Requirement is content-neutral.

2.  The Pre-Approval Requirement is Narrowly Tailored to Serve a Substantial Interest.

Moreover, the Pre-Approval Requirement is narrowly tailored to promote the health and safety of all IU community members. Plaintiffs take two issues with the Pre-Approval Requirement: (1) the requirement to seek prior approval ten days in advance; and (2) the requirement to seek prior approval for nighttime events of small sizes. Both of these objections are properly rejected.[8]

A narrowly tailored regulation is one that "actually advances the state's interest (is necessary), does not sweep too broadly (is not overinclusive), does not leave significant influences bearing on the interest unregulated (is not underinclusive), and could be replaced by no other regulation that could advance the interest as well with less infringement of speech (is the least-restrictive alternative)." *Republican Party of Minnesota v. White*, 416 F.3d 738, 751 (8th Cir. 2005) (collecting cases). As discussed above, a valid time, place, and manner regulation must also serve significant governmental interests. *Ward*, 491 U.S. at 791. It is not a requirement that the regulation must be the "least restrictive or least intrusive means" of achieving the government's content-neutral goals. *Id.* at 798.

All that is required is that the restriction "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799 (quoting *Albertini*, 472 U.S. at 689); *see also Frisby*, 487 U.S. at 485 ("A complete ban can be narrowly tailored but only if each activity within the proscription's scope is an appropriately targeted evil.")). Similarly, the Supreme Court has noted that courts should not insert themselves into regulatory judgments more appropriately made by the states or the political branches of government. *Frisby*, 487 U.S. 474. Accordingly, a court should not

_____

[8] Plaintiffs also suggest that the Pre-Approval Requirement is overbroad because it applies to expressive conduct that is not a preplanned event and does not permit non-IU community members to "spontaneously and contemporaneously assemble" or peacefully distribute literature. But as explained above, this position contradicts the plain language of both the Policy and the Standards. Such misinterpretation, like the "[f]anciful," "[un]realistic" speculation arising from it, fails to establish that the challenged language has been unconstitutionally applied even as to Plaintiffs—let alone that the overall "ratio of unlawful-to-lawful applications is … lopsided enough" to satisfy their burden "to justify the 'strong' medicine' of facial invalidation for overbreadth," rather than the "usual[]" approach of "handl[ing] unconstitutional applications … case-by-case." *E.g., Hansen*, 599 U.S. at 770, 784-85.

strike down a regulation "simply because [the] court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Ward*, 491 U.S. at 800.

### a.    The University's Interest in Public Safety

As discussed above, the Policy was adopted to ensure the IU community's safety in light of ongoing and intensifying security concerns. [*Akou* Docket, ECF 27-1.] Public safety is a *significant* governmental interest. *See Navratil*, 101 F.4th at 520 ("The Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States to guard and protect.") (cleaned up); *McCullen v. Coakley*, 573 U.S. 464, 487 (2014) ("We have, moreover, previously recognized the legitimacy of the government's interest in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, [and] protecting property rights.'") (quoting *Schenck v. Pro-Choice Network Of W. New York*, 519 U.S. 357, 376 (1997)); *MacDonald*, 243 F.3d at 1025; *Marcavage v. City of Chicago*, 659 F.3d 626, 631 (7th Cir. 2011). Indeed, federal courts have recognized that "[a] college has a right to preserve the campus for its intended purpose." *Glover v. Cole*, 762 F.2d 1197, 1203 (4th Cir. 1985). As such, there can be no debate that the Policy addresses a substantial interest.

### b.    The Ten-Day Advanced Notice Requirement

Taking each of Plaintiffs' objections in turn, the requirement that pre-approval requests be submitted only ten days in advance easily surpasses this hurdle. Although courts have not prescribed a presumptively constitutional time period for requiring submittal of permit applications pre-event, courts generally consider the actual burden to the entity in processing the application when considering an advance notice requirement. *Thomas*, 227 F.3d at 925-26 (7th Cir. 2000) (upholding Chicago's 30-day advance notice requirement for parks or 60-day advance notice requirement for "special facilities are to be involved" because city processed thousands of applications from competing users).

As the Seventh Circuit has recognized, an approving entity "needs some time to decide whether to grant the permit and, if so, whether to impose conditions on the grant." *Church of Am.*

*Knights of Ku Klux Klan v. City of Gary, Indiana*, 334 F.3d 676, 682 (7th Cir. 2003). In determining a reasonable review period, courts consider the circumstances of the review, including "evidence that the authorities were being overwhelmed by thousands of applications." *Id.* And courts have had "no trouble finding deadlines between three and ten days to be reasonable." *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 518–19 (D.C. Cir. 2010); *see also, Thomas*, 534 U.S. at 318 (upholding a 14-day review period that could be extended for another 14 days).

Here, the University has reviewed over 1,500 requests to use University facilities in the last hundred days alone. [*See* ECF 69-1 at 36, 97-101.] These requests relate to each of the University's seven campuses across the state of Indiana, which each present unique challenges for safety and security.[9] [*See, id.*] Although the University has risen to the occasion and approved the overwhelming majority of requested events, this barrage of requests comes at a time when the University is chronically understaffed and under-resourced concerning event management and public safety. [*Id.*] Put simply, the present situation is far more onerous than in *Thomas*, 534 U.S. 316, where the Seventh Circuit noted that "it would be burdensome to require" a large city (with presumably more resources) to process the same number of applications in less than thirty days. *Thomas*, 227 F.3d at 926. Allowing the University one-third of the time upheld in *Thomas* to process pre-approval requests is reasonable under the circumstances.

          *c.*     *The Application of the Pre-Approval Requirement to Overnight Events*

Similarly, the Pre-Approval Requirement application to overnight events is also constitutionally permissible. The Supreme Court has explained that narrowly tailored permitting schemes are constitutionally permissible when the requirements: (1) do not delegate overly broad

---

[9] This point is further underscored by the testimony of the University's public safety and event management personnel. Based on their combined 100 years of experience with University policing and event management, the Policy is necessary to ensure the IU community's public health, safety, and welfare during overnight hours. [*Compare,* ECF 84-1, at 2-4 -2, at 2-4; -3, at 2-4; *with* ECF 69-3 through 69 -11 at 3 (Plaintiffs' lay opinions that they shouldn't have to seek preapproval because they simply don't want to do so).]

licensing discretion to a government official and (2) leave open ample alternatives for communication. *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992). Permitting schemes must "contain adequate standards to guide the official's decision and render it subject to effective judicial review," thereby eliminating the "risk that he will favor or disfavor speech based on its content." *Thomas*, 534 U.S. at 323; *compare id.* at 324 (upholding scheme that provided several "reasonably specific and objective" grounds for denying a permit and did "not leave the decision to the whim of the administrator") *with Forsyth County, Ga.*, 505 U.S. at 133 (striking down scheme that contained "no articulated standards" and did "not require [reliance] on any objective factors") and *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 769 (1988) (plurality) (striking down licensing scheme that allowed officials to subject permit applications to "such other terms and conditions deemed necessary and reasonable by the Mayor" because "the face of the ordinance itself contain[ed] no explicit limits on the mayor's discretion").

Although some courts have struck down permitting requirements that do not have exceptions for small groups, the Eighth Circuit has recognized that *universities have unique concerns* that factor into review of the university's speech policy. More specifically, the Eight Circuit distinguished university settings from others because "a university is less able than a city or other entity with police powers to deal with a significant disruption on short notice." *Bowman v. White*, 444 F.3d 967, 982 (8th Cir. 2006). Other circuits have similarly recognized that universities are less equipped than cities to respond to disruptions on short notice. *See Am. C.L. Union v. Mote*, 423 F.3d 438, 445 (4th Cir. 2005).

Based on the unique challenges confronted by universities, the *Bowman* court upheld a permit requirement that applies to a single speaker. *Bowman*, 444 F.3d at 981 (explaining that whether the requester was "speaking alone or with others, carrying a sign, or handing out literature, he has demonstrated the capacity to attract a crowd and disrupt the unique educational environment"). As a result, the Eight Circuit determined that "the permit requirement is justified to 'coordinate multiple

uses of limited space,' 'assure preservation of the [campus],' 'prevent uses that are dangerous' to students or other people, and 'to assure financial accountability for damage' caused by [the requested] event." *Id.* quoting (*Thomas*, 534 U.S. at 322).

In this case, the Pre-Approval Requirement recognizes the unique challenges outlined in *Bowman* by distinguishing permitting requirements during the day versus at night. As explained above, overnight events and activities present heightened security and safety issues to the University community, which includes tens of thousands of students, many of whom are minors. [*Akou* Docket, ECF 27-1.] Compounding the problem further, IUPD's ability to quickly and effectively respond is hampered when community threats occur after dark. [*Akou* Docket, ECF 27-1.] Given the *Bowman* court's reasoning that a small event on a university campus can quickly escalate to a group of several hundred people, the University's inability to respond quickly to overnight events justifies the Pre-Approval Requirements modest application, even on small groups.

For all these reasons, the Pre-Approval Requirement is a narrowly tailored time, place, and manner restriction to address a substantial governmental interest.

3.   The Pre-Approval Requirement leaves ample alternatives for communication.

Finally, a time, place, or manner regulation must "leave open ample alternatives for communication." *Forsyth County, Ga.*, 505 U.S. at 130. The Seventh Circuit explained that "[s]o long as the amount of speech left open is ample, it is not fatal that the regulation diminishes the total quantity of speech." *City of Watseka v. Illinois Pub. Action Council*, 796 F.2d 1547, 1553 (7th Cir. 1986), *aff'd*, 479 U.S. 1048 (1987); *see also Wisconsin Action Coal. v. City of Kenosha*, 767 F.2d 1248, 1256 (7th Cir. 1985) ("The government should also show that the alternatives to the prohibited activities are ample and adequate."). In making this determination, courts consider the "methods of communication and asks whether those methods not prohibited by challenged regulation are equivalent to prohibited methods." *Wisconsin Action Coalition*, 767 F.2d at 1254. An adequate alternative, however, "does not

have to be the speaker's first or best choice, or one that provides the same audience or impact for the speech." *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000) (citations omitted).

The Pre-Approval Requirement leaves a significant number of alternative channels for communication including: (1) daytime events; (2) nighttime events that have been approved; (3) spontaneous and contemporaneous assembly at any time; (4) the peaceful distribution of literature at any time; or (5) any other form of expressive conduct that is not an event requiring preapproval, as explained by the Standard. And of course social media is ubiquitous and instantaneous, providing an immediate ability to reach thousands, even millions. Plaintiffs' intended message would not be "rendered useless or is seriously burdened" by using these alternative channels for communication. *Weinberg*, 310 F.3d at 1041. Accordingly, ample alternative channels of communication remain open to Plaintiffs, and therefore this prong of the test is satisfied.

## C.    The Balance of Harms Weighs Against Granting Preliminary Injunction

Finally, Plaintiffs' Motion is properly denied because the balance of harms weighs in favor of not entering a preliminary injunction. *See Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 966 (7th Cir. 2018). Once a moving party has met its heavy burden of establishing the threshold requirements for a preliminary injunction (not achieved here), the Court must balance the harms faced by both parties and the public as a whole by "weigh[ing] the balance of potential harms on a 'sliding scale' against the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015). "The sliding scale approach is not mathematical in nature, rather it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief." *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012) (cleaned up). "Stated another way, the district court

'sit[s] as would a chancellor in equity' and weighs all the factors, 'seeking at all times to minimize the costs of being mistaken.'" *Id.* (quoting *Abbott Laboratories*, 971 F.2d at 12).

Here, the harm to the public and to the University is not hypothetical. It is well-established that universities have interests in "being allowed to manage their affairs and shape their destiny free of minute supervision by federal judges and juries," and in "maintain[ing] an atmosphere conducive to learning." *Brandt v. Bd. of Educ. of City of Chicago*, 480 F.3d 460, 467 (7th Cir. 2007); *see also Am. Future Sys., Inc. v. Pennsylvania State Univ.*, 752 F.2d 854, 865 (3d Cir. 1984) ("[A] public university has a significant interest in carrying out its educational mission, and that this interest necessarily gives it some power to regulate its students' lives."). As discussed above, the University enacted the Policy in response to significant and escalating threats to the IU community. The nighttime political events leading to the Policy's enactment have been the source of significant strain on University resources and of threats, harassment, and intimidation to IU students, many of whom were unrelated and uninvolved in the events at issue. The University has had to spend significant time and resources removing vandalism and cleaning up trash following evening activities.

Moreover, because of continuous and overnight use, Dunn Meadow—a historically significant portion of IU's Bloomington campus—had to be closed for a significant period for environmental remediation. Along with the entire IU community losing access to this space for an extended period, the University was forced to incur over $260,000 in remediation costs. *See* "Dunn Meadow repair costs significantly higher than IU's initial estimate," https://tinyurl.com/mrxjxw8v. These are real threats and costs to both the University and the public.

In contrast, Plaintiffs are free to engage in a wide variety of expressive conduct with no University involvement, including: (1) the peaceful distribution of literature at any time; (2) spontaneous or contemporaneous assembly at any time; (3) preplanned daytime events of fewer than 50 people; or (4) any of the other forms of expressive activity that the Policy does not regulate,

including the vast platforms of social media. If Plaintiffs wish to host a large event or an overnight event, Plaintiffs could simply complete (and, in at least two instances, already have completed) the short, presumptively approved event request form, which simply asks for basic event planning information. Accordingly, Plaintiffs would experience little, if any, harm if their Motion is denied.

Because the limited harm to Plaintiffs substantially outweighs the risk to the University and to the public, the balance of harms weighs in favor of not entering a preliminary injunction.

## IV.     Conclusion

The Policy requires minimal notice for a limited category of events to ensure that the University has sufficient time to curtail real and serious threats to the University and its community. The Policy leaves ample alternative avenues for expressive conduct, including the conduct that Plaintiffs *seek* to engage in. Accordingly, a preliminary injunction is unwarranted.[10]

Respectfully submitted,

*/s/ John R. Maley*
John R. Maley
Dylan A. Pittman
Amanda Jane Gallagher
Charity Seaborn
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
Telephone: (317) 231-7464
Email: jmaley@btlaw.com
dylan.pittman@btlaw.com
amanda.gallagher@btlaw.com
charity.seaborn@btlaw.com

*Counsel for Defendants*

---

[10] To the extent that the Court were to find at this early stage that the Pre-Approval Requirement is impermissible, the presumption of severability counsels that this provision should be severed from the Policy's remaining provisions, which, as noted, Plaintiffs are not challenging. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 625 (2020) ("the Court should 'refrain from invalidating more of the statute than is necessary'" (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652–53 (1984))). Indeed, the Supreme Court has noted its preference to "enjoin only the unconstitutional applications of a statute while leaving other applications in force, or to sever its problematic portions while leaving the remainder intact." *Ayotte*, 546 U.S. at 328–29 (internal citations omitted). For these reasons, the Pre-Approval Requirement is properly considered separately from the remainder of the Policy.