UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JASPER WIRTSHAFTER, *et al.*,       )
                                    )
        Plaintiffs,                 )
                                    )
            v.                      )        No. 1:24-cv-00754-RLY-MJD
                                    )
PAMELA WHITTEN, in her individual and )
official capacity as President of Indiana )
University, *et al.*,               )
                                    )
        Defendants.                 )

---

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

---

Gavin M. Rose
Kenneth J. Falk
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
grose@aclu-in.org
kfalk@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiffs

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................................................iv

**STATEMENT OF THE ISSUES**.................................................................................... 1

**INTRODUCTION** ........................................................................................................ 2

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE** ................................. 4

I.   Since the 1960s, Indiana University has recognized Dunn Meadow as a public forum dedicated to the free exchange of ideas ................................................................................ 4

II.  After the 1969 Policy was amended on the eve of planned demonstrations in April 2024 and the plaintiffs were arrested during those demonstrations, the individual-capacity defendants barred them from exercising their expressive rights on Indiana University property ............. 5

  A.  Indiana University amended the 1969 Policy during a late-night meeting, and the individual-capacity defendants determined that any protesters arrested during the demonstrations would be banned from university property............................................ 5

  B.  During protests in late April of 2024, the plaintiffs were all arrested for allegedly refusing to leave Dunn Meadow when instructed to do so and were banned from Indiana University property for between one year and five years................................................. 6

  C.  After the "trespass warnings" had each been in effect for a period of time, Indiana University decided to "stay" the warnings issued to seven of the ten plaintiffs and ultimately rescinded the warnings issued to all plaintiffs ................................................. 9

  D.  During the period of time that their "trespass warnings" were in effect, the plaintiffs were all prevented from engaging in expressive activity in a public forum in which they wished to engage.................................................................................................................. 10

III. After the Dunn Meadow demonstrations, Indiana University enacted expressive activity policies that, as currently crafted, prohibit expressive activity during late night hours, at least without prior permission, and the plaintiffs are dramatically affected by this prohibition.... 11

  A.  In August 2024, Indiana University prohibited all expressive activity during late night hours, resulting in disciplinary action against several plaintiffs ...................................... 11

  B.  In November 2024, Indiana University amended its earlier policy to allow expressive activity during the nighttime hours but, for most activity, only if permission is secured in advance ............................................................................................................................. 12

C.  The plaintiffs all wish to engage in expressive activity in the many public spaces of Indiana University that are rife with other activity late at night, but they object to the requirement that they obtain prior permission to do so ................................................................... 15

**SUMMARY JUDGMENT STANDARD** ................................................................... 17

**ARGUMENT** ................................................................................................................ 18

I.  The "trespass warnings" issued to the plaintiffs in April 2024 violated the First Amendment and they are entitled to their damages against the individual-capacity defendants, although the amount of these damages must await trial ........................................................ 18

A.  The "trespass warnings" issued to the plaintiffs constituted prior restraints on expressive activity in a public forum and are therefore subject to strict scrutiny under the First Amendment ............................................................................................................... 18

B.  The "trespass warnings" fail any level of scrutiny and therefore violate the First Amendment ............................................................................................................... 21

1.  The "trespass warnings" fail strict scrutiny ............................................. 22

2.  Even if time, place, and manner analysis is applied, the "trespass warnings" fail this test .................................................................................................................. 25

C.  The individual-capacity defendants are liable for the constitutional violations .............. 26

II.  The August 2024 Policy violated the First Amendment and Prof. Akou, Mr. Greene, Prof. McDonald, Prof. Phillips, and Prof. Robinson are entitled to an injunction requiring the expungement of disciplinary action taken against them under this policy .......................... 27

A.  The plaintiffs' challenge to the August 2024 Policy is not moot ................................... 27

B.  The August 2024 Policy, which banned *any* "expressive activity" between 11:00pm and 6:00am, was plainly unconstitutional ........................................................................ 28

III. The November 2024 Policy violates the First Amendment and must be enjoined ............. 30

A.  The November 2024 Policy is substantially and unconstitutionally overbroad insofar as it requires that even individuals and small groups engaging in expressive activity obtain advance permission before doing so .......................................................................... 31

1.  A wide array of authority holds small-group permitting requirements to be unconstitutionally overbroad as they do not advance any legitimate purpose .......... 31

2.  The November 2024 Policy is not saved because it applies only at night or because it contains an exception for unplanned events that respond to late-breaking news .... 33

B.  The November 2024 Policy is neither content nor viewpoint neutral and fails the requisite strict scrutiny ................................................................................................. 35

C.  The November 2024 Policy is unconstitutional even if it is assessed under traditional time, place, and manner analysis ................................................................................. 37

1.  The November 2024 Policy is not narrowly tailored ............................................... 37

2.  The November 2024 Policy does not leave open ample alternative channels of communication ..................................................................................................... 39

**CONCLUSION** ........................................................................................................... 40

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Alexander v. United States*, 509 U.S. 544 (1993) ........................................................... 20,21

*American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600 (6th Cir. 2005) ............. 31,37

*Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986) ........................................................ 20,21

*Benkendorf v. Village of Hazel Crest*, 804 F.2d 99 (7th Cir. 1986) ....................................... 27

*Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus*, 482 U.S. 569 (1987) .................... 30

*Boardley v. U.S. Dep't of Interior*, 615 F.3d 508 (D.C. Cir. 2010) ....................................... 38

*Boos v. Barry*, 485 U.S. 312 (1988) ..................................................................... 29

*Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000) ......................................................... 29

*Brown v. Kemp*, 86 F.4th 745 (7th Cir. 2023) ......................................................... 35,36

*Chavez v. Ill. State Police*, 251 F.3d 612 (7th Cir. 2001) ............................................ 26,27

*Church of Am. Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676 (7th Cir. 2003) .................... 31

*City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984) .............................. 28

*City of Austin, v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61 (2022) ......................... 36

*Coalition to March on the RNC v. City of Milwaukee*, 2024 WL 3358149 (E.D. Wis. July 8, 2024) ...... 22,23

*Cohen v. California*, 403 U.S. 15 (1971) ................................................................ 29

*Collin v. Chicago Park Dist.*, 460 F.2d 746 (7th Cir. 1972) ...................................... 2,20,22,24

*Cox v. City of Charleston*, 416 F.3d 281 (4th Cir. 2005) ................................................ 32

*Cox v. Louisiana*, 379 U.S. 536 (1965) ................................................................. 18

*Doe v. Cummins*, 662 Fed. App'x 437 (6th Cir. 2016) .................................................... 28

*Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019) ..................................................... 28

*Douglas v. Brownell*, 88 F.3d 1511 (8th Cir. 1996) ..................................................... 32

iv

*Employment Division v. Smith*, 494 U.S. 872 (1990) .................................................................22

*Entmt. Concepts, Inc. v. Maciejewski*, 631 F.2d 497 (7th Cir. 1980)...................................20

*Flint v. Dennison*, 488 F.3d 816 (9th Cir. 2007) .......................................................................28

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) .............................................18

*Frisby v. Schultz*, 487 U.S. 474 (1988) ............................................................................. 25,37

*Gillespie v Trans Union Corp.*, 482 F.3d 907 (7th Cir. 2007) ...............................................34

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..................................................................18

*Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 63 F.3d 581 (7th Cir. 1995).........29

*Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir. 1994) ....................................31,32,34

*Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048 (7th Cir. 2004) ...........................33

*Knowles v. City of Waco*, 462 F.3d 430 (5th Cir. 2006) ..........................................................38

*Levine v. U.S. Dist. Court for the Cent. Dist. of Ca.*, 764 F.2d 590 (9th Cir. 1985) .........20,22

*Logan v. Commercial Union Ins. Co.*, 96 F.3d 971 (7th Cir. 1996) ......................................18

*Marcavage v. City of Chicago*, 659 F.3d 626 (7th Cir. 2011) ................................................31

*NAACP v. Button*, 371 U.S. 415 (1963).....................................................................................25

*NAACP, Western Region v. City of Richmond*, 743 F.2d 1346 (9th Cir. 1984) ..................32

*Nebraska Press Ass'n v. Stuart*, 427 U.S. 539 (1976) ............................................................19

*Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971) ................................................... 19,20

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983)........................ 18,19

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015).................................................................. 35,36

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988)......................................26

*Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046 (7th Cir. 2008) ...........................19

*Sanville v. McCaughtry*, 266 F.3d 724 (7th Cir. 2001)...........................................................26

*Schneider v. State of N.J., Town of Irvington*, 308 U.S. 147 (1939) ....................................26

*Scott v. City of Daytona Beach*, 740 F. Supp. 3d 1205 (M.D. Fla. 2024) ........................................33

*Sec'y of State of Md. v. J.H. Munson Co.*, 467 U.S. 947 (1984) ................................................. 28,29

*Sizelove v. Madison-Grant United Sch. Corp.*, 597 F. Supp. 3d 1246 (S.D. Ind. 2022) ................................28

*Smith v. Exec. Dir. of Ind. War Memorials Comm'n*, 742 F.3d 282 (7th Cir. 2014)...........................31,34,38

*South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) ........................................ 22,37

*Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011)..........................................................................18

*Tanner v. Ziegenhorn*, 2020 WL 5648642 (C.D. Ark. Sept. 22, 2020) ........................................37

*Thayer v. City of Worcester*, 144 F. Supp. 3d 218 (D. Mass. 2015) ..........................................29

*Turner v. Plafond*, 2011 WL 62220 (N.D. Cal. Jan. 7, 2011)..........................................................39

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)............................................................passim

**Statutes**

Ind. Code § 21-39-8-5 ........................................................................................................19

Ind. Code § 21-39-8-6 ................................................................................................. 19,28

Ind. Code § 21-39-8-9(b) ...............................................................................................19

Ind. Code § 35-43-2-2(b) ......................................................................................... 21,23

Ind. Code § 35-50-3-2 .....................................................................................................21

**Other Sources**

Dictionary.com, *protest*, *at* https://www.dictionary.com/browse/protest ................................36

Minutes of the Bd. of Trustees of Ind. Univ., July 19, 1963, *available at* https://webapp1.dlib.indiana.edu/iubot/view?docId=1963-07-18&doc.view=print&toc.depth=1&toc.id=d1e119&brand=iubot ..........................................................................................................................................4

The Onion, *How Universities Are Cracking Down On Palestine Protests*, Sept. 2, 2024, *at* https://theonion.com/how-universities-are-cracking-down-on-palestine-protests ..........................................29

## STATEMENT OF THE ISSUES

As on many college campuses across the country, beginning in late April of 2024 protests concerning the war in Gaza and the plight of the Palestinian people took root in Dunn Meadow, a large open area—and designated "Assembly Ground"—on the Bloomington campus of Indiana University. These since-consolidated cases arise from (a) the decision to ban persons arrested during the protests from returning to university property to exercise their First Amendment rights and (b) successive attempts by Indiana University to dramatically curtail late-night expressive activity on its property. Pursuant to Local Rule 7-1(e)(3), the issues presented for review are as follows:

1.      Whether the issuance of "trespass warnings" to each of the plaintiffs, which had the effect of prohibiting them from entering property operated by Indiana University and thereby prevented them from participating in the ongoing protests in Dunn Meadow as well as other expressive activities, violated the First Amendment to the United States Constitution such that President Pamela Whitten and Superintendent Benjamin Hunter are liable for monetary damages.

2.      Whether a since-superseded policy in effect from August 1st through November 15th of 2024, which prohibited all expressive activity on Indiana University property between 11:00pm and 6:00am, violated the First Amendment to the United States Constitution such that formal disciplinary warnings that were issued to five of the plaintiffs for violating the policy must be expunged.

3.      Whether Indiana University's current expressive activity policy—which requires advance permission for all protests and speeches, as well as for the circulation of petitions, taking place on university property between 11:00pm and 6:00am, subject only to a narrow exception for certain "spontaneous and contemporaneous" unplanned activities—violates the First Amendment to the United States Constitution, particularly given that it applies even to individual or small-group protests while leaving entirely unregulated countless other activities that routinely take place on campus late at night.

1

## Introduction

In the 1960s, at the height of the Civil Rights Movement and then the Vietnam War, Indiana University officially designated Dunn Meadow—a 20-acre open space on its Bloomington campus—as an "Assembly Ground" dedicated to the free exchange of ideas on all subjects. The policies formalizing this designation appear to have served the university well, for after procedural rules were adopted in September 1969 they went unaltered for more than 55 years. That changed during a late-night meeting on April 24, 2024, the day before demonstrations concerning the plight of the Palestinian people were planned to commence in Dunn Meadow. Indiana University's response to these demonstrations, and the subsequent amendments to its university-wide expressive activity policy have given rise to these since-consolidated cases.

First, in the original action, the plaintiffs seek their damages against President Pamela Whitten and Superintendent Benjamin Hunter, both of whom were instrumental in issuing "trespass warnings" to the plaintiffs after their arrests for misdemeanor trespass during the protests on April 25th or April 27th. As is relevant here, these warnings prohibited the plaintiffs from returning to Dunn Meadow to participate in the ongoing demonstrations or from entering a wide array of other university property to exercise their First Amendment rights. Whether or not the plaintiffs were properly subject to arrest in the first place is not at issue here, for the Seventh Circuit long ago held that past wrongdoing may only justify a curtailment of expressive rights in a public forum if it creates "a well-founded belief that violence would occur" if an individual is allowed to return to that forum. *Collin v. Chicago Park Dist.*, 460 F.2d 746, 754 (7th Cir. 1972). That standard is most assuredly not met here. In fact, university officials have already recognized as much, for within a week they had "stayed" the "trespass warnings" issued to seven of the ten plaintiffs and they ultimately rescinded the warnings issued to all plaintiffs. Before this happened, however, the plaintiffs were all denied the ability to exercise their First Amendment rights. They are entitled to their damages resulting from this violation.

And second, in the action initially filed under Cause No. 1:24-cv-01469-TWP-MJD, in two university-wide policies enacted by its Board of Trustees in the wake of the Dunn Meadow protests, Indiana University first prohibited *all* late-night expressive activity and currently prohibits persons from engaging in any sort of protest activity, speeches, or circulation of petitions, absent advance permission, between 11:00pm and 6:00am. This is so even though the public areas of its Bloomington campus are vibrant with groups of people engaging in a wide array of activities, unregulated by the university, during these hours: persons can be found, for instance, returning to campus from nearby restaurants and bars, participating in sky-watching events sponsored by the astronomy department, engaging in celebrations after sporting events, or simply "hanging out" or listening to music in the many open areas on campus. Five of the plaintiffs were formally disciplined when the since-superseded policy prohibiting all late-night expressive activity was in effect, and they are entitled to have these disciplinary actions expunged. And the restriction on nighttime activity contained within the current version of Indiana University's expressive activity policy—formally designated "Expressive Activity Policy – UA-10"—violates the First Amendment for a wide array of reasons. The plaintiffs all wish to engage in expressive activity governed by this restriction and they are therefore detrimentally affected by the policy. They are entitled to an injunction prohibiting the official-capacity defendants from enforcing the policy's nighttime restriction.

The bottom line here is that both the plaintiffs' damages claim and their injunctive claim revolve around significant intrusions on the right to engage in expressive activity in a public forum, where First Amendment protections are at their zenith. There are no disputed issues of material fact related to the merits of the plaintiffs' legal claims, and they are therefore entitled to summary judgment on all issues except the amount of their damages. Their damages, of course, must await trial.[1]

---

[1]    The plaintiffs' injunctive claim has been fully briefed in the context of their request for a preliminary injunction. (*See* Dkts. 70, 85 & 89). Portions of this brief are therefore taken, substantially verbatim, from earlier briefing in this cause. Documents filed under the original cause number (that is, 1:24-cv-00754-RLY-

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**I.    Since the 1960s, Indiana University has recognized Dunn Meadow as a public forum dedicated to the free exchange of ideas**

Dunn Meadow is a large, 20-acre open area on the campus of Indiana University in Bloomington.  (Dkt. 80 ¶ 10).  It is in close proximity to the Indiana Memorial Union (which contains a hotel, the student bookstore, and a variety of other offices and amenities), Ernie Pyle Hall (which contains, among other things, the Office of Admissions), and other university buildings and amenities.  (Dkt. 97-1 ¶ 3; Dkt. 97-8 ¶ 3).  It is bordered on the west by Indiana Avenue and on the north by Seventh Street (both of which see significant vehicular and pedestrian traffic), and on the south and east by a well-traveled pedestrian walkway adjacent to a creek that runs through campus.  (Dkt. 97-1 ¶ 3; Dkt. 97-8 ¶ 3).

On July 19, 1963, the Trustees of Indiana University ("the Trustees")—adopting the recommendations of the Faculty Council Special Committee on Student Demonstrations—formally established Dunn Meadow "as the Indiana University Assembly Ground," where "members of the University community may express themselves freely on all subjects, within the limits of applicable laws and regulations, with or without advance notice."  Minutes of the Bd. of Trustees of Ind. Univ., July 19, 1963, at ¶ 6(a)(2), *available at* https://webapp1.dlib.indiana.edu/iubot/view?docId=1963-07-18&doc.view=print&toc.depth=1&toc.id=d1e119&brand=iubot (last visited May 15, 2015).  This designation was further formalized in a policy enacted in 1969, in which the Trustees reiterated Dunn Meadow's designation "as a public forum for expression on all subjects."  (Dkt. 80 ¶ 11).  This "1969 Policy" further provided as follows:

> Universities in our civilization are places where dissenting and controversial views can be aired and discussed.  This exchange of views is not merely something to be tolerated; it is a source of diversity and strength for our society as a whole. . . .  [T]he

_____

TAB), whether filed before or after consolidation, are cited as "Dkt."  Documents filed under the second cause number prior to consolidation (that is, 1:24-cv-01469-TWP-MJD) are cited as "*Akou* Dkt."

mere fact that some find a demonstration distasteful is no more reason to ban it than to ban an idea the listener finds distasteful. We have reviewed the history of demonstrations in [Dunn Meadow]. . . . [T]his history shows us a lively and vigorous commitment to the exploration of matters of public concern: the vigor of that commitment is to us one of the measures of greatness in a university.

(Dkt. 1-1 at 1; Dkt. 22 ¶ 14). As alluded to in the policy itself, over the years Dunn Meadow has been the location of numerous protests, demonstrations, and other First Amendment expression on a variety of issues. (Dkt. 80 ¶ 12).

The 1969 Policy, extant for more than half a century, provided that signs, symbols, and structures could be used in expressive activities in Dunn Meadow, without advance permission, from 6:00am to 11:00pm. (*Id.* ¶ 13). Use of those temporary structures outside this time period required permission secured in advance. (*Id.*).

## II. After the 1969 Policy was amended on the eve of planned demonstrations in April 2024 and the plaintiffs were arrested during those demonstrations, the individual-capacity defendants barred them from exercising their expressive rights on Indiana University property

### A. Indiana University amended the 1969 Policy during a late-night meeting, and the individual-capacity defendants determined that any protesters arrested during the demonstrations would be banned from university property

Late in the evening of April 24, 2024, the day before demonstrations protesting the war in Gaza were to begin in Dunn Meadow, the 1969 Policy was changed by an ad hoc committee convened by Indiana University. (Dkt. 80 ¶ 14; Dkt. 97-1 ¶ 7; Dkt. 97-3 ¶ 7; Dkt. 97-6 ¶ 7). Under the changed policy, permission had to be obtained prior to the erection of temporary installations of any structures, including tents and signage, in Dunn Meadow, regardless of the time of day of the planned display. (Dkt. 80 ¶ 14). This policy change, however, did not alter the portion of the 1969 Policy that designates Dunn Meadow as a public forum, and Dunn Meadow remained and remains a public forum to this day. (*Id.* ¶ 15).

Also on the evening of April 24th, Pamela Whitten (the President of Indiana University) and Benjamin Hunter (the Associate Vice President and Superintendent for Public Safety), along with

other university personnel, discussed Indiana University's "enforcement of Indiana's criminal trespass statute" against protesters in Dunn Meadow. (Dkt. 97-11 at 1 [RFA No. 1]; *see also* Dkt. 80 ¶ 21). Superintendent Hunter directed Indiana University Police Department personnel to issue no-trespass orders to individuals arrested in Dunn Meadow during the planned demonstrations. (Dkt. 80 ¶ 24; Dkt. 97-11 at 3 [Interr. Nos. 1-3]). President Whitten was aware that no-trespass orders might be issued to protesters in Dunn Meadow and had the ability to prevent these orders from being issued, but she did not take any steps to do so. (Dkt. 80 ¶¶ 22-23; Dkt. 97-11 at 2 [RFA Nos. 3-5]).

**B. During protests in late April of 2024, the plaintiffs were all arrested for allegedly refusing to leave Dunn Meadow when instructed to do so and were banned from Indiana University property for between one year and five years**

On April 25, 2024 and subsequent days, the anticipated demonstrations took place in Dunn Meadow. (Dkt. 97-1 ¶ 8; Dkt. 97-2 ¶ 8; Dkt. 97-3 ¶ 8; Dkt. 97-4 ¶ 8; Dkt. 97-5 ¶ 8; Dkt. 97-6 ¶ 8; Dkt. 97-7 ¶ 8; Dkt. 97-8 ¶ 8; Dkt. 97-9 ¶ 8; Dkt. 97-10 ¶ 8).

All ten plaintiffs reside in Monroe County, Indiana: four (Heather Akou, David McDonald, Sarah Phillips, and Benjamin Robinson) are professors employed by Indiana University in Bloomington; one (Jess Tang) is an employee of Indiana University in Bloomington; three (Anjali Biswas, Bryce Greene, and Madeleine Meldrum) are graduate students at Indiana University in Bloomington; and two (Maureen Murphy and Jasper Wirtshafter) are alumni of Indiana University who continue to reside in Bloomington. (Dkt. 97-1 ¶¶ 1-2; Dkt. 97-2 ¶¶ 1-2; Dkt. 97-3 ¶¶ 1-2; Dkt. 97-4 ¶¶ 1-2; Dkt. 97-5 ¶¶ 1-2; Dkt. 97-6 ¶¶ 1-2; Dkt. 97-7 ¶¶ 1-2; Dkt. 97-8 ¶¶ 1-2; Dkt. 97-9 ¶¶ 1-2; Dkt. 97-10 ¶¶ 1-2). Each of the plaintiffs believes strongly that the ongoing war in Gaza, or what they consider to be the genocide of Palestinians by Israel, represents a grave injustice and a humanitarian crisis, and they are particularly concerned about the plight and well-being of the Palestinian people and, in light of the well-publicized atrocities in Gaza, are also concerned about Indiana University's financial ties to Israel. (Dkt. 97-1 ¶ 6; Dkt. 97-2 ¶ 6; Dkt. 97-3 ¶ 6; Dkt. 97-4 ¶ 6; Dkt. 97-5 ¶ 6; Dkt.

97-6 ¶ 6; Dkt. 97-7 ¶ 6; Dkt. 97-8 ¶ 6; Dkt. 97-9 ¶ 6; Dkt. 97-10 ¶ 6).  Given these concerns, each of

the plaintiffs attended the demonstrations in Dunn Meadow between April 25th and April 27th.  (Dkt.

97-1 ¶ 8; Dkt. 97-2 ¶ 8; Dkt. 97-3 ¶ 8; Dkt. 97-4 ¶ 8; Dkt. 97-5 ¶ 8; Dkt. 97-6 ¶ 8; Dkt. 97-7 ¶ 8; Dkt.

97-8 ¶ 8; Dkt. 97-9 ¶ 8; Dkt. 97-10 ¶ 8).

Several of the plaintiffs who attended the demonstrations on April 25th were at the time

unaware that the 1969 Policy had been amended late the previous evening to disallow the daytime use

of temporary structures absent prior approval.  (Dkt. 97-2 ¶ 8; Dkt. 97-4 ¶ 8; Dkt. 97-5 ¶ 8; Dkt. 97-

6 ¶ 8; Dkt. 97-8 ¶ 8; Dkt. 97-9 ¶ 8; Dkt. 97-10 ¶ 8).  Although at least two of the plaintiffs noticed

posted signage indicating that structures were not allowed even during the daytime, when they

consulted Indiana University's website, the website still displayed the 1969 Policy allowing structures

during the day.  (Dkt. 97-4 ¶ 8; Dkt. 97-8 ¶ 8; *see also* Dkt. 97-10 ¶ 8 [noticed signage in the days after

April 25th although the website continued to display the 1969 Policy]).  Professor Robinson believed

that this meant the signage articulated standards inconsistent with Indiana University's formal policies.

(Dkt. 97-8 ¶ 8).  Professor McDonald was similarly confused, and witnessed concern amongst many

protesters that they were being provided disinformation by Indiana University in order to dissuade

them from participating in the protest.  (Dkt. 97-4 ¶ 8).

Regardless, on April 25th, after engaging in nonviolent protest for a period of time, five of the

plaintiffs—Ms. Biswas, Prof. McDonald, Ms. Meldrum, Ms. Murphy, and Prof. Robinson—were

arrested for criminal trespass either for allegedly refusing to remove tents or for allegedly refusing to

disperse so that tents could be removed.  (Dkt. 97-2 ¶ 9; Dkt. 97-4 ¶ 9; Dkt. 97-5 ¶ 9; Dkt. 97-6 ¶ 9;

Dkt. 97-8 ¶ 9).  After their arrests, they each received a written "trespass warning" from Indiana

University.  (Dkt. 97-2 ¶ 10; Dkt. 97-4 ¶ 10; Dkt. 97-5 ¶ 10; Dkt. 97-6 ¶ 10; Dkt. 97-8 ¶ 10).  These

"trespass warnings" informed them that they had been "trespassed from" all Indiana University

properties, and further explained as follows:

7

> You are hereby notified that you are banned from reentering the above described property. Should you be found anywhere on the above described property at any time between the dates listed below you will be arrested for the offense of Criminal Trespass under Indiana Code IC 35-43-2-2, which may result in your being charged with a Class A Misdemeanor or a Level 6 felony. If you would like to appeal this warning, please contact the Indiana University Police Department administration.

(Dkt. 97-2 at 6; Dkt. 97-4 at 6; Dkt. 97-5 at 6; Dkt. 97-6 at 6; Dkt. 97-8 at 7). The warnings provided to each of these plaintiffs were set to expire on April 25, 2025—one year after their issuance. (Dkt. 97-2 at 6; Dkt. 97-4 at 6; Dkt. 97-5 at 6; Dkt. 97-6 at 6; Dkt. 97-8 at 7).

President Whitten was informed on or about April 25th that "trespass warnings" had been issued to Dunn Meadow protesters but took no steps to prevent similar warnings from being issued subsequent to that date and took no immediate steps to rescind or suspend the warnings that had already been issued or to order their rescission or suspension. (Dkt. 80 ¶ 25).

Two days later, on April 27th, the remaining plaintiffs—Prof. Akou, Mr. Greene, Prof. Phillips, Ms. Tang, and Mr. Wirtshafter—were arrested for identical reasons after engaging in nonviolent protest. (Dkt. 97-1 ¶ 9; Dkt. 97-3 ¶ 9; Dkt. 97-7 ¶ 9; Dkt. 97-9 ¶ 9; Dkt. 97-10 ¶ 9). Following their arrests, they each received similar "trespass warnings," although they were banned only from the Bloomington campus of Indiana University (and not from all Indiana University properties as the other plaintiffs had been). (Dkt. 97-1 at 6; Dkt. 97-3 at 7; Dkt. 97-7 at 6; Dkt. 97-9 at 6; Dkt. 97-10 ¶ 10).[2] The "trespass warnings" received by four of these individuals were set to expire one year and one day after their issuance (that is, on April 28, 2025). (Dkt. 97-1 at 6; Dkt. 97-7 at 6; Dkt. 97-9 at 6; Dkt. 97-10 ¶ 10). Mr. Greene's warning was not set to expire until April 28, 2029—more than five years after its issuance. (Dkt. 97-3 at 7).

---

[2]     In their operative complaint, the plaintiffs alleged that the "trespass warnings" issued to all plaintiffs barred them "from entering any Indiana University property for at least one year." (Dkt. 72 ¶ 20). This allegation was admitted by the defendants. (Dkt. 80 ¶ 20; *see also id.* ¶¶ 28, 31). Regardless, as indicated, the warnings themselves were limited to the Bloomington campus of Indiana University. Counsel apologizes for the earlier error, which is obviously not pertinent to the merits of the plaintiffs' First Amendment claim.

While all plaintiffs were also initially charged with misdemeanor trespass, these charges were voluntarily dismissed after the Monroe County Prosecutor declined to prosecute. (Dkt. 80 ¶ 19).

**C. After the "trespass warnings" had each been in effect for a period of time, Indiana University decided to "stay" the warnings issued to seven of the ten plaintiffs and ultimately rescinded the warnings issued to all plaintiffs**

Although the process for doing so was not very clear, each of the plaintiffs appealed the issuance of their "trespass warning." (Dkt. 97-1 ¶ 14; Dkt. 97-2 ¶ 14; Dkt. 97-3 ¶ 14; Dkt. 97-4 ¶ 14; Dkt. 97-5 ¶ 14; Dkt. 97-6 ¶ 14; Dkt. 97-7 ¶ 14; Dkt. 97-8 ¶ 14; Dkt. 97-9 ¶ 14; Dkt. 97-10 ¶ 14). Between April 29th and May 3rd, seven of the plaintiffs learned that their bans from Indiana University property had been "stayed" pending their appeals. (Dkt. 97-1 ¶ 14; Dkt. 97-2 ¶ 14; Dkt. 97-4 ¶ 14; Dkt. 97-5 ¶ 14; Dkt. 97-7 ¶ 14; Dkt. 97-8 ¶ 14; Dkt. 97-9 ¶ 14). Although Mr. Greene, Ms. Murphy, and Mr. Wirtshafter also requested stays, these requests were denied. (Dkt. 97-3 ¶ 14; Dkt. 97-6 ¶ 14; Dkt. 97-10 ¶ 14). The e-mails informing them of these denials explained that "[t]his means that you are still prohibited from coming on any IU property until further notice." (Dkt. 97-3 at 8; Dkt. 97-6 at 7; Dkt. 97-10 at 7). For Mr. Greene and Mr. Wirtshafter, this language was employed even though their warnings only banned them from the Bloomington campus. (Dkt. 97-3 at 7; Dkt. 97-10 ¶ 10).

Even though Indiana University refused to stay three of the plaintiffs' "trespass warnings" during the pendency of their appeals, on May 24th the Interim Chief of the Indiana University Police Department issued identical letters to at least six of plaintiffs granting their appeals. (Dkt. 97-1 at 7; Dkt. 97-5 at 7; Dkt. 97-6 at 9; Dkt. 97-7 at 7; Dkt. 97-8 at 8; Dkt. 97-10 at 9). These letters provided as follows:

> The Indiana University Police Department has considered your appeal of the trespass warning banning you from all Indiana University property. This trespass warning was issued to you on [4/25/2024 or 4/27/2024]. Please be advised that your appeal has been granted, and this trespass warning has been rescinded effective immediately.

(Dkt. 97-1 at 7; Dkt. 97-5 at 7; Dkt. 97-6 at 9; Dkt. 97-7 at 7; Dkt. 97-8 at 8; Dkt. 97-10 at 9). The other four plaintiffs also received notices that their appeals had been granted and that their "trespass

warnings" had been rescinded (Dkt. 97-2 ¶ 15; Dkt. 97-3 ¶ 15; Dkt. 97-4 ¶ 15; Dkt. 97-9 ¶ 15), although

Mr. Greene's warning was not rescinded until July (Dkt. 97-3 ¶ 15).

> ### D. During the period of time that their "trespass warnings" were in effect, the plaintiffs were all prevented from engaging in expressive activity in a public forum in which they wished to engage

The bottom line is that each of the plaintiffs was prevented by the "trespass warning" they

received from entering Indiana University property for a period of time ranging from a few days to

nearly three months.  (Dkt. 97-1 ¶ 16; Dkt. 97-2 ¶ 16; Dkt. 97-3 ¶ 16; Dkt. 97-4 ¶ 16; Dkt. 97-5 ¶ 16;

Dkt. 97-6 ¶ 16; Dkt. 97-7 ¶ 16; Dkt. 97-8 ¶ 16; Dkt. 97-9 ¶ 16; Dkt. 97-10 ¶ 16).  Because of these

warnings, they therefore did not return to Dunn Meadow to participate in the ongoing

demonstrations, although they desired to do so and would have done so were it not for the warnings.

(Dkt. 97-1 ¶ 13; Dkt. 97-2 ¶ 13; Dkt. 97-3 ¶ 13; Dkt. 97-4 ¶ 13; Dkt. 97-5 ¶ 13; Dkt. 97-6 ¶ 13; Dkt.

97-7 ¶ 13; Dkt. 97-8 ¶ 13; Dkt. 97-9 ¶ 13; Dkt. 97-10 ¶ 13).  They all wished to return to Dunn Meadow

to engage in these non-violent demonstrations even without the presence of tents.  (Dkt. 97-1 ¶ 13;

Dkt. 97-2 ¶ 13; Dkt. 97-3 ¶ 13; Dkt. 97-4 ¶ 13; Dkt. 97-5 ¶ 13; Dkt. 97-6 ¶ 13; Dkt. 97-7 ¶ 13; Dkt.

97-8 ¶ 13; Dkt. 97-9 ¶ 13; Dkt. 97-10 ¶ 13).

The inability to return to Dunn Meadow to participate in these demonstrations was felt

particularly acutely by the three plaintiffs for whom Indiana University refused to stay their "trespass

warnings," as this period of time was the height of the nationwide protest movement, present on many

college campuses, in support of Palestine and the Palestinian people.  (Dkt. 97-3 ¶ 17; Dkt. 97-6 ¶ 16;

Dkt. 97-10 ¶ 16).  By the time they were allowed to return to Dunn Meadow, the movement had

largely lost momentum.  (Dkt. 97-3 ¶ 17; Dkt. 97-6 ¶ 16; Dkt. 97-10 ¶ 16).

And, of course, the plaintiffs were all banned from entering Indiana University property to

engage in expressive activity unrelated to the ongoing Dunn Meadow protests as well.  (*See supra* at 7-

8).  Professor Robinson, for instance, had intended to attend—and speak at—a rally of the Indiana

Graduate Workers Coalition that took place at the Sample Gates on the Bloomington campus on April 29th. (Dkt. 97-8 ¶ 16). He was not able to attend this rally due to the "trespass warning" that had been issued against him, and he therefore had someone else read his remarks for him. (*Id.*).

III. **After the Dunn Meadow demonstrations, Indiana University enacted expressive activity policies that, as currently crafted, prohibit expressive activity during late night hours, at least without prior permission, and the plaintiffs are dramatically affected by this prohibition**

A. **In August 2024, Indiana University prohibited all expressive activity during late night hours, resulting in disciplinary action against several plaintiffs**

Following the protests in Dunn Meadow, on July 29, 2024 the Trustees enacted a new policy—"Expressive Activity Policy – UA-10"—which took effect on August 1, 2024. (Dkt. 72-1; Dkt. 80 ¶ 33). This "August 2024 Policy" regulated so-called "expressive activities" on any property of Indiana University. (Dkt. 72-1; Dkt. 80 ¶ 34). The definition of "expressive activities" was adopted from Indiana Code § 21-39-8-5, and thus included:

(1) Participating in speech or conduct protected by the First Amendment to the Constitution of the United States.
(2) Communicating by any lawful verbal, written, audio visual, or electronic means.
(3) Participating in peaceful assembly.
(4) Protesting.
(5) Making speeches, including speeches of guest speakers.
(6) Distributing literature.
(7) Carrying signs.
(8) Circulating petitions.

(Dkt. 72-1 at 6; Dkt. 80 ¶ 35). The August 2024 Policy thus prohibited *all* expressive activity, as defined, during nighttime hours: "Expressive Activity must take place between the hours of 6:00 a.m. and 11:00 p.m." (Dkt. 72-1 at 5; Dkt. 80 ¶ 36).

Violations of the August 2024 Policy could result in "immediate action by [Indiana] University including but not limited to citation, trespass, and/or interim suspension from campus." (Dkt. 72-1 at 7; Dkt. 80 ¶ 37). Students who violated the policy might also be subject to "suspension or expulsion from the University," and faculty and other employees might be subject to "suspension or termination

11

of University employment." (Dkt. 72-1 at 7; Dkt. 80 ¶ 37).

On August 25, 2024, four plaintiffs—Prof. Akou, Mr. Greene, Prof. Phillips, and Prof. Robinson—participated in a candlelight vigil, not disruptive in any way, at the Sample Gates that began at 11:30pm and that was designed to protest the August 2024 Policy and its temporal prohibition on expressive activity. (Dkt. 69-2 ¶¶ 7-11; Dkt. 69-4 ¶ 7; Dkt. 69-8 ¶¶ 7-11; Dkt. 69-9 ¶¶ 7-9). The Sample Gates are stone gates that form an entryway onto the campus and that frame a large sidewalk area and plaza. (Dkt. 69-8 ¶¶ 9-10). Prof. McDonald participated in a similar vigil on September 8, 2024. (Dkt. 69-5 ¶ 8; *id.* at 5). The four professors who participated in vigils all received written warnings from Indiana University for violating the August 2024 Policy. (Dkt. 69-2 ¶ 12; Dkt. 69-5 ¶ 8; Dkt. 69-8 ¶ 12; Dkt. 69-9 ¶ 10). The letters informed them that the warnings would be kept in their permanent personnel files and that "further violations of [the August 2024 Policy] and/or other University policies" may result in a variety of additional disciplinary sanctions, up to and including the termination of their employment. (Dkt. 69-2 at 6; Dkt. 69-5 at 5; Dkt. 69-8 at 7; Dkt. 69-9 at 6). And Mr. Greene, a graduate student, was likewise issued a formal notice indicating that he was being investigated for violating the August 2024 Policy. (Dkt. 88-1).

The disciplinary letters issued to Prof. Phillips and Prof. Robinson concluded as follows:

> On a personal note, let me add that I find the aspect of the overly broad application of expressive activity between the hours of 11:00 p.m. and 6:00 a.m. a problematic component of the policy and will continue to bring this issue to the attention of the campus. As you expressed so compellingly in our meeting I, too, am and remain deeply committed to IU and to the values of the College.

(Dkt. 69-8 at 7; Dkt. 69-9 at 6). Identical sentiments were expressed in the letter issued to Prof. McDonald. (Dkt. 69-5 at 6). The letter issued to Prof. Akou, on the other hand, warned of "the seriousness of th[e] violation of University policy." (Dkt. 69-2 at 6).

**B. In November 2024, Indiana University amended its earlier policy to allow expressive activity during the nighttime hours but, for most activity, only if permission is secured in advance**

Following the initiation of the *Akou* case (*Akou* Dkt. 1) and the filing of a preliminary-injunction motion (and supporting brief) targeted at the August 2024 Policy (*Akou* Dkt. 10; *Akou* Dkt. 21), the Trustees amended that policy on November 15, 2024.  (Dkt. 72-2; Dkt. 80 ¶ 41).  This "November 2024 Policy" superseded the August 2024 Policy and took effect immediately upon its approval by the Trustees.  (Dkt. 80 ¶ 41).

The November 2024 Policy retains the earlier policy's broad definition of "expressive activity." (Dkt. 72-2 at 7).  In pertinent part, it then provides as follows under the heading "Limited Content-Neutral Overnight Restrictions":

1. Pursuant to IC 21-39-8-9(b)(4), during the overnight hours of 11:00 p.m. to 6:00 a.m. IU Community Members may spontaneously and contemporaneously assemble and distribute literature.

2. For the protection of the University community and in furtherance of the educational mission of the University, from the overnight hours of 11:00 p.m. to 6:00 a.m. the activities listed below are prohibited on University property unless:

   a. they are part of a scheduled or authorized University activity extending into that time period, or

   b. prior written approval has been obtained from the appropriate University office . . . .

3. The Expressive Activities prohibited on University property during the overnight hours of 11:00 p.m. to 6:00 a.m. are:

   - protesting;
   - making speeches;
   - circulating petitions; and
   - all other unapproved conduct and activities otherwise prohibited by this Policy or applicable law.

(*Id.* at 5-6).  An "IU Community Member," who may "spontaneously and contemporaneously assemble and distribute literature," is defined as a university employee, a student or student organization, "[a]ll University units," university contractors, "[a]ny individual using Indiana University resources or facilities or receiving funds administered by Indiana University," and "[v]olunteers and

other representatives when speaking or acting on behalf of Indiana University." (*Id.* at 2-3).

As a formal policy approved by the Trustees, the November 2024 Policy, like the August 2024 Policy before it, controls over and supersedes all other policies, directives, or rules not approved by the Trustees. (Dkt. 69-1 at 9:3 – 10:2).[3] Nonetheless, in January 2025, Indiana University implemented a "University Space Use Pre-Approval Standard," which was not approved by the Trustees and therefore is controlled by the November 2024 Policy (and other Trustee-approved policies). (Dkt. 69-1 at 17:3 – 18:7, 86-89). This "Pre-Approval Standard" requires prior approval for events of more than fifty people taking place on university property between 6:00am and 11:00pm, as well as for any "[p]replanned event," regardless of size, taking place between 11:00pm and 6:00am. (*Id.* at 86). It then provides, "[f]or the sake of clarity," that prior approval is not required for "[p]replanned events of less [*sic*] than 50 persons that will not extend into the overnight hours of 11:00 p.m. to 6:00 a.m.," for "[s]pontaneous and contemporaneous assembly which occurs without prior planning or announcement for the purpose of an immediate and spontaneous response to a newsworthy occurrence," or for "[t]he peaceful distribution of literature at any time." (*Id.* at 87).

The terms "spontaneous," "contemporaneous," and "newsworthy" are not defined in the Pre-Approval Standard. (*Id.* at 86-89). The key is that if an event is preplanned, it is not "spontaneous and contemporaneous." (*Id.* at 20:4-8).

The Pre-Approval Standard further notes that, if competing requests are made for the use of the same space, space will be allocated based on the following categories, listed in terms of priority:

1. Academic Activities.
2. University-Sponsored Events, including events "hosted by faculty, staff, and officially recognized student organizations."
3. Community Engagement, including "events with external organizations that align with the University's mission."

---

[3]    Dkt. 69-1 is the transcript of the deposition of Doug Booher, the Associate Vice President of Events and Conferences for Indiana University – Bloomington. (Dkt. 69-1 at 4:14-24). He was deposed as the designate of the Trustees and President Whitten (in her official capacity) pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. (*Id.* at 73-76).

4.  External requests.

(*Id.* at 87-88).  An event "align[ing] with the University's mission" is an event that is consistent with the "expressed mission of the University in terms of teaching and learning."  (*Id.* at 29:14-25).

Any application to utilize university space must be submitted at least ten days before an event and must include information about the event, the expected number of attendees, an "Emergency Preparedness Plan," and "[a]ny special equipment or setup requirements."  (*Id.* at 88).  All applications will be approved so long as they satisfy the following criteria: (a) availability of the requested space, (b) "[c]ompliance with the general principles [of the Pre-Approval Standard]," and (c) "[a]dequacy of event planning (e.g., safety measures, setup needs)."  (*Id.*).  Among other things, however, applicants "may be required to pay applicable fees, including those for staffing, security, or cleaning, and must provide proof of liability insurance if necessary."  (*Id.* at 87).

### C. The plaintiffs all wish to engage in expressive activity in the many public spaces of Indiana University that are rife with other activity late at night, but they object to the requirement that they obtain prior permission to do so

In addition to Dunn Meadow—the designated "Assembly Ground" that is described in great detail above—the Bloomington campus of Indiana University contains numerous outdoor areas, "including grassy areas, walkways, and similar common areas," where people congregate at all hours. (Dkt. 69-8 ¶ 17; Dkt. 69-9 ¶ 17).  There is no campus curfew, and these areas are thus vibrant with groups of people engaging in various activities after 11:00pm and before 6:00am.  (Dkt. 69-8 ¶ 17; Dkt. 69-9 ¶ 17).  For instance, persons will often walk through campus on their return from nearby restaurants and bars, will depart the Indiana Memorial Union after its bowling lanes close, will participate in late-night sky-watching events on campus (some sponsored by the astronomy department), will attend fraternity parties that spill into Dunn Meadow, will engage in revelry in large numbers following a basketball game, will perform (or listen to) live music on campus, or will simply "hang out" in groups throughout campus.  (Dkt. 69-5 ¶ 11; Dkt. 69-8 ¶ 17; Dkt. 69-9 ¶¶ 14, 16).  All

of this happens after 11:00pm.  (Dkt. 69-5 ¶ 11; Dkt. 69-8 ¶ 17; Dkt. 69-9 ¶¶ 14, 16).

The plaintiffs all wish to engage in protests or similar activities, without seeking prior permission, after 11:00pm and before 6:00am.  (Dkt. 69-2 ¶¶ 18, 22-23; Dkt. 69-3 ¶¶ 10-13; Dkt. 69-4 ¶¶ 9-11; Dkt. 69-5 ¶¶ 7-10; Dkt. 69-6 ¶¶ 8-10; Dkt. 69-7 ¶¶ 10-11; Dkt. 69-8 ¶¶ 15-16; Dkt. 69-9 ¶¶ 11-15; Dkt. 69-10 ¶¶ 8-10; Dkt. 69-11 ¶¶ 9-10).  Prof. Akou, for instance, has previously engaged in peaceful and non-disruptive protests on campus after 11:00pm and wishes to make speeches and circulate petitions during this time without seeking prior permission.  (Dkt. 69-2 ¶¶ 6-11).  She wants to engage in such simple protests as wearing expressive t-shirts and religious items, but even this passive protest action cannot occur after 11:00pm without prior permission.  (*Id.* ¶¶ 18-19).  The remaining plaintiffs desire to engage in similar activities after 11:00pm without obtaining prior permission: some wish to participate in candlelight vigils (Dkt. 69-5 ¶ 7; Dkt. 69-6 ¶ 8); some wish to hold signs, wear t-shirts with messages, display religious items, or exhibit other visual symbols as a form of protest (Dkt. 69-3 ¶¶ 7-9; Dkt. 69-5 ¶ 6; Dkt. 69-7 ¶ 10; Dkt. 69-8 ¶ 7; Dkt. 69-9 ¶ 11; Dkt. 69-11 ¶ 10); some wish to peaceably assemble with others (Dkt. 69-3 ¶ 7; Dkt. 69-5 ¶ 6; Dkt. 69-9 ¶ 11); and some with to give speeches or circulate petitions (Dkt. 69-4 ¶ 10; Dkt. 69-7 ¶ 10; Dkt. 69-8 ¶ 7; Dkt. 69-9 ¶ 11; Dkt. 69-10 ¶ 8).  Moreover, the plaintiffs recognize that important events occur between 11:00pm and 6:00am, and they believe they have a right to respond to these events through expressive activity, without prior permission—even if the activity is preplanned in some way.  (Dkt. 69-2 ¶ 23; Dkt. 69-4 ¶ 11; Dkt. 69-5 ¶ 10; Dkt. 69-6 ¶ 12; Dkt. 69-8 ¶ 15; Dkt. 69-9 ¶ 12).

Many of the protest activities in which the plaintiffs wish to engage are likely to involve fewer people and be less disruptive than the wide range of non-expressive group activities that regularly take place on university property after 11:00pm.  (Dkt. 69-3 ¶ 14; Dkt. 69-6 ¶ 13; Dkt. 69-7 ¶ 10; Dkt. 69-8 ¶ 18; Dkt. 69-9 ¶ 17).

The plaintiffs uniformly object to having to apply for permission to exercise their First

Amendment rights.  (Dkt. 69-2 ¶ 23; Dkt. 69-3 ¶ 13; Dkt. 69-4 ¶¶ 6, 9; Dkt. 69-5 ¶ 6; Dkt. 69-6 ¶ 8; Dkt. 69-7 ¶ 12; Dkt. 69-8 ¶ 15; Dkt. 69-9 ¶¶ 11-12; Dkt. 69-10 ¶¶ 8-9; Dkt. 69-11 ¶ 9).  To be sure, even late at night, the November 2024 Policy allows an "IU Community Member" to "spontaneously and contemporaneously assemble and distribute literature."  (Dkt. 72-2 at 5).  While the precise contours of this exception may not be entirely clear, as noted, the exception does not apply to any preplanned activity (Dkt. 69-1 at 20:4-8) and the exception is entirely unavailable to Ms. Murphy and Mr. Wirtshafter (who are not "IU Community Members") (Dkt. 69-7 ¶ 7; Dkt. 69-11 ¶ 6).  The plaintiffs recognize that, even if they did not otherwise object to seeking permission to exercise their First Amendment rights, newsworthy events frequently call for a quick response, and situations arise when they wish to participate in an organized, and preplanned, protest in response to late-breaking news.  (Dkt. 69-2 ¶ 23; Dkt. 69-4 ¶ 11 Dkt. 69-5 ¶ 10; Dkt. 69-6 ¶ 12; Dkt. 69-9 ¶¶ 12, 15; Dkt. 69-10 ¶ 9).  When this happens, they obviously do not want to wait at least ten days to see if Indiana University will allow them to do so.  (Dkt. 69-2 ¶ 23; Dkt. 69-4 ¶ 11 Dkt. 69-5 ¶ 10; Dkt. 69-6 ¶ 12; Dkt. 69-9 ¶¶ 12, 15; Dkt. 69-10 ¶ 9).  And at least Ms. Biswas—who is employed by Indiana University—does not wish to identify herself as a protest organizer by seeking a permit, particularly if the event conflicts with positions the university has taken.  (Dkt. 69-3 ¶ 12).

## SUMMARY JUDGMENT STANDARD

The standard for the granting of summary judgment in the Seventh Circuit is clear:

[S]ummary judgment is warranted only if there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law.

The initial burden of production rests upon the moving party to identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  Once the moving party satisfies this burden, the nonmovant must set forth specific facts showing that there is a genuine issue for trial. . . . If no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law.

17

*Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996) (internal citations and quotations omitted).

**ARGUMENT**

**I.    The "trespass warnings" issued to the plaintiffs in April 2024 violated the First Amendment and they are entitled to their damages against the individual-capacity defendants, although the amount of these damages must await trial**

The plaintiffs' damages claim in this case presents a single, discrete legal issue: may a governmental entity deny individuals the ability to exercise their expressive rights in a public forum due exclusively to an allegation that they behaved inappropriately, but non-violently, during a previous protest?  The answer is an emphatic "no."  The "trespass warnings" issued against the plaintiffs violated the First Amendment, and the individual-capacity defendants are liable for this violation.

**A.  The "trespass warnings" issued to the plaintiffs constituted prior restraints on expressive activity in a public forum and are therefore subject to strict scrutiny under the First Amendment**

It is, of course, beyond dispute that participation in a political demonstration represents a quintessential exercise of an individual's First Amendment rights.  *See, e.g.*, *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *Grayned v. City of Rockford*, 408 U.S. 104, 116 (1972); *Cox v. Louisiana*, 379 U.S. 536, 544-52 (1965); *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011).  And these rights are at their zenith when exercised in public fora such as streets or parks, which "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)).

It is also beyond dispute that Dunn Meadow and other outdoor portions of Indiana University are public fora.  Not only does the 1969 Policy specifically designate Dunn Meadow as "an assembly ground"—that is, "a public forum for expression on all subjects" (Dkt. 1-1 at 1)—but state law explicitly provides that "protected expressive activities" must be allowed in *all* "outdoor area[s] of

campus" subject only to "reasonable time, place, and manner restrictions," Ind. Code § 21-39-8-9(b).[4] This limited restriction on expressive activities is consistent with First Amendment jurisprudence, which allows for the enforcement of "regulations of the time, place, and manner of expression" in public fora so long as those regulations "are content neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45 (citations omitted).

While this standard is already extremely protective of First Amendment freedoms, justifying the "trespass warnings" issued against the plaintiffs faces an additional hurdle here: these warnings prohibited the plaintiffs from attending the ongoing demonstrations in Dunn Meadow (or engaging in other expressive activity on Indiana University property) altogether. This is a classic "prior restraint," where a government official has "den[ied] use of a forum in advance of actual expression." *Ward v. Rock Against Racism*, 491 U.S. 781, 795 n.5 (1989) (quoting *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)); *see also, e.g.*, *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008) ("The term 'prior restraint' is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur.") (cleaned up). "[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), and, as such, "[a]ny prior restraint on expression comes . . . with a 'heavy presumption' against its constitutional validity," *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (citations omitted). They "are subject to strict scrutiny because of the peculiar dangers presented by such a restraint,"

---

[4]    "Protected expressive activity" is defined to include, *inter alia*, "[p]articipating in speech or conduct protected by the First Amendment to the Constitution of the United States," "[p]articipating in peaceful assembly," "[p]rotesting," "[m]aking speeches," and "[c]arrying signs." Ind. Code § 21-39-8-5. And an "[o]utdoor area of campus" is defined as any outdoor area "where members of the campus community are commonly allowed," and includes "grassy areas, walk-ways, and similar common areas" so long as access is not "restricted from a majority of the campus community." Ind. Code § 21-39-8-6.

*Levine v. U.S. Dist. Court for the Cent. Dist. of Ca.*, 764 F.2d 590, 595 (9th Cir. 1985) (citation omitted), and the government thus "carries of heavy burden of showing justification for the imposition of such a restraint," *Org. for Better Austin*, 402 U.S. at 419.

To be sure, the "trespass warnings" were issued in response to behavior that Indiana University deemed inappropriate, and the Supreme Court has distinguished between "unconstitutional prior restraint[s] on speech" and "permissible criminal punishment" that serves to restrict speech. *Alexander v. United States*, 509 U.S. 544, 549 (1993); *see also Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705-06 & n.2 (1986). But one of the keys to this distinction, as recognized in *Alexander*, is that a restriction may only be deemed permissible punishment for past behavior when it flows from a *judicial* determination that some sort of violation has occurred and that the punishment is an appropriate response to that violation. 509 U.S. at 552 (distinguishing a post-conviction punishment from *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 66 (1989), in which the Court had reiterated that "mere probable cause to believe a legal violation ha[d] transpired is not adequate to remove books or films from circulation"); *see also Arcara*, 478 U.S. at 706 (describing "criminal and civil sanction[s] imposed *through the legal process*") (emphasis added); *Entmt. Concepts, Inc. v. Maciejewski*, 631 F.2d 497, 505-06 (7th Cir. 1980) (holding unconstitutional an ordinance that "authorize[d] a prior restraint against the showing of any film based solely upon an administrative determination of obscenity in past films"); *Collin v. Chicago Park Dist.*, 460 F.2d 746, 756-57 (7th Cir. 1972) ("The teaching of our cases is that, because only a judicial determination in an adversary proceeding ensures the necessary sensitivity to freedom of expression, only a procedure *requiring* a judicial determination suffices to impose a valid final restraint.") (quoting *Freeman v. Maryland*, 380 U.S. 51, 58 (1965)) (emphasis in *Collin*).

In fact, this case underscores *why* a judicial determination is necessary before future speech may be restricted based on past conduct. Not only does this requirement ensure that the restriction on expressive activity results from a finding "beyond a reasonable doubt" rather than a mere allegation,

*Alexander*, 509 U.S. at 552, but it ensures that the punishment is properly tailored to the alleged wrongdoing itself.  Both *Alexander* and *Arcara* underscored that the wrongdoers' expressive activity was only impacted to the extent that it relied on materials that had been utilized in the illegal enterprise. *See id.* at 551 (The forfeiture order "only deprives [the speaker] of specific assets that were found to be related to his previous racketeering violations."); *Arcara*, 478 U.S. at 707 ("The First Amendment is not implicated by the enforcement of a public health regulation . . . against the physical premises in which respondents happen to sell books.").  And even then, the orders "d[id] not *forbid* [the speakers] from engaging in any expressive activities in the future" but instead left them "perfectly free" to do so.  *Alexander*, 509 U.S. at 550-51.  Compare that to this case.  The only allegation against the plaintiffs was that they committed criminal trespass—that is, that they remained in Dunn Meadow (a public forum) after being instructed to leave.  *See* Ind. Code § 35-43-2-2(b).  Even though they could not have been imprisoned for more than one year *if tried and convicted* of this offense, *see id.* (Class A misdemeanor); Ind. Code § 35-50-3-2, many of the plaintiffs were initially banned from Indiana University property for more than one year (albeit only by a day) and Mr. Greene was banned from Indiana University for *five* years (*see supra* at 8).  And these bans, applying either to university property throughout Indiana or to the entirety of the Bloomington campus, had almost nothing to do with the temporally and physically limited events that resulted in their arrests.

In other words, the "trespass warnings" received by the plaintiffs are not permissible punishment for past conduct within the meaning of *Alexander.*  They are a severe, direct, and presumptively unconstitutional prior restraint on expressive activity.

## B. The "trespass warnings" fail any level of scrutiny and therefore violate the First Amendment

As a prior restraint on speech, the "trespass warnings" issued to the plaintiffs are only constitutionally permissible if they were the least restrictive means of advancing a compelling interest. They fail this test.  In fact, even if traditional time, place, and manner analysis is applied, the warnings

do not pass muster.  Their issuance violated the First Amendment under any test.

### 1.  The "trespass warnings" fail strict scrutiny

Because the "trespass warnings" are subject to strict scrutiny, the issuance of these warnings was unconstitutional unless "the government establishes that: (1) the activity restrained poses either a clear and present danger or a serious and imminent threat to a protected competing interest, (2) the order is narrowly drawn, and (3) less restrictive alternatives are not available."  *Levine*, 764 F.2d at 595 (internal citations omitted).  Strict scrutiny "really means what it says," *Employment Division v. Smith*, 494 U.S. 872, 888 (1990), and "has always been a demanding and rarely satisfied standard." *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J.) (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)).

It is a standard that cannot be met here.  The plaintiffs were each banned from Dunn Meadow—and an overwhelming amount of other Indiana University property—during a period of time, ranging from a couple of days to several months, when daily protests concerning the war in Gaza were allowed to continue in Dunn Meadow.  In other words, the individual-capacity defendants may not attempt to justify these bans based on any perceived danger of the protests themselves.  Rather, the only permissible justification for the restriction on the plaintiffs' First Amendment rights would be "the probability of imminent violence"—or perhaps other disruptive activity—by the plaintiffs in particular.  *See Collin v. Chicago Park Dist.*, 460 F.2d 746, 752 (7th Cir. 1972).  However, as the Seventh Circuit made clear in *Collin*, "[o]nly a *specific* intent to cause violence, directed to the specific demonstration and manifested by specific plans, should suffice for [a prior restraint]."  *Id.* at 754 (citation omitted) (emphasis in original).  The *Collin* court did not definitively determine "whether a person's past conduct can or cannot ever justify a denial" of their First Amendment rights but, even if that conduct may be considered, it may only be considered to the extent that it serves as "a predicate for a well-founded belief that violence would occur" in the future.  *Id.*; *see also, e.g., Coalition to March on*

*the RNC v. City of Milwaukee*, 2024 WL 3358149, at *19 (E.D. Wis. July 8, 2024) ("*Collin* makes clear that even a 'powerful overriding interest' such as curtailing incitements to violence does not justify a sweeping prior restraint of expressive conduct on the basis of past violence.") (internal citation omitted).

That is an impossible showing here. For one, none of the plaintiffs was even arrested for a violent act: they were all arrested for misdemeanor trespass. (*See supra* at 9). That is, they were arrested for allegedly refusing to leave Dunn Meadow—a public forum—when instructed to do so. *See* Ind. Code § 35-43-2-2(b). Indeed, the decision to issue "trespass warnings" to any individuals arrested during the Dunn Meadow protests was made during a meeting on the evening of April 24, 2024 (Dkt. 97-11 at 1 [RFA No. 1]; *see also* Dkt. 80 ¶ 21)—before the protests even began—and so any individual's specific conduct *could not* have factored into the decision. Notably, even Indiana University promptly concluded that allowing the plaintiffs to return to Dunn Meadow did not present any untoward risks. After all, within a few days it had "stayed" seven of the plaintiffs' "trespass warnings" (allowing their return to university property), and it ultimately granted each of their administrative appeals of these warnings. (*See supra* at 9-10). By then, of course, the damage had been done: the plaintiffs had all been prevented from returning to the ongoing demonstrations in Dunn Meadow, or to other Indiana University property, to exercise their First Amendment rights.

The individual-capacity defendants therefore cannot demonstrate that the "trespass warnings" issued to the plaintiffs were justified by a compelling interest. These warnings were also not narrowly drawn or the least restrictive alternative to advance Indiana University's interest in preventing violence. For one, to the extent that the defendants were justified in believing that the plaintiffs would engage in imminent lawlessness—and they most assuredly were not—this belief was limited to the ongoing protests in Dunn Meadow. But the "trespass warnings" received by five plaintiffs applied to *all* Indiana University property, and the warnings received by the other five plaintiffs applied to the *entirety*

of the Bloomington campus. (*See supra* at 7-8). Prof. Robinson, for instance, was prevented from attending a rally of the Indiana Graduate Workers Coalition at which he had been scheduled to speak. (Dkt. 97-8 ¶ 16). The individual-capacity defendants' response to arrests in Dunn Meadow was sweeping in its scope and dramatically out of step with any perceived threat. For this reason alone, it is not narrowly tailored to Indiana University's interests.

Similarly, each of the plaintiffs was banned from university property for at least a full year (*see supra* at 8), and Mr. Greene was banned for five years plus a day (Dkt. 97-3 ¶ 10). How is this conceivably tailored to the defendants' concerns about the potential for lawlessness during the Dunn Meadow protests in late April of 2024? Obviously it is not. *Collin* makes clear that, when a prior restraint is imposed on the basis of an individual's past actions, those actions "must be extremely closely related in time and character" to the activity in which that individual wishes to engage. 460 F.2d at 754. Imposing a lengthy prospective ban applicable to a wide variety of activities in response to concerns, valid or not, specific to the April 2024 protests in Dunn Meadow fails this test. Even if the defendants had a compelling interest in the issuance of "trespass warnings" to the plaintiffs, these warnings were not remotely tailored to that interest.

And a less restrictive alternative to these prospective bans clearly existed: should the defendants' fears of lawlessness come to fruition, the plaintiffs may be arrested and prosecuted for any criminal behavior. Again, *Collin* makes clear that this is the response that does not unduly restrict First Amendment activity. "[N]one of what we have said," explained the Seventh Circuit, "prevents the prosecution of plaintiff[s] . . . if in the course of [their activity] they incite or start violence. . . . It is the prior restraint which is condemned." *Id.* at 755. So too here.

In sum, as a prior restraint on expressive activity, the "trespass warnings" issued to the plaintiffs are presumptively unconstitutional and must meet an exacting standard. They fail every prong of the analysis.

24

**2. Even if time, place, and manner analysis is applied, the "trespass warnings" fail this test**

Even if not deemed a prior restraint on speech requiring the application of strict scrutiny, the "trespass warnings" nonetheless represent an incursion on expressive activity in a public forum. As such, they still must satisfy the well-traveled time, place, and manner test. Under this test, a restriction must be "narrowly tailored to serve a significant governmental interest, and [must] leave open ample alternative channels for communication." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citation omitted). For many of the same reasons that these warnings fail strict scrutiny, they fail this analysis as well.

The plaintiffs were each arrested on either April 25th or April 27th because they were alleged to have refused to remove tents erected on Dunn Meadow or refused to disperse so that tents could be removed. (*See supra* at 7-8). Even assuming a significant governmental interest justifying a prohibition on tents or similar structures, the "trespass warnings" issued to the plaintiffs were, at best, tangentially related to this interest. They prevented the plaintiffs from returning to Indiana University property regardless of whether they or anyone else brought tents—all plaintiffs desired to return to Dunn Meadow to participate in the ongoing demonstrations even without the presence of tents (*see supra* at 10)—and, again, they applied to university property far beyond Dunn Meadow and for a period of time far longer than the Dunn Meadow protests were likely to last. "A complete ban [on expressive activity] can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (applying time, place, and manner analysis); *see also, e.g.*, *NAACP v. Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.") (internal citations omitted). The "trespass warnings" at issue here represented the very antithesis of narrow tailoring.

Nor did they leave open ample alternative channels for communication. These warnings were

issued against the backdrop of demonstrations that were taking place on college campuses across the country and, in Bloomington, that were specifically taking place in Dunn Meadow. The warnings entirely prevented the plaintiffs from lending their voices to this movement, full stop. Any suggestion that they could have made their opinions known in another manner ignores both the reality of this movement and, more fundamentally, the principle that "[t]he First Amendment mandates that we presume that speakers, not the government, know best both what they want to say and how to say it." *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 790-91 (1988); *see also, e.g.*, *Schneider v. State of N.J., Town of Irvington*, 308 U.S. 147, 163 (1939) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.").

Even if the "trespass warnings" are subjected to time, place, and manner analysis rather than strict scrutiny, they are not justifiable. They represent a dramatic, unwarranted incursion on the plaintiffs' expressive rights, and do not withstand any level of scrutiny. Their issuance violated the First Amendment.

### C. The individual-capacity defendants are liable for the constitutional violations

Of course, to be liable for damages under 42 U.S.C. § 1983, President Whitten and Superintendent Hunter "must be 'personally responsible for the deprivation of a constitutional right.'" *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001)). Although the individual-capacity defendants may not have specifically issued the challenged "trespass warnings" to the plaintiffs, a supervisory official is liable under § 1983 if he or she "directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Chavez*, 251 F.3d at 652 (citation omitted). In other words, supervisory liability attaches when an individual "know[s] about the conduct and facilitate[s] it, approve[s] it, condone[s] it, or turn[s] a blind eye for fear of what they might see." *Id.* at 651 (quotation and citation omitted).

These standards are easily met with respect to both President Whitten and Superintendent

Hunter.  Superintentendent Hunter acknowledges that, the day before planned demonstrations were to begin in Dunn Meadow, he directed the issuance of "trespass warnings" to anyone arrested during the protests.  (Dkt. 80 ¶ 24; Dkt. 97-11 at 3 [Interr. Nos. 1-3]).  While President Whitten may not have issued this directive, she was present when the directive issued and had the ability to prevent the issuance of the "trespass warnings" but did not do so.  (Dkt. 80 ¶¶ 22-23; Dkt. 97-11 at 2 [RFA Nos. 3-5]).  And, after warnings were issued to several protesters on April 25th, she took no steps to prevent similar warnings from being issued subsequent to that date and took no immediate steps to rescind or suspend the warnings that had already been issued or to order their rescission or suspension.  (Dkt. 80 ¶ 25).  In other words, Superintendent Hunter "directed the conduct causing the constitutional violation" and President Whitten, at best, "turn[ed] a blind eye" toward that conduct.  *Chavez*, 251 F.3d at 651-52.  They are both liable for the plaintiffs' damages.

## II. The August 2024 Policy violated the First Amendment and Prof. Akou, Mr. Greene, Prof. McDonald, Prof. Phillips, and Prof. Robinson are entitled to an injunction requiring the expungement of disciplinary action taken against them under this policy

### A. The plaintiffs' challenge to the August 2024 Policy is not moot

Of course, the August 2024 Policy has been superseded by the November 2024 Policy.  The plaintiffs do not seek damages as a result of the enforcement of the August 2024 Policy, and this would therefore normally mean that their challenge to that policy is moot.  *See, e.g.*, *Benkendorf v. Village of Hazel Crest*, 804 F.2d 99, 101 (7th Cir. 1986).  But five of the plaintiffs—four professors and one student—were formally disciplined for violating the August 2024 Policy.  The written warnings received by the four professors all warned of the potential for future disciplinary action, up to and including termination, should they violate any other university policies.  (*See supra* at 12).  And the notice received by Mr. Greene informed him that any violation of the August 2024 Policy would also "violate the IU Code of Student Rights, Responsibilities, and Conduct and/or the Residence Halls/Apartments Rules and Regulations," and could potentially subject him to "disciplinary action,

suspension, or expulsion." (Dkt. 88-1 at 1-2).

Case law is clear that, even when a challenged policy has been superseded, a disciplinary record remains a present harm that can be remedied. *See, e.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019) ("marred" disciplinary record "is a continuing harm for which [an individual] can seek redress") (citing cases); *Doe v. Cummins*, 662 Fed. App'x 437, 444 (6th Cir. 2016) (order compelling the removal of "a negative notation from appellants' disciplinary records" is "nothing more than prospective remedial action"); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007); *Sizelove v. Madison-Grant United Sch. Corp.*, 597 F. Supp. 3d 1246, 1285 & n.15 (S.D. Ind. 2022). This abundant jurisprudence is directly on point. Because several plaintiffs were disciplined under the August 2024 Policy, their challenge to this policy remains extant and the defendants may be compelled to expunge their records.

### B. The August 2024 Policy, which banned *any* "expressive activity" between 11:00pm and 6:00am, was plainly unconstitutional

Between August 1st and November 15th of 2024, the First Amendment simply did not exist late at night at Indiana University. That is not an exaggeration: the August 2024 Policy, applicable to "all Indiana University property," provided that all expressive activity—including, *inter alia*, "[p]articipating in speech or conduct protected by the First Amendment"—"must take place between the hours of 6:00 a.m. and 11:00 p.m." (Dkt. 72-1 at 3, 5-6).

As set forth above (*see supra* at 18-19 & n.4), the many public areas of Indiana University constitute public fora where case law is most solicitous of First Amendment rights. *See also* Ind. Code § 21-39-8-6. Ultimately, however, forum analysis is unnecessary for, regardless of forum, a substantially broad regulation is unconstitutional, either because it creates "a realistic danger that [it] will significantly compromise recognized First Amendment protections of parties not before the Court," *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984), or because "in all its applications [it] directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest," *Sec'y of State of Md. v. J.H. Munson Co.*,

467 U.S. 947, 965-66 n.13 (1984). A broader restriction on First Amendment expression could not be hypothesized: not only did the August 2024 Policy prohibit a large political rally in Dunn Meadow but it prohibited a reporter for the Indiana Daily Student from attempting to write a news article from their dorm room at 2:00am, a politically active student from imploring their friends to "vote for Smith" while walking back to on-campus housing after visiting a nearby bar, or a visitor to the campus from wearing a "Free Palestine" t-shirt late at night. Although hardly an authoritative source, the overbreadth of the August 2024 Policy was illustrated by a satirical article from The Onion, which described "some of the most popular strategies colleges are using in their crackdowns [on pro-Palestine protests]" and noted that "[c]olleges like Indiana University are setting a strict 11 p.m. curfew for all feelings." The Onion, *How Universities Are Cracking Down On Palestine Protests*, Sept. 2, 2024, *at* https://theonion.com/how-universities-are-cracking-down-on-palestine-protests (last visited May 19, 2025). While doubtless intended as hyperbole, given that the First Amendment protects the "freedom to think as you will and to speak as you think," *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 660-61 (2000) (citation omitted), this description of the August 2024 Policy was painfully close to the truth.

What possible justification does Indiana University have to prohibit someone wearing an expressive t-shirt at 11:30pm? This, of course, is expressive activity. *See, e.g.*, *Cohen v. California*, 403 U.S. 15, 19 (1971). So too is wearing religious symbols, *see, e.g.*, *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 63 F.3d 581, 586 (7th Cir. 1995), gathering with friends to quietly discuss politics or organize, *see, e.g.*, *Boos v. Barry*, 485 U.S. 312, 318 (1988), or quietly holding a protest sign, *see, e.g., Thayer v. City of Worcester*, 144 F. Supp. 3d 218, 232 (D. Mass. 2015). The examples are virtually endless, which is to be expected given that the August 2024 Policy prohibited all First Amendment expression, in whatever form, between 11:00pm and 6:00am. There is no justification, let alone a compelling one, for such a total ban on expression.

The Seventh Circuit has held a juvenile curfew statute (ending at 5:00am and beginning at

either 11:00pm or 1:00am, depending on the day of the week) to be unconstitutional, even when it created an affirmative defense for minors engaged in First Amendment activity. *See Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1060-65 (7th Cir. 2004). The August 2024 Policy applied to adults, established a lengthier prohibition on expressive activity, and created no such defense. Even in an airport, the Supreme Court has held unconstitutional the establishment of a "First Amendment Free Zone" that prohibited "even talking and reading, or the wearing of campaign buttons or symbolic clothing." *See Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus*, 482 U.S. 569, 575 (1987). "Under such a sweeping ban," said the Court, "virtually every individual who enters [the airport] may be found to violate the resolution by engaging in some 'First Amendment activit[y].'" *Id.* The same may be said of the August 2024 Policy, which, although temporally limited, applied throughout Indiana University's many open areas and not merely in the restrictive confines of an airport.

In *Jews for Jesus*, the Supreme Court concluded that it was unnecessary to engage in forum analysis because the restriction was overbroad, and therefore facially unconstitutional, no matter what. *Id.* at 573. The same tack is appropriate here. But, even so, forum analysis yields the same result: given that the August 2024 Policy applied in a public forum, the same considerations that render the policy substantially overbroad also mean that it is not narrowly tailored and does not leave open ample alternative channels for communication. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The policy was unconstitutional, and the disciplinary actions resulting from the plaintiffs' violations of that policy must be expunged.

## III.    The November 2024 Policy violates the First Amendment and must be enjoined

While not erecting the same absolute ban on expressive activity as its immediate predecessor, the November 2024 Policy, now in effect, remains unconstitutional. As soon as the clock strikes 11:00pm, Indiana University continues to prohibit the simplest of First Amendment activities— including silent or small group protests, speaking to a limited number of people, carrying a sign, or

asking persons to sign a petition—unless prior approval is sought at least ten days in advance. The limited exception for certain unplanned "spontaneous and contemporaneous" activity does not save the policy. The November 2024 Policy violates the First Amendment and must be enjoined.

### A. The November 2024 Policy is substantially and unconstitutionally overbroad insofar as it requires that even individuals and small groups engaging in expressive activity obtain advance permission before doing so

#### 1. A wide array of authority holds small-group permitting requirements to be unconstitutionally overbroad as they do not advance any legitimate purpose

Before 11:00pm, only a group of fifty or more persons must obtain a permit before engaging in expressive activity on university property. (Dkt. 69-1 at 86). But between 11:00pm and 6:00am, advance permission must be obtained regardless of the size of the activity. (*Id.*). Indeed, it must be obtained even for a solitary protest. A wide range of authority holds this unconstitutionally overbroad.

"Permit schemes and advance notice requirements that potentially apply to small groups are nearly always overly broad and lack narrow tailoring." *American-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (6th Cir. 2005). This is because "advance notice provisions . . . 'drastically burden free speech,'" *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994) (citation omitted), without serving any permissible governmental interest. Thus, the Seventh Circuit has held that "[r]equirements that small groups obtain a permit to gather in a traditional public forum frequently fail the narrow tailoring requirement." *Smith v. Exec. Dir. of Ind. War Memorials Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014); *see also, e.g.*, *Marcavage v. City of Chicago*, 659 F.3d 626, 635 & n.9 (7th Cir. 2011) (collecting similar cases from five circuits); *Church of Am. Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 683 (7th Cir. 2003) (requiring permit seekers to apply 45 days in advance, no matter the circumstances, violates the First Amendment). Unsurprisingly, numerous cases hold similar requirements unconstitutional if they (1) that mandate a permit be sought under all circumstances or (2) require that it be sought far in advance of an event. *See, e.g.*, *City of Dearborn*, 418 F.3d at 607-08 (30-day notice provision is "invalid on its face" and applying a permit requirement to small groups is

"hopelessly overbroad"); *Cox v. City of Charleston*, 416 F.3d 281, 286 (4th Cir. 2005) (permit requirement for small groups facially violates the First Amendment as it burdens more speech than necessary to advance legitimate interests); *Douglas v. Brownell,* 88 F.3d 1511, 1524 (8th Cir. 1996) (5-day requirement in parade ordinance is invalid as it "restricts a substantial amount of speech that does not interfere with the city's asserted goals"); *Grossman,* 33 F.3d at 1207 (permit requirement for small groups is unconstitutional insofar as "we simply cannot agree that six to eight people carrying signs in a public park constitute[s] enough of a threat to the safety and convenience of park users . . .to justify the restrictions imposed on their speech"); *NAACP, Western Region v. City of Richmond*, 743 F.2d 1346, 1357 (9th Cir. 1984) (requirement that a parade permit be sought twenty days in advance is unconstitutional as "all available precedent suggests that a 20-day advance notice requirement is overbroad").

As in these cases, the November 2024 Policy requires advance permission for late-night "protesting," "making speeches," or "circulating petitions" (Dkt. 72-2 at 5)—regardless of how many people are involved in the activity.  Again, what interest does Indiana University have in requiring someone to obtain prior permission before they wear a "Free Palestine" t-shirt or a religious medallion as a form of protest?  What interest does it have in knowing in advance that a single protester intends to hold a political sign in front of the Sample Gates?  Or in regulating an individual giving a "speech" to two friends or asking those same two friends to sign a petition?  The answer, of course, is that it has no conceivable interest in any of this.  And yet it requires all of these persons to apply for and obtain a permit before they engage in expressive activity.  At the same time, it has absolutely no problem with dozens of persons streaming back from Bloomington bars late at night or congregating in a parking lot to watch the stars.  It has no problem with hundreds of persons celebrating a basketball victory or overflowing from a fraternity party.  Consistent with the authority noted above, the November 2024 Policy applies to a significant amount of speech that has absolutely nothing to do with any purported regulatory interests, and it is unconstitutionally overbroad.

**2. The November 2024 Policy is not saved because it applies only at night or because it contains an exception for unplanned events that respond to late-breaking news**

To be sure, unlike in the small-group cases cited above, the permit requirement of the November 2024 Policy applies only late at night and the policy creates an exception that allows "IU Community Members" to engage in "[s]pontaneous and contemporaneous assembly which occurs without prior planning or announcement for the purpose of an immediate and spontaneous response to a newsworthy occurrence." (Dkt. 69-1 at 87; Dkt. 72-2 at 5). Neither factor saves the policy.

First, there is simply no suggestion in any of the small-group cases that advance notice requirements comport with the First Amendment if they only exist at night. First Amendment analysis does not change merely because expressive activity occurs after dark. *See, e.g.*, *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1062-63 (7th Cir. 2004) (holding unconstitutional a juvenile curfew law while noting that often "the late hours is closely linked  with the purpose and message of the activity"); *Scott v. City of Daytona Beach*, 740 F. Supp. 3d 1205, 1217 (M.D. Fla. 2024) (holding unconstitutional a night-time prohibition on panhandling). This is particularly true here, where the nature of the forum—a college campus—is such that activities and informal gatherings frequently occur during nighttime hours. To be sure, Indiana University has previously attempted to justify the November 2024 Policy based on perceived threats created by activities taking place late at night. But it has done so while continuing to allow virtually any activity other than protesting, making speeches, or circulating petitions to proceed without prior notice. Again, despite Indiana University's voiced concerns, a small, silent vigil in front of the Sample Gates at 11:30pm does not impinge in any way on the university's interests, and certainly does not create any greater danger than the dozens of persons walking exuberantly past the vigil as they return to campus after an evening at nearby restaurants or bars.

And second, the November 2024 Policy is not saved by its limited exception for certain unplanned events that respond to late-breaking news. Initially, this exception is not even available to

Ms. Murphy or Mr. Wirtshafter, who, while alumni of Indiana University and Bloomington residents, are not "IU Community Members."[5]  More fundamentally, however, the impact of a permitting requirement on "[s]pontaneous expression" in response to late-breaking news, *see Grossman*, 33 F.3d at 1206, is only one problem with such a requirement.  The bigger problem is that, when applied to small groups, forcing persons to obtain a permit "fail[s] the narrow tailoring requirement" insofar as these groups seldom "interfer[e] with orderly, fair use of [public] space."  *Smith*, 742 F.3d at 289.

All of that aside, the exception for "spontaneous and contemporaneous" expression is only available for an "unplanned" event.  (*See supra* at 14-15, 17).  But not all speech that responds promptly to late-breaking news is "unplanned"; in fact, very little of it likely is.  Take, for instance, Indiana University's late-night amendment—on April 24, 2024—of the 1969 Policy governing expressive activity in Dunn Meadow.  Had they learned of this amendment immediately upon its passage, students or faculty might have deemed a prompt protest appropriate.  But if, instead of simply taking to the streets, a small group of concerned persons arranged to meet in front of President Whitten's office at midnight, the event is no longer "unplanned"—and, if it had happened after the enactment of the November 2024 Policy, would have required prior approval secured ten days in advance.  And

---

[5]      Indiana University has previously taken the position that Ms. Murphy and Mr. Wirtshafter *are* "IU Community Members" insofar as they utilize the resources or facilities of the university simply by being on campus.  (Dkt. 85 at 13 n.2).  Although this particular deprivation of Ms. Murphy and Mr. Wirtshafter's First Amendment rights is perhaps minor compared to the other constitutional privations caused by the November 2024 Policy, this argument is mistaken.  While certainly Indiana University may be entitled to some solicitude in interpreting its own policy, it may not do so in a manner that renders other provisions of the policy superfluous.  *See, e.g., Gillespie v Trans Union Corp.*, 482 F.3d 907, 909 (7th Cir. 2007) (referring to statutory interpretation) (other citations omitted).  By its terms, the November 2024 Policy only applies to activities on university property and applies to "all guests and visitors to Indiana University and to . . . Indiana University Community Members." (Dkt. 72-2 at 2).  If a person is an "IU Community Member" merely by stepping foot on university property, there would be no need to define "IU Community Members" at all; there would be no need to distinguish "guests and visitors to Indiana University" from "IU Community Members"; there would be no need to specifically articulate various categories of "IU Community Members" (of which individuals using "Indiana University resources or facilities" is just one category) (*id.* at 2-3); and there would be no need to limit the exception for "spontaneous[] and contemporaneous[]" assembly to "IU Community Members" (*id.* at 5).  Indiana University's interpretation would render substantial portions of its own policy meaningless and the interpretation is simply not plausible.

this is to say nothing of the fact that not all spontaneous speech takes place as an "immediate . . . response to a newsworthy occurrence." (Dkt. 69-1 at 87). Suppose a female student receives a B grade and, believing that she was graded more harshly than her male classmates, desires to wear a "women's rights are human rights" t-shirt. That is an immediate response but not one that concerns a newsworthy occurrence. Or what about a student who remembers on April 21st that the next day is Earth Day and wishes to wear a "stop deforestation" t-shirt? That is a newsworthy occurrence but not an immediate response. And yet the November 2024 Policy makes allowance for none of this.

The fact that the November 2024 Policy governs small-group activity only late at night and creates a limited exception for certain "spontaneous and contemporaneous" expression does not alter the overbreadth of the policy. The policy is unconstitutional.

### B.    The November 2024 Policy is neither content nor viewpoint neutral and fails the requisite strict scrutiny

As detailed above, the First Amendment allows for reasonable regulations on the time, place, and manner of expression or conduct in a public forum if the regulations are content neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). On the other hand, if a regulation of expression is based on the content of that expression, or "content-based," it is subject to strict scrutiny, requiring that it be narrowly tailored to serve a compelling state interest. *See, e.g.*, *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citations omitted). Similarly, strict scrutiny is also warranted if regulation of speech discriminates based on its viewpoint. *See, e.g.*, *Brown v. Kemp*, 86 F.4th 745, 780 (7th Cir. 2023). "If applying the regulation requires an examination or distinguishing of speech only in service of drawing neutral lines, the statute is considered agnostic as to content. Otherwise, the regulation is considered content- or viewpoint-discriminatory on its face and warrants strict scrutiny." *Id.* "A regulation of speech is facially content based under the First Amendment if it targets speech based on its communicative content—that is, if it applies to particular speech because

35

of the topic discussed or the idea or message expressed." *City of Austin, v. Reagan Nat'l Advertising of Austin, LLC*, 596 U.S. 61, 69 (2022) (cleaned up).

Despite labelling itself "content-neutral" (Dkt. 72-2 at 5), the November 2024 Policy is anything but. Under that policy, if the "message expressed" is one of protest, it is prohibited from 11:00pm to 6:00am absent a permit; if the speaker chooses to express any other message, it is perfectly fine. Thus, a group of students with guitars in Dunn Meadow on a warm spring night may perform popular music. But if they are performing a song in protest of American foreign policy, their activity is prohibited absent a permit. If students walk through campus at 11:30pm wearing t-shirts that say "Beat Purdue," that is allowed without restraint. But if the t-shirts say "Fire President Whitten"—let alone "Leave Gaza Now"—it is a protest and is not allowed without prior permission. Carrying a sign that says "Remember to Vote Tomorrow" is entirely unproblematic; carrying a sign that says "Vote Smith Out of Office" is not. "Some facial distinctions based on a message are obvious, [and] defining regulated speech by particular subject matter" is a clear example of a content-based regulation of speech. *Reed,* 576 U.S. at 163. The November 2024 Policy is even worse: a "protest" is defined as "an expression or declaration of objection, disapproval, or dissent," *see* Dictionary.com, *protest, at* https://www.dictionary.com/browse/protest (last visited May 20, 2025), meaning that expressions of approval or support appear to be unregulated by the policy. That is not just content-based discrimination; it is discrimination based on viewpoint.[6]

---

[6]    Although the permit requirement imposed by the November 2024 Policy is unconstitutional for the reasons noted above, even the process for obtaining a permit established in the Pre-Approval Standard is unconstitutional as creating a viewpoint-based restriction on First Amendment expression. After all, this standard ranks Indiana University's preferences for resolving "competing requests for use of space," and gives a priority to "events promoting partnerships with external organizations that align with the University's mission." (Dkt. 69-1 at 88). Nowhere in the list is there any priority or mention of permits for persons to engage in protests that do not align with this mission. This is obviously not viewpoint neutral. "A speech regulation is viewpoint-based when it goes beyond general discrimination against speech about a specific topic and instead regulates one perspective within a debate about a broader topic." *Brown,* 86 F.4th at 780. Moreover, the ranking of the preferences for allocating permission to use the public spaces at Indiana University, which makes no mention of private protests, is itself unconstitutional as "[g]overnment actors commit

Once again, strict scrutiny is "a demanding and rarely satisfied standard." *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 718 (2021) (statement of Gorsuch, J.). Indiana University plainly has no interest in distinguishing amongst persons or groups based on the message they seek to deliver and, even if such an interest could be hypothesized, the November 2024 Policy would not be properly tailored to that interest. The policy fails this demanding standard.

### C. The November 2024 Policy is unconstitutional even if it is assessed under traditional time, place, and manner analysis

Again, all parties agree that the many public areas of Indiana University represent public fora where free speech rights are at their greatest. Therefore, even if deemed content neutral, the November 2024 Policy still must be narrowly tailored to serve a significant interest and leave open ample alternative channels for communication. *Ward*, 491 U.S. at 791. It fails on both fronts.

#### 1. The November 2024 Policy is not narrowly tailored

"A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988) (citation omitted). That is, the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799 (footnote omitted). The November 2024 Policy fails the narrow tailoring requirement in two primary ways.

First, as noted above, the requirement that an individual or a small group apply for a permit has been repeatedly deemed to be a First Amendment violation as it is "hopelessly overbroad." *City of Dearborn*, 418 F.3d at 608. For the same reason, such a requirement "lacks narrow tailoring." *Id*. Whatever interests Indiana University might have in regulating large gatherings of people do not justify the imposition of a permitting requirement when only a few people—or perhaps only one person—

---

unconstitutional viewpoint discrimination in any kind of public forum when they hamper speech because of 'the specific motivating ideology or the opinion or perspective of the speaker.'" *Tanner v. Ziegenhorn*, 2020 WL 5648642, *1 (C.D. Ark. Sept. 22, 2020) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 825 (1995)), *aff'd*, 2023 WL 327848 (8th Cir. Jan. 20, 2023).

engage in protest. This is especially true given that college students are frequently out in large numbers after 11:00pm engaging in non-protest activities that are not regulated by the November 2024 Policy. As the Fifth Circuit has tersely explained, "[o]ther circuits have held, and we concur, that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant governmental interest." *Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) (citing cases); *see also, e.g., Smith*, 742 F.3d at 289. The absence of tailoring is even more obvious here: not only is the November 2024 Policy overinclusive insofar as it requires that even solo or small-group protesters obtain advance permission before engaging in expressive activity, but it is underinclusive with respect to any safety-related justification given that it leaves entirely unregulated the many non-protesters on Indiana University property late at night.

And second, in order to be able to engage in protests or speeches, or to solicit signatures for a petition, a person must obtain permission and, in so doing, disclose their name and provide other identifying information. (Dkt. 69-1 at 22:12-16). This impinges on the potential protester's right to engage in anonymous speech: "[a] speaker's 'decision to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment.'" *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 523 (D.C. Cir. 2010) (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (2010)). In *Boardley*, the D.C. Circuit held unconstitutional a permit requirement that applied to small-group activities in part because "the permit requirement infringes on individuals' ability to engage in anonymous speech." *Id.* The burden of disclosing "identifying information," said the court,

> falls harder on individuals and small groups than on larger groups. Whereas members of large groups easily can remain anonymous—except, perhaps, for the leader who fills out the permit application—a lone individual has no choice but to put her own name on the application. Moreover, common experience reveals that large groups tend to seek as much publicity as possible; anonymity is more often prized by those operating outside of an organized group. In sum, the permit requirement imposes substantial burdens on individuals and small groups—burdens which the government has failed to justify.

*Id.* at 524. These observations are just as applicable here. Particularly given that persons engaged in

38

non-protest activity may do so anonymously, the permit requirement of the November 2024 Policy is not narrowly tailored for this reason as well.

### 2. The November 2024 Policy does not leave open ample alternative channels of communication

Finally, the November 2024 Policy does not leave open ample alternative channels for persons to exercise their First Amendment rights. Even if permit requests under the November 2024 Policy are easy to make and are approved as a matter of course, they still must be submitted at least ten days before an event. (Dkt. 69-1 at 88). Not all protest activity, however, takes place with ten days' notice. For persons who do not demonstrate this foresight, there is no alternative whatsoever: they simply must forgo exercise of their First Amendment rights. *See, e.g., Turner v. Plafond*, 2011 WL 62220, at *12 (N.D. Cal. Jan. 7, 2011) (holding unconstitutional a permit requirement applicable to any number of protesters who wished to display signs on the Golden Gate Bridge in part because the requirement failed the ample-alternatives prong of time, place, and manner analysis insofar as it "completely prevent[ed] a single speaker from spontaneously expressing his views with a sign on the bridge").

To be sure, under the November 2024 Policy, any "IU Community Member"—but not Ms. Murphy or Mr. Wirtshafter (*see supra* at 33-34 & n.5)—may still engage in certain unplanned "[s]pontaneous and contemporaneous assembly" that immediately responds to a newsworthy occurrence." (Dkt. 69-1 at 87). On the other hand, any preplanned event—whether or not in immediate response to a "newsworthy occurrence"—requires a permit. (Dkt. 69-1 at 20:4-8). But just because something is preplanned does not mean it is not spontaneous: even preplanned protests frequently occur in response to newsworthy matters and must occur as quickly as possible, and certainly sooner than the ten-day lag forced on speakers by the November 2024 Policy. (*See supra* at 17). Again, when something newsworthy happens, the November 2024 Policy does not allow persons to arrange to meet their friends for a late-night protest on campus. That is a "planned" event.

The bottom line is that the requirement that persons wait ten days to engage in any protest

activity, regardless of the impact that their activity is likely to have on Indiana University's interests, serves to entirely prevent a wide swath of speech. It is unconstitutional for this reason as well.

## CONCLUSION

The plaintiffs are entitled to summary judgment on each of their legal claims. The "Limited Content-Neutral Overnight Restrictions" of the November 2024 Policy must be permanently enjoined. Indiana University must similarly be required to expunge any disciplinary action taken against persons who engaged in expressive activity in violation of the August 2024 Policy. And the plaintiffs are entitled to partial summary judgment against the individual-capacity defendants on their damages claim, although the precise amount of their damages must await trial.

Gavin M. Rose
Kenneth J. Falk
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
grose@aclu-in.org
kfalk@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiffs