UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JASPER WIRTSHAFTER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00754-RLY-MKK |
| | ) | |
| THE TRUSTEES OF INDIANA | ) | |
| UNIVERSITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

On November 15, 2024, Indiana University ("IU" or "the University") enacted a policy requiring prior approval for protests on campus occurring between 11:00 p.m. and 6:00 a.m.  Plaintiffs are students, faculty, and other individuals who have protested on IU's Bloomington campus and wish to protest on campus in the future.  They sue the Trustees of Indiana University, Pamela Whitten (the President of the University), and Benjamin Hunter (the Associate Vice President and Superintendent for Public Safety of the University) for violating their rights under the First Amendment.  Plaintiffs now move for a preliminary injunction to enjoin the policy's pre-approval requirement for overnight protests.  For the reasons set forth below, the court **GRANTS** Plaintiffs' motion.

I.      **Background**

A.      **IU's Expressive Activity Policy**

The IU Board of Trustees enacted the Expressive Activity Policy ("the Policy") on

1

July 29, 2024.  (*Akou* Docket,[1] Filing No. 27-1, Hunter Decl. ¶ 13).  The Policy was

amended on November 15, 2024.  (*See* Filing No. 72-2, Expressive Activity Policy at 2).

It applies to all University property, all guests and visitors to the University, and to the

following "IU Community Members":

> A. Any employee of the University, including administrators, academic appointees, staff, part-time, and student employees;
> B. All students and student organizations;
> C. All University units;
> D. University contractors;
> E. Any individual using Indiana University resources or facilities or receiving funds administered by Indiana University; and
> F. Volunteers and other representatives when speaking or acting on behalf of Indiana University.

(*Id.* at 2–3).

The Policy puts in place "Limited Content-Neutral Overnight Restrictions":

> 1. Pursuant to IC 21-39-8-9(b)(4),[2] during the overnight hours of 11:00 p.m. to 6:00 a.m. IU Community Members may spontaneously and contemporaneously assemble and distribute literature.
> 2. For the protection of the University community and in furtherance of the educational mission of the University, from the overnight hours of 11:00 p.m. to 6:00 a.m. the activities listed below are prohibited on University property unless:
>     a. they are part of a scheduled or authorized University activity extending into that time period, or;
>     b. prior written approval has been obtained from the appropriate University office:
>         - Students and Student Organizations: Campus Chief

---

[1] On December 10, 2024, *Akou v. The Trustees of Indiana University*, 1:24-cv-01469-RLY-MJD, was consolidated with this case and closed.  (Filing No. 57).  Citations to filings in *Akou* are referenced by the "*Akou* Docket."

[2] Indiana Code § 21-39-8-9(b) provides that "a state educational institution may enforce reasonable time, place, and manner restrictions on campus or in the state educational institution's domain that meet the following requirements: . . . (4) The restrictions allow members of the campus community to spontaneously and contemporaneously assemble and distribute literature."

> > Student Affairs Officer; or
> > - Faculty: Executive Vice Chancellor of Academic Affairs; or Campus Chief Academic Officer; or
> > - Staff, Guests, and Visitors[:] University Events.
> 3. The Expressive Activities prohibited on University property during the overnight hours of 11:00 p.m. to 6:00 a.m. are:
> > - protesting;
> > - making speeches;
> > - circulating petitions; and
> > - all other unapproved conduct and activities otherwise prohibited by this Policy or applicable law.

(*Id.* at 5–6.)

In January 2025, the University enacted the University Space Use Pre-Approval Standard ("the Pre-Approval Standard"). (Filing No. 69-1, Booher Dep. at 17 & Ex. 1002 at 86.) It was not enacted by the Trustees, and it is therefore controlled by University policies. (*Id.* at 17–18.) It establishes the standards for prior approval of certain uses of University spaces. (*Id.* at 17–18 & Ex. 1002 at 86.) Relevant here, prior approval is required for "[p]replanned events of more than 50 people between 6:00 a.m. and 11:00 p.m." and "[p]replanned events during the overnight hours of 11:00 p.m. to 6:00 a.m.," regardless of size. (*Id.*). The Pre-Approval Standard clarifies that prior approval is not required for "[p]replanned events of less than 50 people that will not extend into the overnight hours of 11:00 p.m. to 6:00 a.m.," "[s]pontaneous and contemporaneous assembly which occurs without prior planning or announcement for the purpose of an immediate and spontaneous response to a newsworthy occurrence," and "[t]he peaceful distribution of literature at any time." (*Id.*, Ex. 1002 at 87.) Applications for approval must be submitted at least ten days in advance and must include the

3

"[e]xpected number of attendees." (*Id.*, Ex. 1002 at 88).

### B.    Basis for the Policy

The IU Police Department ("IUPD") safeguards IU's campuses and students. (*Akou* Docket, Hunter Decl. ¶ 12).  "IUPD is currently understaffed, which significantly hampers IUPD's ability to police the campus, staff university events, and respond to emergent issues." (*Id.* ¶ 3).  IUPD's understaffing has limited its ability to "manage large-scale, nighttime crowd-control situations." (*Id.* ¶ 4).  Several of IU's campuses lack a police presence at night.  (*Id.*).  Furthermore, IUPD faces additional challenges during overnight events due to limited visibility, closed facilities, and increased alcohol and substance abuse.  (*Id.* ¶ 5; Filing No. 84-1, Bennett Decl. ¶ 18).  Because most campus buildings are closed overnight, unplanned events can lead to environmental and sanitary issues due to a lack of access to restrooms or waste disposal facilities.  (*Akou* Docket, Hunter Decl. ¶ 6).  Adding to these challenges, all IU campuses are open to the public and are not fenced or closed off to pedestrians.  (Bennett Decl. ¶ 9).  The campuses are porous in the sense that people may enter campus undetected.  (*Id.*).

Beginning in October 2023, IU experienced increased reports of antisemitic and Islamophobic activity and many protests in response to the Israeli-Palestinian conflict. (*Akou* Docket, Hunter Decl. ¶¶ 7–9).  In April 2024, protestors created an "encampment" to continuously occupy Dunn Meadow on IU's Bloomington campus.[3]  (*Id.* ¶ 10).  The

---

[3] Dunn Meadow is a large open field.  (*Akou* Docket, Filing No. 20-8, Robinson Decl. ¶ 13).  In 1969, the IU Board of Trustees designated Dunn Meadow as "the Indiana University Assembly Ground" and "a public forum for expression on all subjects." (Expressive Activity Policy at 3; Filing No. 80, Answer ¶ 11).  Dunn Meadow has been

encampment significantly strained IUPD's resources.  (*Id.*).  Altercations broke out between encampment protestors and other IU students.  (*Id.*).  Encampment protestors reportedly vandalized IU property.  (*Id.*).  IUPD received reports of encampment protestors engaging in unhygienic practices, including defecating in buckets and bathing in and collecting water from IU's Campus River.  (*Id.*).  IUPD also received reports of unaffiliated individuals with violent criminal histories occupying the encampment.  (*Id.* ¶ 11).  An unhoused individual experienced a drug overdose in the encampment.  (*Id.*).  As a result of the encampment, Dunn Meadow was closed for "significant environmental remediation."  (*Id.* ¶ 6).

University officials maintain that the pre-approval requirement for overnight activities allows University personnel adequate time to plan for sufficient staffing and resources, which protects "public health, safety, and welfare."  (Bennett Decl. ¶ 19; Filing No. 84-3, Booher Decl. ¶ 15).  It also allows personnel to "re-set and plan for the next day" and reduces the risk of "habitat[ing]" on campus.  (Bennett Decl. ¶ 17; Booher Decl. ¶ 13).

### C.    The Plaintiffs

Plaintiffs are individuals with varying connections to the University.  Heather Akou, David McDonald, Sarah Phillips, and Benjamin Robinson are professors.  (Filing No. 69-2, Akou Decl. ¶ 2; Filing No. 69-5, McDonald Decl. ¶ 2; Filing No. 69-8, Phillips Decl. ¶ 2; Filing No. 69-9, Robinson Decl. ¶ 2).  Anjali Biswas, Bryce Greene, and

---

the site of many demonstrations and other expressive activities over the years.  (*Akou* Docket, Robinson Decl. ¶ 13).

Madeleine Meldrum are graduate students. (Filing No. 69-3, Biswas Decl. ¶ 2; Filing No. 69-4, Greene Decl. ¶ 2; Filing No. 69-6, Meldrum Decl. ¶ 2). Jess Tang is an employee. (Filing No. 69-10, Tang Decl. ¶ 2). Maureen Murphy and Jasper Wirtshafter graduated from IU but are not currently associated with the University as a student or employee. (Filing No. 69-7, Murphy Decl. ¶ 2; Filing No. 69-11, Wirtshafter Decl. ¶ 2).

Plaintiffs have previously engaged in protests on University property and wish to do so between 11:00 p.m. and 6:00 a.m. without seeking prior permission. (*See, e.g.*, Akou Decl. ¶¶ 5–7, 22; Tang Decl. ¶¶ 7–8, 11). In August and September 2024, Akou, McDonald, Phillips, and Robinson participated in candlelight vigils at the Sample Gates on IU's Bloomington campus after 11:00 p.m. to protest the Policy. (*See* Akou Decl. ¶¶ 7–11; McDonald Decl. ¶ 8 & Ex.; Phillips Decl. ¶¶ 8–11; Robinson Decl. ¶¶ 8–9). They received sanctions in the form of written warnings for their participation in the vigils, which violated an earlier version of the Policy that barred all "Expressive Activity" between 11:00 p.m. and 6:00 a.m. (*See* Akou Decl. ¶ 12 & Ex. ("I am imposing a common sanction by issuing this written warning and letter of reprimand and filing a copy of the same in your permanent personnel file . . . ."; McDonald Decl. ¶ 8 & Ex. ("[A] common sanction is being issued with this written warning and a copy of the same will be kept in your permanent personnel file."); Phillips Decl. ¶ 12 & Ex. (same); Robinson Decl. ¶ 10 & Ex. (same); Filing No. 72-1, Original Expressive Activity Policy at 5). University officials informed these plaintiffs that the University would continue to enforce the Policy. (McDonald Decl. Ex. (explaining that, during the instant lawsuit, "the University will continue to enforce" the Policy); Phillips Decl. Ex. (same); Robinson

6

Decl. Ex. (same); *see* Akou Decl. Ex. ("[C]ontinued violations of [the Policy] . . . may result in investigation . . . .")).  Additionally, University officials warned there could be additional disciplinary action for further violations of the Policy, such as "citation, trespass, interim suspension from campus, and/or termination of employment." (McDonald Decl. Ex.; Phillips Decl. Ex.; Robinson Decl. Ex.; *see also* Akou Decl. Ex.). Greene also received a notice concerning violations of the Policy for participating in a vigil after 11:00 p.m.  (Greene Decl. ¶ 7).

　　Akou applied to hold an event called "The First Amendment Exists 24/7" at the Sample Gates on November 10, 2024, from 10:30 p.m. to 11:30 p.m.  (Akou Decl. ¶¶ 13–14).  The application described the event as a "peaceful candlelight vigil to discuss and exercise our First Amendment rights."  (*Id.* ¶ 13).  However, a University official indicated that the vigil could not extend past 11:00 p.m. because the University considered it to be a protest.  (*See id.* ¶¶ 14–15).  Ultimately, the event took place and continued beyond 11:00 p.m.  (*See id.* ¶ 16).  Although Akou wanted to continue to participate in the event past 11:00 p.m., she left campus at 10:59 p.m. and stood on the public sidewalk because she did not want to face further punishment.  (*Id.* ¶ 17).  The other plaintiffs have wanted to participate in unapproved after hours protests on campus but have refrained from doing so due to the Policy.  (*E.g.*, Meldrum Decl. ¶¶ 8–10; *see, e.g.*, Phillips Decl. ¶¶ 7, 16).

　　Meanwhile, several of the plaintiffs have observed other activities not prohibited by the Policy occur on campus after 11:00 p.m., such as fraternity parties, "post-basketball game celebrations that can involve large groups of persons," groups using

telescopes, and people playing music.  (*See* McDonald Decl. ¶ 11; Phillips Decl. ¶ 17; Robinson Decl. ¶¶ 14, 16–17).

### D.    This Lawsuit

Plaintiffs filed suit, alleging that the Policy's pre-approval requirement for overnight events violates the First Amendment.  Plaintiffs moved for a preliminary injunction, requesting that the court enjoin the Policy to the extent it "prohibits the following activities on Indiana University property if they occur without prior permission between the hours of 11:00 p.m. and 6:00 a.m.: protesting, making speeches, circulating petitions, and all otherwise unapproved conduct and activities otherwise prohibited." (Filing No. 73, Mot. for Preliminary Inj.).

## II.    Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Instead, the issuance of an injunction is committed to the "sound discretion" of the district court.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  In exercising that discretion, the court is guided by four factors: whether the plaintiff has shown (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction serves the public interest.  *See Winter*, 555 U.S. at 20.  The court ordinarily employs a "sliding scale" approach when balancing these factors such that the more likely the plaintiffs are to win, the less heavily the balance of harms must weigh in their favor and vice versa.  *See*

*Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387–88 (7th Cir. 1984); *see also Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

In the First Amendment context, the likelihood of success on the merits "will often be the determinative factor." *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004). That is because a violation of the First Amendment "unquestionably constitutes irreparable injury, and injunctions protecting First Amendment freedoms are always in the public interest." *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 830 (7th Cir. 2014) (internal quotation marks omitted).

## III. Discussion

Defendants argue that Plaintiffs lack standing to seek their requested preliminary injunction and that Plaintiffs' claims are not ripe. The court considers Defendants' jurisdictional arguments before turning to the merits of Plaintiffs' motion for a preliminary injunction. *See Okoro v. Bohman*, 164 F.3d 1059, 1061 (7th Cir. 1999).

### A. Standing and Ripeness

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (cleaned up) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). Article III's case-and-controversy requirement implicates "[t]wo related doctrines of justiciability": standing and ripeness. *Trump v. New York*, 592 U.S. 125, 131 (2020). The doctrine of standing requires that the plaintiff has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial

9

decision." *Spokeo*, 578 U.S. at 338. Relatedly, the doctrine of ripeness requires that a case is not "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump*, 592 U.S. at 131 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). In a pre-enforcement challenge, standing and ripeness "plumb the same concept: timing." *Carr v. Trs. of Purdue Univ.*, No. 1:24-cv-00772-SEB-MJD, 2024 WL 3819424, at *4 (S.D. Ind. Aug. 14, 2024).

To satisfy Article III standing, a plaintiff's injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up) (*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). In a facial challenge under the First Amendment brought pre-enforcement, such as this one, "plaintiffs must make one of two showings to establish an injury in fact." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020). "First, a plaintiff may show an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat the policy will be enforced against him when he does." *Id.* "Second, a plaintiff may show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result." *Id.*

Plaintiffs have not made the first showing. Plaintiffs state that they *would like* to engage in conduct forbidden by the Policy, such as participating in unapproved after hours protests on campus. (*See, e.g.*, McDonald Decl. ¶¶ 6–7, 10). But they do not assert that they *intend* to engage in these activities despite the Policy and risk enforcement. Instead, Plaintiffs' claimed injuries go to a chilling effect and self-censorship.

In pre-enforcement cases, plaintiffs may "establish standing based on a current

injury if they have resorted to self-censorship out of 'an actual and wellfounded fear' that the law will be enforced against them." *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (emphasis omitted) (quoting *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988)). A plaintiff's fear of enforcement must be "actual and reasonable," not merely "imaginary or speculative." *Id.* (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). The chilling effect must be "objectively reasonable," *Speech First*, 968 F.3d at 638, not "subjective," *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972). Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

Plaintiffs have sufficiently identified prohibited conduct that they wish to engage in but have refrained from out of fear of enforcement. Akou, McDonald, Meldrum, Murphy, and Tang have expressed a desire to engage in unapproved after hours protests on campus and stated that they have refrained from doing so due to the Policy. (Akou Decl. ¶¶ 6, 22; McDonald Decl. ¶¶ 6–8; Meldrum Decl. ¶¶ 8–10; Murphy Decl. ¶¶ 7–11; Tang Decl. ¶¶ 8–9, 11). The remaining plaintiffs have also indicated that they "wish," "want," or "would like" to participate in such protests, with the implication being that they have not done so due to the Policy. (Phillips Decl. ¶¶ 7, 16 (stating that unapproved after hours protests on campus continue to occur and he "would like to participate in them without risking sanctions"); Biswas Decl. ¶¶ 6–7, 11; Greene ¶¶ 6, 9; Robinson Decl. ¶ 11; Wirtshafter Decl. ¶¶ 6, 10). The fact that Plaintiffs have "adjusted [their] behavior" to refrain from protesting "reflects the chilling of protected speech, demonstrating an

'actual' fear of enforcement." *Brown*, 86 F.4th at 767.

Moreover, Plaintiffs have established that their fear of enforcement is well-founded. The existence of the Policy implies a threat to enforce it. *See Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010) ("[T]he existence of a statute implies a threat to prosecute . . . ."); *see also Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003) ("[T]he threat [of prosecution] is latent in the existence of the statute."); *Bell v. Keating*, 697 F.3d 445, 451 (7th Cir. 2012) ("The existence of the statute constitutes the government's commitment to prosecute in accordance with it . . . ."). Moreover, Defendants have enforced an earlier version of the Policy against some of the plaintiffs for conduct similar to the conduct they now wish to engage in. (*See* Akou Decl. ¶¶ 7–9, 12 & Ex.; McDonald Decl. ¶ 8 & Ex.; Phillips Decl. ¶¶ 8, 12–13 & Ex.; Robinson Decl. ¶¶ 8–10 & Ex.). In fact, University officials informed these plaintiffs that the University would continue to enforce the Policy. (McDonald Decl. Ex.; Phillips Decl. Ex.; Robinson Decl. Ex.; *see* Akou Decl. Ex.). This supports a credible threat of enforcement. *See Brown*, 86 F.4th at 767 ("A history of enforcement proceedings against similar conduct weighs in favor of a finding that plaintiffs' fear of enforcement are well-founded.").[4] Additionally,

---

[4] Although this history of enforcement was under an earlier version of the Policy, the fact that the prior version of the Policy was enforced lends legitimacy to Plaintiffs' fear of enforcement against similar conduct under the current Policy. Nothing in the statements that the University would continue to enforce the Policy was contingent on the Policy not being amended. In any event, even if the history of enforcement here was not sufficiently analogous, the existence of the Policy and the lack of disavowal of enforcement would be sufficient to establish a credible threat of enforcement and render Plaintiffs' fears of enforcement well founded. *See Am. Booksellers Ass'n*, 484 U.S. at 393 ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them.").

Defendants have not "clearly disavowed" plans to enforce the Policy, which supports finding a credible threat of prosecution. *Id.* at 769; *see also Am. Booksellers Ass'n*, 484 U.S. at 393 ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise."). As such, Plaintiffs' fear of enforcement is well-founded and reasonable. *See Brown*, 86 F.4th at 768–69.

Defendants contend that Plaintiffs lack standing because much of the desired conduct Plaintiffs reference is not prohibited by the Policy. For example, Akou wishes to wear expressive t-shirts and religious items on University property after 11:00 p.m. (Akou Decl. ¶ 18). Defendants assert that the Policy does not prohibit this conduct. However, Akou stated she wants to wear these articles of clothing "as a means of protest." (*Id.*). This applies to much of the conduct Defendants object to. This is sufficient for standing, as Plaintiffs' desired course of conduct need only be "'*arguably*' proscribed by the challenged" policy. *Brown*, 86 F.4th at 764 (emphasis added) (citing *Babbitt*, 442 U.S. at 298); *see also Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010). In any event, Defendants' argument is beside the point because all the Plaintiffs stated that they want to engage in protests, which is undoubtedly covered by the Policy. (*See, e.g.*, Akou Decl. ¶ 6; *see* Expressive Activity Policy at 6).[5]

---

[5] The parties also dispute whether Wirtshafter and Murphy are "IU Community Members" such that they may exercise the Policy's carveout for spontaneous and contemporaneous assembly and distribution of literature. The court need not decide this issue. As for standing, Wirtshafter and Murphy have standing regardless of whether the Policy's exception for IU Community Members applies to them because they have self-censored from engaging in unapproved overnight protests, which the Policy prohibits for guests, visitors, and IU Community Members. (Wirthshafter Decl. ¶¶ 8–10; Murphy Decl. ¶¶ 7–11; Expressive Activity Policy at 2–3). As for the likelihood of success on the merits, because the court concludes that the Policy's requirement for pre-approval of overnight protests is likely unconstitutional and preliminarily enjoins that

13

Defendants also argue that Plaintiffs lack standing because their statements that their requests for approval will be denied are unsupported. As explained above, Plaintiffs have all expressed a desire to participate in *unapproved* protests; they do not wish to request approval for protests. (*See, e.g.*, Akou Decl. ¶¶ 6, 22). Their statements that, if they do request approval, their requests will be denied, are unnecessary to confer standing as they have established they are self-censoring from participating in unapproved protests.

For the same reasons, Plaintiffs' request for preliminary injunctive relief is ripe for review. Ripeness in a pre-enforcement case depends on two criteria: (1) the fitness of the issues for judicial review, and (2) the hardship to the parties of withholding pre-enforcement review. *Smith v. Wis. Dep't of Agric., Trade, & Consumer Prot.*, 23 F.3d 1134, 1141 (7th Cir. 1994); *Sweeney v. Raoul*, 990 F.3d 555, 560 (7th Cir. 2021) (quoting *Abbott Lab'ys. v. Gardner*, 387 U.S. 136, 149 (1967)). The issues in this preliminary injunction motion are fit for review, as there is an adequate factual record regarding Plaintiffs' self-censorship. *See Carr*, 2024 WL 3819424, at *5 (pointing to the adequacy of the factual record as an indicator of fitness for judicial review). Moreover, withholding pre-enforcement review would result in hardship to the Plaintiffs, who have resorted to self-censorship to avoid enforcement of the policy. *See Smith*, 23 F.3d at 1141 ("The principle at work in the hardship analysis is that a plaintiff should not be required to face the Hobson's choice between forgoing behavior that he believes to be

---

portion of the Policy, the Policy's exception for spontaneous and contemporary activities by IU Community Members is no longer relevant.

lawful and violating the challenged law at the risk of prosecution.").  Because Plaintiffs have suffered the current injury of self-censorship, *Brown*, 86 F.4th at 761, their injury is not dependent on contingent future events, *Trump*, 592 U.S. at 131.  As such, their motion for preliminary injunction is ripe.

In conclusion, Plaintiffs have standing to seek the requested preliminary injunction, and their motion for a preliminary injunction is ripe for review.

### B.   Likelihood of Success on the Merits

Now the court turns to the merits of Plaintiffs' motion for preliminary injunction. Plaintiffs argue that the pre-approval requirement is unconstitutional for two reasons: (1) it is substantially overbroad, and (2) it is not a reasonable time, place, and manner restriction.  The court first discusses whether the Policy is a reasonable time, place, and manner restriction and then considers whether the Policy is substantially overbroad.

#### 1.   Time, Place, and Manner Analysis

The government's ability to regulate expressive activity in public forums, such as Dunn Meadow and other public areas of IU's campuses, is limited.  *See Surita v. Hyde*, 665 F.3d 860, 869–70 (7th Cir. 2011); (Expressive Activity Policy at 3).  In a public forum, "the government may impose reasonable restrictions on the time, place, or manner of protected speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Regulations of the time, place, and manner of a speaker's activities do not violate the First Amendment if "the restrictions are (1) content-neutral, (2) narrowly tailored to serve a significant government interest, and (3) leave open ample alternative channels for communication." *Marcavage v. City of Chicago*, 659 F.3d 626, 630 (7th Cir. 2011).  The

parties dispute whether the Policy is content-neutral and thus what level of scrutiny applies.[6]  The court need not decide this issue because, even assuming the pre-approval requirement is content-neutral and intermediate scrutiny applies, the Policy is not narrowly tailored.

### i.    Significant Government Interest

Defendants maintain that the University adopted the Policy to ensure the IU community's safety.  (Filing No. 85, Defs.' Resp. at 24; Bennett Decl. ¶ 19).  The government's interest in protecting public safety is a significant interest.  *See McCullen v. Coakley*, 573 U.S. 464, 486 (2014); *Navratil v. City of Racine*, 101 F.4th 511, 520 (7th Cir. 2024).  Plaintiffs do not dispute the University has a significant interest in public safety.

### ii.    Narrow Tailoring

To achieve narrow tailoring, a time, place, and manner regulation "'need not be the least restrictive or least intrusive means' of furthering the government's interest."  *Smith v. Exec. Dir. of Ind. War Mem'ls Comm'n*, 742 F.3d 282, 289 (7th Cir. 2014) (quoting *Ward*, 491 U.S. at 798).  That said, "the government 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'"  *Id.* (quoting *Ward*, 491 U.S. at 799); *see also McCullen*, 573 U.S. at 486 ("For a content-neutral time, place, or manner regulation to be narrowly tailored, it must not

---

[6] If a restriction is not content-neutral, strict scrutiny applies and the regulation must be narrowly tailored to serve a compelling government interest.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015).

'burden substantially more speech than is necessary to further the government's legitimate interests.'" (quoting *Ward*, 491 U.S. at 799)).

"Requirements that small groups obtain a permit to gather in a traditional public forum frequently fail the narrow-tailoring requirement." *Smith*, 742 F.3d at 289; *see also Knowles v. City of Waco*, 462 F.3d 430, 436 (5th Cir. 2006) ("Other circuits have held, and we concur, that ordinances requiring a permit for demonstrations by a handful of people are not narrowly tailored to serve a significant government interest."). For example, in *Cox v. City of Charleston*, the court found that the Charleston's permit requirement for parades and assemblies with no exception for small gatherings was not narrowly tailored. 416 F.3d 281, 285 (4th Cir. 2005). The City attempted to justify the permit requirement's application to small groups by citing safety issues, but the court noted that the City failed to "explain how a small demonstration that may become inflammatory would tax its police force any differently than, for example, a street fight between two individuals, so as to justify requiring advance warning of all small demonstrations." *Id.* The court concluded that while the permit requirement's application to small groups might succeed in mitigating potential safety concerns, it did so "at too high a cost, namely, by significantly restricting a substantial quantity of speech that does not impede the City's permissible goals." *Id.* (cleaned up) (quoting *Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1392 (D.C. Cir. 1990)).

Other examples of courts striking down permit requirements that apply to small groups abound. *See Smith*, 742 F.3d at 289 (concluding fourteen-person limit on demonstrations at Monument Circle without a permit was likely unconstitutional given

17

that groups of twenty-five could gather for lunch without a permit); *Am.-Arab Anti-Discrimination Comm. v. City of Dearborn*, 418 F.3d 600, 608 (holding that permit requirement that applied to small groups was not narrowly tailored because it swept "too broadly and improperly defin[ed] the type of public processions which f[e]ll within the city's significant interests"); *Grossman v. City of Portland*, 33 F.3d 1200, 1207 (9th Cir. 1994) (finding permit requirement for a group of six to eight people carrying signs in a park was not narrowly tailored); *Douglas v. Brownell*, 88 F.3d 1511, 1524 (8th Cir. 1996) (expressing concern about narrow tailoring of permit requirement that applied to groups of ten or more people).

Furthermore, "advance notice requirements" of permit schemes "that potentially apply to small groups are nearly always overly broad and lack narrow tailoring." *Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 608. "Any notice period is a substantial inhibition on speech." *Id.* at 605; *see also Grossman*, 33 F.3d at 1206 (stating that advance notice requirements "drastically burden free speech"). "[T]he length of the required period of advance notice is critical to its reasonableness . . . ." *Church of Am. Knights of Ku Klux Klan v. City of Gary*, 334 F.3d 676, 682 (7th Cir. 2003). The Seventh Circuit has noted that "the time required to consider an application will generally be shorter the smaller the planned demonstration." *Id.* Courts consider the burden on the government in evaluating permit applications to ascertain the reasonableness of the advance notice requirement. *See id.* at 682–83 (noting that, prior to 45-day notice requirement at issue, "permits were often sought no more than two weeks before the planned event and no one complained that the period was too short to enable an adequate

18

evaluation of the application"); *Thomas v. Chi. Park Dist.*, 227 F.3d 921, 925–26 (7th Cir. 2000) (upholding thirty-day notice requirement for use of Chicago parks because "thousands of permit applications are filed with the park district every year," and thus, "it would be burdensome to require the park to process the applications in a significantly shorter time"), *aff'd*, 534 U.S. 316 (2002).  Courts have struck down lengthy advance notice periods because they lacked narrow tailoring.  *Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 607 (finding thirty-day notice requirement was not narrowly tailored); *Douglas v. Brownell*, 88 F.3d 1511, 1523–24 (8th Cir. 1996) (holding that five-day notice requirement was not narrowly tailored).  Requirements for long periods of advance notice are particularly problematic when applied to small groups.  *See City of Gary*, 334 F.3d at 683 (holding that 45-day advance-notice period applied to groups of all sizes violated the First Amendment).

Here, the Policy is likely not narrowly tailored to serve the University's interest in public safety because it requires permits for small groups.  For events occurring from 11:00 p.m. to 6:00 a.m., the pre-approval requirement applies regardless of the size of the protest.  Defendants represent that overnight events present heightened security and safety issues due to IUPD's understaffing, limited visibility, closed facilities, and increased alcohol and substance abuse.  (*See Akou* Docket, Hunter Decl. ¶¶ 4–5; Bennett Decl. ¶ 18).  However, in discussing challenges posed by nighttime events, Hunter stated that understaffing has limited IUPD's ability to "manage *large-scale*, nighttime crowd-control situations."  (*Akou* Docket, Hunter Decl. ¶ 4 (emphasis added)).  On this record, the University's interest in public safety is not likely to be implicated by a protest

19

involving two people, even if they seek to express themselves at night.  *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1042 (9th Cir. 2006) (explaining that the government's interest in obtaining notice of "the need for additional public safety and other services" is implicated "[o]nly for quite large groups").  This is particularly so given that individuals and groups are free to engage in other activities during the overnight hours.  (*See, e.g.*, McDonald Decl. ¶ 11); *see Smith*, 742 F.3d at 289; *Cox*, 416 F.3d at 285; *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 522 (D.C. Cir. 2010) ("No doubt *some* individuals and small groups will cause" problems for park security, "but many will not; and the government has not explained why those engaged in free expression are more likely to be problematic than anyone else.").  Because the Policy applies to small groups, Plaintiffs are likely to succeed in demonstrating that the Policy burdens substantially more speech than is necessary to achieve the University's goals and thus fails narrow tailoring.

Furthermore, the Policy likely lacks narrow tailoring because the required notice period is too long for small groups.  There is nothing in the record demonstrating the necessity of a ten-day advance notice period for a protest involving only two people.[7]  Perhaps the University requires ten days to evaluate a permit application for a nighttime protest involving hundreds or thousands of students, but that period is likely unreasonable

---

[7] In their brief, Defendants assert that "the University has reviewed over 1,500 requests to use University facilities in the last hundred days alone."  (Defs.' Resp. at 25).  They cite to Doug Booher's deposition and exhibits to the deposition.  (*See id.*; Booher Dep.).  However, the court could not find support for Defendants' assertion in Defendants' citation or elsewhere in the record.

20

for small groups. *See City of Gary*, 334 F.3d at 683. The Seventh Circuit's decision in *Thomas* does not suggest otherwise. In *Thomas*, the court found that Chicago's thirty-day advance notice period was reasonable given that the City received thousands of permit applications every year. 227 F.3d at 925–26. However, Chicago's permit requirement only applied to events involving fifty or more people. *See id.* at 923. In contrast, the Policy's advance notice requirement for nighttime events applies to events of all sizes. Thus, the ten-day notice period likely burdens substantially more speech than required to serve the University's interest in public safety and lacks narrow tailoring.

Defendants argue that universities have unique safety concerns and point to *Bowman v. White*, 444 F.3d 967 (8th Cir. 2006), to support the Policy. In *Bowman,* the court upheld a university policy that required "Non-University Entities" to reserve campus space for use three days in advance. 444 F.3d at 972. The court found that the policy was narrowly tailored, even though the plaintiff was a single speaker, because he attracted audiences of up to two hundred people. *Id.* at 981. Thus, in effect, *Bowman* did not involve a single speaker or small group—the permit requirement was narrowly tailored as applied to the plaintiff because his preaching resulted in crowds ranging from fifty to two hundred people. *See id.* Moreover, *Bowman* involved a three-day notice period, *id.* at 972, which is significantly shorter than the ten-day period at issue here. The *Bowman* decision does not change the court's conclusion.

In sum, the Policy likely burdens substantially more speech than necessary to

further the University's interest in public safety and thus lacks narrow tailoring.[8] Plaintiffs are likely to succeed on the merits of their claim that the Policy violates the First Amendment.

### 2.    *Overbreadth Analysis*

Plaintiffs also argue that the Policy is unconstitutionally overbroad.  Under the overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech."  *United States v. Williams*, 553 U.S. 285, 292 (2008). A plaintiff may prevail on an overbreadth challenge by demonstrating that there is "a realistic danger that the statute . . . will significantly compromise recognized First Amendment protections of [third] parties."  *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)).  To be unconstitutional under the overbreadth doctrine, a statute's overbreadth must be substantial.  *See id.*  A statute is substantially overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

The Policy is unconstitutionally overbroad for the same reasons it lacks narrow tailoring.  As the Sixth Circuit explained, "[p]ermit schemes and advance notice requirements that potentially apply to small groups are nearly always overly

---

[8] Because the court finds that the Policy likely fails narrow tailoring, the court need not consider whether the Policy leaves open ample alternative channels for communication.

broad and lack narrow tailoring." *Am.-Arab Anti-Discrimination Comm.*, 418 F.3d at 608. Because the Policy's pre-approval requirement and ten-day notice period for nighttime events applies to small groups, the Policy is "hopelessly overbroad." *Id.*

### C.    Irreparable Harm

The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Moreover, quantifying a First Amendment injury "is difficult and damages are therefore not an adequate remedy." *Flower Cab Co. v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982). Therefore, because the court concluded that the Policy likely violates the First Amendment, Plaintiffs have established they would suffer irreparable harm if they were denied a preliminary injunction.

### D.    Balance of the Equities

The balance of equities generally weighs in favor of injunctions protecting First Amendment rights. *See Alvarez*, 679 F.3d at 589–90 ("[I]f the moving party establishes a likelihood of success on the merits, the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional."). Where a university seeks to apply a "policy in a manner that violates [the plaintiff's] First Amendment rights . . . then [the university's] claimed harm is no harm at all." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006); *see also Joelner*, 378 F.3d at

620 ("[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because 'it is always in the public interest to protect First Amendment liberties.'" (quoting *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998))).  Because the Policy likely violates the First Amendment, the balance of equities weighs in favor of preliminary injunctive relief.

### E.    Public Interest

"[I]njunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y*, 453 F.3d at 859.  "[T]he public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Alvarez*, 679 F.3d at 590.  Because the requested preliminary injunction would protect First Amendment rights, granting the preliminary injunction is in the public interest.

### F.    Scope of the Injunction

Plaintiffs ask that the court preliminarily enjoin Whitten and the Trustees of Indiana University from enforcing "so much of the amended Expressive Activity policy that prohibits the following activities on Indiana University property if they occur without prior permission between the hours of 11:00 p.m. and 6:00 a.m.: protesting, making speeches, circulating petitions, and all otherwise unapproved conduct and activities otherwise prohibited." (Mot. for Preliminary Inj.).  As Defendants point out, Plaintiffs do not seek to enjoin any other provision of the Policy.  (Defs.' Resp. at 11; *see* Mot. for Preliminary Inj.).

In fashioning injunctive relief, there is a strong presumption of severability. *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 625 (2020) (stating that courts

should "refrain from invalidating more of the statute than is necessary" (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652–53 (1984) (plurality opinion))). As the Supreme Court explained, "when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We prefer . . . to sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29 (2006). Accordingly, the court enjoins enforcement of the Policy only to the extent it prohibits protesting, making speeches, circulating petitions, and all other unapproved conduct and activities otherwise prohibited on University property without prior permission and between the hours of 11:00 p.m. and 6:00 a.m.

### G.    Bond

A preliminary injunction may only issue if "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Notwithstanding this language in Rule 65, the Seventh Circuit has instructed that district courts may "waive the requirement of an injunction bond" if they are "satisfied that there's no danger that the opposing party will incur any damages from the injunction." *Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010); *see also Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1997) (recognizing that "[u]nder appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)").

Plaintiffs contend that a preliminary injunction here will not expose the University to damages or risk of economic harm and requests that the court issue this injunction

25

without bond. Defendants make no argument to the contrary. The court is satisfied that the University will not suffer any damages if the policy is enjoined. Thus, "[t]here is no reason to require a bond" in this case. *Habitat Educ. Ctr.*, 607 F.3d at 458; *see also Allen v. Bartholomew Cnty. Ct. Servs. Dep't*, 185 F. Supp. 3d 1075, 1087 (S.D. Ind. 2016). Plaintiffs shall not be required to post a bond.

## IV.    Conclusion

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction (Filing No. 73) is **GRANTED**. The injunction shall be set forth in a separate order.

**IT IS SO ORDERED** this 29th day of May 2025.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.