UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JASPER WIRTSHAFTER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) No. 1:24-cv-00754-RLY-MKK |
| | ) |
| THE TRUSTEES OF INDIANA UNIVERSITY, | ) |
| *et al.*, | ) |
| | ) |
| Defendants. | ) |

**UNIVERSITY DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AND MEMORANDUM IN
SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT**

John R. Maley
Dylan A. Pittman
Amanda Jane Gallagher
BARNES & THORNBURG LLP
11 South Meridian Street
Indianapolis, IN 46204
Telephone: (317) 231-7464
Email:  jmaley@btlaw.com
dylan.pittman@btlaw.com
amanda.gallagher@btlaw.com

Charity Seaborn
BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, IL  60606
312.214.4827
charity.seaborn@btlaw.com

*Counsel for Defendants*

# TABLE OF CONTENTS

I.   Statement of the Issues ................................................................................................ 1

II.  Introduction ............................................................................................................... 1

III. Statement of Material Facts Not In Dispute ............................................................ 2

   A.   The University's Express Commitment to Speech .......................................... 2

   B.   IUPD's Responsibility for Campus Safety .................................................... 2

   C.   Escalating Campus Tensions ........................................................................ 3

   D.   Dunn Meadow Encampment Starting in April 2024 ...................................... 4

   E.   Amendment of Dunn Meadow Policy and Issuance of Trespass Warnings ............ 4

   F.   Prior Policy effective August 2024 ............................................................... 8

   G.   Prior Policy effective November 2024 .......................................................... 10

IV.  Statement of Material Facts In Dispute .................................................................. 12

V.   Summary Judgment Standard .................................................................................. 19

VI.  Defendants Are Entitled to Summary Judgment on All Claims ............................. 19

   A.   Both non-damages claims fail. .................................................................... 20

      1.   Both non-damages claims are barred for mootness and lack of standing. ... 20

      2.   The non-damages claims, unable to meet *Ex Parte Young*, fail on sovereign immunity. ........................................................................................ 25

      3.   Plaintiffs lack viable, non-speculative basis for their requested relief anyway. ........................................................................................ 26

   B.   The damages claim fails as a matter of law. ................................................ 28

      1.   President Whitten and Superintendent Hunter have qualified immunity. ..... 28

      2.   IU's President and Superintendent lacked requisite personal involvement in the circumstances on which Plaintiffs' claim relies. ..................................... 38

VII. Plaintiffs Are Not Entitled to Their Requested Partial Summary Judgment ....................... 38

   A.   Plaintiffs are not entitled to summary judgment on their non-damages claims. ........ 39

   B.   Nor are Plaintiffs  entitled to partial summary judgment on their damages claim. .... 40

VIII. Conclusion ............................................................................................................... 40

Page(s)

## Cases

*Al-Alamin v. Gramley,*
926 F.2d 680 (7th Cir. 1991) ........................................................................25

*Ashcroft v. al-Kidd,*
563 U.S 731 (2011) ........................................................................................36

*Arbaugh v. Y & H Corp.,*
546 U.S. 500 (2006) ......................................................................................20

*Arcara v. Cloud Books, Inc.,*
478 U.S. 697 (1986) ......................................................................................31

*Bell v. Taylor,*
2015 WL 13238677 (S.D. Ind. Dec. 4, 2015) ..............................................28

*Benkendorf v. Village of Hazel Crest,*
804 F.2d 99 (7th Cir. 1986) ..........................................................................23

*Boy Scouts of America v. Dale,*
530 U.S. 640 (2000) ......................................................................................32

*Brown v. Kemp,*
86 F.4th 745 (7th Cir. 2023) ..........................................................21, 22, 40

*Cardinal Chem. Co. v. Morton Int'l, Inc.,*
508 U.S. 83 (1993) ........................................................................................28

*Carr v. Trustees of Purdue Univ.,*
2024 WL 3819424 (S.D. Ind. Aug. 14, 2024) ..............................................21

*Chavez v. Ill. State Police,*
251 F.3d 612 (7th Cir. 2001) ..................................................................29, 38

*City of L.A. v. Lyons,*
461 U.S. 95 (1983) ............................................................................24, 26, 27

*City of Mesquite v. Aladdin's Castle, Inc.,*
455 U.S. 283 (1982) ......................................................................................23

*City of Tahlequah v. Bond,*
595 U.S. 9 (2021) ....................................................................................36, 40

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ......................................................................................22

*Collin v. Chicago Park Dist.,*
460 F.2d 746 (7th Cir. 1972) ........................................................................33

*District of Columbia v. Wesby,*
583 U.S. 48 (2018) ........................................................................................36

*Doe v. Purdue Univ.,*
928 F.3d 652 (7th Cir. 2019) ..............................................................24, 25, 27

*Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago,*
326 F.3d 924 (7th Cir. 2003) ..................................................................22, 23

*Flint v. Dennison,*
488 F.3d 816 (9th Cir. 2007) ........................................................................25

*Free Speech Coal., Inc. v. Paxton,*
145 S. Ct. 2291 (2025) ..................................................................................32

*Glover v. Cole,*
  762 F.2d 1197 (4th Cir. 1985) ........................................................................... 35

*Green v. Mansour,*
  474 U.S. 64 (1985) .............................................................................................. 25

*Gresham v. Peterson,*
  225 F.3d 899 (7th Cir. 2000) ............................................................................. 35

*Hill v. Colorado,*
  530 U.S. 703 (2000) ............................................................................................ 34

*In re Associated Press,*
  162 F.3d 503 (7th Cir. 1998) ............................................................................. 26

*Indiana Coal. for Pub. Educ. - Monroe Cnty. v. McCormick,*
  338 F. Supp. 3d 926 (S.D. Ind. 2018) .............................................................. 21

*Kisela v. Hughes,*
  584 U.S. 100 (2018) ............................................................................................ 36

*Kremens v. Bartley,*
  431 U.S. 119 (1977) ............................................................................................ 24

*Kress v. CCA of Tennessee, LLC,*
  694 F.3d 890 (7th Cir. 2012) ............................................................................. 25

*Laird v. Tatum,*
  408 U.S. 1 (1972) ................................................................................................. 22

*LAJIM, LLC v. General Electric Co.,*
  917 F.3d 933 (7th Cir. 2019) ............................................................................. 26

*Liebhart v. SPX Corp.,*
  998 F.3d 772 (7th Cir. 2021) ............................................................................. 26

*Luce v. Town of Campbell, Wisconsin,*
  872 F.3d 512 (7th Cir. 2017) ............................................................................. 35

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ............................................................................................ 21

*MacDonald v. City of Chicago,*
  243 F.3d 1021 (7th Cir. 2001) ........................................................................... 35

*Malley v. Briggs,*
  475 U.S. 335 (1986) ............................................................................................ 36

*Marcavage v. City of Chicago,*
  659 F.3d 626 (7th Cir. 2011) ............................................................................. 35

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ............................................................................................ 35

*Milwaukee Police Ass'n v. Jones,*
  192 F.3d 742 (7th Cir. 1999) ............................................................................. 26

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ............................................................................................ 26

*Murthy v. Missouri,*
  603 U.S. 43 (2024) .............................................................................................. 22

*Navratil v. City of Racine,*
  101 F.4th 511 (7th Cir. 2024) ............................................................................ 35

*Nicodemus v. City of S. Bend, Ind.,*
  137 F.4th 654 (7th Cir. 2025) .......................................................... 30, 32, 33, 34

*O'Shea v. Littleton,*
  414 U.S. 488 (1974) ...................................................................................... 26, 27

*Ozinga v. Price,*
  855 F.3d 730 (7th Cir. 2017) ............................................................................ 21, 22, 23, 25

*Palay v. United States,*
  349 F.3d 418 (7th Cir. 2003) ............................................................................ 12

*Pearson v. Callahan,*
  555 U.S. 223 (2009) ......................................................................................... 29

*Plumhoff v. Rickard,*
  572 U.S. 765 (2014) ......................................................................................... 36

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ......................................................................................... 40

*Sabo v. Erickson,*
  128 F.4th 836 (7th Cir. 2025) ......................................................................... 29, 36, 37

*Samuelson v. LaPorte Cmty. Sch. Corp.,*
  526 F.3d 1046 (7th Cir. 2008) ......................................................................... 32, 38

*Sanville v. McCaughtry,*
  266 F.3d 724 (7th Cir. 2001) ........................................................................... 29, 38

*Schenck v. Pro-Choice Network of W. New York,*
  519 U.S. 357 (1997) ......................................................................................... 35

*Schirmer v. Nagode,*
  621 F.3d 581 (7th Cir. 2010) ........................................................................... 21

*Schmidling v. City of Chicago,*
  1 F.3d 494 (7th Cir. 1993) ............................................................................... 22

*Sears, Roebuck and Co. v. American Mutual Liability Ins. Co.,*
  372 F.2d 435 (7th Cir. 1967) ........................................................................... 28

*Sizelove v. Madison-Grant United Sch. Corp.,*
  597 F. Supp. 3d 1246 (S.D. Ind. 2022) ......................................................... 25

*Speech First, Inc. v. Killeen,*
  968 F.3d 628 (7th Cir. 2020) ........................................................................... 21, 22, 23

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ......................................................................................... 21

*Steel Co. v. Citizens for a Better Env't.,*
  523 U.S. 83 (1998) ........................................................................................... 20

*Tanner v. Ziegenhorn,*
  2020 WL 5648642 (C.D. Ark. Sept. 22, 2020) ............................................. 40

*Thole v. U. S. Bank N.A,*
  590 U.S. 538 (2020) ......................................................................................... 21

*Trotter v. Klincar,*
  566 F. Supp. 1059 (N.D. Ill. 1983) ................................................................. 28

*Virginia v. American Booksellers Ass'n, Inc.,*
  484 U.S. 383 (1988) ......................................................................................... 21

*W.T. Grant Co. v. U.S.,*
  345 U.S. 629 (1953) ......................................................................................... 26

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ......................................................................................... 34, 35, 37

*Wernsing v. Thompson,*
  423 F.3d 732 (7th Cir. 2005) ........................................................................... 21, 26, 37

*White v. Pauly,*
  580 U.S. 73 (2017) ........................................................................................... 36

*Wilton v. Seven Falls Co.,*
   515 U.S. 277 (1995) ............................................................................................................28
*Yun Chen v. Holder,*
   715 F.3d 207 (7th Cir. 2013) .............................................................................................12

**Statutes**

28 U.S.C. § 2201 ..................................................................................................................28
42 U.S.C. § 1983 ..................................................................................................................29
I.C. § 21-39-4-6 .....................................................................................................................3
I.C. § 21-31-2-1 .....................................................................................................................6
I.C. § 21-39-4-6 .....................................................................................................................3
I.C. § 35-43-2-2 .....................................................................................................................6
I.C. chapter 21-39-8 ..............................................................................................................8
I.C. § 21-39-8-9 ...................................................................................................................11
I.C. § 35-43-2-2 ................................................................................................................5, 7
I.C. § 21-39-4-5 .....................................................................................................................2

**Rules**

Federal Rule of Civil Procedure 56 .....................................................................................19
Federal Rule of Civil Procedure 1 .......................................................................................39

## I.    Statement of the Issues

Whether summary judgment is required for Defendants—not Plaintiffs—on Plaintiffs':

1.  damages claim against the two individual-capacity Defendants (Indiana University's President and its Superintendent for Public Safety), given Plaintiffs' inability to make one (or both) of their two required showings for qualified immunity, or their failure to state a claim for Section 1983 damages liability against those officials otherwise;

2.  claim involving IU's superseded August 2024 Policy, for which Plaintiffs seek an injunction expunging disciplinary items that have been formally rescinded and confirmed to have no continuing force or effect; and

3.  claim challenging overnight restrictions from IU's November 2024 Policy, which has been superseded by IU's operative amended Policy that has no such overnight restrictions.

## II.    Introduction

This case challenges University actions and policies that no longer exist and seeks relief that the law—starting with Article III—does not permit. Plaintiffs assert First Amendment claims for damages based on temporary trespass warnings they received from law enforcement following their arrests for conduct including criminal trespass, and for other relief based on superseded policy material and rescinded disciplinary matters. Each claim fails on multiple grounds. Far from warranting Plaintiffs' requested partial summary judgment about "liability" and injunctions targeting past matters that have no continuing effect, this case requires summary judgment for Defendants, not Plaintiffs.

Among others set forth in this Brief, core points compelling that result are these:

1.    The damages claim cannot survive qualified immunity, as Plaintiffs cannot meet either of their two-part burden to show: (a) that the two individual-capacity Defendants (the University's President and Superintendent) violated Plaintiffs' constitutional rights, and (b) that the rights were clearly established at the time of the challenged conduct. Unable to satisfy either prong, Plaintiffs instead, *e.g.*, rely on inapposite case law that does not establish, clearly or otherwise, anything that Defendants could have violated. They also rely on circumstances outside those Defendants' personal involvement and thus outside any cognizable basis for Section 1983 damages liability.

1

**2.**    The non-damages claims are based on past, inoperative policy and disciplinary material that lacks continuing force or effect. These claims pose no Article III controversy, and in any event fail to satisfy *Ex Parte Young* or present a non-speculative, viable basis for federal redress.

Defendants' Motion should be granted, Plaintiffs' denied, and this suit dismissed.

## III.    Statement of Material Facts Not In Dispute

### A.    The University's Express Commitment to Speech

The University is expressly committed to protecting IU community members' rights to free speech. [*E.g.*, Ex. 11 (operative UA-10 Policy) at 4]  Regarding its Bloomington campus, IU recognizes its property known as Dunn Meadow has served as an important place for IU community members to engage in free expression. [*Id.*] In 1969, IU's Board of Trustees designated Dunn Meadow as the Indiana University Assembly Ground. [*Id.*] Dunn Meadow has since been the site of numerous protests, demonstrations, and other expression on a variety of issues. [*Id.* at 4; ECF80 at 4, ¶12.]

### B.    IUPD's Responsibility for Campus Safety

Although the Bloomington campus is its flagship location, IU has two core campuses, five regional campuses, and two regional centers. *See* IU Locations, at http://iu.edu/about/locations.html (last accessed 7/31/25). These settings range from a traditional college campus to urban environments. [*See* ECF84-1, ¶ 9; -2, ¶10.] Each is open to the public and not fenced or closed off from pedestrians [ECF84-1, ¶9], such that persons can often enter and exit campus quickly  and undetected. [ECF84-2 ¶10; -3, ¶8.] This is especially true for the Bloomington campus, which is 1,933 acres and, in some places, heavily wooded. *See* Protect IU, at*:* https://protect.iu.edu/about/index.html (last accessed 7/31/25). Given the numerous resident students (many of them minors), this presents unique challenges to IU to ensure its community's safety and welfare. [ECF84-1, ¶10; -2, ¶11; -3, ¶9.]

The IU Police Department ("IUPD") serves as the general police power for the University. [*See generally, e.g., Akou* ECF27-1; *accord* Ind. Code §§ 21-39-4-5(a) (describing "powers, privileges,

immunities, and duties" of police officers); I.C. § 21-39-4-6.] As with each campus, IUPD's primary jurisdiction in Bloomington is real property owned or occupied by the university, including the streets passing through and adjacent to such property. [*Akou* ECF27-1 at 1, ¶3; *accord* I.C. § 21-39-4-6(a).][1]

### C.    Escalating Campus Tensions

In line with nationwide trends, the IU community experienced increased political tensions starting in the fall of 2023. [*Akou* ECF27-1 at 2, ¶7.] Around this period, IU saw an uptick in reported instances of antisemitic and Islamophobic activity, and multiple reported acts of intimidation and harassment against IU community members engaged in political and other activities. [*Id.* at 2-3, ¶¶7-9.] For example, in November 2023 IUPD found a swastika painted on the Rotary Building on the Indianapolis campus; in January 2024 Chabad House on the Bloomington campus received a bomb threat; in March 2024 professors reported getting threatening emails in Hebrew and English. [*Id.*] During this time, students also reported being harassed on campus due to their ethnicity or religion, with, *e.g.*, one report[ing] that he had been called a terrorist because he was Palestinian, and multiple students reporting in December 2024 about concerning a group of men showing up to a gathering in support of Palestine and yelling that the students were "terrorists" and "rapists." [*Id.*].

As the conflict intensified, many students, faculty, and community members engaged in peaceful acts of political expression on University property. [*Id.* at 2-3, ¶8.] In total, IU authorized and supported over 100 events related to the conflict. [*Id.*] Unfortunately, however, starting in the spring of 2024, IU and IUPD received reports that some events were becoming increasingly disruptive to campus activities and hostile to non-participants. [*Id.* at 2-3, ¶¶7-9.] For instance:

- In February 2024, a student protester harassed and intimidated a prospective student on a tour, using explicit language and following the prospect into buildings. [*Id.*]

---

[1] *Akou v. The Trustees of Indiana Univ.*, No. 1:24-cv-1469-RLY-MJD was consolidated with this case on December 10, 2024, and was closed. [*Akou* ECF57.] Any cite to a filing from the *Akou* docket is prefaced by "*Akou*" (*e.g.*, page 2 of the *Akou* docket's first filing would be *Akou* ECF1 at 2).

- The next month, protesters disrupted a Naval Surface Warfare Center event held at the Luddy School of Informatics, Computing, & Engineering. [*Id.*] They were given three warnings to cease interruptions, but IUPD had to be dispatched. [*Id.*]

- During a panel held by the IU Walter Center for Career Achievement, protesters raised concerns about the war and engaged a heated exchange with the panel. [*Id.* at 3, ¶9.]

Burdens were thus increased on IUPD to ensure campus safety and continuity of operations. [*Id.* at 2-4, ¶¶7-12.] IUPD and IU's Office of Emergency Management and Continuity was asked to monitor campus tours. [*Id.*] More IU resources were dedicated to assessing security across IU. [*Id.*]

### D.    Dunn Meadow Encampment Starting in April 2024

In late April 2024, protestors established an "encampment" in Dunn Meadow, further straining University and IUPD resources. [*Id.* at 3, ¶10.] Altercations occurred between protestors and individuals leaving events for other student organizations. [*Id.*] Encampment residents were also the reported source of vandalism to IU property. [*Id.*] IUPD received reports of such residents engaging in unhygienic practices, including setting up "dry toilets" on Dunn Meadow, and bathing in and collecting water from IU's Campus River, a small stream just south of the encampment. [*Id.*]

Parts of the encampment became occupied by individuals unaffiliated with IU. [*Id.* at 3-4, ¶11.] IUPD received reports of persons with violent criminal histories (*e.g.*, firearm and weapons violations) taking up occupancy in the encampment. [*Id.*] One person overdosed on drugs in the encampment. [*Id.*] Because of the encampment, Dunn Meadow had to be closed for significant environmental remediation, making it unavailable for IU operations and the IU community. [*Id.* at 2, ¶6.] .]

### E.    Amendment of Dunn Meadow Policy and Issuance of Trespass Warnings[2]

The original Dunn Meadow policy required advance permission for use of structures in Dunn Meadow from 11:00pm through 6:00am. [ECF80 at 5, ¶13; ECF98 at 11 (citing Bd. Minutes, July 19, 1963, at ¶13); *see* ECF1-1 at 1-2 (January 1969 "Policy for the use of Indiana University Aassembly

---

[2] After originally seeking prospective relief against their no-trespass orders [ECF1 at 2], Plaintiffs recognized the "orders against the[m] have been rescinded, thereby mooting the … claim for injunctive and declaratory relief" [ECF35 at 1-2].

Ground" recommending creation of committee "to oversee the implementation of these provisions, to give continuing advice on changes of policy, and to provide, if necessary, more detailed regulation …"; "[i]n cases of non-compliance, the University should use the legal process to enforce its rights").] In its amended version as of April 24, 2024, the policy required such permission for installation of structures, such as tents and signage, in Dunn Meadow, regardless of time of day. [ECF80 at 5, ¶14.]

In its present version effective since 2021, IUPD general order G18.1.1 authorizes IUPD to issue no-trespass orders or "trespass warnings." [ECF97-11 at 1; Ex. 1 at 1.] Per G18.1.1:[3]

- The "IUPD … strives to maintain a safe academic environment and workplace. Officers will appropriately regulate areas open and accessible to the public (building lobbies, open spaces on campus), as well as appropriately restrict areas of the campus that are not open to the public (private offices, research labs, residence halls). To accomplish this, the use of trespass warnings and arrests may be employed." [Ex. 1 at 1.]

- Example "situations in which a … warning may be issued include" when [*id.* at 2-4]:
  - "An individual's actions are deemed to be harmful or disruptive to the University or its community";
  - "An individual's actions are harmful, disruptive, and/or contrary to the University's policies, rules or regulations";
  - "An individual is present in an area that is not open to the public, without proper authorization, or in a public building after the building is closed";
  - "An individual's actions are contrary to Indiana law";
  - "Any other situation where an individual's actions pose a public safety issue."

- "IUPD has discretion on the length of the … warning on [IU] property upon careful evaluation of the totality of the circumstances," but an "IUPD supervisor must approve any … warning longer than one year and has the final issuing authority (subject to appeal) on the length of all … warnings in light of the totality of the circumstances." [*Id.*.]

- Warnings recipients may appeal *via* the process referenced in G18.1.1. [*Id.* at 5.]

G18.1.1 also states that "for additional guidance," "[o]fficers may refer to IC 35-43-2-2" [*id.* at 4]—the criminal trespass statute prohibiting, *e.g.*, anyone "not having a contractual interest in the property" from "knowingly or intentionally" either "enter[ing] the real property of another person

---

[3] G18.1.1 is publicly accessible at https://protect.iu.edu/iu-police-department/community-policing/general-orders/iupd-general-orders.html (last accessed 7/31/25), specifically by clicking the arrow to the left of "Chapter 18: Other Orders" and then clicking "G18.1.1 Trespass Warning and Arrests."

after having been denied entry by the other person" or "that person's agent ..." or "refus[ing] to leave the real property of another person after having been asked to leave by the other person" or "that person's agent ..." (I.C. §§ 35-43-2-2(b)(1), -(2)). [*Accord* I.C. § 21-31-2-1 (IU's "board of trustees" "may govern the ... disposition ... and ... method and purpose of use ... of property owned, used, or occupied by [IU], including travel over and assembly upon the property."); ECF80 at 7, ¶26.]

On April 24, 2024, University personnel including President Whitten attended a meeting regarding the Dunn Meadow encampment. [ECF97-11 at 1.] Application of Indiana's criminal trespass laws was discussed at the meeting. [ECF80 at 7, ¶21.] Consistent with G18.1.1 [Ex. 1 at DEF367-71], at some point IU Superintendent for Public Safety Benjamin Hunter directed IUPD  personnel to issue trespass warnings to individuals who had been arrested in Dunn Meadow [ECF80 at 7, ¶24]. Although IU's President was "generally aware of the authority of the IUPD to issue no-trespass orders and was generally aware that no-trespass orders might be issued as the result of enforcement in Dunn Meadow," she did not expressly authorize the issuance of no-trespass orders was not "directly consulted" prior to such issuance.  [ECF97-11 at 1-2, 4.]

No later than "first thing in the morning" of April 25, 2024, signage had been posted in Dunn Meadow showing the as-amended restrictions on structures even during daylight hours. [ECF97-4 at 3, ¶8; -8 at 3, ¶8; *accord* ECF97-1 at 3, ¶8 (Akou knew of the amended policy upon entering Dunn Meadow on April 27).] IU personnel orally conveyed the same. [ECF97-4 at 3, ¶8.] Signage "detailed the policy change" in "subsequent days," too. [ECF97-10 at 3, ¶8; *accord* ECF97-9 at 3, ¶8 (Tang, who got her warning on April 27, "learned about the change in the ... days" "subsequent" to April 25).]

During demonstrations in Dunn Meadow on April 25 or April 27, 2024, "[P]laintiff w[ere] arrested for criminal trespass." [ECF80 at 5-6, ¶¶16-18.] While "[d]emonstrations were ... allowed to continue in Dunn Meadow" [*id.*], each Plaintiff, immediately after being arrested, got a "'no-trespass

order' pursuant to Indiana Code § 35-43-2-2, from [IUPD] officers" [*id.* at 6, ¶20; ECF97-1 thru -10]. Plaintiffs say the warnings resulted from "their arrests for misdemeanor trespass" [ECF98 at 9]:

- On April 25, Biswas, McDonald, Meldrum, Murphy, and Robinson "were arrested for criminal trespass either for allegedly refusing to remove tents or for allegedly refusing to disperse so that tents could be removed." [*Id.* at 14 (citing ¶9 of ECF97-2, -4, -5, -7, -8).]
- On April 27, remaining Plaintiffs Akou, Greene, Phillips, Tang, and Wirtshafter "were arrested for identical reasons …." [*Id.* at 15 (citing ¶9 of ECF97-1, -3, -7, -9, -10).]

In response to a production request for "audio, video, or photographs of," *e.g.*, "events depicting any Plaintiff or created by any Plaintiff in Dunn Meadow in 2024," Plaintiffs produced certain material and otherwise objected that "the events that took place in April of 2024 are not relevant to either litigation." [Ex. 2 at 4-5.]

Plaintiffs cite no evidence that IU's President or Superintendent specified, or even knew of, the duration or scope of any temporary access restrictions set forth in the warnings initially issued to any Plaintiff. [*See generally, e.g.*, ECF98.] In any event, the warnings noted the option "to appeal" and how to start the appeal process. [*Id.* at 15; ECF97-1 at 6; -2 at 6; -3 at 7; -4 at 6; -5 at 6; -6 at 6; -7 at 6; -8 at 7; -9 at 6.] And "within a few days" post-issuance, the warnings were "stayed" for seven Plaintiffs thus "allowing their return to university property" [ECF98 at 30], and all Plaintiffs commenced "administrative appeals" of the warnings that were ultimately "granted" [*id.*]. Plaintiffs say these developments show the "University promptly conclud[ing] that allowing the [P]laintiffs to return to Dunn meadow did not present any untoward risks." [*Id.* at 30; *see also id.* at 9.]

In line with G18.1.1 [Ex. 1 at 3-4], Plaintiffs' warnings specified different "Expiration Date[s]" and "Location[s] Trespassed From." [ECF97-1 at 6 (Akou's put expiration at no more than one year later, counting from day after warning, and referenced campus); -10 at 6 (Tang's same); -7 at 6 (Phillips's same); -2 at 6 (Biswas's was to expire no more than a year post-issuance, and referenced IU properties); -4 at 6 (McDonald's same); -5 at 6-7 (Meldrum's same); -6 at 6 (Murphy's same); -8 at 7 (Robinson's same); -3 at 7 (Greene's was to expire within five years, and referenced campus).

The vast majority of Plaintiffs' warnings were ultimately in effect for a few days at most, thus ending in April or early May—still during what Plaintiffs called "the height of the nationwide protest movement" [ECF97-3 at 5, ¶17; -6 at 5, ¶16; -10 at 5, ¶16.][4]

Meanwhile, multiple Plaintiffs engaged in the Dunn Meadow demonstrations on one or more days before being arrested and receiving a warning. [ECF97-7 at 3, ¶¶8-10 (two days for Phillips: April 25 and 26); -9 at 3, ¶8 (same for Tang); -3 at 3, ¶8 (same for Greene); -10 at 3, ¶8 (same for Wirtshafter); -1 at 3, ¶8 (one day for Akou: April 26).] As for Plaintiff Greene, even in the period from his April 27 trespass warning through its rescission, he "frequently supported the demonstrators by appearing across the street from Dunn Meadow." [ECF97-3 at 5, ¶17.] "The demonstrations continued in Dunn Meadow every day until the beginning of August 2024…." [*Id.*; *accord* ECF97-6 at 3-4, ¶11.]

### F.    Prior Policy effective August 2024

On July 29, 2024, IU's Board approved UA-10 Expressive Activity Policy (the "August 2024 Policy") that was effective from August 1, 2024 [ECF72-1] until November 15, 2024, when it was superseded by the November 2024 Policy [ECF72-2]. This Policy's express goal was to "provide[] the time, place, and manner guidelines for Expressive Activity on University property" and "ensure[] the University's educational mission is actualized while preserving the rights guaranteed to Indiana University Community Members under the U.S. Constitution and IC 21-39-8." [ECF72-1 **at 5.**]

---

[4] [ECF97-7 at 3-4, ¶¶9-16 (Phillips's Saturday, April 27, 2024 warning was stayed the next business day, on April 29, and on May 24 she saw her appeal was granted and warning rescinded); -1 at 3-5, ¶¶14-16 (Akou's April 27 warning was stayed two business days later but otherwise had same timing as Phillips's); -2 at 3-4, ¶¶10-16 (Biswas's April 25 warning was stayed two business days later, on April 29, and she later saw her appeal was granted and warning rescinded); -4 at 3-5, ¶¶9-16 (McDonald's same); -8 at 3-5, ¶¶9-16 (same for Robinson, who saw on May 24 his appeal was granted and warning rescinded); -9 at 3-4, ¶¶9-16 (Tang's April 27 warning was stayed three business days later, on May 1, and she later saw her appeal was granted and warning rescinded); -5 at 3-4, ¶¶9-16 (Meldrum's April 25 warning was stayed within six business days, on May 3, and on May 24 she saw her appeal was granted and warning rescinded); -6 at 3-5, ¶¶9-16 (Murphy got her warning on April 25, on May 24 she saw her appeal was granted and the warning rescinded); -10 at 3-5, ¶¶9-16 (Wirtshafter got his warning on April 27 on May 24 he saw his appeal was granted and warning rescinded); Ex. 2 at 9 (Greene saying he got his warning "on April 27, 2024, and he believes that he received notice that it had been lifted on June 24, 2024"), ECF97-3 at 3-5 (Greene saying he "did not receive this notice until sometime, I believe, in July").]

Plaintiffs previously challenged the August 2024 Policy, framing their claim as "seeking to enjoin the temporal limitation contained in [such Policy] that prevented any expressive activity from occurring on University property between the hours of 11:00 p.m. and 6:00 a.m." [*Akou* ECF39 at 1 (citing ECF10 (8/30/2024 preliminary-injunction motion)).]  Once that policy version was superseded *via* November 2024 amendment, though, Plaintiffs withdrew their motion for preliminary injunction that sought requested such relief. [*Id.* at 1-2.]  They acknowledge they cannot seek injunctive relief against any restriction from the August 2024 Policy, as it was superseded.  [ECF98 at 34.]

Plaintiffs Akou, McDonald, Phillips, Robinson, and Greene do seek "expungement" of certain IU disciplinary warnings or actions, cited in their Brief, related to the August 2024 Policy. [*Id.* at 19, 34-35.]  Specifically, their Brief cites five letters, from August or September of 2024, that those Plaintiffs received from IU Bloomington leadership regarding compliance with that prior Policy version.  [*Id.* (citing ECF69-2 at 6-7 (Akou's ltr.); ECF69-5 at 5-6 (McDonald's); ECF69-8 at 7-8 (Phillips's); ECF69-9 at 6-7 (Robinson's); ECF88-1 at 1-3 (Greene's).]

IU, however, has rescinded all letters it had sent to faculty and students as to compliance with the August 2024 policy, including those it had sent to Plaintiffs Akou, Phillips, Robinson, McDonald, and Greene [ECF69-2, -5, -8, -9; ECF88-1]. [Ex. 3 at 1-2; Ex. 8 at 1-2.]  In June 2025, IU Bloomington leadership sent letters to, *e.g.*, Akou, McDonald, Phillips, and Robinson. [Ex. 3 (Shrivastav Decl.) at 1-2; Ex. 4 (Akou's ltr.) at 1; Ex. 5 (McDonald's) at 1; Ex. 6 (Phillips's) at 1; Ex. 7 (Robinson's) at 1.]  Each was signed by IU Bloomington Provost & Executive Vice Chancellor Rahul Shrivastav, who has University-wide and Bloomington-specific responsibilities including being IU Bloomington's Chief Academic Officer. [Exs. 3–7.] Each had the subject "Re: Formal Rescission of Letter of Reprimand"; referenced the correspondence that had been directed to such Plaintiff as just noted; and confirmed: "**your letter of reprimand hereby rescinded and no longer has any force or effect**." [Exs. 4–7.] Each stated that the "original letter of reprimand and this letter will remain in your permanent file to

document the rescission and invalidation of the original letter. This is to provide a clear record of this action for faculty and other parties." [*Id.*]

Executive Vice Chancellor Shrivastav understands that the University, and the Office of the Provost & Executive Vice Chancellor at IU Bloomington where the four Plaintiffs just named are professors, have no intention of restoring or reinstating what his June 25, 2025 correspondence to those professors rescinded and confirmed to have no force or effect. [Ex. 3 at 1-2.] He understands the rescissions noted in his June 25 correspondence are therefore definitive. [*Id.*]

As for Greene—who cites and complains of an August 2024 letter about the August 2024 Policy [ECF98 at 19 (citing ECF88-1)]—July 9, 2025 correspondence signed by IU Bloomington Senior Associate Dean of Students Elizabeth Spotts was sent to Mr. Greene and confirmed: "**the charges and/or resolution reached in your case are hereby rescinded and no longer have any force or effect**" [Ex. 8 (Spotts Decl.); Ex. 9 (Greene ltr.) at 1; Ex. 10 (Greene ltr.) at 1]. This July correspondence also stated, "The original charges, resolution, and this letter will remain in your conduct file to document the rescission and invalidation of the underlying incident. This is to provide a clear record of the action taken and will be retained consistent with the University's records retention schedule. There is no further action to take related to this matter." [Ex. 9, -10.]

### G.    Prior Policy effective November 2024

The August 2024 Policy was amended on November 15, 2024 by the November 2024 Policy [ECF72-2 at 1], which took effect that day until being amended and superseded on June 12, 2025, by the operative, Board-enacted version [Ex. 11]. The November 2024 Policy stated: "To allow for freedom of expression and peaceful demonstration on campus while also respecting the University's operations," certain "regulations for Expressive Activity" identified therein "are in place." [ECF72-2 at 4.] The only IU policy provision Plaintiffs seek to enjoin is the November 2024 Policy's "Limited Content-Neutral Overnight Restrictions." [*E.g.*, ECF98 at 47.]

10

That provision, which is no longer in effect [Ex. 11], stated [ECF72-2 at 5-6]:

1. Pursuant to IC 21-39-8-9(b)(4), during the overnight hours of 11:00 p.m. to 6:00 a.m. IU Community Members may spontaneously and contemporaneously assemble and distribute literature.

2. For the protection of the [IU] community and in furtherance of the educational mission of the [IU], from the overnight hours of 11:00 p.m. to 6:00 a.m., the activities listed below are prohibited on [IU] property unless:

> they are part of a scheduled or authorized [IU] activity extending into that time period or prior written approval has been obtained from the appropriate [IU] office:
> - Students and Student Organizations: Campus Chief Student Affairs Officer; or
> - Faculty: Executive Vice Chancellor of Academic Affairs; or Campus Chief Academic Officer; or
> - Staff, Guests, and Visitors: University Events.

3. The Expressive Activities prohibited on [IU] property during the overnight hours of 11:00 p.m. to 6:00 a.m., are:

> • protesting;
> • making speeches;
> • circulating petitions; and
> • all other unapproved conduct and activities otherwise prohibited by this Policy or applicable law.

But, the November 2024 Policy no longer exists. [*See* Ex. 11.] As of the Board's June 12, 2025 quarterly meeting, it was superseded by the current Board-enacted UA-10 Policy, which has no overnight restrictions. [*Id.*] Also effective since June 12 is the amended, operative version of IU's Space Use Pre-Approval Standard. [Ex. 12.] This version, which "shall be interpreted in favor of free speech rights," requires prior approval for, *e.g.*, "[p]replanned events of large groups of 50 or more persons" (and clarifies that prior approval is "not required" for, *e.g.*, "[p]replanned events of groups of fewer than 50 persons"); and shortens the prior Standard's 10-day period to "three business days in advance for preplanned events of large groups of 50-99 persons," and "five business days in advance for preplanned events of large groups of 100 or more persons." [*Compare id.* at 1-3, *with* ECF69-1 at 86 (superseded Standard had provision, which no longer exists, that "[p]rior approval [was] required

for," *e.g.*, "[p]replanned events during the overnight hours of 11:00 p.m. to 6:00 a.m.").] Also effective since June 12, the Board amended IU's Event Management Policy. [Ex. 13.][5]

## IV.    Statement of Material Facts In Dispute

Defendants maintain that undisputed facts above require summary judgment in their favor, and thus bar summary judgment for Plaintiffs. Multiple parts of Plaintiffs' "Statement of Material Facts Not in Dispute" [ECF98 at 11-24], however, are immaterial, unsupported, or refuted by the record, and thus further preclude Plaintiffs' (and only Plaintiffs') summary-judgment request.

*Circumstances preceding challenged actions*—Plaintiffs' "Statement" does not mention the fraught conditions, including reports of intimidation and harassment, that preceded challenged actions, such as the meeting of IU personnel on April 24, 2024, the issuance of trespass warnings on April 25, 2024, and April 27, 2024, and expressive-activity policy developments.[6]

If their Statement means to suggest those circumstances did not exist or that the challenged actions happened in a vacuum, the record refutes the suggestion.

*April 24, 2024 discussion*—Plaintiffs say that on April 24, 2024, "Pamela Whitten (the President of Indiana University) and Benjamin Hunter (the Associate Vice President and Superintendent for Public Safety), along with other university personnel, discussed Indiana University's 'enforcement of Indiana's criminal trespass statute' against protesters in Dunn Meadow." [ECF98 at 12-13 (ECF97-11 at 1; ECF80 ¶21).] Yet Plaintiffs cite nothing indicating IU's President personally "discussed" this. Their cited Answer paragraph says "[o]n April 24, 2024, President Whitten

---

[5] The Court may also take judicial notice of public-university policies as matters of public record. *See Palay v. United States*, 349 F.3d 418, 425 n.5 (7th Cir. 2003); *Qui Yun Chen v. Holder*, 715 F.3d 207, 212 (7th Cir. 2013).

[6] [*See supra* at 3-4 (citing November 2023 swastika vandalism [*Akou* ECF27-1 at 2, ¶7]; January 2024 bomb threat [*id.*]; February 2024 incident of protester using explicit language against prospective student during campus tour and following the latter into buildings [*id.* at 2-3, ¶¶7-8]; March 2024 report from professors receiving threatening emails in Hebrew and English [*id.* at 2, ¶7]; student report of being called terrorist because he was Palestinian [*id.*]; heated exchange at panel held by IU Walter Center for Career Achievement [*id.* at 3, ¶9]; March 2024 disruption of event at Luddy School of Informatics, Computing, and Engineering, despite three warnings to cease interruptions [*id.*]); *see also* ECF98 at 31 (noting, though criticizing in hindsight, "fears of lawlessness").]

was in a meeting with University personnel, including Benjamin Hunter, at which meeting the use of Indiana's criminal trespass laws against the persons demonstrating in Dunn Meadow was discussed." [ECF80 at 6, ¶21.] Their other cite is to page one of the Responses to their Requests for Admission [ECF97-11], which also does not say the President herself discussed the issue; indeed, the next page says she was not even "directly consulted or involved prior to the issuance of any" warning [*id.* at 2].

And, if Plaintiffs mean to suggest that IUPD had no authority to issue trespass warnings until April 24, 2024, the record lends no support. Instead, as noted above, IUPD's publicly available General Order G18.1.1, whose current version has been effective since October 2021, already contemplated such warnings and recognized IUPD's authority to issue them. [Ex. 1 at 1-5; *accord* ECF80 at 6, ¶20 ("each [P]laintiff received a 'no-trespass order' pursuant to Indiana Code § 35-43-2-2," a longstanding law with language remaining materially intact since current G18.1.1 took effect).]

***Plaintiffs' knowledge of Dunn Meadow policy change***—Plaintiffs say "[s]everal of the plaintiffs who attended the demonstrations on April 25th were at the time unaware that the 1969 Policy had been amended late the previous evening to disallow the daytime use of temporary structures absent prior approval." [ECF98 at 14 (citing ¶8 of ECF97-2, -4, -5, -6, -8, -9, -10).]

For one, Plaintiffs have asserted no claim about the level of notice or due process afforded in relation to the April 2024 Dunn Meadow policy amendment. [*See generally, e.g.*, ECF91; ECF72; *Akou* ECF48.] Nor can they cite anything personally linking any purported notice deficiency to either individual-capacity Defendant. In any event, Plaintiff McDonald says he "attended the demonstration … on April 25th," and acknowledges that upon "arriv[ing] at Dunn Meadow first thing in the morning" he "noticed posted signage indicating that structures were not allowed even during daylight hours," and he further concedes "[s]imilar information was provided to [him] orally by an Indiana University employee." [ECF97-4 at 3, ¶8 ("This was the first time I learned that the 1969 Policy might have been changed."); *accord* ECF97-8 at 3, ¶8 (similar); -6 at 3, ¶8 (not mention or disputing existence of signage);

-9 at 3, ¶8 (same).] Although Plaintiff McDonald says that at some point "he referenced [IU] expressive activity policies on its website" and it "still displayed the 1969 Policy allowing structures during daylight hours," he does not say when this was, or claim that it made him forget the posted signage. [ECF97-4 at 3, ¶8; *accord* ECF97-8 at 3, ¶8 (similar); ECF97-10 at 3, ¶8 (Wirtshafter acknowledges that "in the … days" "subsequent" to April 25, 2024, he "noticed that yard signs were displayed on Dunn Meadow that detailed the policy change," and he says "[a]t the same time" as one or more of those unspecified "subsequent" days, "Policy still appeared as the current policy on [IU's] website").]

*Details of arrests and trespass warnings or of underlying conduct*—Regarding their conduct preceding or underlying their arrests and warnings, Plaintiffs say, *e.g.*: "on April 25th, after engaging in nonviolent protest for a period of time," Biswas, McDonald, Meldrum, Murphy, and Robinson "were arrested for criminal trespass either for allegedly refusing to remove tents or for allegedly refusing to disperse so that tents could be removed" [ECF98 at 14 (citing ¶9 of ECF97-2, -4, -5, -6, -8)]; and "on April 27th, the remaining [P]laintiffs" "were arrested for identical reasons after engaging in nonviolent protest" [*id.* at 15  (citing ¶9 of ECF97-1, -3, -7, -9, -10).]

Then Plaintiffs discuss variations in the expiration dates and scope set forth in their 10 total warnings. [ECF98 at 14-15 (saying that while some expressly set their "Expiration Date" at no more than a year post-warning, others set it further out, and that while some described the "Location Trespassed From" as Bloomington campus, others described it more broadly); *but see id.* at 17 (suggesting, contrary to the variation in scope, "each of the plaintiffs was prevented by the 'trespass warning' they received from entering **Indiana University property**" (cites omitted) (emph. added)).]

If Plaintiffs mean to argue that their warnings' specific details of duration and scope were not proportional to their specific underlying conduct, their L.R. 56-1(a) Statement—whose trespass-warning section makes four total references to individual-capacity Defendants [*id.* at 12-13, 15]—does

not and cannot cite evidence that the President or Superintendent were personally involved in or aware of those Plaintiff-specific details, let alone at the time of the challenged actions. [*See generally id.*]

Further, in response to deposition questions about circumstances (*e.g.*, instructions from law enforcement) immediately preceding Plaintiffs' April 2024 trespass warnings and arrests, multiple Plaintiffs invoked Fifth Amendment rights against self-incrimination and refused to answer. [Ex. 17 (Greene Dep.) at 10 (35:9-25, 36:1-9); Ex. 18 (Phillips Dep.) at 10 (34:2-25); Ex. 19 (Murphy Dep.) at 12 (43:8-21); Ex. 20 (Meldrum Dep.) at 8 (27:1-13); Ex. 21 (Tang Dep.) at 12 (41:20-42:12); Ex. 22 (Robinson Dep.) at 18 (68:17-69:19).] And part of Plaintiffs' response to request for production (seeking "audio, video, or photographs of," *e.g.*, "events depicting any Plaintiff or created by any Plaintiff in Dunn Meadow in 2024") was an objection that "the events that took place in April of 2024 are not relevant to either litigation." [Ex. 2 at 4-5.]

### *Period that trespass warnings were in effect before being stayed and later rescinded—*

As Plaintiffs frame it, the "violat[ion]" for which the President and Superintendent are allegedly "personally responsible" is "the issuance of 'trespass warnings.'" [*E.g.*, ECF98 at 8; *accord* ECF97 at 1 (saying the "consolidated cases arise from (a) **the decision** to ban persons arrested during protests from returning to university property to exercise their First Amendment rights and (b)" the superseded August and November 2024 Policies' restrictions on "late-night expressive activity" (emph. added)).] But they devote much of their Statement's trespass-warning portion to complaining about post-issuance circumstances for which they do not and cannot show the President or Superintendent were personally responsible.

For instance, though each Plaintiff secured rescission of his or her trespass warning by successfully appealing it, they say "the process for [appealing] was not very clear." [*Id.* at 16 (citing each Plaintiff's May 2025 declaration at ¶14, which does not elaborate on the claim just quoted).] Yet

they do not and cannot challenge the appeal process, let alone point to evidence making Defendants somehow personally responsible for any purported confusion. [*See generally, e.g., id.*]

Also, as for how long the warnings were in effect post-issuance, Plaintiffs say "each of [them] was prevented by the 'trespass warning' they received from entering [IU] property for a period of time ranging from a few days to nearly three months" [*id.* at 17 (citing ¶16 of ECF97-1 thru -10)], with seven Plaintiffs' warnings lasting until being stayed at some point "[b]etween April 29th and May 3rd"" [*id.* at 16 (citing ¶14 of ECF97-1, -2, -4, -5, -7, -8, -9)], two others lasting until being rescinded on May 24 [*id.* (citing, *e.g.*, ECF97-6 at 8, ECF97-10 at 9)]; and the last (Greene's) "not [being] rescinded until July" [*id.* at 16-17]. "Because of these warnings," Plaintiffs say, "they therefore did not return to Dunn Meadow to participate in the ongoing demonstrations, although they desired to do so and would have done so were it not for the warnings." [*Id.* at 17 (citing ¶13 of ECF97-1 thru -10).]

But again, the record does not support any attempt to personally fault the President and Superintendent for any alleged disproportionality in this regard. [*See generally id.*] And even ascribing arguendo any relevance to such facts:

- Though Plaintiffs say the warnings "prevented them from participating in the ongoing protests in Dunn Meadow" [*e.g., id.* at 8], they elsewhere say "the height of the nationwide protest movement" included at least "end of April and May" of 2024 [¶¶16-17 of ECF97-3, -6, -10], and "the demonstrations continued in Dunn Meadow every day until the beginning of August 2024…." [ECF97-3 at 5, ¶17; *accord* ECF97-6 at 3-4, ¶11].

- Meanwhile, Plaintiff Phillips's Saturday, April 27, 2024 warning was in effect for a single business day, until April 29 [ECF97-7 at 3-4, ¶¶9-16], making her one of six Plaintiffs whose warning was in effect for no more than three business days [*compare id., with* ¶¶9-16 of ECF97-1 (two), -2 (two), -4 (two), -8 (two), -9 (three)]. Three others' warnings also ended in May: Meldrum's was in effect for the six business days ending May 3. [ECF97-5 at 3-4, ¶¶9-16]; and the April 25 and April 27 warnings of Murphy and Wirtshafter were lasted less than a month, before May 24 rescission [¶¶9-16 of ECF97-6 and -10].

- As for Greene's, Plaintiffs [ECF98 at 17] say it "was not rescinded until July" and, for cite, they his May 2025 declaration's paragraph (no. 15) that says he "did not receive th[e] notice [of rescission] until sometime, I believe, in July." Per Greene's prior Interrogatory answers, however, "he believes that he received notice that it had been lifted on June 24, 2024" [Ex. 2 at 9]. And, he testified he did return to the demonstrations, though without "enter[ing] university property." [Ex. 17 (Greene Dep.) at 14 (49:10-15)]: he returned "to the street [he] knew not to be covered by the trespass ban and addressed the remaining people still

in Dunn Meadow." [*Id.* (49:7-9)]. That is, he returned and "participated" "on the perimeter" of Dunn Meadow from "April 27th to August 1st" of 2024. [*Id.* (51:1-9).] Or, as his declaration puts it, he "returned back to the nonuniversity property part of the protest" until it "ended on August 1st." [ECF97-3]. No Plaintiff, including Greene, can claim the warnings prevented him or her from so participating in Dunn Meadow protests.

*Superseded August 2024 Policy*—Plaintiffs also reference the superseded August 2024 Policy, the focus of prior preliminary-injunction briefing [*Akou* ECF28 (Defs.' Br.) at 1-7]. Their summary-judgment Brief suggests five of them received disciplinary notices "for violating the August 2024 Policy" and ask that these be "expunge[d]." [ECF98 at 19, 34-35 (citing ECF69-2 at 6-7 (Akou's ltr.); -5 at 5-6 (McDonald's); -8 at 7-8 (Phillips's); -9 at 6-7 (Robinson's); ECF88-1 at 1-3 (Greene's).] But the only disciplinary actions Plaintiffs cite as needing expunged have already been "rescinded" and confirmed by IU to lack "any force or effect." [*Compare id.*, *with* Exs. 3–10.]

*Superseded November 2024 Policy*—The November 2024 Policy, the subject of briefing earlier this year [ECF85 (Defs.' Br.) at 8-18], amended its predecessor to include a "Limited Content-Neutral Overnight Restrictions." [ECF72-2] Plaintiffs' summary-judgment Brief says the November 2024 Policy is "current" and its "'Limited Content-Neutral Overnight Restrictions' must be permanently enjoined." [ECF98 at 8, 10, 18, 47.] But as of June 12, 2025, the November 2024 Policy has been superseded by the current UA-10 Policy, which has no overnight restriction [Ex. 13].

Plaintiffs also say that "in January 2025 … [IU] implemented a 'University Space Use Pre-Approval Standard,' which was not approved by the Trustees and therefore is controlled by the November 2024 Policy (and other Trustee-approved policies)," and they note some language from that January 2025 iteration of the Standard. For example, Plaintiffs say that the January 2025 version "requires prior approval for events of more than fifty people taking place on university property between 6:00am and 11:00pm, as well as for any '[p]replanned event,' regardless of size, taking place between 11:00pm and 6:00am." [ECF98 at 21 (citing ECF69-1 at 86)], and that "[a]ny application to utilize university space must be submitted at least ten days before an event" [*id.* at 22].

Yet the January 2025 Standard is no longer in place. The current one—which took effect no later than June 12, 2025, and "shall be interpreted in favor of free speech rights"—does not have the above language Plaintiffs reference. [Ex. 12 at 1-4.] Instead, it says prior approval is required for, *e.g.*, "[p]replanned events of large groups of 50 or more persons" (and clarifies that prior approval is "not required" for, *e.g.*, "[p]replanned events of groups of fewer than 50 persons"). [*Id.* at 1-3.] And apart from having no overnight restriction or 10-day request period, the current Standard states that "[e]xcept to the extent UA-10" (which also has no such requirements) "provides otherwise, a completed application must be submitted through the University's event registration system at least: 1. Three business days in advance for preplanned events of large groups of 50-99 persons; 2. Five business days in advance for preplanned events of large groups of 100 or more persons." [*Id.* at 3.]

In any event, as IU's Associate Vice President of Events and Conferences Doug Booher testified in January 2025 (when the prior Standard was still in effect), the approach of the University Events Registration Committee in reviewing submissions "is to always default to yes whenever possible …." [ECF69-1 at 50-51 (50:25-51:23).] "[F]ull review occurs in … a three-pronged approach," with "the first" being whether there "is … planning in place to have a safe event," "the second" whether there is "a safety plan that will enable the event to be administered safely," and "the third" whether it is "compliant with [IU] policy." [*Id.*]. These considerations include having a "safety plan … to evacuate," "designat[ing]" "a point person," and "identif[ying]" a "place of safety." [*Id.*]

"Events that may implicate the rights guaranteed under the First Amendment for speakers to speak, audiences to hear, and protesters to protest often require advance logistical planning and coordination with authorized university officials [Ex. 16 (UA-14)] to provide for a safe and successful event. Internal and external sponsors of events must consult UA-19 [Ex. 13], Event Management … to determine whether their event requires such logistical support." [ECF72-2 at 6.] Nine of the ten

Plaintiffs do not claim to have submitted any requests under the prior Standard, let alone any that were denied. [ECF69-2, -3, -4, -5, -6, -7, -8, -9, -10, -11; *compare* ECF69-2 at 3.]

Plaintiffs also say, in an argument footnote, that "the process for obtaining a permit established in the … Standard is unconstitutional" as it "ranks [IU's] preferences for resolving 'competing requests for use of space,' and gives a priority to 'events promoting partnerships with external organizations that align with [IU's] mission.'" [ECF98 at 43 n.6 (citing ECF69-1 at 88).] "Nowhere in the list," they argue, "is there any priority or mention of permits for persons to engage in protests that do not align with this mission …," and it "makes no mention of private protests" specifically." [*Id.* (cites omitted).] Yet Plaintiffs did not and cannot present any facts in their L.R. 56-1(a) Statement (or anywhere) showing any harm they are or will be suffering from the Standard not expressly "mention[ing] … private protests" or expressly including "any priority or mention of permits for persons to engage in protests that do not align with th[e] mission" [*id.* at 43 n.6]—*i.e.*, the "expressed mission of [IU] in terms of teaching and learning [*id.* at 22 (citing ECF69-1 at 29:14-25)].

## V.    Summary Judgment Standard

Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## VI.    Defendants Are Entitled to Summary Judgment on All Claims

Summary judgment for Defendants is required on all claims. First, Plaintiffs seek to hold IU President Whitten and Superintendent Hunter personally liable for damages on the theory that issuance of trespass warnings in Dunn Meadow in April 2024 violated Plaintiffs' First-Amendment rights. This claim against those two officials—as Plaintiffs have confirmed in filings and disclosures [*e.g.*, Ex. 14; ECF98 at 34;**]**, and in discussion among their counsel and Defendants'—is the only claim on which they seek damages. Yet qualified immunity bars it for Plaintiffs' failure to show that either official violated clearly established rights. Lack of personal involvement, too, ends the claim.

The other two claims seek non-monetary relief challenging policy and disciplinary matters with no live effect. [*See, e.g.*, ECF98 at 10.] No Plaintiff has an Article III, cognizable basis to press those claims, which fail on multiple grounds including mootness, deficient standing, sovereign immunity, and lack of any viable, non-speculative for the redress sought.[7]

### A.    Both non-damages claims fail.

Both non-damages claims rest on challenges to superseded policies ("Policy Claims"). One attacks the superseded August 2024 Policy [*id.* at 8], seeking to hold IU "liab[le]" and obtain "an injunction requiring defendants to expunge any disciplinary action taken against the plaintiffs as a result of the plaintiffs' violation of" the past policy [ECF97 at 1-2]—*i.e.*, they target disciplinary records that have already been rescinded and confirmed to lack force or effect [*supra* at 9-10].

The other attacks the superseded November 2024 Policy, seeking to hold IU "liab[le]" and to get "an injunction against the enforcement of the restriction on late-night expressive activity in Indiana University's current policy." [ECF97 at 1-2; ECF98 at 47 ("[c]oncluding" that "[t]he 'Limited Content-Neutral Overnight Restrictions' of the November 2024 Policy must be permanently enjoined").]

Summary judgment is required for Defendants on both those claims, as no justiciable, viable basis exists for the sole relief sought. *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 101 (1998) ("Article III is an antecedent question such that a court cannot "resolve contested questions of law when its jurisdiction is in doubt"); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006) (once a federal court sees it lacks subject-matter jurisdiction, "the court must dismiss the complaint in its entirety"). Absence of actual controversy also compels that result for further reasons including sovereign immunity (as the Claims cannot meet *Ex Parte Young*) and the speculative, deficient basis for the relief.

---

[7] Plaintiffs describe the "bottom line" of their case in terms of "both the plaintiffs' damages claim and their injunctive claim" [ECF98 at 10], without advocating any "declaratory" relief (a term not appearing in their Brief [*see generally id.*]). Nevertheless, this Brief notes jurisdictional and other deficiencies dispositive of injunctive or declaratory relief alike.

1.      Both non-damages claims are barred for mootness and lack of standing.

Article III principles of mootness and standing bar Plaintiffs' non-damages claims for resting on policy amendments and other developments have been superseded and have no effect.   "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (cleaned up; cite omitted). An "'actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation.'" *Ozinga v. Price*, 855 F.3d 730, 734 (7th Cir. 2017) (cites omitted). Article III's controversy requirement involves two sister doctrines, standing and mootness, that are "always … threshold jurisdictional question[s] … we must address," "raised" or not. *Wernsing v. Thompson*, 423 F.3d 732, 744–45 (7th Cir. 2005) (cite omitted).

Standing requires Plaintiffs to show, "separately for each form of relief sought" (*Schirmer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010)), (1) "injury in fact that is concrete, particularized, and actual or imminent" (rather than conjectural or hypothetical); (2) "was caused by the defendant"; and (3) "would likely be redressed by the requested judicial relief" (*Thole v. U. S. Bank N.A*, 590 U.S. 538, 540 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)); *Indiana Coal. for Pub. Educ. - Monroe Cnty. v. McCormick*, 338 F. Supp. 3d 926, 941 (S.D. Ind. 2018) ("remedy must be tailored to redress the plaintiff's particular injury" (cite omitted))); *see also Speech First, Inc. v. Killeen*, 968 F.3d 628, 638 (7th Cir. 2020) (to show injury-in-fact in pre-enforcement facial challenge under First Amendment, "plaintiffs must make one of two showings to establish an injury in fact"—either "show[ing] an intention to engage in a course of conduct arguably affected by a policy, and that he faces a credible threat the policy will be enforced against him when he does," or "show[ing] a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result").[8]

---

[8] Plaintiffs may show "a *current* injury if they have resorted to self-censorship out of an 'actual and well-founded fear' that the law will be enforced against them." *Carr*, 2024 WL 3819424, at *4 (citing *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023) (quoting *Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988))). They "must show a chilling effect on

Relatedly, courts dismiss as moot when what is challenged no longer exists. *E.g. Price*, 855 F.3d at 734–35 ("Any injunction directed to the prior regulations foreclosing the accommodation to Ozinga Brothers (which is the very sort of injunction that the district court entered here) necessarily would be meaningless, as those regulations no longer exist"; "the issue of the validity of the old regulation[s] is moot, [and] this case has lost its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract questions of law" (cite omitted)); *Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago ("Federation")*, 326 F.3d 924, 929–32 (7th Cir. 2003) ("Because the City has repealed the challenged ordinance and because we find no evidence in the record creating a reasonable expectation that the City will reenact that ordinance, we affirm the district court's holding that this case is moot.")*; accord Killeen*, 968 F.3d at 645-46 (affirming mootness of challenge to Code provision the University of Illinois had repealed; distinguishing the Seventh Circuit's mootness test from another circuit's "more stringent" one "requir[ing] not only a formal process to repeal a policy but affirmative signals from the University that the repeal was genuine").

Mootness arises if "a challenged ordinance is repealed during the pendency of litigation, and a plaintiff seeks only prospective relief." *Federation,* 326 F.3d at 929. "When a plaintiff's complaint is focused on a particular statute, regulation, or rule and seeks only prospective relief, the case becomes moot"—and "there is no longer an ongoing controversy"—"when the government repeals, revises, or replaces the challenged law and thereby removes the complained-of defect." *Price*, 855 F.3d at 734 (cites omitted); *accord Federation*, 326 F.3d at 930 ("the general rule that repeal, expiration, or significant

---

speech that is objectively reasonable" (*Killeen*, 968 F.3d at 638)—not "merely 'imaginary or speculative'" (*Brown*, 86 F.4th at 761) or "subjective" (*Laird v. Tatum*, 408 U.S. 1, 13–14 (1972))—and they "must substantiate a concrete and particularized chilling effect on his protected speech or expressive conduct to pursue prospective relief" (*Killeen*, 968 F.3d at 638–39 (cite omitted)). Litigants "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013); *see also Murthy v. Missouri*, 603 U.S. 43, 59 (2024) ("'Past exposure to illegal conduct' can serve as evidence of threatened future injury but 'does not in itself show a present case or controversy regarding injunctive relief' (cite omitted)); *Schmidling v. City of Chicago*, 1 F.3d 494, 499 (7th Cir. 1993) (no standing regardless whether there was prior enforcement of "earlier version of the ordinance").

amendment to challenged legislation ends the ongoing controversy and renders moot a plaintiff's request for injunctive relief" (cites omitted)).

"At that point, … the source of the plaintiff's prospective injury has been removed, and there is no effectual relief whatever that the court can order." *Price*, 855 F.3d at 734  (cites omitted); *accord Benkendorf v. Village of Hazel Crest*, 804 F.2d 99, 101 (7th Cir. 1986) (amendment exempting plaintiff's activities from ordinance mooted appeal). "Only when there is a substantial likelihood that the offending policy will be reinstated if the suit is terminated will a court recognize that the controversy remains live." *Id.* (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 & n.11 (1982) (no mootness despite repeal of challenged statute as city had announced its intent to reenact the statute if judgment were vacated)). "Otherwise, we presume that government officials have acted in good faith in repealing the challenged law or policy." *Id.* (cite omitted).

Although a plaintiff in a case "between private parties" might argue that a defendant "remains free to … return to his old ways" even after ceasing the challenged conduct, "this is not the view we have taken toward acts of voluntary cessation by government officials." *Federation*, 326 F.3d at 929–32 (adding that, "[t]o adopt [plaintiff's]  view that mere repeal is insufficient to moot a case would essentially put this court in the position of presuming that the City has acted in bad faith—harboring hidden motives to reenact the statute after we have dismissed the case—something we ordinarily do not presume"; "because we find no evidence in the record creating a reasonable expectation that the City will reenact that ordinance, we affirm the district court's holding that this case is moot." (quote marks & cites omitted)); *accord Killeen*, 968 F.3d at 645 (similar).

These principles defeat both claims here over defunct policy and disciplinary matters.

*Claim involving November 2024 Policy*—Plaintiffs say that "the restriction on nighttime activity contained within the [November 2024] version of Indiana University's expressive activity policy—formally designated "Expressive Activity Policy – UA-10"—violates the First Amendment

for a wide array of reasons," and that they "wish to engage in expressive activity governed by this restriction and they are therefore detrimentally affected by the policy" and "are entitled to an injunction prohibiting the official-capacity defendants from enforcing the policy's nighttime restriction." [ECF98 at 10; *compare id.* at 38 ("[t]he November 2024 Policy violates the First Amendment and must be enjoined"), *with id.* at 20 (defining "November 2024 Policy" as ECF72-2).]

Yet the November 2024 Policy is not "current" [ECF98 at 8, 10], having been superseded by the operative, Board-enacted June 12, 2025 amendment, which lacks the "nighttime" restriction that had allegedly "detrimentally affected" Plaintiffs. [Ex. 11.] Plaintiffs have no live, Article III basis to secure any injunctive (or declaratory) relief on the November 2024 policy. The claim fails for mootness and lack of standing. [ECF98 at 34 (acknowledging "moot[ness]" normally bars a claim that, like Plaintiffs' claim involving the November 2024 Policy, challenges a superseded policy and does not seek damages from past enforcement of it).]

Their cited case law confirms this dispositive Article III barrier. *Benkendorf*, 804 F.2d at 101 (noting defendant "amended its ordinance" while appeal was "pending," and holding "[b]ecause the ordinance was amended to exempt the type of activity that [plaintiff] challenged in his original complaint, the appeal of the denial of the preliminary injunction sought in that complaint is moot. *See Kremens v. Bartley*, 431 U.S. 119, 129 … (1977) (enactment of new statute moots claims based on old statute).") (cited by ECF98 at 34).[9]

---

[9] *See also Doe v. Purdue Univ.*, 928 F.3d 652, 658, 666 (7th Cir. 2019) (holding that plaintiff, who sought prospective relief challenging a university's "process of investigation and adjudicating" sexual-misconduct charges and sought "remov[al]" of a university sanction "condition[ing] [his] reentry" to the university, lacked standing for such relief because he did not claim that "he intends to return to [the university]—a necessary fact to demonstrate a cognizable injury from [sanction's] barriers to re-entry"; he did not claim "that he intends to re-enroll at [the university], much less that he faces a 'real and immediate threat' that [it] would again investigate him for sexual misconduct, much less that any such investigation would violate due process" (citing *City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983) (being choked by police "does nothing to establish a real and immediate threat" of "again be[ing] stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part")))).

24

*Claim involving August 2024 Policy*—No Article III controversy exists as to the claim seeking expungement of already-rescinded disciplinary material lacking force or effect [*compare* ECF98 at 19, 34-35 (citing ECF69-2 at 6; -5 at 5; -8 at 7; -9 at 6; ECF88-1 at 1-2), *with supra* at 9-10 (citing Exs. 3–10)]. Plaintiffs do not and cannot show any cognizable harm to them post-rescission that their requested relief could redress. *Price*, 855 F.3d at 734 (cites omitted); *compare with Purdue Univ.*, 928 F.3d at 662-63, 666 (case not involving any prior such rescission and instead noting that a university's "official determination of guilt" not only continued to "ma[r]" his record but "foreclosed the possibility of [plaintiff's] re-enrollment in" a Navy ROTC program, thus dimming any chance of plaintiff's desired "career in the Navy"); *Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007) (cited by ECF98 at 35 but similarly not involving prior rescission); *Sizelove v. Madison-Grant United Sch. Corp.*, 597 F. Supp. 3d 1246, 1285 & n.15 (S.D. Ind. 2022) (same).

> **2.**    The non-damages claims, unable to meet *Ex Parte Young*, fail on sovereign immunity.

For the same reasons that the challenges to superseded policies and rescinded disciplinary matters cannot meet Article III, such challenges cannot fit *Ex Parte Young* and so cannot survive sovereign immunity. "[D]eclaratory or injunctive relief is only proper if there is a continuing violation of federal law." *Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 893–94 (7th Cir. 2012) (citing *Green v. Mansour*, 474 U.S. 64, 73 (1985)). "'When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers.'" *Id.* (quoting *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991)). That is what happened in *Kress*: Complaining that a jail gave inadequate medical care and exposed inmates to inhumane conditions, plaintiffs in 2008 filed pleadings against the jail seeking injunctive and declaratory relief; but then "the warden testified that measures had been taken to remedy the aforementioned problems in 2008 and 2009, after [plaintiffs] had left the jail," and they "d[id] not dispute these remedial measures were taken." *Id.* at 891, 893–94. "Therefore, due to the lack

of evidence of any ongoing constitutional violations, the district court had no choice. The grant of summary judgment was proper." *Id.*

So it is here. With no ongoing violation of federal law (and no sovereign-immunity exception claimed beyond *Ex Parte Young*), no injunctive relief (or declaratory relief, if it were requested) against official-capacity Defendants is proper.

**3.**    Plaintiffs lack viable, non-speculative basis for their requested relief anyway.

Even if the non-damages somehow cleared Article III or sovereign immunity, Plaintiffs present no viable, non-speculative basis for their desired relief.

"An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). Plaintiffs, as the parties seeking such relief, "must still satisfy the court that" the relief "is required." *Wernsing*, 423 F.3d at 744–45 (cited omitted)). A "'necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive.'" *Id.* (quoting *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 748 (7th Cir. 1999) (quoting *W.T. Grant,* 345 U.S. at 633)). Mere "theoretical possibility" of a repeat violation is not enough. *Id.* (cite omitted)); *accord id.* (citing *In re Associated Press,* 162 F.3d 503, 511 (7th Cir. 1998) (requiring a "reasonable expectation that the same complaining party would be subjected to the same action again") (internal quotations omitted)); *id.* at 745 (reversing pro-plaintiff grant of partial summary judgment, because although the Inspector General of DHS's successor "theoretically could reimpose his pre-clearance directive, but nothing in the record suggests that she is likely to do so).[10]

---

[10] *See also Liebhart v. SPX Corp.*, 998 F.3d 772, 779 (7th Cir. 2021) ("Critically, a finding of liability on a defendant's part does not automatically give rise to an entitlement to injunctive relief"; "an injunction issues 'only as necessary to protect against otherwise irremediable harm.'" (citing, *e.g.*, *LAJIM*, 917 F.3d at 944)); *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974) ("Respondents have failed … to establish the basic requisites of the issuance of equitable relief in these circumstances— the likelihood of substantial and immediate irreparable injury, and the inadequacy of remedies at law"); *Lyons*, 461 U.S. at 111 (plaintiff "fares no better if it be assumed that his pending damages suit affords him Article III standing to seek an injunction as a remedy for the claim arising out of the [past] events. The equitable remedy is unavailable absent a showing

Prior briefing addressed the earlier requests for (preliminary) injunctive relief on the challenge to the August 2024 Policy [*Akou* ECF28 at 9-16] and the November 2024 Policy [*e.g.*, ECF85 21-27]. But policy revision and disciplinary rescission leave no basis for the permanent injunctions sought.

**Claim involving August 2024 Policy**—Plaintiffs seek a permanent injunction requiring IU to "expunge their records." [ECF98 at 35.] Again, IU already rescinded the disciplinary matters, formally invalidating prior correspondence about the August 2024 Policy. [Exs. 3–10.] Nothing supports mistaking those matters for "a present harm that can be remedied." [ECF98 at 35 (citing *Purdue Univ.*, 928 F.3d at 666 (case not involving rescinded disciplinary record).] Rescission documentation confirms that any prior disciplinary activity "no longer has any force or effect." [p. 1 of Exs. 4–7, 9, 10.] "The equitable remedy is unavailable absent a showing of irreparable injury, a requirement that cannot be met where," as here, "there is no showing of any real or immediate threat that the plaintiff will be wronged again." *Lyons*, 461 U.S. at 111. Unable to show rescinded matters are or will be harming them, Plaintiffs are not entitled to the injunction.

**Claim involving November 2024 Policy**—Plaintiffs also lack viable, non-speculative grounds to enjoin the November 2024 Policy, which has been superseded by the operative UA-10 version that does not have the overnight restrictions at the core of this case. Plaintiffs have no basis to think the past version will be reinstated. Though they claim to have been "detrimentally affected" by the November 2024 Policy, they cannot claim any actual or future harm from the current one.

Plaintiffs' summary-judgment motion and brief do not articulate (much less show entitlement to) "declaratory" relief, instead describing their requested relief as damages and a pair of injunctions. [*See generally* ECF97 at 1-2; ECF98.] Declaratory relief could not save any Policy Claim here anyway for reasons akin to those just noted on injunctive relief, including but going beyond the fully

---

of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that [he] will be wronged again—a 'likelihood of substantial and immediate irreparable injury'" (quoting *O'Shea*, 414 U.S. at 502)).

dispositive barriers of Article III and sovereign immunity. The Federal Declaratory Judgment Act, 28 U.S.C. § 2201, relieves parties to a justiciable controversy "from uncertainty and insecurity with respect to legal relations." *Sears, Roebuck and Co. v. American Mutual Liability Ins. Co.,* 372 F.2d 435, 438 (7th Cir. 1967). The "court is not obligated to consider whether to grant declaratory relief." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286–87 (1995). "[A] party seeking [it] has the burden of establishing the existence of an actual case or controversy." *Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 95 (1993); *see Trotter v. Klincar*, 566 F. Supp. 1059 (N.D. Ill. 1983), *aff'd*, 748 F.2d 1177 (7th Cir. 1984)*; Bell v. Taylor*, 2015 WL 13238677 (S.D. Ind. Dec. 4, 2015) (denying declaratory relief as it "would do nothing to affect the defendant's behavior toward [plaintiff]"; consideration of such relief was improper without "a substantial controversy of sufficient immediacy and reality").

Plaintiffs cannot (and do not attempt) to "establis[h] the existence of an actual case or controversy" here, as any declaratory relief granted in relation to superseded policies or rescinded disciplinary material could make no cognizable difference to Plaintiffs. *Morton Int'l,* 508 U.S. at 95; s*ee also Bell*, 2015 WL 13238677, at *5 (denying declaratory relief that would deem plaintiff the owner of photo and all rights to it, as he already "took the … [p]hoto and received a valid certificate of copyright for" it). Plaintiffs are not entitled to declaratory relief, even if it were sought.

## B.    The damages claim fails as a matter of law.

### 1.    President Whitten and Superintendent Hunter have qualified immunity.

Plaintiffs describe their damages claim as alleging that "[t]he actions of [D]efendants Whitten and Hutton, in their individual capacities, in issuing and allowing to be issued no-trespass orders against [P]laintiffs, which resulted in them being banned from exercising their rights to expression in a public forum, violated the First Amendment." [ECF91 at 1.] This cannot survive qualified immunity, which "shields a government official from suit for damages under § 1983 when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances

28

she confronted." *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025) (cite omitted); *accord id.* at 842-43 (noting "the Supreme Court's directive to resolve immunity questions 'at the earliest possible stage in litigation'" (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)), as it "protects government officials from both litigation and liability"). "To overcome [the] defense, [P]laintiffs must show" two things: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Id.* at 843 (cite omitted). Their failure here to show either element ends the claim, although "[c]ourts may exercise their discretion when choosing which element to address first." *Id.* (citing *Pearson*, 555 U.S. at 232). Either way, the claim cannot proceed.

a.     IU's President and Superintendent did not violate the alleged right.

A recap of what the damages claim does and does not challenge sets the stage. Plaintiffs cannot, so they do not, raise any challenge to the IUPD General Order that—since taking effect years before Plaintiffs' arrests—authorizes trespass warnings and contemplates their issuance, and outlines a process for appealing them. [Ex. 1 at 1-5; *accord* ECF98 at 30 (each Plaintiff pursued and won appeals)]. Nor do they venture to challenge IU's April 2024 policy amendment [*see* ECF80 at 5, ¶14] requiring permission for structural installations, such as tents, in Dunn Meadow.

Instead, and acknowledging that President Whitten and Superintendent Hunter cannot be "liable for damages under 42 U.S.C. § 1983" without being "personally responsible" for depriving Plaintiffs of a constitutional right [ECF98 at 33 (quoting *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (quoting *Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001)))], they claim that Superintendent Hunter so deprived them by "direct[ing] [IUPD] personnel to issue no-trespass orders to individuals who had been arrested in Dunn Meadow" [ECF80 at ¶24 (cited by ECF98 at 34)].

As for IU's President, Plaintiffs say that, although she "was not directly consulted … prior to the issuance of any no-trespass order" and did not expressly "authorize" any such issuance [ECF97-11 at 1-2], she somehow infringed their rights by being "aware of the possibility of the[ir] issuance"

(contemplated by G18.1.1 [Ex. 1]) and not undertaking to "prevent" that possibility [ECF80 at ¶¶22-23 (cited by ECF98 at 34)]. [*See also* ECF97-11 at 4 (she "was generally aware of the authority of the IUPD to issue [such] orders and … that [such] orders might be issued as the result of enforcement in Dunn Meadow").] Plaintiffs also claim that the President was "informed on or about April 25th that 'trespass warnings' had been issued to Dunn Meadow protesters," but she did not undertake "to prevent similar [ones] from being issued subsequent to that date"; and—apart from the "University promptly conclud[ing]" that the risk of lifting the warnings was low enough that it "stayed" seven of them "within days" and ultimately granted the appeals of all of them [ECF98 at 30]—did not undertake "immediate steps to rescind or suspend the warnings that had already been issued or to order their rescission or suspension" [*id.* at 15 (citing ECF80 ¶25)].

Yet for their accusation that IU's President and Superintendent violated their First-Amendment rights, Plaintiffs rely on strict and intermediate scrutiny arguments that hold no water. As for their arguments urging strict scrutiny, Plaintiffs do not and cannot claim the trespass warnings were content-based. Indeed, regulation is "deemed neutral" where, as here, it "serves purposes unrelated to the content of expression," even if it has "incidental effect on some speakers or messages but not others." *Nicodemus v. City of S. Bend, Ind.*, 137 F.4th 654, 663, 665-67 (7th Cir. 2025).

Nor do Plaintiffs claim that their expression—versus their "behavior" in the eyes of the law-enforcement personnel who arrested them for criminal trespass—triggered the warnings' issuance. [*See generally* ECF98; *compare with Nicodemus*, 137 F.4th at 666 ("[o]ne's movement toward an officer within the buffer zone after being told by the officer to stop approaching triggers the buffer law, not any speech or message that one may seek to convey"). Instead they acknowledge they were "arrested for misdemeanor trespass" [*see* ECF98 at 30; *id.* at 27 (attributing warnings to "behavior")], and cannot claim that they received the warnings from IUPD ***because*** of any expressive activity—let alone that

the President or Superintendent had predicted such would be the case. [**Ex. 2** at 4-5 (Plaintiffs saying "the events that took place in April of 2024 are not relevant to either litigation").]

Instead, Plaintiffs' sole proposed basis for strict scrutiny is the faulty premise that the warnings "had the *effect*" of temporarily "prohibit[ing]" Plaintiffs from physically "entering" certain property where Plaintiffs say they otherwise would have engaged in expressive activities, and so, the theory goes, the warnings must have been prior restraints triggering strict scrutiny. [ECF98 at 8, 25-26 (emph. added) (urging application of "strict scrutiny").] Not so. They cannot point to authority holding that such content-neutral trespass warnings become prior restraints merely for having some effect on expression. *E.g.*, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 698, 705 & n.2 (1986) (cited by ECF98 at 27-28) (in rejecting a free-speech challenge to enforcement of a public health regulation that authorized closure of a premises and "conclud[ing]" instead that "the First Amendment is not implicated by the enforcement of [such] against the physical premises in which respondents happen to sell books," *Arcara* held that the regulation "differs from a prior restraint" in multiple respects: Aside from the closure order "not be[ing] imposed on the basis of an advance determination that the distribution of *particular* materials is prohibited," the order "would impose no restraint at all on the dissemination of particular materials, since respondents are free to carry on their bookselling business at another location, *even if such locations are difficult to find*." (emphs. added)).

In fact, they rely on case law saying "[a] restriction is a prior restraint if it meets four elements" having nothing to do with IUPD's warnings: "(1) the speaker must apply to the decision maker before engaging in the proposed communication; (2) the decision maker is empowered to determine whether the applicant should be granted permission on the basis of its review of the content of the communication; (3) approval of the application requires the decision maker's affirmative action; and (4) approval is not a matter of routine, but involves 'appraisal of facts, the exercise of judgment, and

the formation of an opinion' by the decision maker." *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008) (cleaned up) (cited by ECF98 at 26).

To the contrary, precedent has refused to apply strict scrutiny in such circumstances involving some effect on expression. *Nicodemus*, for example, applied longstanding precedent in upholding, and rejecting proposed application of "prior restraint" case law to, a "buffer law" that "allows officers to order [a person] to stop approaching" and makes it a crime to defy the order by thereafter coming within 25 feet of the officers, even if only to engage in expressive activity such as videorecording. *Nicodemus*, 137 F.4th at 661-62, 666, 669. Though the law "restricted those who want to engage in protected First Amendment activity from access[ing] traditional public forums" and engaging in such activity at a convenient location of their choosing, it was a content "neutral" restriction "trigger[ed]" by behavior (approaching officer after being told not to) rather than by "any speech or message that one may seek to convey." *Id.* at 663, 665-67. It triggered, and passed, less than strict scrutiny, even though it may "impact" expressive activity such as "the right to record." *Id.* at 670.

Although the plaintiff in *Nicodemus*, like those here, invoked "a special line of cases" that "dealing with permitting and licensing statutes in public forums" and suggesting "a licensing statute placing unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship," *Nicodemus* "decline[d]" the plaintiff's invitation to "import the logic of the permitting and licensing cases from their specialized context" into the context of the buffer law, which, like any warning here, was "not a permitting or licensing statute." *Id.* at 667.

Just last month, the Supreme Court similarly reiterated long-settled principle that laws having "only an incidental effect on protected speech'" do not trigger strict scrutiny, even if they place "burdens" on it. *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2306, 2309 (2025) (quoting *Boy Scouts of America v. Dale*, 530 U.S. 640, 659 (2000); upholding such a law and not deeming it a prior restraint).

Nor do Plaintiffs fare better in suggesting, without support, that "a judicial determination is necessary before future speech may be restricted based on past conduct." [ECF98 at 27 (citing nothing).] Whatever is meant by "based on past conduct," Plaintiffs do not and cannot cite authority holding that undisputedly content-neutral regulation of conduct—such as G18.1.1, which expressly serves non-punitive interests in "safe[ty]" [**Ex. 1** at 1-5]—needs an unspecified prior "judicial determination" before it can impact "future speech." [*See generally* ECF98.] Case law has no such initial-judicial-determination rule, which is why, *e.g.*, *Nicodemus* neither applied nor mentioned any such thing en route to upholding a buffer law that allowed non-judicial personnel (police) to issue orders that can effectively restrict expressive activity (*e.g.*, ability to further approach to effectively videorecord police work) based on past conduct (*i.e.*, approaching police). 137 F.4th at 667-68.

Plaintiffs, in the end, have no basis to transform the trespass warnings into prior restraints, their lone proposed basis for applying strict scrutiny. [*E.g.*, ECF98 at 28-29 (saying that "[a]s a prior restraint on speech, the 'trespass warnings' issued to [P]laintiffs are only constitutionally permissible if they were the least restrictive means of advancing a compelling interest," and, for their view that the warnings "fail strict scrutiny," relying on inapposite prior-restraint case law including *Collin v. Chicago Park Dist.*, 460 F.2d 746, 752 (7th Cir. 1972), which held a city's denial of "Nazi Party" "leader['s]" permit to express "unacceptabl[e]" "views" at a park was an unlawful prior restraint; further citing *Collin*, 460 F.2d at 752 for proposition that "the only permissible justification for the restriction on the plaintiffs' First Amendment rights would be 'the probability of imminent violence'—or perhaps other disruptive activity—by the plaintiffs in particular," when in reality *Collin* stated that "the probability of imminent violence" was "in this case, possibly the only constitutionally permissible" such rationale).]

Regardless, their proposed application of strict scrutiny relies on circumstances for which they do not and cannot show the President or Superintendent were "personally responsible." [ECF98 at 29 (emphatically claiming Plaintiffs "were each banned from Dunn Meadow—and an overwhelming

33

amount of other Indiana University property—during a period of time, ranging from a couple of days to several months"; *id.* at 30-31 ("the 'trespass warnings' received by five [P]laintiffs applied to *all* Indiana University property, and the warnings received by the other five ... applied to the *entirety* of the Bloomington campus. (*See supra* at 7-8). Prof. Robinson, for instance, was prevented from attending a rally of the Indiana Graduate Workers Coalition at which he had been scheduled to speak. (Dkt. 97-8 ¶ 16). The individual-capacity [D]efendants' response to arrests in Dunn Meadow was sweeping in its scope and dramatically out of step with any perceived threat."); *id.* at 31 ("each of the [P]laintiffs was banned from university property for at least a full year (*see supra* at 8), and Mr. Greene was banned for five years plus a day (Dkt. 97-3 ¶ 10)"—"a lengthy prospective ban" that "fails" standards).]

Equally unavailing are the fall-back arguments on time, place, and manner. This inquiry, for which Plaintiffs [ECF98 at 32] cite *Ward*, 491 U.S. at 791, "boils down to whether the 'time, place, and manner' regulation at issue is 'reasonable'" (*Nicodemus*, 137 F.4th at 668 (quoting *Ward*, 491 U.S. at 791; *Hill*, 530 U.S. at 730–31)). Here too, their purported application of the test relies on circumstances for which they cannot show IU's President or Superintendent were "personally responsible." [ECF98 at 32-33 ("these warnings ... fail" time, place, and manner analysis "[f]or many of the same reasons that the[y] ... fail strict scrutiny"; "again, they applied to university property far beyond Dunn Meadow and for a period of time far longer than the Dunn Meadow protests were likely to last" and "entirely prevented [P]laintiffs from lending their voices to this movement, full stop").]

Further, their lead cite in applying the test is to *Frisby v. Schultz*'s statement that "'[a] complete ban [on expressive activity] can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil.'" [ECF98 at 32 (quoting 487 U.S. 474, 485 (1988)).] But beyond the Court's post-*Frisby* recognition in *Ward* that the law must not be "substantially broader than necessary," *Ward* clarifies that "the requirement of narrow tailoring is satisfied 'so long as the [state interest] would be achieved less effectively absent the regulation.'" 491 U.S. at 799-800 (cleaned up);

34

*accord id.* at 800 ("[a]bsent th[e] requirement" that "city's sound technician control the mixing board," "city's interest would have been served less well"; "Court of Appeals erred in failing to defer to … city's reasonable determination that its interest in controlling volume would be best served by" such requirement). Here, no one seriously disputes that IU's interests—*e.g.*, maintaining campus safety amid escalating tension—would be achieved less effectively without trespass warnings. [*See also* ECF98 at 32 (also not questioning "significant governmental interest justifying a prohibition on tents or similar structures"); *accord* ECF97-3 at 5, ¶17 (acknowledging IU did not stop "the demonstrations" from "continu[ing] in Dunn Meadow every day until" they concluded months later).][11]

As for alternative channels of communications, Plaintiffs rely on the unsupported premise that "[t]he warnings entirely prevented [them] from lending their voices to this movement, full stop." [ECF98 at 33 (citing nothing).] Greene's testimony refutes this. [Ex. 17 at 14 (49:7-15, 51:1-9) (he returned to the demonstrations, albeit without "enter[ing] university property"; he just went "to the street [he] knew not to be covered by the trespass ban and addressed the remaining people still in Dunn Meadow"—*i.e.*, he returned and "participated" "on the perimeter" of Dunn Meadow from "April 27th to August 1st" of 2024).] No Plaintiff can disclaim ability to have done the same. Nor would such channels be "[in]adequate" if not someone's "first or best choice," or if unable to "provid[e] the same audience or impact for the speech." *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000).

Plaintiffs' inability to show qualified immunity's violation prong is, alone, the end of the claim.

---

[11] Public safety is a significant governmental interest. *See Navratil*, 101 F.4th at 520 ("The Constitution principally entrusts the safety and the health of the people to the politically accountable officials of the States to guard and protect.") (cleaned up); *McCullen v. Coakley*, 573 U.S. 464, 487 (2014) ("We have, moreover, previously recognized the legitimacy of the government's interest in 'ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, [and] protecting property rights.'") (quoting *Schenck v. Pro-Choice Network of W. New York*, 519 U.S. 357, 376 (1997)); *MacDonald*, 243 F.3d at 1025; *Marcavage v. City of Chicago*, 659 F.3d 626, 631 (7th Cir. 2011). Indeed, federal courts have recognized that "[a] college has a right to preserve the campus for its intended purpose. *Glover v. Cole*, 762 F.2d 1197, 1203 (4th Cir. 1985). As such, there can be little debate that the Policy seeks to address a significant interest. The University need not provide an "empirical justification" if "the potential benefits of the rule can be appreciated without one." *Luce v. Town of Campbell, Wisconsin*, 872 F.3d 512, 516–17 (7th Cir. 2017).

> b.    The right was not clearly established.

Independently dispositive is their inability to meet the "high bar" of showing the right was clearly established at the time of the challenged conduct." *Sabo*, 128 F.4th at 843 (cite omitted). "A constitutional or statutory right is 'clearly established' when the law is "'sufficiently clear" that every "reasonable official would understand that what he is doing" is unlawful."' *Id.* at 843-44 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *al-Kidd*, 563 U.S. at 741)); *see also id.* at 845 ("qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law"' (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986))). "In other words, to clearly establish a right, existing precedent must place the constitutional or statutory question 'beyond debate."' *Id.* at 843-44 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017))).

This requires "granularity." *Id.* at 848 (defendant correctional officers were "not lawyers," and "it is sometimes difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation the officer confronts" (cite omitted; cleaned up)). "The Supreme Court has repeatedly instructed us 'not to define clearly established law at too high a level of generality."' *Id.* at 844 (quoting *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021)) (other cites omitted). "[T]he crucial question" is "whether the official acted reasonably *in the particular circumstances* that he or she faced." *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)) (emphasis is *Sabo*'s). "[W]here the reasonableness of an officer's actions depends on the circumstances, as it does here, plaintiffs must define clearly established law with much more specificity." *Id.*

Plaintiffs fall well short, unable to cite authority for their theory that IU's President or Superintendent violated any of their First-Amendment rights—let alone clearly established ones—in relation to the issuance of trespass warnings. [*See generally* ECF98 at 25-34; *compare also id.* at 32 (saying their "damages claim … presents a single, discrete legal issue" that—based on a conclusory, superficial premise that IU "den[ied] [Plaintiffs] the ability to exercise their expressive rights," and a

characterization of underlying conduct about which Plaintiffs refused to testify (*supra* at 15)—asks: "may a governmental entity deny individuals the ability to exercise their expressive rights in a public forum due exclusively to an allegation that they behaved inappropriately, but non-violently, during a previous protest?"), *with generally id.* at 25-34 (citing no case addressing such question, never mind clearly establishing Plaintiffs' desired answer).]

Again, their sole basis for urging strict scrutiny is the suggestion that, as trespass warnings are not necessarily preceded by a "judicial determination" and may have the effect of burdening expressive activity, they must be prior restraints. This, as explained above, is not the law, and certainly not clearly established. *Accord Wernsing*, 423 F.3d at 750 ("If the clearly established question could be resolved merely by observing that unjustified prior restraints on speech are prohibited, then no defendant could ever prevail on the clearly established prong of the qualified immunity analysis—the inquiry would always produce an outcome identical to that issuing from the first prong of the immunity analysis (violation of a valid legal right).").] Hence, Plaintiffs do not and cannot cite authority to clearly establish the proposition at all, let alone with requisite "granularity" relative to whether these particular officials "acted reasonably in the particular circumstances that he or she faced." *Sabo*, 128 F.4th at 844, 846, 848 (reaching same result after "compar[ing] the precedent [Plaintiffs] cit[e] in support of th[e] alleg[ed]" unlawfulness "against the facts of his case"; none of it "clearly established" anything from which such "alleged unlawfulness … follow[ed] immediately' (cite omitted)).

Instead, Plaintiffs point to case law like *Ward*, 491 U.S. at 791 that applies less than strict scrutiny (and does not ascribe prior restraint status to) restrictions that impact expressive activity without any prior judicial determination. Again, rather than endorsing their understanding of prior restraints, their cited case law says "[a] restriction is a prior restraint if it meets four elements"—*e.g.*, "the decision maker is empowered to determine whether the applicant should be granted permission

on the basis of its review of the content of the communication"—that have nothing to do with IUPD trespass warnings. *Samuelson*, 526 F.3d at 1051 (cleaned up) (cited by ECF98 at 26).

Even if strict scrutiny applied, Plaintiffs identify nothing that clearly establishes IU's President or Superintendent acted unlawfully when reacting in real-time to the particular circumstances here. Plaintiffs cannot claim that any of their cited cases involved those circumstances. [*See generally* ECF98.] Instead, they unavailingly resort to citing circumstances for which they cannot show IU's President or Superintendent were personally involved. [*Supra* at 33-34.] Application of the time, place, and manner test yields the same. For reasons discussed above in explaining Plaintiffs' failure to show that either Defendant's reaction to the particular circumstances failed that level scrutiny at all, Plaintiffs do not and cannot cite authority demonstrating that any such unlawfulness had been clearly established. [*Supra* at 33-35.] Their reliance on circumstances outside Defendants' personal involvement, and on inapposite case law otherwise, does not suffice. [*Id.*]

> **2.** IU's President and Superintendent lacked requisite personal involvement in the circumstances on which Plaintiffs' claim relies.

Though Plaintiffs acknowledge that an individual's liability for damages under Section 1983 requires personal involvement in a violation [ECF98 at 33 (quoting *Sanville*, 266 F.3d at 740 (quoting *Chavez*, 251 F.3d at 651))], their arguments purportedly applying strict and intermediate scrutiny, respectively, rely on circumstances in which the record ascribes no personal involvement to IU's President or Superintendent, such as the varying temporal and physical scopes of the trespass warnings each Plaintiff ultimately received. [*Supra* at 33-35.] This, too, ends the claim.

## VII. Plaintiffs Are Not Entitled to Their Requested Partial Summary Judgment

For the same reasons shown above that full summary judgment is required terminating this case in Defendants' favor, Plaintiffs are not entitled to their requested partial summary judgment, which seeks judgment "on the issue of liability," plus injunctions (a) "requiring [D]efendants to expunge any disciplinary action taken against … [P]laintiffs" in relation to the superseded August 2024

Policy, and (b) "against enforcement of the restriction on late-night expressive activity in" the superseded November 2024 one. Thus, for efficiency and judicial economy per Federal Rule of Civil Procedure 1, Defendants incorporate those reasons by reference here for their opposition to Plaintiffs' Motion. Also, the below discussion underscores and expands salient points that, though not preclusive of summary judgment for Defendants, preclude any such judgment for Plaintiffs.

### A. Plaintiffs are not entitled to summary judgment on their non-damages claims.

The same above-noted reasons requiring summary judgment for Defendants on the Policy Claims—*e.g.*, mootness, deficient standing, sovereign immunity, lack of viable, non-speculative basis for the relief—equally preclude any summary judgment for Plaintiffs. Apart from incorporating those reasons here, Defendants highlight core points barring Plaintiffs' requested partial summary judgment.

- Plaintiffs suggest this Court should "expunge any disciplinary action taken against persons who engaged in expressive activity in violation of the August 2024 Policy." [ECF98 at 47.] The only disciplinary actions Plaintiffs cite have already been "rescinded" and confirmed by IU to lack "any force or effect." [Ex. 3–10.]

- Rescinded matters that lack force or effect refute any previously claimed fear, including as to any suggestion in the rescinded material statements that a Plaintiff was being "investigated" on now-rescinded allegations [ECF98 at 10 (citing ECF88-1)] or that "'further violations of' a past policy with no force or effect 'and/or other University policies' may result in a variety of additional disciplinary sanctions, up to and including the termination of their employment" [*id.* (quoting ECF69-2, -5, -8, -9)].

- Though Plaintiffs say the November 2024 Policy is "current" and that its "'Limited Content-Neutral Overnight Restrictions' … must be permanently enjoined" [*id.* at 8, 10, 18, 47], this has been superseded by the operative, amended UA-10 Policy, which lacks any such overnight restrictions [Ex. 13].

- Plaintiffs say "in January 2025 … [IU] implemented a 'University Space Use Pre-Approval Standard'" "require[ing] prior approval for events of more than fifty people taking place on university property between 6:00am and 11:00pm, as well as for any '[p]replanned event,' regardless of size, taking place between 11:00pm and 6:00am" [ECF98 at 21 (citing ECF69-1 at 86)]. Yet the current version, effective since June 2025, has no such requirements. [**Ex. 12**.] It requires prior approval for, *e.g.*, "[p]replanned events of large groups of 50 or more persons" (and clarifies that prior approval is "not required" for, *e.g.*, "[p]replanned events of groups of fewer than 50 persons"). [*Id.* at 1-2.] And beyond having no overnight restriction or 10-day period, the Standard now states that "[e]xcept to the extent UA-10" (which also has no such requirements [**Ex. 13**]) "provides otherwise, a completed application must be submitted through [IU's] event registration system at least: 1. Three business days in advance for preplanned events of large groups of 50-99 persons;

2. Five business days in advance for preplanned events of large groups of 100 or more persons." [Ex. 12 at 3.]

- In an argument footnote, Plaintiffs attack the Standard's "process for obtaining a permit" because, "[a]fter all, [it] ranks [IU's] preferences for resolving 'competing requests for use of space,' and gives a priority to 'events promoting partnerships with external organizations that align with the [IU's] mission.'" [ECF98 at 43 n.6 (citing ECF69-1 at 88).] "Nowhere in the list," the argument goes, "is there any priority or mention of permits for persons to engage in protests that do not align with this mission. This is obviously not viewpoint neutral." [*Id.* (citing *Brown*, 86 F.4th at 780, for proposition that "[a] speech regulation is viewpoint-based when it goes beyond general discrimination against speech about a specific topic and instead regulates one perspective within a debate about a broader topic").] "'[T]he ranking of the preferences for allocating permission to use the public spaces at [IU], which makes no mention of private protests, is itself unconstitutional … viewpoint discrimination.'"" [*Id.* (citing *Tanner v. Ziegenhorn*, 2020 WL 5648642, *1 (C.D. Ark. Sept. 22, 2020) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 825 (1995)))"] This theory is a non-starter, for reasons even aside from Plaintiffs' acknowledgment that the only non-damages requested relief left in this case is a pair of injunctions having nothing to do with abstract objections to priority language in a Standard that expressly "shall be interpreted in favor of free speech rights." Their L.R. 56-1(a) Statement did not and cannot present any facts showing particularized Article III harm from the Standard not expressly including "any priority or mention of permits for persons to engage in protests that do not align with th[e] mission" [ECF98 at 43 n.6]—*i.e.*, the "expressed mission of [IU] in terms of teaching and learning [*id.* at 22 (citing ECF67-1 at 29:14-25)]—or not expressly "mention[ing] … private protests" [*id.* at 43 n.6].

Thus, no Article III controversy exists on Plaintiffs' (August 2024 or November 2024) Policy Claims. They fail also due to sovereign immunity and lack of viable, non-speculative basis for relief.

### B.    Nor are Plaintiffs entitled to partial summary judgment on their damages claim.

For the reasons (incorporated here) this Brief noted as requiring summary judgment ending the damages claim [*supra* at 28-38], Plaintiffs are not entitled to their requested summary judgment establishing "liability." Qualified immunity bars the claim for Plaintiffs' inability to show either official violated a clearly established right. Plaintiffs cannot show personal involvement anyway.

## VIII.   Conclusion

Defendants' summary-judgment motion should be granted, and Plaintiffs' denied.

Respectfully submitted by counsel for Defendants,
*/s/ John R. Maley*
John R. Maley, Dylan A. Pittman, Amanda Jane Gallagher, Charity Seaborn
BARNES & THORNBURG LLP