UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JASPER WIRTSHAFTER, *et al.*,      )
                                    )
        Plaintiffs,                )
                                    )
        v.                          )        No. 1:24-cv-00754-RLY-MJD
                                    )
PAMELA WHITTEN, in her individual and )
official capacity as President of Indiana )
University, *et al.*,               )
                                    )
        Defendants.                )

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY
JUDGMENT AND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

### INTRODUCTION

A reader of the defendants' brief might be forgiven for concluding that Indiana University officials were, in April 2024, forced to confront circumstances unprecedented in American history that required the equally unprecedented decision to prohibit individuals, including the plaintiffs, from participating in ongoing protests in the university's self-declared "Assembly Ground"—undeniably a public forum. That is not so. Without minimizing the role that officials play in ensuring the safety of those who enter the public spaces within their purview, the First Amendment has successfully protected expressive activity during the Civil Rights Movement and the Vietnam War. It has been invoked in support of the activities of suffragists, trade unionists, and the annual March for Life. In more recent years, it has seen Occupy Wall Street and Black Lives Matter. Indeed, much of First Amendment case law has developed *because* public actors improperly invoked safety interests to justify a crackdown on controversial speech. *See, e.g.*, *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969) (rally of the Ku Klux Klan); *Collin v. Smith*, 578 F.2d 1197, 1204-07 (7th Cir. 1978) (Nazi march through Skokie, Illinois). The fact of the matter is that the First Amendment is most

vital on issues where passions are inflamed and tensions run high.

All of that is to say that, far from being unique, this case—and the circumstances that led to it—fits squarely within a well-trod jurisprudential framework. Before Frank Collin sought to march through Skokie he sought to hold a rally at Marquette Park in Chicago, and the Seventh Circuit was clear that past conduct may only justify a restriction on First Amendment expression in a public forum when it gives rise to "a well-founded belief that violence would occur" absent the restriction. *Collin v. Chicago Park Dist.*, 460 F.2d 746, 754 (7th Cir. 1972). The plaintiffs, of course, are not Nazis or Klan members. They are university professors, staff, students, and alumni who wished to lend their voices to the nationwide protest movement emanating from the war and humanitarian crisis in Gaza. While the defendants underscore various concerns related to demonstrations in Dunn Meadow that took place during the Spring and Summer of 2024, these demonstrations were allowed to continue. The defendants do not even attempt an argument—nor could they—that the plaintiffs' arrests for misdemeanor trespass gave rise to a "well-founded belief" that their participation in these ongoing protests would somehow engender violence. This, however, is the precise showing that they are required to make and, under any standard, the actions of the individual-capacity defendants, who issued the "trespass warnings" (Superintendent Hunter) and allowed them to be issued and remain in effect (President Whitten) violated clearly established law under the First Amendment.

This leaves the plaintiffs' claims for prospective relief, which target two since-superseded expressive activity policies (referenced as the August 2024 Policy and the November 2024 Policy) enacted by Indiana University in the wake of the Dunn Meadow protests. Indiana University does not contend that either policy was constitutional but instead argues that the plaintiffs' claims have been rendered moot because, after the plaintiffs sought partial summary judgment (Dkt. 97) and after this Court preliminarily enjoined the challenged provision of the November 2024 Policy (Dkt. 101), Indiana University "rescinded" the disciplinary action it took against five plaintiffs for violating

the August 2024 Policy and formally amended the November 2024 Policy. For different reasons, its mootness arguments cannot carry the day. For one, the relief it has offered for its unconstitutional enforcement of the August 2024 Policy—the rescission rather than expungement of disciplinary records, which is explicitly premised on the preliminary injunction—is neither complete nor permanent. And, given Indiana University's repeated amendments to its expressive activity policies and that the latest amendment was made only in response to this Court's preliminary-injunction decision and on the eve of its deadline for responding to the plaintiffs' summary-judgment request, this is the rare case where even the formal amendment of the November 2024 Policy does not establish mootness under the "voluntary cessation" exception to that doctrine.

The plaintiffs are entitled to judgment on all issues except the amount of their damages.

### ISSUES CONCERNING THE FACTS

**I.      This case does not hinge on any disputed issues of material fact**

While the defendants' brief contains a section titled "Statement of Material Facts in Dispute" (Dkt. 121 at 18-25), nearly all of the facts that they identify remain clearly undisputed. In several instances, the defendants merely identify additional (and undisputed) facts that they believe should be considered. These were omitted from the plaintiffs' factual statement either because they are not material to the plaintiffs' claims (*see id.* at 18 ["*Circumstances preceding challenged actions*"]) or because the events recited by the defendants had not yet taken place (*see id.* at 23-25 ["*Superseded August 2024 Policy*" and "*Superseded November 2024 Policy*"]). This does not create a triable issue.

In two additional instances, the defendants' purported "dispute" appears to be a semantic one. For instance, they take issue with the plaintiffs' description of President Whitten as having "discussed Indiana University's 'enforcement of Indiana's criminal trespass statute' against protesters in Dunn Meadow." (*Id.* at 18-19 ["*April 24, 2024 discussion*"]). The record reflects that President Whitten "was in an evening meeting" during which this enforcement was "discussed," and that she

"had the ability to prevent the no-trespass orders from being issued" but took no steps to prevent their issuance. (Dkt. 97-11 at 1-2 [RFA Nos. 1, 4 & 5]). Even if President Whitten's role during this discussion was a passive one—perhaps an unlikely role for a university president—the law is clear that a supervisory official cannot avoid liability under 42 U.S.C. § 1983 by "turn[ing] a blind eye" to a constitutional violation. (Dkt. 98 at 33-34). Relatedly, without identifying a factual dispute, the defendants take issue with the plaintiffs' description of the manner in which the "trespass warnings" impacted the expressive activities in which they wished to engage. (Dkt. 121 at 21-23 ["*Period that trespass warnings were in effect*"]). This is, of course, at the heart of the plaintiffs' claim. The defendants' contention appears to be that the individual defendants' involvement in the violation of the plaintiffs' rights was limited to the late-night meeting on April 24th. Of course, when a decision impinges on constitutional freedoms, it does not matter when exactly that decision was made. In any event, President Whitten was informed on April 25th "that the no-trespass orders had been issued and took no steps to prevent no-trespass orders from being issued subsequent to that date and took no immediate steps to rescind or suspend them or to order their recission or suspension." (Dkt. 80 at 7 [¶ 25]). A supervisory official aware of an ongoing constitutional violation and with the ability and authority to prevent it simply may not disclaim liability when she declines to intervene. *See, e.g.*, *Taylor v. Ways*, 999 F.3d 478, 494 (7th Cir. 2021). The defendants ignore this.[1]

---

[1]    Much of the defendants' discussion is devoted to the (undisputed) fact that most of the plaintiffs were only prohibited from entering Dunn Meadow for a period of days before their "trespass warnings" were stayed. (Dkt. 121 at 22). They do not elaborate on why they believe this might relieve them of liability. Clearly it does not, for "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The defendants do, however, identify an inconsistency in Bryce Greene's statements regarding when his "trespass warning" was formally lifted. (Dkt. 121 at 22). Uncertain of the precise date, he has provided his best estimate in interrogatories ("believes" it was lifted on June 24th, Dkt. 122-2 at 9), in deposition testimony ("believe[s]" it "may have been . . . June something, late June, mid-July," Dkt. 122-17 at 15 [53:2-8]), and in his affidavit ("sometime, I believe, in July," Dkt. 97-3 at 4 [¶ 15]). It is not clear why the defendants, who clearly have records of their own actions, have not just provided the Court with documentation establishing the precise date. In any event, this inconsistency goes to the amount of Mr. Greene's damages (that is, the length

4

This leaves only a purported dispute regarding the plaintiffs' awareness that the "1969 Policy" had been changed during a late-night meeting on the eve of scheduled protests in Dunn Meadow. (Dkt. 121 at 19-20 ["*Plaintiffs' knowledge of Dunn Meadow policy change*"]). The plaintiffs are entitled to summary judgment whether or not they were aware of this change, for under no circumstances does an arrest for misdemeanor trespass establish "a well-founded belief that violence would occur" if they returned to Dunn Meadow. *See Collin*, 460 F.2d at 754. In any event, all the defendants are saying is that some persons noticed signage in Dunn Meadow indicating that structures were not permitted during daylight hours. But it was the *manner* in which this signage differed from the 1969 Policy—which was still posted to Indiana University's website—that created confusion. (*See, e.g.*, Dkt. 97-4 at 3 [¶ 8] ["{M}any protesters appeared to believe that they were being provided disinformation . . . in order to dissuade them from participating in the protest."]; Dkt. 97-8 at 3 [¶ 8] ["I believed at the time that the signage . . . articulated standards inconsistent with Indiana University's formal policies."]). Absolutely none of this is disputed.

## II.    Supplemental statement of additional facts not in dispute

In their previous brief, the plaintiffs described disciplinary action taken against four professors and one student—Prof. Akou, Mr. Greene, Prof. McDonald, Prof. Phillips, and Prof. Robinson—for violating the "August 2024 Policy," which prohibited any expressive activity after 11:00pm, by participating in late-night candlelight vigils. (Dkt. 98 at 19).

Pursuant to Indiana University's internal procedures, the four professors (along with other faculty members who had been similarly disciplined) formally appealed the disciplinary action taken against them. (Supp. Decl. of H. Akou [attached as Exh. 1], ¶ 5). On May 28, 2025—that is, the day after the plaintiffs filed their request for partial summary judgment (Dkt. 97) and the day before this Court issued its preliminary-injunction decision (Dkt. 101)—the professors received a decision on

---

of time that his First Amendment rights were violated), not liability.

their appeal from the Provost and Executive Vice Chancellor of Indiana University. (*Id.*, ¶ 6). In this decision, the Provost concluded that the "legality" of the August 2024 Policy could "only [be] resolved through the legal system," that the August 2024 Policy "was a valid policy," that the "finding and sanction against [the professors] are the consequences" of their "civil disobedience," and that the sanction against them was "appropriate." (Attachment to Supp. Decl. of H. Akou). The Provost therefore "uph[e]ld the finding and sanction" against the professors. (*Id.*).

ARGUMENT

## I.    The plaintiffs are entitled to partial summary judgment on their damages claims

In a forty-page brief, the individual defendants do not cite a single case in which the exclusion of an individual from an ongoing protest in a public forum was deemed to satisfy First Amendment standards. Nor, as noted, do they even attempt an argument that *Collin*'s "well-founded belief" standard was met. While the defendants' specific arguments are addressed in detail below, these failures manifest the shortcomings in their position.

### A. Both President Whitten and Superintendent Hunter are personally responsible for the issuance of the "trespass warnings" to the plaintiffs

Interspersed throughout the defendants' merits argument are repeated references to the "personal responsibility" of President Whitten and Superintendent Hunter for any alleged violation. (*See, e.g.*, Dkt. 121 at 35, 39-40). The argument then concludes with a perfunctory section devoted to the individual defendants' "personal involvement" in these violations. (*See id.* at 44). These arguments are not developed, and it is not clear that the defendants mean to advance an argument apart from their contention that the plaintiffs' rights were not violated.

To the extent that the individual defendants intend to contend that they lacked the type of personal involvement in the issuance of the plaintiffs' "trespass warnings" necessary to support liability under 42 U.S.C. § 1983, they are wrong. As underscored previously, a supervisory official is liable under § 1983 for a constitutional violation if he or she "directed the conduct causing the

6

constitutional violation, or if it occurred with [their] knowledge or consent." *Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001) (citation omitted).  This standard is met if they "kn[e]w about the conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what they might see." *Taylor v. Ways*, 999 F.3d 478, 494 (7th Cir. 2021) (citation omitted).  That is clearly the case here: Superintendent Hunter directed the issuance of the "trespass warnings," and President Whitten was present when this directive issued and had the ability to prevent the issuance of the "trespass warnings" yet declined to do so.  (Dkt. 98 at 33-34 [citing record]).  She was also promptly informed of the issuance of the "trespass warnings" and took no immediate steps to rescind or suspend them.  (*Id.* [same]).  The defendants offer no meaningful rebuttal to any of this.

**B. The "trespass warnings" violated the plaintiffs' First Amendment rights**

The question, therefore, is whether the defendants' directives prohibiting the plaintiffs from returning to the ongoing Dunn Meadow protests violated the First Amendment.  In opposing the plaintiffs' constitutional claim, the defendants "throw a variety of arguments . . . against the wall, with the hope that one might stick." *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 708 (7th Cir. 2014).  In doing so, they almost entirely ignore the obvious: the plaintiffs were all banned from participating in an ongoing political demonstration in a public forum—an exercise of core First Amendment rights—and the defendants caused this to happen.  Under any standard, this is unconstitutional.

**1. The "trespass warnings" issued to the plaintiffs represent a classic prior restraint on speech subject to strict scrutiny**

"The term 'prior restraint' is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008).  It should not require citation to demonstrate that banning a would-be speaker from entering a public forum represents such an order.  If it did, this is how the Supreme Court describes its prior-restraint cases:

In these cases, the plaintiffs asked the courts to provide relief where public officials

had forbidden the plaintiffs the use of public places to say what they wanted to say. The restraints took a variety of forms, with officials exercising control over different kinds of public places under the authority of particular statutes. All, however, had this in common: they gave public officials the power to deny use of a forum in advance of actual expression.

*Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). It is precisely that right—the right to participate in ongoing protests in Dunn Meadow—that the plaintiffs were denied. And they were denied that right in advance of their actual speech. This is a classic prior restraint.

The closest the individual defendants come to addressing this issue is their recitation of the "four elements" of a prior restraint articulated in *Samuelson*, 526 F.3d at 1051, which generally focus on the discretionary denial of a public employee's request to engage in expressive activity. But *Samuelson* did not purport to articulate the definition of a prior restraint under all circumstances. Prior-restraint cases take different forms. Some, like *Samuelson*, arise from challenges to permitting policies, where individuals must apply to the government before engaging in speech. *See, e.g., Thomas v. Chicago Park Dist.*, 534 U.S. 316, 320-21 (2002); *Se. Promotions*, 420 U.S. at 552-54. Others arise, as here, where would-be speakers are simply ordered to remain silent. *See, e.g., Vance v. Universal Amusement Co., Inc.*, 445 U.S. 308, 316-17 (1980) (per curiam) (prohibition on exhibition of motion picture under "public nuisance" statute); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam) (prohibition on publication of the "Pentagon Papers"); *Org. for Better Austin v. Keefe*, 402 U.S. 415, 418-19 (1971) (prohibition on "peaceful pamphleteering"). The defendants' attempt to apply *Samuelson* here makes no sense when the "trespass warnings" effected a total ban on expression. *See, e.g., Whitney v. City of Milan*, 2011 WL 13076917, at *2, 13 (W.D. Tenn. Feb. 3, 2011) (concluding that reliance on *Samuelson* and similar cases was "misplaced" because the challenged "directives [not to engage in certain speech] were, in essence, a gag order").

The "trespass warnings" constitute a prior restraint on the plaintiffs' speech because they "den[ied] use of a forum in advance of actual expression," *Se. Promotions*, 420 U.S. at 553, full stop.

The fact that the defendants denied this opportunity outright rather than requiring the plaintiffs to first ask permission does not inure to their benefit.[2]

> **2.  In contending that the "trespass warnings" issued to the plaintiffs were something other than a prior restraint, the defendants inappropriately conflate different legal principles, and strict scrutiny applies here**

The individual defendants nonetheless contend that banning the plaintiffs from returning to the Dunn Meadow protests did not constitute a "prior restraint" because, in their words, these bans merely had an "incidental effect" on the plaintiffs' speech rights.  (Dkt. 121 at 37-39).  To state the obvious: for a period of time ranging from a few days to multiple months (*see* Dkt. 98 at 16-18), the plaintiffs were entirely prohibited from participating in ongoing demonstrations—indeed, in a nationwide movement—protesting the war in Gaza.  If this is not a direct, substantial, and virtually unprecedented impingent on individuals' First Amendment rights, it is not clear what is.  In any event, the defendants appear to blur three distinct lines of cases, each of which is treated separately.

a.  *Speech versus conduct.*  First, the individual defendants attempt to characterize the plaintiffs' constitutional challenge as directed to Indiana University's general order authorizing the issuance of "trespass warnings" in the first place, which it believes to be an "undisputedly content-neutral regulation of conduct."  (Dkt. 121 at 39).  This argument can be easily dispensed with.

For one, the plaintiffs do not challenge this general order but instead challenge the individual defendants' decision to issue the specific directives prohibiting them from returning to Dunn Meadow to engage in ongoing protest activity.  The precise authority invoked by the defendants as

---

[2]     Somewhat curiously, much of the defendants' prior-restraint argument is devoted to the Seventh Circuit's recent decision in *Nicodemus v. City of South Bend*, 137 F.4th 654 (7th Cir. 2025), which upheld a buffer law allowing on-duty law enforcement officers to order persons to stop approaching once they come within twenty-five feet of the officer.  (Dkt. 121 at 36, 38-39).  It is not clear what the defendants think *Nicodemus* has to do with this case.  There, the enforcement of the statute took place in response to the plaintiff's speech, not in advance of it, *see* 137 F.4th at 659-60, and so prior-restraint jurisprudence was not invoked.  In fact, the phrase "prior restraint" only appears once in the court's entire decision: a quotation from *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988), which was invoked to address whether the statute was content neutral or content based.  137 F.4th at 666.

the basis for this action is of no moment.

To the extent that the defendants are simply pointing to the fact that the "trespass warnings" issued to the plaintiffs prohibited them entering university property altogether and thereby prevented them from engaging in a wide variety of activities unrelated to expression, their argument runs head first into *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), which holds that a restriction on speech cannot be justified on the grounds that it applies also, or even primarily, to non-speech conduct. In that case, the plaintiffs mounted a First Amendment challenge to a federal criminal statute prohibiting the provision of "material support or resources to a foreign terrorist organization." Of course, the majority of circumstances in which a person might provide "material support or resources" likely do not implicate free-speech protections at all. However, that did not mean that, *when* the statute was applied to speech, it should still be viewed as regulating conduct:

> The Government argues that [the statute] should . . . receive intermediate scrutiny because it *generally* functions as a regulation of conduct. That argument runs headlong into a number of our precedents, most prominently *Cohen v. California*, 403 U.S. 15 (1971). *Cohen* also involved a generally applicable regulation of conduct, barring breaches of the peace. But when *Cohen* was convicted for wearing a jacket bearing an epithet, we did not apply [*United States v. O'Brien*, 391 U.S. 367 (1968)]. Instead, we recognized that the generally applicable law was directed at Cohen because of what his speech communicated—he violated the breach of the peace statute because of the offensive content of his particular message. We accordingly applied more rigorous scrutiny and reversed his conviction.
>
> This suit falls into the same category. The law here may be described as directed at conduct . . . but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message.

*Id.* at 27-28 (cleaned up) (emphasis in original). The same is true of the issuance of the "trespass warnings" here. While there are certainly circumstances under which these directives (and the general order authorizing their issuance) can be applied to non-expressive activity, the plaintiffs wished to engage in pure speech—participating in the ongoing Dunn Meadow protests "consist[ed] of communicating a message." Traditional First Amendment principles apply.

        b.    *Incidental burden on speech.*       Next, relatedly, the defendants invoke case law

standing generally for the principle "that laws having 'only an incidental effect on protected speech' do not trigger strict scrutiny." (Dkt. 121 at 38 [citing *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. __, 145 S. Ct. 2291 (2025)]). This, too, gets them nowhere.

Certainly laws primarily regulating conduct that only incidentally burden speech are subject to intermediate scrutiny. That is the holding of *O'Brien*, on which *Paxton* relies. *See* 145 S. Ct. at 2309. But the restriction on the plaintiffs' speech here was far from "incidental." As the Supreme Court has held, *O'Brien*'s test is "inapplicable" when governmental action "directly and immediately affects [First Amendment] rights." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000). It is difficult to conceive a restriction on expressive freedoms more "direct" and "immediate" than an order resulting from an individual's protest activity that prohibits their continued participation in ongoing demonstrations addressed to an issue of profound international import.

Additionally, as *Holder* makes clear, the *O'Brien* test only applies to a "generally applicable prohibition" on certain activities. 561 U.S. at 26; *see also id.* at 27 ("*O'Brien* does not apply the applicable standard for reviewing a content-based regulation of speech."). That is not this case, where the defendants prohibited some persons—the plaintiffs—but not others from participating in ongoing demonstrations. While the defendants are quick to characterize the "trespass warnings" issued to the plaintiffs as "content neutral" (Dkt. 121 at 37), that is both wrong and beside the point. Not only does "the First Amendment stand[] against attempts to disfavor certain subjects or viewpoints" but it prohibits "restrictions distinguishing among different speakers, allowing speech by some but not others," for "restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010); *see also, e.g.,* *Surita v. Hyde*, 665 F.3d 860, 870 (7th Cir. 2011) ("Restrictions that favor or disfavor certain speech based on the speaker rather than the content of the message are still content based."). The defendants ignore this. Instead, they simply invoke *Paxton* (and, by extension, *O'Brien*) without

11

detailing why they believe this case to be remotely similar.  It is not, and their argument is off-base.

c.    *Prior restraint versus punishment for past conduct.*    Finally,    first    underscoring    the plaintiffs' arrests for misdemeanor trespass and then invoking *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), the defendants appear to rely in part on the distinction between an impermissible prior restraint on speech and a permissible punishment for past conduct that tangentially affects the exercise of expressive rights.  (Dkt. 121 at 36-37).  This distinction was previously addressed by the plaintiffs (*see* Dkt. 98 at 27-28), and the defendants do not meaningfully address their argument.

As underscored previously, the Supreme Court in *Alexander v. United States*, 509 U.S. 549 (1993), held explicitly that, for a restriction on expressive activity to represent punishment for past conduct rather than a prior restraint, there must be, *inter alia*, a "prior judicial determination" of wrongdoing.  *Id.* at 552 (cleaned up).  This is consistent with the Supreme Court's holdings in *Arcara* and *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989)—both of which were specifically addressed in *Alexander*—as well as with the Seventh Circuit's earlier holdings in *Entertainment Concepts, Inc. v. Maciejewski*, 631 F.2d 497 (7th Cir. 1980), and *Collin*.  At this point, the Court would be forgiven if it has a sense of déjà vu, for the plaintiffs said all of this already.  (*See* Dkt. 98 at 27).  Nonetheless, it is worth repeating because the defendants accuse the plaintiffs of "citing nothing" for their contention that "a judicial determination is necessary before future speech may be restricted based on past conduct."  (Dkt. 121 at 39).  That accusation is most assuredly not well taken.  While the plaintiffs did not insert a citation after the precise sentence quoted by the defendants, that is because that sentence merely summarizes the preceding paragraph—which detailed the holdings of *Alexander*, *Arcara*, *Fort Wayne Books*, *Maciejewski*, and *Collin*.  (Dkt. 98 at 27).  The sentence immediately after the sentence quoted by the defendants then cites *Alexander* once again, and the one thereafter cites both *Alexander* and *Arcara*.  The sentence quoted by the defendants, in fact, represents the precise holding of *Alexander*.  Yet, in their entire brief, they do not cite *Alexander* once.

A restriction on expressive activity may only be deemed a punishment for past conduct when that punishment is imposed through the judicial process. This ensures not only that an individual has the opportunity to challenge any allegations of wrongdoing before their First Amendment rights are restricted but also that a neutral arbiter determines that the punishment fits the crime.

*     *     *

The defendants advance no argument that, if the "trespass warnings" were a prior restraint on the plaintiffs' speech, they are subject to something other than strict scrutiny. Despite their invocation of a variety of legal principles, that is exactly what these warnings are.

### 3. The "trespass warnings" fail any standard of review

Ultimately, it does not matter whether this Court applies strict scrutiny (as it must), whether it applies the traditional time, place, and manner analysis applicable to speech restrictions in a public forum, or whether it applies *O'Brien*'s intermediate-scrutiny test. Completely prohibiting the plaintiffs from attending the ongoing protests in Dunn Meadow fails any standard.

a.  *Strict scrutiny.* The defendants advance no argument that the "trespass warnings" issued to the plaintiffs satisfy strict scrutiny. Clearly they do not. In general, there is no doubt that "public safety" is a compelling interest. Nonetheless, the Seventh Circuit in *Collin* was clear that past conduct may only justify a restriction on First Amendment expression when this conduct gives rise to "a well-founded belief that violence would occur" absent the restriction. 460 F.2d at 754. This requires a showing of "a specific intent to cause violence, directed to the specific demonstration and manifested by specific plans." *Id.* (citation and emphasis omitted). The defendants rightly do not even attempt to meet this standard. The plaintiffs were all arrested for misdemeanor trespass, not violent behavior of any sort. And many of them were arrested under circumstances not likely to repeat themselves: Indiana University's late-night amendment to the rules governing expressive activity in Dunn Meadow, which had not yet made its way to the university's own website, sowed

13

confusion about the activity in which protesters were permitted to engage. (*See* Dkt. 98 at 14).

All of that aside, the "trespass warnings" were overwhelming in their scope. They prohibited the plaintiffs from engaging even in speech activity unrelated to the Dunn Meadow protests—as noted previously, Prof. Robinson had planned to speak at a rally of the Indiana Graduate Workers Coalition but was unable to do so (Dkt. 97-8 at 5 [¶ 16])—and did so for a period of time (one year for most plaintiffs and five years for Mr. Greene) long after those protests were likely to end. And even after Indiana University began backing down from the warnings issued to most plaintiffs (by staying those warnings pending an administrative appeal), without any apparent reason to believe that they presented unique dangers to the university community it continued to prohibit Ms. Murphy and Mr. Wirtshafter from entering Dunn Meadow for another month (Dkt. 97-6 at 4-5 [¶¶ 14-16; Dkt. 97-10 at 4-5 [¶¶ 14-16]) and to prohibit Mr. Greene from entering Dunn Meadow for even longer (Dkt. 97-3 at 4-5 [¶¶ 14-16]). This is the antithesis of narrow tailoring.

b.    *Time, place, and manner.* The defendants do not dispute that Dunn Meadow is a traditional public forum—they admitted as much in their answer (Dkt. 80 at 5 [¶ 15])—and so, even if not deemed a prior restraint, the "trespass warnings" issued to the plaintiffs still must be scrutinized under the familiar time, place, and manner test, which requires that the restriction be narrowly tailored to a significant governmental interest and leave open ample alternative channels for communication. *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

Again, it is difficult to conceive a restriction less appropriately tailored than the "trespass warnings," which banned the plaintiffs from university property for a year or more without any showing that "violence would occur" if they were allowed to return. *Collin*, 460 F.2d at 754. Once again, the Supreme Court has been clear that "[a] complete ban [on expressive activity] can be narrowly tailored, but only if each activity within the proscription's scope is an appropriately targeted evil." (Dkt. 98 at 32 [quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)]). The defendants' only

14

response to this is to suggest that *Frisby* has somehow been limited by the Supreme Court's statement in *Ward* that "the requirement of narrow tailoring is satisfied 'so long as the [state interest] would be achieved less effectively absent the regulation.'" (Dkt. 121 at 40 [quoting *Ward*, 491 U.S. at 799]). Here are the two sentences of *Ward* immediately after the excerpt quoted by the defendants:

> To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. *See Frisby*, 487 U.S. at 485 ("A complete ban can be narrowly tailored but only if each activity within the proscription's scope is an appropriately targeted evil").

491 U.S. at 799-800 (cleaned up). *Ward* stands only for the proposition that the narrow-tailoring requirement of the time, place, and manner analysis does not impose a least-restrictive-means test. The defendants' suggestion that the "trespass warnings" satisfy this requirement simply because their public-safety interests would be achieved less effectively without these warnings (Dkt. 121 at 41) sorely misses the point of that requirement. A campus that allows no public gatherings at all is surely a safer campus, but it is not one that observes constitutional freedoms.

The defendants' contention that the plaintiffs, while banned from Dunn Meadow, nonetheless retained ample alternative avenues for the exercise of their First Amendment rights (*see id.*) is similarly unpersuasive. Their reference to the fact that Mr. Greene returned to the public street abutting university property is simply a recognition that, unlike Indiana University, the City of Bloomington did not restrict the plaintiffs' expression. In advancing this argument, they do not appear to recognize that their position that the plaintiffs should have simply protested nearby severely undermines the contention that the plaintiffs all presented an unacceptable safety risk.

In any event, there are two problems with the defendants' argument, one legal and the other factual. The legal problem is that, to be adequate, "alternative avenues of expression must be within the jurisdiction that controls the [property]. It is not sufficient to say that neighboring communities permit the type of speech that the challenged [action] bans." *Palmetto Props., Inc. v. Cnty. of DuPage*,

160 F. Supp. 2d 876, 883 (N.D. Ill. 2001) (citing *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76-77 (1981)). In other words, to be ample, the alternative must be "within the forum in question." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 655 (1981); *see also, e.g., Initiative & Referendum Inst. v. U.S. Postal Serv.*, 417 F.3d 1299, 1310-11 & n.6 (D.C. Cir. 2005) (tracing Supreme Court precedent and concluding that there must be an "intra-forum alternative"). The defendants are not relieved of their constitutional obligations merely because Bloomington complied with its.

And the factual problem is just as fatal. This is not a case where an entire protest was moved a short distance away to ensure that a security perimeter could be erected. *See, e.g., Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1226 (10th Cir. 2007) (perimeter outside NATO conference). Rather, the demonstrations concerning the war in Gaza were taking place *inside* Dunn Meadow, and the defendants entirely prohibited the plaintiffs from participating in these demonstrations. The suggestion that standing on the other side of a busy thoroughfare from an ongoing protest is adequate simply ignores this reality, for "participating in a demonstration"—with the ability to interact with and support fellow protesters, partake in chants and other group displays, and serve as a visual reminder of the size of the movement—is markedly different from "supporting a demonstration" from a nearby location. On top of all this, one of the purposes of the demonstration was to voice "concern[] about Indiana University's financial ties to Israel" (Dkt. 97-6 at 2 [¶ 6]; Dkt. 97-10 at 2 [¶ 6]), meaning that the locus mattered to the message: protesting on city property does not tell people that Indiana University is part of the problem in the same manner that protesting in its own self-declared "Assembly Ground" does.

    c.   *Intermediate scrutiny.*    Finally, even if the "trespass warnings" are somehow deemed a regulation of "conduct" with only an incidental burden on speech, that does not immunize them from scrutiny. They must still "further[] an important or substantial governmental interest . . . unrelated to the suppression of free expression" and the restriction on "First Amendment

freedoms" must be "no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377. This test is virtually indistinguishable from time, place, and manner analysis. *See, e.g.*, *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 714 (7th Cir. 2003) ("[T]he Supreme Court has held that the time, place, and manner test embodies much of the same standards as those set forth in *United States v. O'Brien*.") (citations omitted). Even under *O'Brien*'s version of intermediate scrutiny, the "trespass warnings" were not remotely tethered to Indiana University's public-safety interests.

### C. Neither President Whitten nor Superintendent Hunter is entitled to qualified immunity

Nor are the individual defendants entitled to qualified immunity. While this analysis requires the law to be "sufficiently clear" to place officials on notice that their actions were "unlawful," *Sabo v. Erickson*, 128 F.4th 836, 843-44 (7th Cir. 2025) (citation omitted), they "can be on notice that their conduct violates established law even in the absence of earlier cases involving fundamentally similar or materially similar facts." *Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (cleaned up). Indeed, "general statements of the law are not inherently incapable of giving fair and clear warnings, and . . . a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (citation omitted). The defendants advance no argument that they could reasonably have construed Dunn Meadow as anything other than a traditional public forum (they have admitted it was) or the ongoing protests as anything other than core First Amendment activity. To reiterate, then: the individual defendants banned the plaintiffs from participating in ongoing demonstrations in a public forum merely because they were arrested for refusing to leave that forum when ordered to do so.

Since at least 1975—and likely far earlier—the law has been clearly established that, regardless of the "form[]" an order takes, the denial of the "use of a forum in advance of actual expression" constitutes a prior restraint subject to strict scrutiny. *See Se. Promotions*, 420 U.S. at 552-53. Since at least 1972, the law in this circuit has been clearly established that past conduct may only

17

justify a restriction on First Amendment expression when this conduct gives rise to "a well-founded belief that violence would occur" absent the restriction. *See Collin*, 460 F.2d at 754. Even ignoring prior-restraint analysis, since at least 1985, the law has been clearly established that "speakers can be excluded from a public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest." *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) (citation omitted). Since at least 1994, the law has been clearly established that, to meet this exacting standard, officials restricting speech in a public forum must "do more than simply posit the existence of the disease sought to be cured" but must instead demonstrate that "harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994). And since at least 2003, it has been clearly established that, even if the "trespass warnings" are erroneously deemed a regulation of conduct impinging on speech rights rather than a direct regulation of speech, the defendants must still meet this same burden. *See Ben's Bar*, 316 F.3d at 714. The defendants' qualified-immunity argument exists against the backdrop of their failure to cite a single case allowing the exclusion of an individual from an ongoing protest in a public forum.

Not surprisingly, cases where individuals have been prohibited from joining ongoing First Amendment activity in a public forum appear to be rare. But, when this has happened, qualified-immunity defenses have been rejected even when the speaker was not aligned with the group making primary use of the public space. *See, e.g., Harcz v. Boucher*, 763 F. App'x 536, 538-39, 543-44 (6th Cir. 2019) (rejecting, at the pleading stage, a qualified-immunity argument when protesters with "misgivings about certain aspects of [a] celebration" of the anniversary of the Americans with Disabilities Act were prevented from entering an event on the grounds of the Michigan State Capitol); *Childress v. Walker*, 943 F. Supp. 2d 1332, 1341, 1348-49 & n.14 (M.D. Ala. 2013) (rejecting a qualified-immunity argument when a leafleteer was ejected from an event in a public forum for

allegedly "disrupting the assembly and . . . offending some of the patrons"); *cf. Teesdale v. City of Chicago*, 690 F.2d 829, 834 & n.1 (7th Cir. 2012) (speakers cannot be excluded from festival in a public forum even at the request of organizers). Suffice it to say that, if it is clearly established that speakers cannot be excluded from a public forum when their voices are at odds with organizers, it is clearly established that they may not be excluded when their voices are aligned with organizers—at least without specific, individualized evidence meeting *Collin*'s "well-founded belief" standard.

Against all this, the defendants add only two things. First, they focus most prominently on the plaintiffs' contention that the "trespass warnings" cannot be viewed as permissible punishments for past conduct because they were not preceded by a "judicial determination" of wrongdoing. (Dkt. 121 at 43). This is a curious focal point, for at no point do the defendants develop any argument that the warnings *may* be justified on this basis. In any event, as underscored both previously and above, the judicial-determination requirement is taken directly from *Alexander*, 509 U.S. at 552, and the law in this regard has thus been clearly established since that case issued in 1993. (*See* Dkt. 98 at 27-28; *supra* at 12-13). Again, *Alexander* is not cited once in the defendants' brief.

And finally, the defendants seek reprieve in their need to act in "real time" to "particular circumstances." (Dkt. 121 at 44). It is not clear what this means: not only did the defendants decide in advance of the Dunn Meadow protests that any individual arrested would receive a "trespass warning"—such that they *could not* have found the individual-specific intent to cause violence required by *Collin*, 460 F.2d at 753-54—but they allowed three of the plaintiffs' warnings to remain in effect for a month or more (*see* Dkt. 97-3 at 4-5 [¶ 16]; Dkt. 97-6 at 5 [¶ 16]; Dkt. 97-10 at 5 [¶ 16]). To the extent that they are merely seeking to underscore the tense political environment in which they were operating, that was doubtless true in Skokie (and countless other instances) as well: this is already baked in to the governing legal standards and, thus, the qualified-immunity analysis. It should be enough to say that, more than half a century ago, the Seventh Circuit deemed it "patent

that a hostile audience is not a basis for restraining otherwise legal First Amendment activity" and reiterated that "the possible tendency of [an individual's] words to provoke violent retaliation" cannot justify a restriction on their speech." *Collin*, 460 F.2d at 754-55.[3]

## II.    The plaintiffs are entitled to summary judgment on their injunctive claims

The plaintiffs' injunctive claims in this case challenge two iterations of Indiana University's expressive activity policy: the August 2024 Policy (Dkt. 72-1), under which five of the plaintiffs were formally disciplined; and the November 2024 Policy (Dkt. 72-2), which was in effect at the time the plaintiffs sought summary judgment and remained in effect until it was amended in the wake of this Court's preliminary-injunction decision (Dkt. 101).  Indiana University does not even attempt to defend the constitutionality of either policy.  Instead, it contends that its eleventh-hour "rescission" of the discipline issued under the August 2024 Policy and its (equally eleventh-hour) amendment of the November 2024 Policy render the plaintiffs' claims moot.  (Dkt. 121 at 26-34).  Under the circumstances of this case, it is wrong on both fronts.[4]

### A.   The plaintiffs' challenge to the August 2024 Policy is not moot

---

[3]      The individual defendants cite *Wernsing v. Thompson*, 423 F.3d 732 (7th Cir. 2005), as an example of a case where the imposition of a prior restraint was not deemed to violate clearly established law.  (*See* Dkt. 121 at 43).  *Wernsing* was an employee-speech case, where prior restraints on speech instituted by a governmental employer are subject to the balancing test of *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995).  *See* 423 F.3d at 743-44.  As the Seventh Circuit has reiterated in a related context, "[i]t is an undeniable fact about balancing tests . . . that they produce a wide gray area between the clearly legal and the clearly illegal" such that qualified immunity "require[s] giving the benefit of the doubt to the reasonable public official if the particular case falls within that gray area." *Harnishfeger v. United States*, 943 F.3d 1105, 1120 (7th Cir. 2019) (cleaned up).  Suffice it to say that no similar "gray area" exists when an official prohibits persons from participating in expressive activity in a public forum.  Here, as noted, the Supreme Court has long placed the burden squarely on the shoulders of public officials to demonstrate a paramount need to restrict speech in a public forum—whether viewed through strict or intermediate scrutiny.

[4]      Also reciting principles regarding Article III standing, sovereign immunity, and whether a "non-speculative basis" exists for relief, Indiana University raises its arguments using an array of different nomenclature.  These arguments add nothing to its mootness argument—they all focus on whether this Court retains authority to grant prospective relief—and are therefore not addressed separately.  *See, e.g., Marie v. Mosier*, 122 F. Supp. 3d 1085, 1101-02 (D. Kan. 2015) ("Defendants . . . have repeated the[ir] mootness arguments throughout their filings but cloaked them in a surfeit of different labels [including sovereign immunity and standing].  However labeled, none of these arguments are persuasive.") (citations omitted).

Until it was amended several months after its enactment, the August 2024 Policy prohibited *all* "expressive activity" on Indiana University property during nighttime hours. (*See* Dkt. 98 at 18). Given this broad prohibition, when four of the professor-plaintiffs—Prof. Akou, Prof. McDonald, Prof. Phillips, and Prof. Robinson—participated in candlelight vigils to protest the policy, they received formal disciplinary warnings that, among other things, warned of escalating sanctions for future violations of university policies. (*Id.* at 19). Mr. Greene, a graduate student who also participated in one of the vigils, received a similar "disciplinary warning." (*Id.*; Dkt. 122-9 at 1).

Given all this, these five plaintiffs have sought "an injunction requiring the defendants to expunge any disciplinary action taken against [them] as a result of [their] violation of the [August 2024 Policy]." (Dkt. 97 at 1; Dkt. 98 at 34-35, 47). Nearly a month after this Court enjoined the challenged portion of the November 2024 Policy, Indiana University issued each of these plaintiffs a letter purporting to "rescind[]" the disciplinary action taken against them. (Dkts. 122-4, 122-5, 122-6, 122-7 & 122-9). Indiana University now argues that this action renders the plaintiffs' challenge to the August 2024 Policy moot. (Dkt. 121 at 31). For two independent reasons, this is wrong.

1.    *First,* the rescission of disciplinary action taken against the plaintiffs is explicitly linked to this Court's preliminary injunction. This is what the letters of rescission actually say:

> On May 29, 2025, the United States District Court for the Southern District of Indiana issued an ORDER GRANTING PRELIMINARY INJUNCTION in the matter of Jasper Wirtschafter, *et al.,* v. the Trustees of Indiana University, *et al.,* No. 1:24-cv-00754-RLY-MKK. The preliminary injunction entered by the court enjoined Indiana University from enforcing the Expressive Activity Policy to the extent it prohibited certain activities on Indiana University property occurring without prior permission between the hours of 11:00 p.m. and 6:00 a.m.
>
> Given the Court's order, **your letter of reprimand is hereby rescinded and no longer has any force or effect**. The original letter of reprimand and this letter will remain in your permanent personnel file to document the rescission and invalidation of the original letter. This is to provide a clear record of this action for faculty and other parties.

(Dkts. 122-4, 122-5, 122-6 & 122-7; *see also* Dkt. 122-9 [similar language applicable to Mr. Greene's discipline]).  In other words, Indiana University took this action only to ensure compliance with the preliminary injunction.  But a preliminary injunction is *always* temporary and lasts only until the entry of final judgment, and "[c]ompliance with the provisions of a preliminary injunction does not render moot plaintiffs' underlying claims because if the injunction is dissolved without a decision on the merits, there is nothing to keep defendants from resuming the activity that had been restrained by the preliminary injunction."  *Marie v. Mosier*, 122 F. Supp. 3d 1085, 1102 (D. Kan. 2015) (cleaned up); *see also, e.g.*, *Sonic Indus., LLC v. Simple Tie Ventures, LP*, 2021 WL 5988296, at *11 (W.D. Okla. July 12, 2021) (quoting *Marie*); *Disney Enterprises, Inc. v. VidAngel Inc.*, 2019 WL 4565168, at *1 (C.D. Cal. Sept. 5, 2019) ("VidAngel has shown, at most, that it complied with the preliminary injunction, but mere compliance with the law does not moot injunctive relief."); *cf. Costa v. Bazron*, 464 F. Supp. 3d 132, 142 (D.D.C. 2020) ("If compliance with the terms of a TRO were sufficient to defeat entry of a preliminary injunction, few—if any—cases would make it past the TRO stage.").

The timing of the letters of rescission underscores the applicability of this jurisprudence. Following the formal disciplinary action taken against them, the four professors jointly appealed that action contending, among other things, that the August 2024 Policy—and the discipline imposed for violating that policy—ran afoul of the First Amendment.  (Supp. Decl. of H. Akou, ¶ 5).  Although Indiana University does not acknowledge this, the very day before this Court issued its preliminary injunction, it formally rejected these appeals (thus affirming the disciplinary action taken against the professors).  (*Id.*, ¶ 6 & Attachment).  In doing so, it informed the professors that their "individual perspectives . . . as they relate to the legality of [the August 2024 Policy] are immaterial" insofar as the policy's legality can "only [be] resolved through the legal system and not [by] the university." (*Id.*).  Not until several weeks after the preliminary injunction issued, and on the eve of its due date for responding to the plaintiffs' summary-judgment motion, did Indiana University rescind its

disciplinary action. The reason it did so was explicitly and solely the preliminary injunction.

In the absence of a permanent injunction mandating the expungement of the disciplinary actions taken against the plaintiffs, the letters of rescission are meaningless. *See, e.g.*, *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010 ("An expired or vacated injunction does not prevent [the] government from punishing conduct, committed before the vacatur, that violates its laws.").[5]

2.    *And second,* regardless of the circumstances under which Indiana University has rescinded the disciplinary actions taken under the August 2024 Policy, it still has not given the plaintiffs what they have actually asked for: the *expungement* of their disciplinary records.

A claim is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016) (citation omitted). "A case is not moot as long as some relief is possible." *Bozek v. Bank of Am., N.A.*, 682 F. App'x 507, 507 (7th Cir. 2017); *see also In re Envirodyne Indus., Inc.*, 29 F.3d 301, 304 (7th Cir. 1994) ("At least partial relief is possible, and that is enough to satisfy the requirements of Article III.").

_____

[5]    To be sure, the preliminary injunction was targeted at the November 2024 Policy (which required prior permission for certain nighttime expressive activity) rather than the August 2024 Policy (which banned nighttime expressive activity altogether). Indiana University appropriately recognized that this Court's holding regarding the constitutionality of the less-restrictive November policy meant that actions taken under the August policy could not stand either. But that does not change the fact that its rescission decision is expressly linked to an order that is, by definition, temporary.

Additionally, the fact that the rescission of the plaintiffs' discipline is expressly linked to a temporary injunction renders it unnecessary for this Court to determine whether this action satisfies Indiana University's "formidable burden" under the "voluntary cessation" exception to the mootness doctrine of demonstrating that discipline will not be reinstated. *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). As detailed below, under this doctrine Indiana University must "ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 189 (citation omitted). The evidence it offers—two affidavits attesting to the "understand[ing]" of administrators without authority to bind the university (Dkts. 122-3 at 2, 122-8 at 2)—falls far short of this standard. As the Seventh Circuit has made clear, "a mere statement" of future intentions in a sworn declaration "is not enough." *Speech First, Inc. v. Killeen*, 968 F.3d 628, 646 (7th Cir. 2020); *see also, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020) ("There is no evidence that [the president of a university] controls whether the University will restore the challenged [policy] during or after his tenure."); *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 769 (6th Cir. 2019) ("[T]here is no evidence in the record that Harper—or any potential future Vice President for Student Affairs—has control over whether the University will reimplement the challenged [policy]. So even if Harper stated that the University would never reenact the challenged [policy], it is difficult to understand why that statement should be construed to have any binding or controlling effect as far as mootness goes.").

While Indiana's University's "rescission" of the plaintiffs' letters of reprimand allows the unconstitutional discipline to "remain in [their] permanent personnel file[s]" (or "conduct file" in the case of Mr. Greene) (Dkts. 122-4, 122-5, 122-6, 122-7 & 122-9), an order requiring the expungement of their discipline would result in the complete elimination of "all evidence" of the unconstitutional action, *Flint v. Dennison*, 488 F.3d 816, 824 (9th Cir. 2007). The "expungement [of a disciplinary record] is certainly a form of meaningful relief." *Id.* at 824 (cleaned up). And, in fact, it is a form of relief that is awarded with regularity. *See, e.g.*, *Jensen v. Brown*, 131 F.4th 677, 697-99 (9th Cir. 2025); *Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019); *Jackson v. Hayakawa*, 761 F.2d 525, 526-27 (9th Cir. 1985); *Sizelove v. Madison-Grant United Sch. Corp.*, 597 F. Supp. 3d 1246, 1287 (S.D. Ind. 2022); *Doe v. Purdue Univ.*, 2019 WL 1369348, at *2 (N.D. Ind. Mar. 25, 2019).[6] A claim is not moot when "some relief" remains "possible," *Bozek*, 682 F. App'x at 507, and here it is undeniable that some relief remains possible.

The difference between "expungement" and "rescission" is not inconsequential. The former form of relief ensures that no trace remains of Indiana University's unconstitutional behavior; the latter allows its actions to be referenced, and potentially produced to third parties, in the future. Given the range of potential employment actions largely committed to the university's discretion, ensuring that decisionmakers do not have access to unconstitutional disciplinary action taken against the plaintiffs, whether or not formally "rescinded," is vital. Indiana University's statement that its letters of reprimand and the corresponding letters of rescission must remain in the plaintiffs' files "to provide a clear record of [its] action for faculty and other parties" (Dkts. 122-4, 122-5, 122-6 & 122-7) only drives the point home: why does it believe it necessary to possess a "clear record" of something that should not have happened in the first place? To the extent that it

---

[6]    Although bearing the same caption, the two *Doe v. Purdue University* decisions arose from different litigation with altogether different plaintiffs.

relies on its "retention schedule" (Dkt. 122-9), that schedule must yield to the First Amendment.

For this reason, too, the plaintiffs' challenge to the August 2024 Policy is not moot.

### B.  The plaintiffs' challenge to the November 2024 Policy is not moot

Nor is the plaintiffs' challenge to the November 2024 Policy moot.  To be sure, Indiana University amended this policy in the wake of this Court's preliminary-injunction decision—and after the plaintiffs had sought summary judgment—to omit the challenged restrictions on nighttime expressive activity.  But the "voluntary cessation" exception to the mootness doctrine erects a high bar that Indiana University must clear to demonstrate that the plaintiffs' claim is no longer justiciable.  It fails to make the requisite showing that the challenged behavior will not be repeated.

"Voluntary cessation does not moot a case or controversy unless subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonable be expected to recur." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (cleaned up); *see generally United States v. W.T. Grant Co.*, 345 U.S. 629, 632-33 (1953).  Otherwise,

> a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends.  Given this concern, our cases have explained that "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 190 (2000).

*Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  That is, an action "does not become moot merely because the conduct . . . has terminated, if there is a possibility of recurrence, since otherwise the defendants would be free to return to their old ways."  *Allee v. Medrano*, 416 U.S. 802, 810-11 (1974).

To be sure, as Indiana University notes, "the complete repeal of a challenged policy" will generally be deemed to meet this standard, "unless there is evidence creating a reasonable expectation that the University will reenact the policy or one substantially similar."  *Speech First, Inc. v. Killeen*, 968 F.3d 628, 645 (7th Cir. 2020) (cleaned up).  Even with this special solicitude, this is the

rare case where the amendment of a governmental policy does not render the challenge moot.

For one, Indiana University's action was taken *only* in response to this Court's preliminary injunction. Once again, compliance with a preliminary injunction does not establish mootness. (*See supra* at 22-23). Thus, in another First Amendment challenge to a formal university policy, the Fifth Circuit recently concluded that the plaintiffs' challenge to that policy was not moot when the university had been informally pressured into amending its policy during the pendency of preliminary-injunction proceedings: "University officials didn't voluntarily cease their challenged conduct—they backed down only because the district court pressured [them] to do so." *Speech First, Inc. v. McCall*, 138 F.4th 219, 223 (5th Cir. 2025). That holding is even more apropos here, where Indiana University's policy change was *compelled* by this Court's preliminary injunction.

Even ignoring the fact that its policy change was a court-mandated one, "[t]he timing of [Indiana] University's change . . . raises suspicions that its cessation is not genuine." *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 769 (6th Cir. 2019); *see also, e.g.*, *McCall*, 138 F.4th at 223 (identifying "the suspicious timing of [a] change" as one reason to conclude that a university's policy change does not effect mootness). The plaintiffs amended their complaint to target the November 2024 Policy less than two weeks after it was enacted. (*Akou* Dkt. 48). For seven months, Indiana University was thus aware of the plaintiffs' constitutional concerns but took no action. Instead, it used this time first to enact a "Pre-Approval Standard" for the enforcement of the policy (Dkt. 69-1 at 86-89) and then to vigorously defend the policy's constitutionality, going so far as to contend that the policy is necessary to ensure "public safety" on its campuses. (Dkt. 85 at 31-34). The February 2025 meeting of the Indiana University Board of Trustees—convened long after the plaintiffs filed their preliminary-injunction brief—contained no mention whatsoever of the possibility of amending the November 2024 Policy. *See* Minutes of the Bd. of Trs. of Ind. Univ., Feb. 20, 2025, *available at* https://institutionalmemory.iu.edu/aim/items/aeaae00e-9d24-4341-95de-184703015b55 (last visited Aug.

14, 2025).  Indeed, as recently as May 7, 2025, Indiana University was still telling this Court that it had "upheld [its] commitment to the First Amendment in all [its] decisions" and that the November 2024 Policy was a "reasonable" means of advancing its interest in "protecting the safety of students, faculty, and staff while preserving [its] core educational mission." (Dkt. 93 at 1-2).

Only after this Court's preliminary-injunction decision was a change to this policy even contemplated.  This series of events does not establish mootness.  *See also, e.g.*, *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329 (5th Cir. 2020) ("[T]he timing of the University's policy amendments is at least as suspicious as was the timing of the changes in *Schlissel*" insofar as "the University did not commence review, much less change its policies, until after the district court decision.").

The suspect nature of Indiana University's eleventh-hour policy change is underscored by its repeated amendments to this policy.  For more than half a century, expressive activity—at least in Dunn Meadow on the Bloomington campus—was governed by the same policy (previously referenced as "the 1969 Policy") that was overwhelmingly and explicitly permissive of First Amendment rights.  (*See* Dkt. 98 at 11-12).  In April of 2024, this policy was formally amended on the eve of planned demonstrations concerning the war in Gaza, and the following summer the August 2024 Policy was enacted.  (*See id.* at 12-13, 18-19).  Then, after the initiation of this lawsuit and the briefing of a preliminary-injunction motion (*Akou* Dkts. 21, 28 & 31), and on the same day as a scheduled settlement conference (*see, e.g.*, Dkt. 51), Indiana University amended its policy once again by enacting the November 2024 Policy.  (*See* Dkt. 98 at 19-21).  After the plaintiffs' amended complaint targeted at the latest iteration of this policy took issue with, *inter alia*, the vagueness of a provision allowing persons to "spontaneously and contemporaneously assemble and distribute literature" (*Akou* Dkt. 48 at 7 [¶ 31]), Indiana University released its "Pre-Approval Standard" elaborating on this provision shortly before preliminary-injunction briefing was to commence (Dkt. 69-1 at 86-87).  Finally, only after the temporal restrictions of the November 2024 Policy were

preliminarily enjoined did Indiana University enact the policy that it contends moots the plaintiffs' challenge. (Dkt. 122-11). In other words, although its policies went unchanged for 55 years, Indiana University has now amended those policies four times (five, if the "Pre-Approval Standard" counts) in just over a year.

And, as noted, up until the very day before the preliminary injunction issued, the professors against whom the August 2024 Policy had been enforced were being informed that their discipline was proper and that it would stand. (Attachment to Supp. Decl. of H. Akou).

This is not the behavior of a governmental actor with a *bona fide* desire to ensure that persons are permitted to exercise their First Amendment rights even in the absence of judicial oversight. This is the behavior of an entity that is only willing to relax its restrictions on those rights *because of* that continued oversight. Even where governmental policies are concerned, under the voluntary-cessation exception, a case is not moot where "officials with a track record of 'moving the goalposts' retain authority to reinstate th[e] heightened restrictions at any time." *Tandon v. Newsom*, 593 U.S. 61, 64 (2021) (per curiam) (citation omitted). That observation fits this case to a tee.

On top of all this, even now Indiana University offers no commitment—much less a binding one—not to return to its old ways. Notwithstanding its amendment of the November 2024 Policy, the university has neither "issued a controlling statement of future intention" nor "presented . . . sworn testimony" from anyone, let alone an individual with authority to bind it, that its policy change is permanent. *McCall*, 138 F.4th at 223. Indeed, in a forty-page brief, it does not even tell this Court that it will not revert to previous iterations of its expressive activity policy. Had it done so, that would still not be enough. *See Fenves*, 979 F.3d at 328-29 (rejecting a mootness argument in a challenge to a university policy in part because "statements in brief are not a controlling statement of future intention); *cf. Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 458 n.1 (2017) (even announcement of a policy change by the Governor of Missouri does not "mak[e] 'absolutely

clear' that [state] could not revert to its [former] policy" in the future). But its silence is still telling.

This is the rare case where even a formal change in governmental policy does not establish mootness. There is every reason to conclude that this policy change results not from Indiana University's recognition of the error of its ways but from its desire to avoid a final decision on the merits. Under the "voluntary cessation" exception, the plaintiffs' challenge to the November 2024 Policy is not moot. Its restriction on nighttime expressive activities must be permanently enjoined.[7]

## CONCLUSION

This is an extremely simple case. Despite the defendants' apparent assertion that what they faced in April 2024 was some sort of unprecedented confluence of circumstances requiring an unforgiving crackdown on expressive activity, it was not. To the contrary, the First Amendment "best serve[s] its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger," *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949), and the history of the Free Speech Clause provides countless examples of inappropriate crackdowns on expressive rights in the name of "public safety." Given this, the constitutional

---

[7]    In *Killeen*, the Seventh Circuit interpreted the Sixth Circuit's decision in *Schlissel* (and, presumably, the Fifth Circuit's similar decisions in *McCall* and *Fenves*) as having "applied a more stringent test to determine mootness than the one [this Circuit's] precedent demands." 968 F.3d at 646. It is not obvious why that is so: as noted, *Killeen* itself holds that the presumption that a formal policy change establishes mootness may be rebutted by "evidence that the repeal was not genuine," *id.* at 645, and both the Fifth and Sixth Circuits appear to have merely applied that standard to the facts of their particular cases. Indeed, the Seventh Circuit in *Killeen* described, apparently with approval, *Schlissel*'s holding that the "suspect" timing of a policy change may avoid mootness where the challenged policy was "actively" enforced prior to its amendment and where the university "was not so much as considering changing the [policy]" before litigation was initiated. *Id.* at 647 n.3 (emphasis omitted). And it acknowledged that the Supreme Court had concluded in *Trinity Lutheran* that the case was not moot when "the governor issued a press release on the eve of oral argument . . . announcing a repeal of the challenged policy." *Id.* at 646.

*Killeen* itself is easily distinguishable. As is relevant here, the plaintiff in that case challenged a provision of a university's student code that required prior approval before students could engage in certain expressive activity. *Id.* at 636. This provision, however, had never been enforced—there was "no evidence . . . that the University was even aware it was on the books"—and was repealed "shortly after the lawsuit was initiated." *Id.* at 636, 647 n.3; *see also id.* at 645-46 (describing the policy as "never previously enforced" and underscoring the lack of evidence that "the University ever enforced the policy"). In other words, the plaintiff in *Killeen* challenged a policy that was, for all intents and purposes, a complete nullity, and that was removed promptly after the constitutional infirmity was first brought to the university's attention. The contrast here is obvious.

framework under which the defendants were required to operate is actually well travelled. More than half a century ago, the Seventh Circuit reiterated that, to restrict a speaker from accessing a public forum, an official must possess "a well-founded belief that violence would occur" if they were allowed to do so. *Collin*, 460 F.2d at 754. The individual defendants, one of whom issued these restrictions and the other of whom had the power to stop them but chose not to, do not even attempt to meet this standard. The plaintiffs are therefore entitled to summary judgment against the individual defendants on all issues except the amount of their damages.

If anything, resolving the plaintiffs' injunctive claims is even simpler, for the defendants do not contend that either the August 2024 Policy or the November 2024 Policy was constitutional. Under the circumstances of this case, where Indiana University has a recent history of repeatedly changing course once it is called on to defend its expressive activity policies and where its most recent iteration of these policies (and its rescission of disciplinary action taken against five plaintiffs) was only contemplated in the aftermath of this Court's preliminary-injunction decision, the plaintiffs' requests for prospective relief arising from both policies remain viable. Given that these policies were always indefensible, and now are not defended, the plaintiffs are entitled to summary judgment and a permanent injunction mandating the expungement of all disciplinary action taken under the August 2024 Policy and prohibiting the enforcement of any temporal limitations similar to those contained within the November 2024 Policy.

Gavin M. Rose
Kenneth J. Falk
Stevie J. Pactor
ACLU of Indiana
1031 E. Washington St.
Indianapolis, IN 46202
317/635-4059
fax: 317/635-4105
grose@aclu-in.org
kfalk@aclu-in.org
spactor@aclu-in.org

Attorneys for Plaintiffs