UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JASPER WIRTSHAFTER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:24-cv-00754-RLY-MKK |
| | ) | |
| THE TRUSTEES OF INDIANA | ) | |
| UNIVERSITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
AND DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

In April 2024, college campuses across the United States witnessed a wave of protests responding to the ongoing Israeli-Palestinian conflict. Indiana University was no exception. This case presents a clash between the First Amendment rights of protestors and the University's interest in maintaining campus safety.

Plaintiffs herein are University professors, students, and others who have protested on IU's campus. The dispute began when Indiana University Police Department personnel issued trespass warnings to Plaintiffs arrested at an encampment established in Dunn Meadow. IU's Board of Trustees later adopted a policy banning all expressive activity on IU property between the hours of 11:00 p.m. and 6:00 a.m. After Plaintiffs sued University officials for violating their First Amendment rights, the Trustees reversed course. They amended the policy to instead require pre-approval for protests on campus occurring between 11:00 p.m. and 6:00 a.m. Plaintiffs moved to preliminarily enjoin President Whitten and the Trustees from enforcing that policy. The court granted that

1

motion.  The Trustees then removed the overnight restrictions.  The University also rescinded disciplinary warnings that were previously issued to certain Plaintiffs for violating the original policy.

But Plaintiffs still ask this court for injunctive relief and damages.  They request an injunction that would prohibit President Whitten and the Trustees from enacting the same or a substantially similar policy in the future and require the University to expunge the disciplinary actions from their permanent records.  They also seek damages from Pamela Whitten (the President of Indiana University) and Benjamin Hunter (the Associate Vice President and Superintendent for Public Safety) for the period when the trespass warnings prohibited them from entering Indiana University property.  Both parties have filed motions for summary judgment.  For the reasons set forth below, both motions are **DENIED in part** and **GRANTED in part**.

## I.    Background

### A.    Dunn Meadow Demonstrations and the Trespass Warnings

Dunn Meadow is a large, 20-acre open area on the campus of Indiana University ("IU" or "the University") in Bloomington, Indiana.  (Dkt. 80 ¶ 10).  In 1969, IU's Board of Trustees (or "Trustees") designated Dunn Meadow as the Indiana University Assembly Ground, where "members of the University community may express themselves freely on all subjects, within the limits of applicable laws and regulations, with or without advance notice."  (Minutes of the Bd. of Trustees of Ind. Univ., July 19, 1963; *see* Dkt. 80 ¶ 11).[1]

---

[1] Available at https://webapp1.dlib.indiana.edu/iubot/view?docId=1963-07-18&doc.view=print&toc.depth=1&toc.id=d1e119&brand=iubot.

Dunn Meadow has since been the site of numerous protests, demonstrations, and other expression on a variety of issues. (Dkt. 80 ¶ 12).

In late April 2024, protestors planned to make Dunn Meadow the headquarters of their protest of the war in Gaza by establishing an encampment. (*See id.* ¶ 14; Dkt. 97-1 ¶ 7; Dkt. 97-3 ¶ 7; Dkt. 97-6 ¶ 7). Existing policy required advance permission for the use of structures in Dunn Meadow from 11:00 p.m. to 6:00 a.m. (Dkt. 80 ¶ 13). But on April 24, 2024, in anticipation of the encampment's establishment the following day, the University amended its policy to require advance permission to use structures, like tents and signage, in Dunn Meadow, regardless of the time of day. (*See id.* ¶ 14; Dkt. 97-1 ¶ 7; Dkt. 97-3 ¶ 7; Dkt. 97-6 ¶ 7).

That same evening, university personnel, including Pamela Whitten (the President of Indiana University) and Benjamin Hunter (the Associate Vice President and Superintendent for Public Safety), met to discuss the planned encampment in Dunn Meadow. (Dkt. 97-11 at 1). The meeting included a discussion about IU's "enforcement of Indiana's criminal trespass statute" against protestors in Dunn Meadow. (*Id.*; *see also* Dkt. 80 ¶ 21). Indiana University Police Department ("IUPD") general order G18.1.1 authorizes IUPD to issue no-trespass orders or "trespass warnings" to "protect University property and/or members of its community." (Dkt. 122-1 at 1–2). Consistent with G18.1.1, Superintendent Hunter directed IUPD personnel to issue trespass warnings to individuals arrested in Dunn Meadow during the planned demonstrations. (Dkt. 80 ¶ 24; Dkt. 97-11 at 3). President Whitten was aware of IUPD's authority to issue trespass warnings and that trespass warnings might be issued to protestors in Dunn Meadow.

3

(Dkt. 80 ¶ 22; Dkt. 97-11 at 2).  She also had the ability to prevent these orders from issuing, although she took no steps to do so.  (Dkt. 80 ¶ 23; Dkt. 97-11 at 2).

The anticipated demonstrations took place in Dunn Meadow on April 25, 2024, and subsequent days.  (*See, e.g.*, Dkt. 97-1 ¶ 8).  Each of the ten Plaintiffs attended these demonstrations between April 25 and April 27.  (*See, e.g.*, *id.*).  All ten Plaintiffs reside in Monroe County, Indiana, and have varying connections to the University.  Heather Akou, David McDonald, Sarah Phillips, and Benjamin Robinson are professors.  (Dkt. 97-1, ¶ 2; Dkt. 97-4 ¶ 2; Dkt. 97-7 ¶ 2; Dkt. 97-8 ¶ 2).  Anjali Biswas, Bryce Greene, and Madeleine Meldrum are graduate students.  (Dkt. 97-2 ¶ 2; Dkt. 97-3 ¶ 2; Dkt. 97-5 ¶ 2).  Jess Tang is an employee.  (Dkt. 97-9 ¶ 2).  And Maureen Murphy and Jasper Wirtshafter graduated from IU but are not currently associated with the University as a student or employee.  (Dkt. 97-6 ¶ 2; Dkt. 97-10 ¶ 2).

The University posted signage no later than "first thing in the morning" on April 25, 2024, showing the as-amended restrictions on structures during all times of the day.  (Dkt. 97-4 ¶ 8; Dkt. 97-8 ¶ 8).  The signage confused some Plaintiffs because IU's website still displayed the previous version of the policy.  (Dkt. 97-4 ¶ 8; Dkt. 97-8 ¶ 8).  In any event, on April 25, five of the Plaintiffs—Biswas, McDonald, Meldrum, Murphy, and Robinson—were arrested for criminal trespass in Dunn Meadow for allegedly refusing to remove tents or disperse so that tents could be removed.  (Dkt. 97-2 ¶ 9; Dkt. 97-4 ¶ 9; Dkt. 97-5 ¶ 9; Dkt. 97-6 ¶ 9; Dkt. 97-8 ¶ 9).  After their arrests, they each received a trespass warning from IU.  (Dkt. 97-2 ¶ 10; Dkt. 97-4 ¶ 10; Dkt. 97-5 ¶ 10;

Dkt. 97-6 ¶ 10; Dkt. 97-8 ¶ 10).  The trespass warnings informed them that they had been

trespassed from all IU properties and further explained as follows:

> You are hereby notified that you are banned from reentering the above
> described property.  Should you be found anywhere on the above described
> property at any time between the dates listed below you will be arrested for
> the offense of Criminal Trespass under Indiana Code IC 35-43-2-2, which
> may result in your being charged with a Class A Misdemeanor or a Level 6
> Felony.  If you would like to appeal this warning, please contact the Indiana
> University Police Department administration.

(Dkt. 97-2 at 6; Dkt. 97-4 at 6; Dkt. 97-5 at 6; Dkt. 97-6 at 6; Dkt. 97-8 at 6).  The

warnings provided to each of these Plaintiffs were set to expire on April 25, 2025—one

year after their issuance.  (Dkt. 97-2 at 6; Dkt. 97-4 at 6; Dkt. 97-5 at 6; Dkt. 97-6 at 6;

Dkt. 97-8 at 6).

Despite learning about the trespass warnings issued to Dunn Meadow protesters,

President Whitten took no steps to prevent similar warnings from issuing in the future

and took no immediate steps to rescind or suspend the issued warnings or to order their

rescission or suspension.  (Dkt 80 ¶ 25).

Two days later, the five remaining Plaintiffs—Akou, Greene, Phillps, Tang, and

Wirtshafter—were arrested in Dunn Meadow for identical reasons.  (Dkt. 97-1 ¶ 9; Dkt.

97-3 ¶ 9; Dkt. 97-7 ¶ 9; Dkt. 97-9 ¶ 9; Dkt. 97-10 ¶ 9).  They too received trespass

warnings, but the trespass warnings they received banned them only from IU's

Bloomington campus.  (Dkt. 97-1 at 6; Dkt. 97-3 at 7; Dkt. 97-7 at 6; Dkt. 97-9 at 6; Dkt.

97-10 ¶ 10).  And while Greene's warning did not expire for five years and one day, the

other April 27 warnings expired in one year and one day.  (Dkt. 97-1 at 6; Dkt. 97-3 at 7;

Dkt. 97-7 at 6; Dkt. 97-9 at 6; Dkt. 97-10 ¶ 10).

5

Each of the Plaintiffs appealed their respective trespass warnings. (*See, e.g.*, Dkt. 97-1 ¶ 14). Between April 29 and May 3, seven Plaintiffs learned that their warnings had been "stayed" pending their appeals. (Dkt. 97-1 ¶ 14; Dkt. 97-2 ¶ 14; Dkt. 97-4 ¶ 14; Dkt. 97-5 ¶ 14; Dkt. 97-7 ¶ 14; Dkt. 97-8 ¶ 14; Dkt. 97-9 ¶ 14). But Greene's, Murphy's, and Wirtshafter's requested stays were denied. (Dkt. 97-3 ¶ 14; Dkt. 97-6 ¶ 14; Dkt. 97-10 ¶ 14). Later, on May 24, the Interim Chief of IUPD issued identical letters to at least six Plaintiffs granting their appeals. (Dkt. 97-1 at 7; Dkt. 97-5 at 7; Dkt. 97-6 at 9; Dkt. 97-7 at 7; Dkt. 97-8 at 8; Dkt. 97-10 at 9). The other four Plaintiffs also received notices that their appeals had been granted and that their trespass warnings had been rescinded, (Dkt. 97-2 ¶ 15; Dkt. 97-3 ¶ 15; Dkt. 97-4 ¶ 15; Dkt. 97-9 ¶ 15), although Greene's warning was not rescinded until July, (Dkt. 97-3 ¶ 15). During the pendency of their appeals, Plaintiffs could not enter IU property and therefore could not return to Dunn Meadow to participate in the ongoing demonstrations. Neither could they enter IU property to engage in expressive activity unrelated to the ongoing protests in Dunn Meadow.

### B.    August 2024 Policy

On July 29, 2024, the Trustees enacted "Expressive Activity Policy – UA-10" ("August 2024 Policy"), which took effect on August 1, 2024. (Dkt. 72-1). The policy's express goal was to "provide[] the time, place, and manner guidelines for Expressive Activity on University property" and "ensure[] the University's educational mission is actualized while preserving the rights guaranteed to Indiana University Community Members under the U.S. Constitution and IC 21-39-8." (*Id.* at 5). The August 2024

6

Policy prohibited "Expressive Activity" on IU property between the hours of 11:00 p.m. and 6:00 a.m.  (*Id.*)  Violation could result in "immediate action by the University including but not limited to citation, trespass, and/or interim suspension from campus." (*Id.* at 7).  Students who violated the policy might also be subject to "suspension or expulsion from the University," and faculty and other employees might be subject to "suspension or termination of University employment."  (*Id.*).

After 11:00 p.m. on August 25, 2024, four Plaintiffs—Akou, Greene, Phillips, and Robinson—participated in a candlelight vigil on IU's campus designed to protest the August 2024 Policy.  (Dkt. 69-2 ¶¶ 7–11; Dkt. 69-4 ¶ 7; Dkt. 69-8 ¶¶ 7–11; Dkt. 69-9 ¶¶ 7–9).  McDonald participated in a similar vigil on September 8, 2024.  (Dkt. 69-5 ¶ 8; *id.* at 5).  The four professors who participated in vigils received written warnings from IU for violating the August 2024 Policy.  (Dkt. 69-2 ¶ 12; Dkt. 69-5 ¶ 8; Dkt. 69-8 ¶ 12; Dkt. 69-9 ¶ 10).  The letters informed them that IU would keep the warnings in their permanent personnel files and that "continued violations of [the August 2024 Policy] and/or other University policies" may result in a variety of additional disciplinary sanctions, up to and including the termination of their employment.  (Dkt. 69-2 at 6; Dkt. 69-5 at 5; Dkt. 69-8 at 7; Dkt. 69-9 at 6).  Greene, a graduate student, received a formal notice indicating that he was being investigated for violating the August 2024 Policy. (Dkt. 88-1).

### C.    November 2024 Policy

On November 15, 2024, the Trustees amended the August 2024 Policy.  (*See* Dkt. 72-2).  The "November 2024 Policy" superseded the August 2024 Policy and took effect

immediately upon its approval.  (Dkt. 80 ¶ 41).  It applied to all University property, all guests and visitors to the University, and to the following "Indiana University Community Members":

A.    Any employee of the University, including administrators, academic appointees, staff, part-time, and student employees;

B.    All students and student organizations;

C.    All University units;

D.    University contractors;

E.    Any individual using Indiana University resources or facilities or receiving funds administered by Indiana University; and

F.    Volunteers and other representatives when speaking or acting on behalf of Indiana University.

(Dkt. 72-2 at 2–3).

Plaintiffs took particular issue with the "Limited Content-Neutral Overnight Restrictions" provision, which reads as follows:

1.    Pursuant to IC 21-39-8-9(b)(4), during the overnight hours of 11:00 p.m. to 6:00 a.m. IU Community Members may spontaneously and contemporaneously assemble and distribute literature.

2.    For the protection of the University community and in furtherance of the educational mission of the University, from the overnight hours of 11:00 p.m. to 6:00 a.m. the activities listed below are prohibited on University property unless:

a.    they are part of a scheduled or authorized University activity extending into that time period, or;

b.    prior written approval has been obtained from the appropriate University office . . .

3.    The Expressive Activities prohibited on University property during the overnight hours of 11:00 p.m. to 6:00 a.m. are:

- protesting;
- making speeches;
- circulating petitions; and

- all other unapproved conduct and activities prohibited by this Policy or applicable law.

(*Id.* at 5–6).

In January 2025, the University implemented the "University Space Use Pre-Approval Standard." (Dkt. 69-1 at 17, 86–89). This "establishe[d] the standards and procedures for approving the use of Indiana University . . . spaces." (*Id.* at 86). Under the Pre-Approval Standard, prior approval was required for "[p]replanned events of more than 50 people between 6:00 a.m. and 11:00 p.m." and "[p]replanned events during the overnight hours of 11:00 p.m. to 6:00 a.m.," regardless of size. (*Id.*) Prior approval was not required for "[p]replanned events of less than 50 people that will not extend into the overnight hours of 11:00 p.m. to 6:00 a.m.," "[s]pontaneous and contemporaneous assembly which occurs without prior planning or announcement for the purpose of an immediate and spontaneous response to a newsworthy occurrence," and "[t]he peaceful distribution of literature at any time." (*Id.* at 87). Application for approval had to be submitted at least ten days in advance and had to include the "[e]xpected number of attendees." (*Id.* at 88).

Plaintiffs filed suit under 42 U.S.C. § 1983, alleging that the November 2024 Policy's pre-approval requirement for overnight events violated the First Amendment. Plaintiffs moved for a preliminary injunction enjoining President Whitten and the Trustees from enforcing the November 2024 Policy to the extent it "prohibit[ed] the following activities on Indiana University property if they occur without prior permission between the hours of 11:00 p.m. and 6:00 a.m.: protesting, making speeches, circulating

petitions, and all otherwise unapproved conduct and activities otherwise prohibited." (Dkt. 73 at 1).

### D.    This Court's Preliminary Injunction

On May 29, 2025, the court granted Plaintiffs' motion for a preliminary injunction and enjoined President Whitten and the Trustees from enforcing the November 2024 Policy.  (*See* Dkt. 102).  A few weeks later, on June 12, 2025, the Trustees amended the November 2024 Policy to remove any overnight restrictions on speech.  (Dkt. 122-11).  The policy change coincided with an amendment to the University's Pre-Approval Standard.  (Dkt. 122-12).

In June, the University also rescinded the letters of reprimand it had sent to Professors Akou, Phillips, Robinson, and McDonald for violating the August 2024 Policy. (Dkt. 122-4; Dkt. 122-5; Dkt. 122-6; Dkt. 122-7; *see also* Dkt. 122-3).  The rescission letters informed them that their "letter[s] of reprimand [are] hereby rescinded and no longer ha[ve] any force or effect."  (Dkt. 122-4; Dkt. 122-5; Dkt. 122-6; Dkt. 122-7). They also stated that "[t]he original letter of reprimand and this letter will remain in your permanent personnel file to document the rescission and invalidation of the original letter. This is to provide a clear record of this action for faculty and other parties."  (Dkt. 122-4; Dkt. 122-5; Dkt. 122-6; Dkt. 122-7).  Greene received two similar letters in July 2025. (Dkt. 122-9; Dkt. 122-10).  His letters explained that "[t]he original charges, resolution, and this letter will remain in your conduct file to document the rescission and invalidation of the underlying incident . . . consistent with the University's records retention schedule."  (Dkt. 122-9; Dkt. 122-10).

Two days before this court granted Plaintiffs' motion for preliminary injunction, Plaintiffs filed a Motion for Partial Summary Judgment on their First Amendment claims, arguing that (1) the August 2024 Policy violated the First Amendment, and Greene and Professors Akou, McDonald, Phillips, and Robinson are entitled to an injunction requiring the expungement of disciplinary action taken against them under that policy; (2) the November 2024 Policy violates the First Amendment and must be enjoined; and (3) the trespass warnings issued to Plaintiffs in April 2024 violated the First Amendment, and Plaintiffs are entitled to damages against Superintendent Hunter and President Whitten in their individual capacities.  The Defendants filed a Cross-Motion for Summary Judgment, arguing that Plaintiffs' claims for injunctive relief are moot and Superintendent Hunter and President Whitten are entitled to qualified immunity.

## II.    Legal Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute about a material fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court views the facts in the light most favorable to the nonmovant and draws all reasonable inferences in the nonmovant's favor.  *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

Courts often confront cross motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  In such situations, courts must consider each party's motion

individually to determine if that party has satisfied the summary judgment standard.

*Sizelove v. Madison-Grant United Sch. Corp.*, 597 F. Supp. 3d 1246, 1268 (S.D. Ind. 2022).  Here, the court has considered the parties' respective memoranda and the exhibits attached thereto and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective nonmovant.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 574 (1986).

## III.    Discussion

### A.    Mootness

The court begins its analysis by considering whether Plaintiffs' claims seeking injunctive relief in connection with the August 2024 Policy and the November 2024 Policy are moot.  Under Article III, "cases that do not involve 'actual, ongoing controversies' are moot and must be dismissed for lack of jurisdiction." *Fed'n of Advert. Indus. Representatives, Inc. v. City of Chicago*, 326 F.3d 924, 929 (7th Cir. 2003) ("*Federation*") (quoting *Stotts v. Cmty. Unit Sch. Dist. No. 1*, 230 F.3d 989, 990–91 (7th Cir. 2000)).  "A question of mootness arises when . . . a challenged [policy] is repealed during the pendency of litigation, and a plaintiff seeks only prospective relief." *Id.*  "At that point, there is no longer an ongoing controversy: the source of the plaintiff's prospective injury has been removed, and there is no 'effectual relief whatever' that the court can order." *Ozinga v. Price*, 855 F.3d 730, 734 (7th Cir. 2017) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)).

An exception to the mootness doctrine exists, however, for the defendant who voluntarily ceases their "allegedly wrongful behavior" in hopes of mooting a case.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000). Such a change in conduct "does not moot a case or controversy unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (quoting *Laidlaw*, 528 U.S. at 189). Otherwise, "a defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013). Private parties therefore carry a "heavy burden" to persuade the court that "the challenged conduct cannot reasonably be expected to start up again." *Laidlaw*, 528 U.S. at 189.

But this standard differs when the defendants are not private parties but government officials. "[W]hen the defendants are public officials . . . we place greater stock in their acts of self-correction, so long as they appear genuine." *Federation*, 326 F.3d at 929 (quoting *Magnuson v. City of Hickory Hills*, 933 F.2d 562, 565 (7th Cir. 1991)). "A contrary conclusion would 'put this court in the position of presuming [the University] has acted in bad faith—harboring hidden motives to reenact the [policy] after we have dismissed the case—something we ordinarily do not presume.'" *Speech First, Inc. v. Killeen*, 968 F.3d 628, 645 (7th Cir. 2020) (quoting *Federation*, 326 F.3d at 929). So absent "evidence that the repeal was not genuine"—that is, "evidence creating a reasonable expectation that the [University] will reenact the [policy] or one substantially similar"—the complete repeal of a challenged policy renders a case moot. *Federation*, 326 F.3d at 930; *see, e.g.*, *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 &

13

n.11 (1982) (city announced intent to reenact challenged provision if case dismissed); *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993) (city replaced repealed ordinance with substantially similar ordinance).

### 1.    November 2024 Policy

Even though the University repealed the November 2024 Policy following this court's preliminary injunction ruling, Plaintiffs argue that this is the rare case where the amendment of a governmental policy does not render the challenge moot.  But the record lacks sufficient "evidence creating a reasonable expectation that the [University] will reenact the [policy] or one substantially similar."  *Federation*, 326 F.3d at 930.  Plaintiffs' challenge to the November 2024 Policy is therefore moot.

*Killeen* provides an apt starting point for the court's analysis.  That case involved a challenge to a university policy that prohibited students from posting and distributing materials about candidates for non-campus elections without prior approval.  *See Killeen*, 968 F.3d at 636.  Shortly after the plaintiffs filed suit, the university formally repealed the rule.  *Id.*  So the Seventh Circuit dismissed the effort to enjoin the repealed rule as moot. *Id.* at 646.

In doing so, the Seventh Circuit distinguished its mootness analysis from "the Sixth Circuit's more demanding standard," *id.* at 647, which "takes into account the totality of the circumstances surrounding the voluntary cessation, including the manner in which the cessation was executed," *Speech First, Inc. v. Schlissel*, 939 F.3d 756, 768 (6th

Cir. 2019).[2]  The Seventh Circuit's less demanding standard seemingly considers only whether the government officials formally amended the challenged policy.  *See Killeen*, 968 F.3d at 646.  And this standard, unlike the Sixth Circuit's, does not vary the degree of solicitude a voluntary cessation enjoys "based on whether the regulatory processes leading to the change involved legislative-like procedures or were ad hoc, discretionary, and easily reversible actions."  *Schlissel*, 939 F.3d at 768.  Rather, *Killeen* analogized the university's "formal amendment process, which required a full vote by the Conference on Conduct Governance and approval by the Chancellor," to "legislation," even though the university "could repeal the policy in four days' time."  968 F.3d at 646–47.

If formal policy change is sufficient to moot a case against public officials, Plaintiffs' challenge is clearly moot.  The November 2024 Policy is no longer in effect. (*See* Dkt. 122-11).  On June 12, 2025, while this motion was still pending, the Trustees amended the November 2024 Policy to remove the overnight restrictions on expressive activities.  The Board's repeal of the challenged provision coincided with changes to IU's "Space Use Pre-Approval Standard."  (Dkt. 122-12).  The record clearly demonstrates that IU has formally repealed the policy that Plaintiffs challenge.

Plaintiffs, relying on *Schlissel*, nonetheless take issue with the University for "offer[ing] no commitment—much less a binding one—not to return to its old ways."

---

[2] The Sixth Circuit's approach closely resembles the approach employed by the Fifth Circuit.  *See Speech First, Inc. v. McCall*, 138 F.4th 219, 223–24 (5th Cir. 2025) (applying three-factor voluntary-cessation test that considers (1) the absence of a controlling statement of future intention, (2) the suspicious nature of the change, and (3) the university's continued defense of the challenged policies).

(Dkt. 125 at 28). But the Seventh Circuit explained in *Killeen* that it has "never required a government actor to issue a promise that it will not return to its prior policy." 968 F.3d at 647. Indeed, imposing such a requirement would be entirely inconsistent with the presumption that public officials act in good faith.

Notwithstanding IU's formal policy change, the court does have some concerns with the University's timing—concerns the court in *Killeen* did not have to address. Judge Brennan's separate opinion in *Killeen* argued that the timing of the university's repeal "raised suspicions that its cessation was not genuine." *Id.* at 657 (Brennan, J., concurring in part and dissenting in part). The majority discounted those concerns; a quick comparison to *Schlissel* explained why. *Id.* at 647 n.3 (majority opinion). In *Schlissel*, the plaintiff challenged a university's definitions of "bullying" and "harassing." 939 F.3d at 761–62. The university's decision to remove the definitions did not moot the case in part because it had actively used the challenged definitions and there was thus "no indication . . . that the University was so much as *considering* changing the definitions" before it did so. 939 F.3d at 769. In *Killeen*, by contrast, there was "no evidence the provision was ever enforced or that the University was even aware it was on the books." 968 F.3d at 647 n.3. Accordingly, the timing of the repeal was "not so suspect." *Id.* Left unsaid, however, was the relevance of timing in those circumstances where the provision *has* been previously enforced, as in *Schlissel*.

Plaintiffs clearly believe that timing factors into the analysis, for they focus much of their argument on the suspicious timing of IU's policy change. And the court agrees that circumstances here that were absent in *Killeen* make the timing more suspect.

16

Unlike the prior approval rule in *Killeen*, the prohibition on nighttime expressive activity was enforced previously (against Plaintiffs, to boot).  And unlike the university in *Killeen*, IU repeatedly defended the constitutionality of its policy.  Not until the court preliminarily enjoined IU from enforcing the November 2024 Policy did IU formally amend it.  Plaintiffs also note that since April 2024 (on the eve of the planned encampment in Dunn Meadow), the University has amended its policy—a policy that had not changed in over fifty years—four times.  Still, the court reads *Killeen* as foreclosing the result Plaintiffs seek.  Even if the circumstances here make the timing more suspect than it was in *Killeen*, nothing in *Killeen* suggests that suspicious timing ought to rebut the presumption that public officials act in good faith.

The difference between the Seventh Circuit's and the Sixth Circuit's standards ultimately boils down to the evidence a court may consider when a party challenges the presumption that public officials act in good faith.  In the Sixth Circuit, courts can consider, among other things, whether the government has provided affirmative signals that a repeal was genuine, whether the formal amendment process was sufficiently "legislative-like," and whether the timing of a repeal was suspect.  *Schlissel*, 939 F.3d at 768–70.  In this circuit, however, "evidence that the repeal was not genuine" is more limited.  *Killeen*, 968 F.3d at 645.  If, for instance, IU were to inform the court that it will reenact the November 2024 Policy if this court's preliminary injunction expires, the challenge would clearly not be moot.  *See Aladdin's Castle*, 455 U.S. at 289 & n.11.  But the world of evidence the court may consider does not extend much further.  So while concerned about the timing of the repeal, the court nonetheless refuses to find that IU

17

"has engaged in a disingenuous game of 'constitutional cat and mouse.'" *Federation*, 326 F.3d at 931 (quoting *Thomas v. Fiedler*, 884 F.2d 990, 995 (7th Cir. 1989)).  The challenge to the November 2024 Policy is moot.

### 2. August 2024 Policy

The injunctive relief Plaintiffs seek, however, does not end there.  IU has already rescinded the formal disciplinary warnings that five Plaintiffs—Akou, Greene, Phillips, Robinson, and McDonald—received for violating the since-repealed August 2024 Policy. Those letters of reprimand "no longer ha[ve] any force or effect."  (Dkt. 122-4; Dkt. 122-5; Dkt. 122-6; Dkt. 122-7; Dkt. 122-9; Dkt. 122-10).  But the original letters of reprimand remain in their personnel files.  (Dkt. 122-4; Dkt. 122-5; Dkt. 122-6; Dkt. 122-7; Dkt. 122-9; Dkt. 122-10).  Those five Plaintiffs therefore seek an injunction requiring IU "to expunge any disciplinary action taken against [them] as a result of [their] violation of the [August 2024 Policy]."  (Dkt. 97 at 1).

Plaintiffs first argue that the rescissions are "meaningless" and "temporary" because they are "expressly linked" to the court's preliminary injunction.  They seem to think that without the preliminary injunction, the rescissions lack any effect.  But Plaintiffs' interpretation does not follow from the clear language of the rescission letters. They read as follows:

> On May 29, 2025, the United States District Court for the Southern District of Indiana issued an ORDER GRANTING PRELIMINARY INJUNCTION in the matter of Jasper Wirtschafter, *et al.*, v. the Trustees of Indiana University, *et al.*, No. 1:24-cv-00754-RLY-MKK.   The preliminary injunction entered by the court enjoined Indiana University from enforcing the Expressive Activity Policy to the extent it prohibited certain activities on

Indiana University property occurring without prior permission between the hours of 11:00 p.m. and 6:00 a.m.

Given the Court's order, **your letter of reprimand is hereby rescinded and no longer has any force or effect**. The original letter of reprimand and this letter will remain in your permanent personnel file to document the rescission and invalidation of the original letter. This is to provide a clear record of this action for faculty and other parties.

(Dkt. 122-4; Dkt. 122-5; Dkt. 122-6; Dkt. 122-7). The letters suggest that the court's preliminary injunction had some influence on IU's decision to rescind the disciplinary warnings. But regardless of the preliminary injunction's lifespan, nothing in the rescission letters indicates an intent to walk them back. Plaintiffs' argument to the contrary is unavailing.

Like IU's amendment of the November 2024 Policy, the rescission letters constitute formal policy change by public officials and thereby warrant the presumption of good faith. *See Federation*, 326 F.3d at 929 ("[W]hen the defendants are public officials . . . we place greater stock in their acts of self-correction, so long as they appear genuine."). And here, too, Plaintiffs have failed to demonstrate that IU is reasonably likely to reinstate the disciplinary warnings.

But Plaintiffs also argue that IU has not provided them with all the relief they seek; they still want IU to expunge the reprimand letters from their disciplinary records. What is the difference, then, between rescission and expungement? A rescission deprives a previously issued disciplinary action of "any force or effect." But the original letter of reprimand remains in the recipient's file. An expungement, on the other hand, would result in the complete elimination of "all evidence" of the disciplinary action. *Flint v.*

*Dennison*, 488 F.3d 816, 824 (9th Cir. 2007).  Both measures treat the disciplinary actions as though they never happened.  Only expungement, however, wipes the slate clean.  So even if they lack force or effect, the disciplinary warnings remain a stain on Plaintiffs' personnel files.  *See id.* ("When a student's record contains negative information derived from allegedly unconstitutional school regulations, however, that information may jeopardize the student's future employment or college career.").

The difference between rescission and expungement may be small.  But "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).  Such is the case here.  *See, e.g.*, *Doe v. Purdue Univ.*, 928 F.3d 652, 666 (7th Cir. 2019) ("marred" disciplinary record "a continuing harm for which [an individual] can seek redress"); *Flint*, 488 F.3d at 824 (ordering expungement of student's record containing evidence of disciplinary sanctions).  The challenge to the August 2024 Policy is not moot.

### B.    First Amendment Challenge to August 2024 Policy

Since Plaintiffs' challenge to the August 2024 Policy is not moot, the court must consider whether that policy violated the First Amendment.  Generally, restrictions on First Amendment activities on public property necessitate a forum analysis.  The court need not engage in a forum analysis here, however, because the August 2024 Policy is facially unconstitutional under the First Amendment overbreadth doctrine.

Under that doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech."  *United States v. Williams*, 553 U.S. 285, 292 (2008).  A facial

challenge on overbreadth grounds requires "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984). To be unconstitutional under the overbreadth doctrine, a statute's overbreadth must be substantial. *See N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11 (1988). A statute is substantially overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)).

On its face, the August 2024 Policy prohibited *all* expressive activity on IU property between the hours of 11:00 p.m. and 6:00 a.m. (Dkt. 72-1 at 5). The policy adopted the definition of "expressive activities" from Indiana Code § 21-39-8-5. (*Id.* at 6). Those activities include:

(1)  Participating in speech or conduct protected by the First Amendment to the Constitution of the United States.
(2)  Communicating by any lawful verbal, written, audio visual, or electronic means.
(3)  Participating in peaceful assembly.
(4)  Protesting.
(5)  Making speeches, including speeches of guest speakers.
(6)  Distributing literature.
(7)  Carrying signs.
(8)  Circulating petitions.

(*Id.*). The policy thus created a "virtual 'First Amendment Free Zone'" on IU property between the hours of 11:00 p.m. and 6:00 a.m. *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987).

A few specific examples help demonstrate the policy's overwhelming sweep. For one, the policy prohibited an individual from entering any part of campus late at night wearing a shirt emblazoned with "Free Palestine" or "Make America Great Again." *See, e.g.*, *Cohen v. California*, 403 U.S. 15 (1971). It likewise prohibits a reporter for the Indiana Daily Student from writing a news article from their dorm room in the early hours of the morning. "Under such a sweeping ban, virtually every individual who enters [IU property] may be found to violate the [policy] by engaging in some First Amendment activity." *Jews for Jesus*, 482 U.S. at 575 (citation modified). And although the August 2024 Policy is more temporally limited than the regulation in *Jews for Jesus*, which prohibited all expressive activity at Los Angeles International Airport at all times of the day, the distinction is of no importance. Clearly, IU cannot justify such a sweeping ban on First Amendment-protected activities with a governmental interest, let alone a compelling or significant one.

The August 2024 Policy violated the First Amendment. The University must therefore expunge any disciplinary action that resulted from violating that policy from the records of Akou, Greene, Phillips, Robinson, and McDonald.

## C.    Qualified Immunity

As for Plaintiffs' damages claims against Superintendent Hunter and President Whitten in their individual capacities, the University argues that both officials are entitled to qualified immunity.

"Qualified immunity shields a government official from suit for damages under § 1983 'when she makes a decision that, even if constitutionally deficient, reasonably

misapprehends the law governing the circumstances she confronted.'" *Sabo v. Erickson*, 128 F.4th 836, 843 (7th Cir. 2025) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004)). "To overcome a qualified immunity defense, plaintiffs must show '(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

According to the University, Plaintiffs cannot establish either element. Before addressing whether qualified immunity bars Plaintiffs' claims, however, the court first considers the University's argument that Superintendent Hunter and President Whitten cannot be held liable under § 1983 for the trespass warnings.

### 1.    Supervisory Liability

"Liability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018). "The supervisor is therefore liable only if she was personally involved in the constitutional violation." *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021). And "[p]ersonal involvement in a subordinate's constitutional violation requires supervisors to 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" *Id.* at 494 (quoting *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)); *see also Chavez v. Ill. State Police*, 251 F.3d 612, 652 (7th Cir. 2001) (supervisory liability attaches "if [a supervisor] directed the conduct causing the constitutional violation, or if it occurred with [their] knowledge or consent").

23

The University cites *Taylor* for the proposition that Plaintiffs "cannot show any constitutional violation from mere warning issuance." (Dkt. 127 at 8). But that case involved an equal protection race discrimination claim. *Taylor*, 999 F.3d at 485. And "personal involvement in the equal protection context requires specific intent to discriminate." *Id.* at 494. Without evidence that the plaintiff's supervisors acted on the basis of race, they could not be held liable under § 1983. *Id.* at 495. Here, in contrast, Plaintiffs bring a First Amendment claim with no corresponding intent requirement. Mere warning issuance is therefore sufficient to establish supervisory liability if the trespass warnings violated the First Amendment and Superintendent Hunter and President Whitten were personally involved in their issuance.

The University maintains that Superintendent Hunter and President Whitten lacked the personal involvement necessary to support liability for issuing the trespass warnings under § 1983, citing the "varying temporal and physical scopes of the trespass warnings each Plaintiff ultimately received." (Dkt. 121 at 44). But variation aside, Superintendent Hunter nonetheless directed IUPD personnel to issue trespass warnings to individuals arrested during the protests in Dunn Meadow. (Dkt. 80 ¶ 24; Dkt. 97-11 at 3). And President Whitten did not prevent IUPD from issuing the trespass warnings despite her ability to do so. (Dkt. 80 ¶¶ 22–23; Dkt. 97-11 at 2). She likewise took no steps to rescind or suspend the issued trespass warnings. (Dkt. 80 ¶ 25).

Furthermore, Superintendent Hunter and President Whitten did not need to know specific details about each individual trespass warning to support liability, as the University contends. They had already provided their approval of the practice. The court

concludes that Superintendent Hunter "directed the conduct causing the constitutional violation"—conduct that occurred with President Whitten's "knowledge or consent." *Chavez*, 251 F.3d at 652. They can therefore bear personal responsibility under § 1983 for the trespass warnings.

### 2.    First Amendment Claim

Plaintiffs claim that the trespass warnings they received in April 2024 violated the First Amendment. They advance two arguments. First, they argue that the trespass warnings constituted prior restraints on expressive activity in a public forum and fail strict scrutiny review. Second, they argue that the trespass warnings are invalid restrictions on the time, place, or manner of speech. The court addresses each argument in turn.

### i.    Prior Restraint

Plaintiffs first argue that the trespass warnings constituted prior restraints on expressive activity in a traditional public forum and are therefore subject to strict scrutiny under the First Amendment. The University responds that content-neutral trespass warnings cannot become prior restraints merely by having some effect on expression. The court agrees with IU that the trespass warnings are not prior restraints.

"The term 'prior restraint' is used to describe 'administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur." *Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)). Classic examples of prior restraints include permitting and licensing ordinances and

court-ordered injunctions forbidding speech. *See, e.g.*, *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992) (requiring a permit and a fee before authorizing public speaking, parades, or assemblies on a town's public property); *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 415 (1971) ("enjoining petitioners from distributing leaflets anywhere in the town of Westchester, Illinois").  In such cases, "public officials . . . forbid[] the plaintiffs the use of public places to say what they want[] to say." *Se. Promotions, Ltd. v. Conard*, 420 U.S. 546, 553 (1975).

There is a "time-honored distinction," however, between "prior restraints and subsequent punishments." *Alexander*, 509 U.S. at 553–54.  For example, the petitioner in *Alexander* was ordered "to forfeit his wholesale and retail businesses . . . and almost $9 million in moneys acquired through racketeering activity" after a jury convicted him of three RICO offenses predicated on his obscenity convictions. *Id.* at 547–48.  He argued that the forfeiture order constituted a prior restraint on his speech because it effectively shut down his adult entertainment business. *Id.* at 549.  But unlike classic examples of prior restraints, the forfeiture order did not "*forbid* petitioner from engaging in any expressive activities in the future, nor [did] it require him to obtain prior approval for any expressive activities." *Id.* at 550–51.  The Court therefore held that the forfeiture order "was not a prior restraint on speech, but a punishment for past criminal conduct." *Id.* at 553; *see also Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705 n.2 (1986) (no prior restraint where court order closed adult bookstore previously used as a place for prostitution and lewdness because order had "nothing to do with any expressive conduct at all").

26

The trespass warnings here stemmed from demonstrations in Dunn Meadow on April 25 and April 27, 2024. (Dkt. 80 ¶¶ 16–17). During these demonstrations, Plaintiffs were arrested for criminal trespass for their alleged refusal to remove tents or disperse so that tents could be removed. (*See, e.g.*, Dkt. 97-2 ¶ 9). After their arrests, they each received a "'no-trespass order' pursuant to Indiana Code § 35-43-2-2" from IUPD officers. (Dkt. 90 ¶ 20). The trespass warnings read as follows:

> You are hereby notified that you are banned from reentering the above described property. Should you be found anywhere on the above described property at any time between the dates listed below you will be arrested for the offense of Criminal Trespass under Indiana Code IC 35-43-2-2, which may result in your being charged with a Class A Misdemeanor or a Level 6 Felony. If you would like to appeal this warning, please contact the Indiana University Police Department administration.

(*See, e.g.*, Dkt. 97-2 at 6). The trespass warnings issued on April 25 banned five Plaintiffs—Biswas, McDonald, Meldrum, Murphy, and Robinson—from entering all Indiana University properties for one year. (Dkt. 97-2 at 6; Dkt. 97-4 at 6; Dkt. 97-5 at 6; Dkt. 97-6 at 6; Dkt. 97-8 at 7). The trespass warnings issued on April 27 banned the other five Plaintiffs—Akou, Greene, Phillips, Tang, and Wirtshafter—only from the Bloomington campus of Indiana University. (Dkt. 97-1 at 6; Dkt. 97-3 at 7; Dkt. 97-7 at 6; Dkt. 97-9 at 6; Dkt. 97-10 ¶ 10). And while four of the five warnings issued on April 27 expired in one year and one day, (Dkt. 97-1 at 6; Dkt. 97-7 at 6; Dkt. 97-9 at 6; Dkt. 97-10 ¶ 10), Greene's warning did not expire for five years and one day, (Dkt. 97-3 at 7). The court need not consider IUPD general order G18.1.1—the authority that empowers IUPD to issue trespass warnings—because the Plaintiffs pursue an as-applied challenge to the trespass warnings they received, not a facial challenge to the general order.

Plaintiffs claim that the trespass warnings constituted a prior restraint on their speech because the warnings effectively "prohibit[ed] them from returning to Dunn Meadow to engage in ongoing protest activity." (Dkt. 125 at 9). But the trespass warnings did not issue in response to Plaintiffs' anticipated future speech; they did not ban Plaintiffs from University property to prevent them from "say[ing] what they wanted to say." *Se. Promotions*, 420 U.S. at 553. Rather, the trespass warnings issued in response to Plaintiffs' conduct—their refusal to remove tents or disperse so that tents could be removed. (*See, e.g.*, Dkt. 97-2 ¶ 9).

Citing *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), Plaintiffs seem to argue that although the trespass warnings generally regulate conduct, the specific warnings they received applied to pure speech because they prohibited Plaintiffs from participating in the ongoing Dunn Meadow protests. But Plaintiffs' reliance on *Holder* is misplaced. That case involved a First Amendment challenge to a federal criminal statute banning the provision of "material support or resources to a foreign terrorist organization." *Id.* at 8. In most cases, the law's ban on providing "material support or resources" regulated conduct rather than speech. *Id.* at 28. But the plaintiffs wanted to provide material support to certain organizations "in the form of speech." *Id.* So "as applied to plaintiffs[,] the *conduct* triggering coverage under the statute consist[ed] of communicating a message." *Id.* (emphasis added). The Court therefore reviewed the statute using strict scrutiny. *Id.*

If this case is like *Holder*, as Plaintiffs suggest, the question becomes: did the *conduct* that triggered their trespass warnings "consist[] of communicating a message"?

28

*Id.*  The parties do not dispute that what triggered the trespass warnings was Plaintiffs' refusal to remove the tents in Dunn Meadow or disperse so that they could be removed. (*See, e.g.*, Dkt. 97-2 ¶ 9).  Did this conduct therefore "communicat[e] a message"? *Holder*, 561 U.S. at 28.  The court does not think so.  Plaintiffs were certainly *engaged in* expressive activity when IUPD issued the trespass warnings.  But the trespass warnings resulted from conduct *divorced from* Plaintiffs' expression—refusing to remove tents or disperse so that tents could be removed.  Plaintiffs therefore conflate an effect of the trespass warnings—their inability to participate in ongoing Dunn Meadow protests—with the conduct that triggered their issuance.

The point stands that the trespass warnings did not issue "on the basis of an advance determination that the distribution" of Plaintiffs' expression is prohibited. *Arcara*, 478 U.S. at 705 n.2.  This feature alone places the trespass warnings in the category of subsequent punishments and differentiates them from prior restraints.

### ii.    Expressive Activity in a Traditional Public Forum

Plaintiffs next argue that the trespass warnings are nonetheless unconstitutional regulations of speech in a traditional public forum.

"[T]raditional public fora are areas that have historically been open to the public for speech activities." *McCullen v. Coakley*, 573 U.S. 464, 476 (2014).  A law that restricts access to traditional public fora for expressive activity is therefore subject to "First Amendment scrutiny." *Id.*  Both parties agree that Dunn Meadow is a traditional public forum.  So although the trespass warnings say "nothing about speech on [their] face," they are nonetheless subject to First Amendment scrutiny because they "restrict[]

29

those who want to engage in protected First Amendment activity from accessing [a] traditional public forum[]." *Nicodemus v. City of South Bend*, 137 F.4th 654, 663 (7th Cir. 2025) (citation modified).

The government's ability to restrict speech in a traditional public forum is "very limited." *United States v. Grace*, 461 U.S. 171, 177 (1983). "[G]overnment has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). But "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

### a.    Content Neutrality

"The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Id.* "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* "Government regulation of expressive activity is content neutral so long as it is '*justified* without reference to the content of the regulated speech.'" *Id.* at 791–92 (quoting *Clark*, 468 U.S. at 293).

The trespass warnings are facially unrelated to Plaintiffs' speech activities because they make no mention of Plaintiffs' expressive conduct.  (*See, e.g.*, Dkt. 97-2 at 6).  Whether Plaintiffs violate the trespass warnings "'depends' not 'on what they say,' but simply on where they say it." *McCullen*, 573 U.S. at 479 (citation omitted) (quoting *Holder*, 561 U.S. at 27).  And the trespass warnings are "justified without reference to the content of the regulated speech." *Clark*, 468 U.S. at 293.  That's because they issued in response to Plaintiffs' failure to remove tents or disperse so that tents could be removed.  The University claims that the warnings thus advanced its interest in "maintaining campus safety amid escalating tension." (Dkt. 121 at 41).  And since the Court has recognized public safety as a content-neutral concern, *see McCullen*, 573 U.S. at 480, the trespass warnings must be treated as content-neutral.

### b.    Standard of Scrutiny

The court next determines the standard of scrutiny applicable to the trespass warnings.  For generally applicable laws and ordinances, content-neutral restrictions on the time, place, or manner of speech in a public forum are permissible if "they are narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Clark*, 468 U.S. at 293.  But the trespass warnings are not generally applicable because they apply only to Plaintiffs.  So the trespass warnings operate more like content-neutral injunctions. *See, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 762 (1994) ("An injunction, by its very nature, applies only to a particular group (or individuals) and regulates the activities, and perhaps the speech, of that group.").

31

No, the trespass warnings are not formal injunctions; they are not issued by judicial decree.  But consider the practical similarities between the trespass warnings here and the content-neutral injunction in *Madsen*.  The injunction in that case prohibited protesters from demonstrating "in certain places and in various ways outside of a health clinic that perform[ed] abortions." *Id.* at 757.  The Court characterized the injunction as content-neutral because "none of the restrictions imposed by the court were directed at the contents of petitioner's message." *Id.* at 763.  So too here.  The trespass warnings "appl[y] only to a particular group . . . and regulates the activities . . . of that group." *Id.* at 762.  They effectively prohibit Plaintiffs from demonstrating "in certain places." *Id.* at 757.  And "none of the restrictions imposed by the [trespass warnings] were directed at the contents of [Plaintiffs'] message." *Id.* at 763.  These similarities convince the court that the trespass warnings should be subjected to the same standard applicable to content-neutral injunctions.

That standard "require[s] a somewhat more stringent application of general First Amendment principles." *Id.* at 765.  When evaluating the content-neutral injunction in *Madsen*, the Court concluded that the "standard time, place, and manner analysis is not sufficiently rigorous." *Id.*  Instead, the Court considered "whether the challenged provisions of the injunction burden[ed] no more speech than necessary to serve a significant government interest." *Id.*  The court therefore analyzes the trespass warnings using that same standard.

### c.    Narrow Tailoring

Plaintiffs do not dispute that IU has a significant government interest in maintaining public safety on its campus.  Instead, they claim that the trespass warnings they received were not narrowly tailored to further this interest.  The court agrees.

"An order issued in the area of First Amendment rights must be couched in the narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and the essential needs of the public order."  *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183 (1968).  "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'"  *McCullen*, 573 U.S. at 486 (quoting *Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)).  The trespass warnings fail this tailoring requirement because they burden more speech than necessary to advance IU's interest in public safety.

Consider first the scope of the trespass warnings.  The April 25 warnings were not limited to Dunn Meadow.  In fact, unlike the April 27 warnings, they were not even limited to IU's Bloomington campus.  Instead, they barred the five Plaintiffs who received them from *all* IU properties.  (*See, e.g.*, Dkt. 97-2 at 6).  These Plaintiffs therefore faced the threat of arrest upon entering any area of any of IU's campuses across Indiana.  True, on their face, the trespass warnings only prevent Plaintiffs from entering University property.  But one cannot speak where one cannot enter.  So although content-neutral, the trespass warnings effectively prohibited every Plaintiff from exercising their First Amendment rights anywhere on IU's Bloomington campus, regardless of the content

of their speech.  It goes without saying that such a broad ban burdens more speech than necessary to promote public safety on IU's campus.

Consider also the breadth of the trespass warnings.  Except for Greene, the trespass warnings prohibited Plaintiffs from entering the IU Bloomington campus for at least one year.  (*See, e.g.*, Dkt. 97-1).  And the trespass warnings provided no exception during that period for First Amendment expression.  Contrast the trespass warnings here with the trespass warning issued in *Wright v. City of St. Petersburg, Fla.*, 833 F.3d 1291 (11th Cir. 2016).  In *Wright*, a city ordinance authorized police officers to issue trespass warnings "to any individual who violates any City ordinance or State law which was committed while on or within a City facility, building, or outdoor area, including municipal parks."  *Id.* at 1293.  After his arrest in a city park for obstructing a police investigation and resisting arrest, the plaintiff received a trespass warning that prohibited him from re-entering the park for one year.  *Id.* at 1293–94.  But a different provision of the ordinance allowed the City to suspend a trespass warning and permit the offender back onto the property to exercise his First Amendment rights.  *Id.* at 1298.

The trespass warnings here are more troubling because they lacked a similar carveout for First Amendment expression.  Surely allowing Plaintiffs to return to Dunn Meadow—or, for that matter, anywhere on IU's Bloomington campus—for the sole purpose of exercising their First Amendment rights would not undermine the University's interest in public safety.  And yet the trespass warnings here precluded even that.  *See Madsen*, 512 U.S. at 773 (striking down injunction provision banning all "observable images" within 300 feet of abortion clinic); *McCullen*, 573 U.S. at 490 (striking down

34

statute establishing 35-foot buffer zone around abortion clinics); *cf. Clark*, 468 U.S. at 296–98 (upholding prohibition on camping in public park as valid time, place, or manner speech restriction because prohibition limited only manner of demonstration).

Since they foreclosed any possibility of First Amendment expression anywhere on IU's Bloomington campus for at least one year, the trespass warnings burdened more speech than necessary to advance IU's public safety interest.  The trespass warnings, as applied to Plaintiffs, violated the First Amendment.

### 3.    Clearly Established

Having determined that the trespass warnings violated the First Amendment, the court now considers whether the right that IU officials violated was clearly established. "A constitutional or statutory right is clearly established when the law is sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Sabo*, 128 F.4th at 843–44 (internal quotation marks omitted).  "[T]o clearly establish a right, existing precedent must place the constitutional or statutory question 'beyond debate.'" *Id.* at 844 (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018)).  Since "the crucial question" at the core of any qualified immunity analysis is "whether the official acted reasonably in the particular circumstances that he or she faced," *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014), the court does not "define clearly established law at too high a level of generality," *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021).  Instead, "the clearly established law must be 'particularized' to the facts of the case." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).  So "[i]t is not enough that the rule is suggested by then-existing precedent."

*District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  Rather, [t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply."  *Id.*

Based on the record here, Superintendent Hunter and President Whitten are entitled to qualified immunity because the First Amendment rights they violated were not clearly established under the circumstances presented.  The law was not sufficiently clear such that a reasonable official in Superintendent Hunter's or President Whitten's shoes would have known that the directive to IUPD to issue trespass warnings to Plaintiffs violated their First Amendment rights.

Plaintiffs fail to point to a closely analogous case that would have placed Superintendent Hunter and President Whitten on notice that their actions were unlawful. *See Est. of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010) ("[A plaintiff] can demonstrate that the right was clearly established by presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional.").  And this is not a "rare" case where the constitutional violations are so plain that Plaintiffs are not required to point to an analogous case establishing the rights at issue.  *Cf. Taylor v. Riojas*, 592 U.S. 7, 9 (2020) (confining an inmate to a frigid, feces-covered cell for days violated Eighth Amendment's prohibition on cruel and unusual punishments).

Indeed, Plaintiffs err by focusing much of their argument on "general proposition[s]" and not "the specific factual situation that confronted the defendant official[s]." *Wernsing v. Thompson*, 423 F.3d 732, 750 (7th Cir. 2005).  Of course, this is "exactly what the Supreme Court has instructed courts *not* to do."  *Id.*  Plaintiffs also rely

almost exclusively on prior restraint cases.  But the court has already explained why the trespass warnings are not prior restraints but content-neutral restrictions on expressive activity in a traditional public forum.  Prior restraint cases aside, Plaintiffs offer only one case to support their argument that the trespass warnings—once accepted as content-neutral restrictions on the time, place, or manner of speech—clearly violated the First Amendment.  But even that case misses the mark.

Plaintiffs claim that *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702 (7th Cir. 2003), clearly establishes that officials must demonstrate that "harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994).  But that case involved a First Amendment challenge to a local ordinance that prohibited the sale, use, or consumption of alcohol on the premises of "Sexually Oriented Businesses."  316 F.3d at 704.  So not only did the facts of that case differ vastly from the circumstances presented here, but the Seventh Circuit identified the *Ben's Bar* ordinance as a "content-*based* time, place, and manner restriction." *Id.* at 724 (emphasis added).  A case about the constitutionality of a content-based, adult entertainment liquor regulation could not possibly have put President Whitten and Superintendent Hunter on notice that their conduct violated clearly established law.

The record demonstrates that IU officials faced a challenging situation in April 2024.  A reasonable official facing the particular facts of this case could reasonably have believed that their conduct was permissible.  Superintendent Hunter and President

Whitten are therefore entitled to qualified immunity on Plaintiffs' First Amendment claims.

## IV.    Conclusion

For the reasons discussed above, the court **DENIES as moot** Plaintiffs' claim for injunctive relief under the November 2024 Policy in their Motion for Partial Summary Judgment (Dkt. 97).  The court **GRANTS** Plaintiffs' other claim for injunctive relief under the August 2024 Policy.  Defendants are hereby ordered to expunge any disciplinary action taken against Plaintiffs because of Plaintiffs' violation of the August 2024 Policy.  The court **DENIES** Plaintiffs' claim for damages against Superintendent Hunter and President Whitten in their individual capacities.  And the court **GRANTS in part** and **DENIES in part** Defendants' Cross-Motion for Summary Judgment (Dkt. 120). The injunction and final judgment shall be set forth in a separate order.


**IT IS SO ORDERED** this 8th day of January 2026.


RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.